Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERET ISHAK, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WM TECHNOLOGY, INC. f/k/a SILVER SPIKE ACQUISITION CORP., CHRISTOPHER BEALS, ARDEN LEE, DOUGLAS FRANCIS, SUSAN ECHERD, MARY HOITT, SCOTT GORDON, WILLIAM HEALY, and GREGORY M. GENTILE<br><br>Defendants. | No. 2:24-cv-08959-ODW-PVC<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Jay Kang ("Lead Plaintiff") and additional Plaintiffs Mark Schanerman and Rickey Blackman (together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding WM Technology, Inc. ("WM" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded WM Technology, Inc. securities, between May 25, 2021, and September 24, 2024, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Defendant WM Technology, Inc. ("WM Technology") runs a website called weedmaps.com and related mobile applications that allow consumers to find legal cannabis dispensaries. It makes the bulk of its revenue selling advertising to participants in the legal cannabis industry. As a result, a key measure of the success in its business is website traffic. WM Technology presented data to investors about website traffic through the "monthly active user" metric or MAU, which purported to measure the number of unique visitors to their website every month. During the class period, Defendants boasted of rapidly growing MAUs. However, this number was manipulated and false. WM Technology generated a large and increasing

percentage of website visits from individuals who did not intentionally visit the weedmaps.com website, but instead visited a third party website that then automatically showed the user the weedmaps.com site via a "pop under" advertisement. These users did not deliberately seek out the weedmaps.com website or actively engage in it in any way. Before and during the class period, both CEO Christopher Beals and CFO Arden Lee were repeatedly warned that pop-under traffic was a growing percentage of WM Technology's traffic, that such traffic was low quality, and that users who received pop under ads did not meaningfully engage with the website. They were also specifically warned that the company was using these ads to hit internal targets that would allow the company to show continued growth.

3. The truth began to be revealed on August 9, 2022, when the company disclosed that "that the vast majority of users who are directed to weedmaps.com via pop-under advertisements close the site without clicking on any links." On this news, WM's share prices dropped from $3.46 a share to $2.59 a share – a drop of $0.87, or over 25%. On November 7, 2022, Defendants announced that they were no longer using MAUs as a metric, leading WM share prices to drop by $0.64, or approximately 33%, to close on November 8, 2022 at $1.29 per share. The full truth of Defendants' fraud was finally revealed on September 24, 2024, when the SEC announced a settlement with WM Technology as well as Beals and Lee, and releasing a Cease and Desist Order with respect to WM Technology and a civil complaint against Beals and Lee, revealing Beals and Lee's knowledge of the fraud for the first time. On this news, the price of WM Technology, Inc. common stock fell by 1.9% to close at $0.92 on September 25, 2024.

## JURISDICTION AND VENUE

4. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

7. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

8. Lead Plaintiff Jay Kang, as set forth in the certification previously filed as Dkt. No. 18-2, incorporated by reference herein, purchased WM Technology securities during the Class Period and was economically damaged thereby.

9. Plaintiff Mark Schanerman, as set forth in the certification attached hereto as Exhibit 3, incorporated by reference herein, purchased WM Technology securities during the Class Period and was economically damaged thereby.

10. Plaintiff Rickey Blackman, as set forth in the certification attached hereto as Exhibit 4, incorporated by reference herein, purchased WM Technology securities during the Class Period and was economically damaged thereby.

11. Defendant WM Technology, Inc. describes itself as the operator of a "leading online cannabis marketplace for consumers together with a comprehensive set of eCommerce and compliance software solutions for cannabis businesses[.]"

12. WM Technology is incorporated in California and its principal executive offices are located at 41 Discovery, Irvine, California 92618. The Company's Class A common stock trades on the NASDAQ exchange under the ticker symbol "MAPS". The Company's warrants trade on the NASDAQ under the ticker symbol "MAPSW".

13. Until June 16, 2021, WM Technology was a private company known as WM Holding Company, LLC ("Legacy WM"). On June 16, 2021, Legacy WM merged with a Special Purpose Acquisition Company ("SPAC") named Silver Spike Acquisition Corp ("Silver Spike"). Up until that time, Silver Spike shares had traded on the NASDAQ under the ticker "SSPK".

14. Upon the consummation of the merger, both Legacy WM and Silver Spike ceased to exist and were replaced by WM Technology, Inc. and began to trade on NASDAQ under the ticker symbol "MAPS".

15. Defendant Christopher Beals ("Beals") served as the Chief Executive Officer ("CEO") of WM Technology, Inc. ("WM") and its private company predecessor entity from March 2019 until his departure from the Company in November 2022. Prior to his appointment as CEO, Beals held the positions of President and General Counsel at WM, having joined the Company in August 2015. Before his tenure at WM, Beals worked as as Senior Vice President at Colbeck Capital Management.

16. Defendant Arden Lee ("Lee") served as the Chief Financial Officer ("CFO") of WM and its private company predecessor entity from February 2019 until his resignation in July 2023. Before joining WM, Lee worked in investment banking and corporate finance. He served as a Managing Director at Goldman Sachs, where he advised companies on mergers and acquisitions and capital markets transactions. He also held roles at J.P. Morgan and Credit Suisse, with a focus on clients in the technology and consumer sectors.

17. Scott Gordon ("Gordon") served as the CEO of Silver Spike from its inception until the merger with Legacy WM. He also served as a member of the Board of Directors from June 2021 through the end of the class period.

18. William Healy ("Healy") served as the President of Silver Spike from its inception until the merger with Legacy WM.

19. Gregory M. Gentile ("Gentile") served as the CFO of Silver Spike from its inception until the merger with Legacy WM.

20. Defendants Beals, Lee, Gordon, Healy, and Gentile are collectively referred to herein as the "Individual Defendants."

21. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

22. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

23. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to WM under *respondeat superior* and agency principles.

24. Defendant WM and the Individual Defendants are collectively referred to herein as "Defendants."

**Background**

25. WM Technology, Inc., operating under the brand name Weedmaps, is a technology company that provides digital solutions for the cannabis industry. Its primary consumer platform, weedmaps.com, serves as an online marketplace where users can locate cannabis dispensaries, browse product menus, read reviews, and place orders for pickup or delivery where permitted by law. For cannabis businesses, WM Technology offers a suite of subscription-based software tools—collectively known as Weedmaps for Business—that assist with online advertising, customer relationship management, order fulfillment, and compliance with local regulations. The company generates revenue by charging cannabis businesses monthly fees for these services, as well as offering additional advertising options to enhance their visibility on the platform. Headquartered in Irvine, California, WM Technology became a publicly traded company in June 2021 through a merger with a special purpose acquisition company (SPAC).

26. A central component of WM Technology's value proposition to investors was the scale and engagement of its user base, which the Company measured using a single reported consumer metric: "monthly active users" or "MAUs." Throughout the Class Period, WM Technology emphasized MAU growth in its SEC filings, earnings calls, and investor presentations, describing MAU as a "key operating metric" and a primary indicator of the Company's reach, brand strength, and user activity. In these public statements, WM Technology represented that it determined MAUs by counting the number of unique users who had "engaged with" the Weedmaps website or mobile app during the final month

of a reporting period. By highlighting MAU growth while simultaneously defining MAUs as engaged users, WM Technology conveyed to investors that its reported user base reflected individuals who had actively and volitionally interacted with the platform. This narrative was central to investor perceptions of the Company's growth and monetization potential. Crucially, MAUs was the only metric that WM Technology reported to investors purporting to reflect consumer traffic to WM Technology's website.

27. According to the Registration Statement and Proxy, MAUs were used to "evaluate [WM's] business, measure [WM's] performance, identify trends affecting [WM's] business, formulate business plans, and make strategic decisions." WM further explained in the Registration Statement and Proxy that it viewed "MAUs as a key indicator of our growth, the breadth and reach of our weedmaps.com site, the value proposition and consumer awareness of our brand, the continued use of our sites by our users and their level of interest in the cannabis industry."

28. In reality, WM Technology's reported MAU figures were materially misleading. As detailed in a Cease and Desist Order against WM Technology (the "SEC Order"), entered by the SEC on September 24, 2024, from mid 2020 through August of 2022, WM Technology increasingly inflated its MAU metric by counting individuals who had been involuntarily directed to the Weedmaps website through so-called "pop-under" advertisements—digital ads that automatically launched the Weedmaps site in a new browser window underneath the user's active screen when they visited unrelated third-party websites. These users did not seek out the Weedmaps site, and the vast majority of them did not interact with the site at all, and according to the Cease and Desist Order, "less than 2% of the pop-under traffic resulted in an engaged user session." Despite knowing that these individuals did not volitionally visit or interact with the platform, WM Technology included all of them in its reported MAU totals. SEC Order ¶¶ 15–16.

29. The SEC Order went on to explain that at the same time WM Technology was reporting increasing MAUs, "actual engaged user traffic and activity on the WM Technology site was stagnant or declining." WM Technology defined "direct traffic" as traffic that came to the weedmaps.com website directly, and "organic traffic" as referring to users who came to the website through something like a google search. *Id.* at ¶16. Paid traffic refers to traffic through advertisements. *Id.* WM Technology internal records showed that direct and organic traffic declined from July 2020 to June 2022, while paid traffic surged. *Id.* The SEC Order also revealed that while in its public disclosures, MAU was determined by counting users "who have engaged with" the weedmaps.com website, in reality WM Technology included in MAUs any user who visited the site, whether or not they actually engaged with it.

30. The SEC Order further revealed that, internally, WM Technology tracked meaningful user activity through separate metrics such as "active sessions", which required the user to take one of a set of defined actions on the weedmaps.com website, and "eMAUs" (engaged monthly active users), both of which were stagnant or declining during the Class Period (id. ¶ 16). WM Technology did not report either of those metrics during the class period.

31. The SEC Order further revealed that during the second half of 2020 and early 2021, Beals and Lee "received information indicating that pop-under traffic was becoming an increasingly large percentage of WM Technology's website traffic and its overall MAU, and that such traffic was "low quality" and did not meaningfully engage with WM Technology's site." *Id.* at 21. They both "received various weekly updates throughout the summer and fall of 2021 that contained graphs, charts, and commentary showing that WM Technology's direct and organic traffic, as well as the active sessions on the site, had declined by double digits since mid-2020 and that the company's MAU growth was being driven by low engagement paid traffic." *Id.* Specifically, a "November 2021 'Weekly

Business Review' presentation further highlighted that paid traffic was propping up MAU as direct and organic traffic declined, and that the paid traffic, which increasingly included traffic from popunder advertisements, had reached roughly 50% or more of WM Technology's total MAU."

32. Ultimately, following a whistleblower complaint to the board of directors, Defendants began to admit to the inaccuracy of its MAU reporting, though not Beals and Lee's culpability, on August 8, 2022, acknowledging in a press release that "[t]o an increasing degree over time, growth of our monthly active users, reported as MAUs, has been driven by the purchase of pop-under advertisements, which are marketing advertisements on third party websites that automatically present our platform on users' screens in certain circumstances." They further admitted that "the vast majority of users who are directed to weedmaps.com via pop-under advertisements close the site without clicking on any links" and that "users whose access to the website resulted from these pop-under advertisements represented approximately 65% of our MAUs as of June 30, 2022, and 54%, 50% and 54% of our MAUs as of March 31, 2022, December 31, 2021 and September 30, 2021, respectively."

33. On September 24, 2024, the SEC filed a complaint (the "Beals and Lee Complaint") against Defendants Beals and Lee charging them with violations of securities laws. The Beals and Lee Complaint revealed for the first time Defendants Beals and Lee's scienter regarding the misleading statements concerning the importance of MAUs as a key operating metric and the MAU figures reported during the Class Period. A copy of the Beals and Lee Complaint is attached hereto as Exhibit 1 and is fully incorporated by reference herein.

34. Also on September 24, 2024, the SEC filed the SEC Order. The SEC Order contained largely similar findings as against Defendants WM, Beals, and Lee – the latter two called former CEO and former CFO respectively. A copy of

the SEC Order is attached hereto as Exhibit 2 and is fully incorporated by reference herein.

**Materially False and Misleading Statements Issued During the Class Period**

35. On May 25, 2021, the Company filed with the SEC an Amended Registration Statement (the "Registration Statement") under the SEC's Form S-4/A. On May 26, 2021, the Company filed with the SEC its definitive proxy on SEC Form Schedule 14A (the "Proxy") to solicit votes for its June 10, 2021, Special Meeting to approve the planned merger between Legacy WM and Silver Spike. The Registration Statement and Proxy were signed by Defendant Gordon.

36. On behalf of Legacy WM, both Beals and Lee participated in providing the information about Legacy WM's business to the SPAC for its Registration Statement and Proxy, which they knew would be publicly filed with the SEC. The Registration Statement was also signed by Defendants Healy and Gentile.

37. Both the Registration Statement and Proxy contained the following table:

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2020 | 2021 |
| | (dollars in thousands, except for revenue by client) | | | | |
| Paying clients[3] | 4,024 | 4,644 | 3,786 | 4,101 | 4,058 |
| MAUs (in thousands)[4] | 4,684 | 8,009 | 10,000 | 6,457 | 9,163 |

38. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

39. The Registration Statement and Proxy both touted the importance of MAU figures to the Company, stating in relevant part:

> "We view the number of MAUs as a key indicator of our growth, the breadth and reach of our weedmaps.com site, the value proposition and

> consumer awareness of our brand, the continued use of our sites by our users and their level of interest in the cannabis industry."

40. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

41. On August 12, 2021, WM filed with the SEC a current report on form 8-K, signed by Defendant Lee, attaching a press release titled "WM Technology, Inc. Reports Second Quarter 2021 Financial Results and Affirms 2021 Outlook". It stated, in pertinent part, that "Monthly active users ("MAUs")(1)(2) increased to 12.3 million at June 30, 2021 or 75% compared to the prior year period (or 56% when adjusting the current period to exclude the MAUs attributed to the Learn section of weedmaps.com that we were not able to track during the prior period)."

42. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

43. On August 13, 2021, WM filed with the SEC its quarterly financial report for the period ended June 30, 2021 on the form 10-Q ("2Q 2021 10-Q"). Attached to the 2Q 2021 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Beals and Lee attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

44. The 2Q 2021 10-Q touted the importance of MAUs as a key operating metric, stating in pertinent part:

> "We view the number of MAUs as a key indicator of our growth, the breadth and reach of our weedmaps.com site, the value proposition and consumer awareness of our brand, the continued use of our sites by our users and their level of interest in the cannabis industry."

45. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

46. The 2Q 2021 10-Q defined MAU as "the number of unique users opening our Weedmaps mobile app or accessing our weedmaps.com website over the course of a calendar month. In any particular period, we determine our number of MAUs by ***counting the total number of users who have engaged with the weedmaps.com site*** during the final calendar month of the given period." (Emphasis added.)

47. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

48. The 2Q 2021 10-Q further stated that WM's MAU for the reporting period was 12.3 million.

49. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

50. On November 11, 2021, WM Technology held an earnings call the third quarter of 2021. On that call, Beals stated that "we had high double-digit year-over-year growth across all of our metrics, with nearly 40% growth in monthly active users and double-digit US growth in both average monthly paying clients and average revenue per paying client."

51. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under

advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

52. On that same call, Lee stated that "monthly active users accessing the Weedmaps marketplace, and 28% when excluding users attributed to the Learn section of our website, which we didn't track in the prior period."

53. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

54. On November 12, 2021, WM filed with the SEC a current report on form 8-K, signed by Defendant Lee, attaching a press release titled "WM Technology, Inc. Reports Third Quarter 2021 Financial Results". It stated, in pertinent part, that "Monthly active users ("MAUs")(1)(2) increased to 13.9 million at September 30, 2021 or 37% compared to the prior year period (or 28% when adjusting the current period to exclude the MAUs attributed to the Learn section of weedmaps.com that we were not able to track during the prior period)."

55. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

56. On November 12, 2021, WM filed with the SEC its quarterly financial report for the period ended September 30, 2021 on the form 10-Q ("3Q 2021 10-Q"). Attached to the 3Q 2021 10-Q were SOX certifications signed by Defendants Beals and Lee attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

57. The 3Q 2021 10-Q touted the importance of MAUs as a key operating metric, stating in relevant part:

> "We view the number of MAUs as a key indicator of our growth, the breadth and reach of our weedmaps.com site, the value proposition and consumer awareness of our brand, the continued use of our sites by our users and their level of interest in the cannabis industry."

58. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

59. The 3Q 2021 10-Q defined MAU as "the number of unique users opening our Weedmaps mobile app or accessing our Weedmaps.com website over the course of a calendar month. In any particular period, we determine our number of MAUs by ***counting the total number of users who have engaged with the weedmaps.com site*** during the final calendar month of the given period." (Emphasis added.)

60. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

61. Additionally, the 3Q 2021 10-Q stated that WM's MAU for the reporting period was 13.9 million.

62. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

63. On February 23, 2022, WM filed with the SEC a current report on form 8-K, signed by Defendant Lee, attaching a press release titled "WM Technology, Inc. Reports Fourth Quarter and Full Year 2021 Financial Results". It stated, in pertinent part, that "Monthly active users ("MAUs")(1)(2) increased to 15.7 million as of December 31, 2021 or 57% compared to the prior year period

(or 49% when adjusting the current period to exclude the MAUs attributed to the Learn section of weedmaps.com that we were not able to track during the prior period)."

64. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

65. Also on February 23, 2022, Beals and Lee participated in a Q4 2021 conference call. On that call Defendant Beals stated that WM Technology had experienced "over 50% year-over-year growth in our monthly active users we saw in Q4."

66. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

67. On that same call Lee stated that "Our monthly active users grew by over 10% versus Q3."

68. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

69. On February 25, 2022, WM filed with the SEC its annual financial report for the fiscal year ended December 31, 2021 ("2021 10-K"). Attached to the 2021 10-K were SOX certifications signed by Defendants Beals and Lee attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

70. The 2021 10-K touted the importance of MAUs as a key operating metric, stating in relevant part:

> "We view the number of MAUs as a key indicator of our growth, the breadth and reach of our weedmaps.com site, the value proposition and consumer awareness of our brand, the continued use of our sites by our users and their level of interest in the cannabis industry."

71. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

72. The 2021 10-K defined MAU as "the number of unique users opening our Weedmaps mobile app or accessing our Weedmaps.com website over the course of a calendar month. In any particular period, we determine our number of MAUs by ***counting the total number of users who have engaged with the weedmaps.com site*** during the final calendar month of the given period." (Emphasis added.)

73. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

74. Additionally, the 2021 10-K reported WM's MAU for the reporting period as 15.7 million.

75. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

76. On May 4, 2022, WM filed with the SEC a current report on form 8-K, signed by Defendant Lee, attaching a press release titled "WM Technology, Inc. Reports First Quarter 2022 Financial Results". It stated, in pertinent part, that "Monthly active users ("MAUs")(1)(2) increased to 16.4 million at March 31, 2022, up 52% compared to the prior year period."

77. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

78. Also on May 4, 2022, Beals and Lee participated in a Q1 2022 earnings call. On that call Lee stated that "we continue to grow our user base with over 50% growth in monthly active users versus last year."

79. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

80. On May 6, 2022, WM filed with the SEC its quarterly financial report for the period ended March 31, 2022 on the form 10-Q ("1Q 2022 10-Q"). Attached to the 1Q 2022 10-Q were SOX certifications signed by Defendants Beals and Lee attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

81. The 1Q 2022 10-Q touted the importance of MAUs as a key operating metric, stating in pertinent part:

> "We view the number of MAUs as a key indicator of our growth, the breadth and reach of our weedmaps.com site, the value proposition and consumer awareness of our brand, the continued use of our sites by our users and their level of interest in the cannabis industry."

82. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

83. The 1Q 2022 10-Q defined MAU as "the number of unique users opening our Weedmaps mobile app or accessing our weedmaps.com website over

the course of a calendar month. In any particular period, we determine our number of MAUs by ***counting the total number of users who have engaged with the weedmaps.com site*** during the final calendar month of the given period." (Emphasis added.)

84. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

85. Additionally, the 1Q 2022 10-Q reported WM's MAU for the reporting period as 16.4 million.

86. The foregoing statement was misleading for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website.

## THE TRUTH BEGINS TO EMERGE

87. The truth began to emerge on August 9, 2022. That day, WM filed with the SEC its quarterly financial report for the period ended June 30, 2022 on the form 10-Q ("2Q 2022 10-Q"). Attached to the 2Q 2022 10-Q were SOX certifications signed by Defendants Beals and Lee attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

88. In the 2Q 2022 10-Q, the Company disclosed that its board of directors had received an internal complaint regarding "the calculation, definition, and reporting of [its] MAUs." The 2Q 2022 10-Q disclosed that:

> "[O]ne of the ways in which we acquire users is through paid advertising. To an increasing degree over time, growth of our monthly active users, reported as MAUs, has been driven by the purchase of pop-under advertisements, which are marketing advertisements on third party websites that automatically present our platform on users'

> screens in certain circumstances. ***Our internal data suggests that the vast majority of users who are directed to weedmaps.com via pop-under advertisements close the site without clicking on any links. Based on management's review, users whose access to the website resulted from these pop-under advertisements represented approximately 65% of our MAUs as of June 30, 2022, and 54%, 50% and 54% of our MAUs as of March 31, 2022, December 31, 2021 and September 30, 2021, respectively.***"

(Emphasis added.)

89. On this news, WM share prices dropped from $3.46 a share to $2.59 a share – a drop of $0.87, or over 25%.

90. However, Defendants continued to tout MAU as a key operating metric for the Company.

91. The 2Q 2022 10-Q contained false and/or misleading statements by continuing to include MAU as a key operating metric.

92. The truth was further revealed on November 7, 2022, when, after market hours, WM filed its quarterly financial report for the period ended September 30, 2022 on the form 10-Q ("3Q 2022 10-Q"). The 3Q 2022 10-Q revealed that WM would no longer be reporting MAU as a key operating metric, stating, in pertinent part:

> "Monthly Active Users
>
> In addition to key financial and operational metrics listed above, we also previously reported Monthly Active Users ("MAUs"), which represented, in any given period, the total number of unique users who opened our Weedmaps mobile app or gained access to our Weedmaps.com website, including through paid advertising channels, during the final calendar month of the period. As discussed in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2022 (the "Prior 10-Q"), we decided to reevaluate the value to investors of continuing to report MAUs as a key metric on a quarterly or annual basis. We believe that historically, our MAU correlated to the level of our marketing expenditure (which, as previously explained, utilized pop-under advertisements). We observed this as we downshifted our

> marketing spend, including to rely less on the use of pop-under advertisements, during the third quarter.
>
> In the quarter ended September 30, 2022, our MAUs decreased to 11.2 million in the final month of the quarter ended September 30, 2022 from 17.4 million in the final month of quarter ended June 30, 2022. ***Our listing page visits, which is the number of visits to retailer and brand listing pages on the marketplace, remained relatively steady*** during the same period, decreasing slightly from 13.3 million in the final month of the quarter ended June 30, 2022 to 12.8 million during the final month of the quarter ended September 30, 2022. ***We believe this reflects, among other things, the value proposition the marketplace provides to repeat cannabis consumers.***
>
> We are evaluating alternative metrics to provide investors that will shed more clarity on down-funnel marketplace behavior than MAUs historically have, and ***we have determined not to report MAUs going forward.***"
>
> (Emphasis added.)

93. The 3Q 2022 10-Q also announced that Defendant Beals would be stepping down as CEO and a member of the board of directors.

94. On this news, WM share prices dropped by $0.64, or approximately 33%, to close on November 8, 2022 at $1.29 per share.

95. However, it was not until September 24, 2024, that Plaintiff and the class became aware of all the facts constituting this claim – particularly the element of scienter on the part of the Defendants. On that day, the SEC issued a litigation release (the "Release") in which it announced that it had "charged public company WM Technology, Inc. (Nasdaq: MAPS), its former CEO, Christopher Beals, and its former CFO, Arden Lee, for making negligent misrepresentations in WM Technology's public reporting of a self-described key operating metric, the "monthly active users," or "MAU," for WM Technology's online cannabis marketplace." The Release noted that the SEC had "also instituted a related settled administrative proceeding against WM Technology".

96. Per the release, as part of its agreement to settle the SEC's administrative claims, the Company "agreed to the entry of a cease-and-desist order prohibiting further violations of Sections 17(a)(2) and (3) of the Securities Act and Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, 13a-15(a), and 14a-9 thereunder."

97. At the same time, the SEC released the SEC Complaint and the Beals and Lee Order.

98. On this news, the price of WM Technology, Inc. common stock fell by 1.9% to close at $0.92 on September 25, 2024.

99. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## **Additional Allegations in Support of Scienter**

### **Additional Allegations Concerning Beals' Scienter**

100. As revealed in the SEC Order and the Beals and Lee Complaint, Beals knew, as early as the second half of 2020, that "pop-under traffic was becoming an increasingly large percentage of WM Technology's website traffic and its overall MAU, and that such traffic was 'low quality' and did not meaningfully engage with WM Technology's site." The SEC Order and the Beals and Lee Complaint further revealed that Beals "received various weekly updates throughout the summer and fall of 2021 that contained graphs, charts, and commentary showing that WM Technology's direct and organic traffic, as well as the active sessions on the site, had declined by double digits since mid-2020 and that the company's MAU growth was being driven by very low engagement paid traffic." Therefore, Beals had scienter concerning the inflated MAU figures reported to WM shareholders.

101. In addition, Beals' scienter concerning the importance – or lack thereof – of MAUs as a key operating metric can be inferred. First, as stated in the 3Q 2022 10-Q, when the truth concerning the inflated MAU figures came to light,

the Company was quick to abandon MAU as a key operating metric. Second, the 3Q 2022 10-Q also revealed that the Company was able to use an alternative metric – listing page visits – to "reflect[], among other things, the value proposition the marketplace provides to repeat cannabis consumers." Third, as revealed in the Beals and Lee Complaint and SEC Order, WM used various internal metrics besides MAU to track user activity, including direct traffic, organic traffic, paid traffic, active sessions, and eMAU. Finally, as also revealed in the Beals and Lee Complaint and SEC Order, despite knowing about the inflated MAU figures, Defendant Beals took no meaningful steps to address the issues, instead opting to continue to misrepresent MAUs to investors.

102. Furthermore, measuring user engagement with WM's website and app was critical to WM's business model. As repeated throughout WM's various SEC filings, WM believed that increasing users – allegedly measured throughout the Class Period as MAUs – would "increase the value of [WM's] bundled SaaS solutions to business customers[,]" which was the primary revenue source for WM. Put differently, attracting paying customers via user growth was a core operation of WM. As such, Beals knew, or was reckless in not knowing, that MAU was not an effective measure of the Company's business performance, but continued to tout MAU as a key business metric to the investing public.

103. Beals' scienter concerning the fraud alleged herein can also be inferred from the fact that, as announced in the 3Q 2022 10-Q, he stepped down as the CEO and member of the board of directors shortly after the board of directors learned of the manipulation of MAU metrics.

**<u>Additional Allegations Concerning Lee's Scienter</u>**

104. As revealed in the SEC Order and the Beals and Lee Complaint, Lee knew, as early as the second half of 2020, that "pop-under traffic was becoming an increasingly large percentage of WM Technology's website traffic and its overall MAU, and that such traffic was 'low quality' and did not meaningfully engage with

WM Technology's site." The SEC Order and the Beals and Lee Complaint further revealed that Lee "received various weekly updates throughout the summer and fall of 2021 that contained graphs, charts, and commentary showing that WM Technology's direct and organic traffic, as well as the active sessions on the site, had declined by double digits since mid-2020 and that the company's MAU growth was being driven by very low engagement paid traffic." Therefore, Lee had scienter concerning the inflated MAU figures reported to WM shareholders.

105. In addition, Lee's scienter concerning the importance – or lack thereof – of MAUs as a key operating metric can be inferred. First, as stated in the 3Q 2022 10-Q, when the truth concerning the inflated MAU figures came to light, the Company was quick to abandon MAU as a key operating metric. Second, the 3Q 2022 10-Q also revealed that the Company was able to use an alternative metric – listing page visits – to "reflect[], among other things, the value proposition the marketplace provides to repeat cannabis consumers." Third, as revealed in the Beals and Lee Complaint and SEC Order, WM used various internal metrics besides MAU to track user activity, including direct traffic, organic traffic, paid traffic, active sessions, and eMAU. Finally, as also revealed in the Beals and Lee Complaint and SEC Order, despite knowing about the inflated MAU figures, Defendant Lee took no meaningful steps to address the issues, instead opting to continue to misrepresent MAUs to investors.

106. Furthermore, measuring user engagement with WM's website and app was critical to WM's business model. As repeated throughout WM's various SEC filings, WM believed that increasing users – allegedly measured throughout the Class Period as MAUs – would "increase the value of [WM's] bundled SaaS solutions to business customers[,]" which was the primary revenue source for WM. Put differently, attracting paying customers via user growth was a core operation of WM. As such, Lee knew, or was reckless in not knowing, that MAU was not an

effective measure of the Company's business performance, but continued to tout MAU as a key business metric to the investing public.

107. Beals' scienter concerning the fraud alleged herein can also be inferred from the fact that, as announced in the 3Q 2022 10-Q, he stepped down as CFO shortly after the board of directors learned of the manipulation of MAU metrics.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

108. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all persons or entities that purchased or otherwise acquired WM securities during the Class Period.

109. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by WM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

110. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

111. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

112. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the federal securities laws;

b) whether the Registration Statement, Proxy, and/or the Company's SEC filings, and/or public statements have omitted and/or misrepresented material facts about the Company's business, operations, and prospects; and

c) to what extent the members of the Class have sustained damages and the proper measure of damages.

113. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Applicability of Presumption of Reliance:**

***Affiliated Ute***

114. The statements made by Defendants during the Class Period were misleading for omitting to disclose information concerning the inflated MAU figures and the true extent of the importance of MAUs as a business metric, which rendered the Company's statements in the Registration Statement, Proxy, SEC filings, and to the public misleading.

115. Neither plaintiffs nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which primarily are based on omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is necessary is that the facts that WM withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**Application of Presumption of Reliance:**

**Fraud on the Market**

116. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) WM securities were traded in efficient markets during the Class Period.

117. WM's securities traded in efficient markets during the Class Period for the following reasons: (i) the securities were traded on NASDAQ; (ii) on average shares representing more than 37% of the securities' float were traded weekly during the Class Period; (iii) WM timely filed all required annual, quarterly and material event reports with the SEC during the Class Period; (iv) WM regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (v) the price of WM securities responded quickly to incorporate and reflect new public information concerning WM during the Class Period; (vi) currently, 18 market makers currently make a market in WM securities.

118. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public,

including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of WM securities; and (iii) cause Plaintiffs and other members of the Class to purchase WM securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

119. Pursuant to the above plan, scheme, conspiracy and course of conduct, Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for WM securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about WM's finances and business prospects.

120. By virtue of their positions at WM, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

121. Information showing that Defendants acted knowingly or with reckless disregard or the truth is peculiarly within the knowledge and control of Defendants. As the senior managers and/or directors of WM, the Individual Defendants had knowledge of the details of WM internal affairs.

122. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of WM. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to WM's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market prices of WM securities were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning WM's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased WM securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

123. During the Class Period, WM securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased WM securities at prices artificially inflated by the wrongful conduct of Defendants. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of WM securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of WM securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

124. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

125. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

126. This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

**COUNT I**

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against Defendants WM Technology, Beals and Lee**

127. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

128. This Count is asserted against WM Technology, Beals, and Lee is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

129. During the Class Period, WM Technology, Beals, and Lee, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130. WM Technology, Beals, and Lee violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

131. WM Technology, Beals, and Lee acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

132. Beals and Lee, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiffs and the Class.

133. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of WM Technology, Beals, and Lee's statements, Plaintiffs and the other

members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

134. Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by WM Technology, Beals, and Lee's misleading statements and by the material adverse information which WM Technology, Beals, and Lee did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

135. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

136. By reason of the foregoing, WM Technology, Beals, and Lee have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

137. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of common stock giving rise to the cause of action.

## COUNT II

## Violation of 10(b) of the Exchange Act and Rule 10b-5

## Against Beals and Lee

138. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

139. This Count is asserted against Beals and Lee and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC.

140. Beals and Lee violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud. Specifically, Beals and Lee knowingly furnished false and misleading MAU data to Silver Spike Acquisition Corp for inclusion in its registration statement and proxy solicitiation.

141. Beals and Lee acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Silver Spike Acquisition Corp. were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

142. As a result of the foregoing, the market price of WM Technology's securities was artificially inflated during the Class Period. In ignorance of Beals and Lee's fraudulent schemes, relied on the integrity of a market free from manipulation in Allianz securities during the Class Period in purchasing Allianz's securities at prices that were artificially inflated as a result of AGI US's fraudulent scheme.

143. Had Plaintiffs and the other members of the Class been aware that the market price of the Allianz securities had been artificially and falsely inflated by AGI US's fraudulent scheme, they would not have purchased Allianz's securities at the artificially inflated prices that they did, or at all.

144. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

145. By reason of the foregoing, AGI US has violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and is liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in

connection with their purchases of the Company's securities during the Class Period.

146. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of common stock giving rise to the cause of action.

## COUNT III
## Violations of Section 20(a) of the Exchange Act
## Against the Individual Defendants

147. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

148. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

149. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

150. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange

Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

151. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

152. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of common stock giving rise to the cause of action.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 12, 2025

**THE ROSEN LAW FIRM, P.A.**
/s/ Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
Phillip Kim (admitted *pro hac vice*)

Jonathan Stern (*pro hac vice* application forthcoming)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com
philkim@rosenlegal.com
jstern@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*