COOLEY LLP
SARAH M. LIGHTDALE (*pro hac vice*)
(slightdale@cooley.com)
55 Hudson Yards
New York, New York 10001
Telephone: +1 212 479 6000
Facsimile: +1 212 479 5275

ALEXANDRA R. MAYHUGH (300446)
(amayhugh@cooley.com)
MAXIMILIAN SLADEK DE LA CAL (324961)
(msladekdelacal@cooley.com)
NICHOLAS R. ORR (334142)
(norr@cooley.com)
355 S. Grand Avenue, Suite 900
Los Angeles, California 90071
Telephone: +1 213 561 3250
Facsimile: +1 213 561 3244

HEATHER M. SPEERS (305380)
(hspeers@cooley.com)
LINH K. NGUYEN (305737)
(lknguyen@cooley.com
10265 Science Center Drive
San Diego, California 92121
Telephone: +1 858 550 6000
Facsimile: +1 858 550 6420

*Attorneys for Defendants WM Technology, Inc.,*
*Christopher Beals, and Arden Lee*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERET ISHAK, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WM TECHNOLOGY, INC. f/k/a SILVER SPIKE ACQUISITION CORP., CHRISTOPHER BEALS, ARDEN LEE, DOUGLAS FRANCIS, SUSAN ECHERD, MARY HOITT, SCOTT GORDON, WILLIAM HEALY, and GREGORY M. GENTILE<br><br>Defendants. | Case No. 2:24-cv-08959-ODW-PVC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF WM TECHNOLOGY DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**<br><br>Date:      November 10, 2025<br>Time:      1:30 p.m.<br>Dept:      Courtroom 5D, 5th Fl.<br>Judge:     Hon. Otis D. Wright, II |

COOLEY LLP
ATTORNEYS AT LAW

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     FACTUAL BACKGROUND .......................................................................... 2

    A.      WM Technology and the Individual Defendants ................................. 2

    B.      WM Technology Reports "Monthly Active Users" Metric and Discloses Limitations. ....................................................................... 3

    C.      The Company Receives an Internal Complaint, Conducts an Investigation, and Voluntarily Reports to the SEC. ........................... 4

    D.      The Company Keeps Investors Apprised of the SEC Investigation and the SEC Announces a Settlement ............................ 5

    E.      Plaintiffs Belatedly File This Lawsuit. ............................................... 6

III.    LEGAL STANDARDS .................................................................................. 6

IV.     ARGUMENT ................................................................................................. 7

    A.      Plaintiffs' Claims Are Time-Barred. .................................................. 7

    B.      Plaintiffs Fail to Plead a Misstatement Claim. ................................. 10

        1.      Plaintiffs Fail to Plead a Strong Inference of Scienter. ........... 10

            a.      Plaintiffs do not plead motive. ..................................... 10

            b.      No contemporaneous facts support a strong inference of scienter. ...................................................... 11

            c.      Viewed holistically, the more compelling inference is not fraudulent. ........................................................ 15

        2.      Plaintiffs Fail to Plead Falsity. ............................................... 16

            a.      Statements that MAU was a key indicator of growth are inactionable opinions and puffery ............... 16

            b.      The Company reported MAU consistent with footnotes defining the calculations for those figures. ......................................................................... 17

            c.      The Company defined MAU as the number of users "accessing" the website. .................................. 18

            d.      Plaintiffs fail to plead any SOX certifications were misleading. ............................................................ 20

        3.      Plaintiffs Fail to Plead Loss Causation. .................................. 21

    C.      Plaintiffs Fail to Plead a Scheme Claim. .......................................... 22

    D.      Plaintiffs Fail to Plead a Control Person Claim. ............................... 22

V.      CONCLUSION ............................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adobe Inc. Sec. Litig.*,
   2025 WL 936416 (S.D.N.Y. Mar. 27, 2025)......................................................16

*Amorosa v. Gen. Elec. Co.*,
   2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022) .............................................12, 14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................18

*In re Bausch & Lomb, Inc. Sec. Litig.*,
   592 F.Supp.2d 323 (W.D.N.Y. 2008) ...............................................................15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..........................................................................................7

*Berson v. Applied Signal Tech. Inc.*,
   527 F.3d 982 (9th Cir. 2008)...........................................................................12

*Bodri v. GoPro, Inc.*,
   252 F.Supp.3d 912 (N.D. Cal. 2017) ...............................................................13

*Carey Camp v. Qualcomm Inc.*,
   2020 WL 1157192 (S.D. Cal. Mar. 10, 2020)...................................................22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017)...........................................................................15

*In re Cloudera, Inc.*,
   121 F.4th 1180 (9th Cir. 2024).........................................................................19

*Curry v. Yelp Inc.*,
   875 F.3d 1219 (9th Cir. 2017).........................................................................6-7

*Dillard v. Platform Specialty Prods. Corp.*,
   2016 WL 10586301 (S.D. Fla. Dec. 8, 2016) ...................................................15

*In re DNTW Chartered Accts. Sec. Litig.*,
   172 F.Supp.3d 675 (S.D.N.Y. 2016) .................................................................14

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008)...........................................................................7

TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Idaho v. Shoshone-Bannock Tribes*,
  465 F.3d 1095 (9th Cir. 2006) ................................................................................ 18

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) .......................................................................... 11, 13

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ............................................................................ 21, 22

*Lopes v. Fitbit, Inc.*,
  2020 WL 1465932 (N.D. Cal. Mar. 23, 2020) ...................................................... 18

*Mehedi v. View, Inc.*,
  2024 WL 3236706 (N.D. Cal. June 28, 2024) ...................................................... 15

*Merck & Co., Inc. v. Reynolds*,
  559 U.S. 633 (2010) ................................................................................................ 7

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ................................................................... 7, 10, 21

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) .................................................................................. 21

*Ng v. Berkeley Lights*,
  2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ......................................................... 18

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
  730 F.3d 1111 (9th Cir. 2013) .............................................................................. 21

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ......................................................................................... 17, 19

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) ................................................................................... 7

*Palm Harbor Special Fire Control & Rescue Dist. Firefighters
  Pension Plan v. First Solar*,
  2023 WL 4161355 (D. Ariz. June 23, 2023) ......................................................... 21

*Paskowitz v. Pac. Cap. Bancorp*,
  2009 WL 4911850 (C.D. Cal. Nov. 6, 2009) ........................................................ 20

COOLEY LLP
ATTORNEYS AT LAW

iii

**WM TECH DEFS'
MEM. ISO MOTION TO DISMISS
2:24-CV-08959-ODW-PVC**

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Pixar Sec. Litig.*,
450 F.Supp.2d 1096 (N.D. Cal. 2006)......................................................................11

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)................................................................................11

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021)..........................................................................10, 11

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017)................................................................................16

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)..................................................................................11

*Ryan v. FIGS, Inc.*,
2024 WL 187001 (C.D. Cal. Jan. 17, 2024)......................................................11, 14

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
119 F.Supp.3d 1213 (C.D. Cal. 2015)....................................................................12

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999)..................................................................................13

*In re Silver Lake Grp., LLC Sec. Litig.*,
108 F.4th 1178 (9th Cir. 2024)..............................................................................16

*Sneed v. AcelRx Pharms.*,
2022 WL 4544721 (N.D. Cal. Sept. 28, 2022)........................................................22

*In re Solarcity Corp. Sec. Litig.*,
274 F.Supp.3d 972 (N.D. Cal. 2017)......................................................................12

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
802 F.Supp.2d 1125 (C.D. Cal. 2011)..................................................................8, 10

*In re Tenaris S.A. Sec. Litig.*,
493 F.Supp.3d 143 (E.D.N.Y. 2020)......................................................................20

*United Ass'n Nat'l Pension Fund v. Carvana*,
759 F.Supp.3d 926 (D. Ariz. 2024)....................................................................16, 17

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ........................................................................ 14

*Veal v. LendingClub Corp.*,
423 F.Supp.3d 785 (N.D. Cal. 2019) ......................................................... 16, 17

*Waterford Twp. Police v. Mattel Inc.*,
321 F.Supp.3d 1133 (C.D. Cal. 2018) ........................................................ 14-15

*Weston Fam. P'ship LLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) ........................................................................ 7, 20

*In re Wet Seal Inc. Sec. Litig.*,
518 F.Supp.2d 1148 (C.D. Cal. 2007) ............................................................ 14

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ........................................................................ 13

*York Cnty. v. HP, Inc.*,
65 F.4th 459 (9th Cir. 2023) ........................................................................ 8, 9

*Zucco Partners, LLC v. Digimarc Corp*,
552 F.3d 981 (9th Cir. 2009) ....................................................... 10, 11, 15, 22

**Statutes**

15 U.S.C.
§78u-4 .............................................................................................................. 10
§78u-4(b)(1)(B) ................................................................................................ 20

28 U.S.C.
§1658(b)(1) ........................................................................................................ 7

## I.   INTRODUCTION

WM Technology, Inc. ("WM" or the "Company") had been a public company for less than a year when its board received an internal complaint about an operating metric discussed in periodic reports: "monthly active users" or "MAU." The Company reacted responsibly. It promptly formed a special committee of independent directors, hired outside counsel to investigate, and self-reported to the SEC. In August 2022, WM publicly disclosed details about the internal complaint and investigation, along with additional information about the types of user traffic measured by the MAU metric.

Two years later, in September 2024, the SEC announced it had reached settlements with WM and two former officers—Christopher Beals (CEO) and Arden Lee (CFO)—based on allegations that WM, Beals, and Lee (collectively, "WM Defendants") were negligent in reporting MAU. The SEC's theory, which was never tested in litigation, was that WM Defendants negligently omitted disclosing information about a type of user traffic (directed to the Company's consumer-facing website by "pop-under" advertisements) during WM's first year as a public company.

After the Company's extensive August 2022 disclosures regarding MAU, no investor litigation ensued. It was not until the SEC announced the settlement two years later that this case was filed. Plaintiffs copy the SEC's allegations verbatim, then claim—with zero basis—that the very same conduct the SEC deemed merely negligent was actually fraudulent.

The Amended Complaint ("AC") should be dismissed for multiple independent reasons. *First*, Plaintiffs' claims are time-barred. They hinge on information publicly reported and available over two years before this lawsuit, including in the Company's August 2022 quarterly report. *Second*, by relying solely on the SEC's negligence-based allegations, Plaintiffs fail to meet their burden to plead the strong inference of scienter required by the PSLRA. No well-pled facts suggest any Defendant intended to defraud the market or acted with deliberate

recklessness. ***Third***, Plaintiffs fail to plead falsity. The challenged statements are inactionable puffery and opinions and not false or misleading when read in the context they were made. ***Finally***, Plaintiffs fail to plead loss causation as to two of the three alleged corrective disclosures.

Because Plaintiffs cannot remedy these shortcomings through amendment, Defendants request dismissal with prejudice.

## II.    FACTUAL BACKGROUND

### A.    WM Technology and the Individual Defendants.

WM is a technology company, founded in 2008, that provides digital solutions to businesses and consumers in the cannabis industry. ¶25; SEC Compl., ¶16.[1] The AC alleges the Company offers a suite of subscription-based software tools for cannabis businesses—known as Weedmaps for Business—that assist with online advertising, order fulfillment, and compliance with local regulations. ¶25. For consumers, the Company offers an online marketplace—known as Weedmaps—with information about cannabis retailers and brands and an interface for consumers to place orders directly with cannabis retailers, where permitted by law. *Id.* Access to the Weedmaps marketplace is free for consumers; the Company's revenue is generated from its Weedmaps for Business clients. *Id.*

Between 2008 and 2021, WM grew from a small startup to a company with over 600 employees and annual revenue approaching $200 million. Ex. J at 310, 335. On June 16, 2021, WM became a public company following a business combination with Silver Spike Acquisition Corp.—a transaction referred to as a "de-SPAC Transaction." ¶13.

Christopher Beals and Arden Lee were officers of WM before it went public. Beals served as CEO from March 2019 until November 2022. ¶15. Lee served as

---

[1] Unless otherwise noted, "¶" refers to the AC; "SEC Order" refers to Exhibit 1 to the AC; "SEC Complaint" refers to Exhibit 2 to the AC; "Ex." refers to exhibits to the Mayhugh Declaration; emphasis is added, and internal citations, quotations marks, and alterations are omitted.

**WM TECH DEFS'**
**MEM. ISO MOTION TO DISMISS**
**2:24-CV-08959-ODW-PVC**

CFO from February 2019 until July 2023. ¶16. Both departures were voluntary. Ex. Q at 460; Ex. S at 519.

**B.**    **WM Technology Reports "Monthly Active Users" Metric and Discloses Limitations.**

In connection with the de-SPAC Transaction, the Company filed a Registration Statement and Prospectus with the SEC, publicly disclosing information about WM's business, historical financial data, and industry and Company-specific risks. ¶35; Ex. A at 22-79; Ex. B at 94-151. The filings also identified seven key operating and financial metrics. Ex. A at 80-83. The first six metrics—revenue, net income, EBITDA, adjusted EBITDA, monthly-revenue-per-paying-client, and paying clients—focused on Weedmaps for Business, the Company's revenue-generating side. *Id.* The last metric—MAU—focused on its consumer-facing marketplace. *Id.*

The Registration Statement included the definition of MAU in three places: (i) on page 4 under Certain Defined Terms; (ii) as a footnote to the chart where MAU figures were reported; and (iii) in the discussion of MAU trends. *Id.* at 19, 80-83. All three locations defined MAU the same way: as "the number of unique users ***opening*** [our] Weedmaps mobile app or ***accessing*** [our] Weedmaps.com website over the course of a calendar month." *Id.* The latter two locations also identified the measurement period for the reported MAU numbers, which was limited to the final month of the specified period. *Id.* at 81 ("Monthly active users in this table is for ***the last month in the period***."); *id.* at 82 ("In any particular period, we determine our number of MAUs by counting the total number of users who have engaged with the weedmaps.com site during the ***final calendar month of the given period***.").

The Company did not profit from user activity in the Weedmaps consumer-facing marketplace. Nonetheless, it "view[ed] the number of MAUs as a key indicator of our growth, the breadth and reach of our weedmaps.com site, the value proposition and consumer awareness of our brand, the continued use of our sites by our users and

their level of interest in the cannabis industry." *Id.* The Company's opinion that MAU was an indicator of growth was supported by overall growth trends, which showed MAU increasing alongside other key metrics. *E.g.*, Ex. F at 237.

The Company was also forthright about MAU's limitations—*i.e.*, that WM relied on "paid digital advertising…to attract a meaningful portion of [its] clients and consumers"; WM was "able to acquire users at lower costs" as it became "increasingly efficient with [its] marketing spend"; MAU growth was driven, at least in part, by "marketing spend, including web advertising"; and calculating MAU required "significant judgment and may be susceptible to…technical errors," which could result in inaccurate data. Ex. A at 35, 37, 82-83.

WM reported MAU for only four quarters: Q2'21-Q1'22. SEC Order, ¶13. The definition and disclosures about MAU were consistent across all four. ¶¶35-86.

### C. The Company Receives an Internal Complaint, Conducts an Investigation, and Voluntarily Reports to the SEC.

In Q2'22, WM's board received an internal complaint about the calculation, definition, and reporting of MAU. SEC Order, ¶28. The board immediately appointed a special committee of independent directors, which engaged outside counsel to conduct an internal investigation. *Id.*

On August 9, 2022, WM publicly disclosed receipt of the internal complaint and information regarding the results of the investigation. Ex. N at 400-01. It also provided additional details about MAU, including that growth over time was driven in part by the purchase of a specific form of paid web advertising (pop-under advertisements) and that users directed to the platform via such advertisements tended to "close the site without clicking on any links." *Id.* WM also disclosed the percentage of MAU resulting from pop-under advertisements for each of the four quarters MAU was reported. *Id.* And it told investors that it planned "to shift…marketing spend in the coming months to rely less on the use of pop-under

advertisements" and would continue to review what user metrics "may be most useful for investors in evaluating [WM's] evolving business." *Id*.

On the earnings call that same day, Lee reiterated these points. He stated, "we are providing more information about the composition of MAU including with the use of pop-unders, which management believes have been cost effective in promoting brand awareness but limited in driving engagement." Ex. O at 418. No analyst on the call asked any questions about the internal complaint, investigation, pop-unders, or reporting of MAU. *Id*. at 421-28. Instead, they focused on financial performance metrics (revenue, number of paying clients, average-revenue-per-client) and the downturn in the cannabis market. *Id*.

WM also voluntarily reported the matter to the SEC. SEC Order, ¶28.

**D.    The Company Keeps Investors Apprised of the SEC Investigation and the SEC Announces a Settlement.**

After August 2022, WM provided regular updates to investors about its reassessment of user engagement metrics, as well as the ongoing SEC investigation.

On November 8, 2022, WM stated it would no longer report MAU. Ex. Q at 458. It explained that, "historically, MAU correlated to the level of our marketing expenditure (which, as previously explained, utilized pop-under advertisements)," and when WM decreased marketing spend in Q3'22, MAU also declined, but "the number of visits to retailer and brand listing pages on the marketplace[] remained relatively steady." *Id*.

On March 16, 2023, WM confirmed the revisions to MAU had "no impact on our financial results under GAAP or the reporting or disclosure of any currently disclosed non-GAAP financial metric." Ex. R at 501. WM also disclosed the SEC had issued subpoenas to WM and several "current and former employees." *Id*.

On November 8, 2023, WM disclosed that employees had recently provided SEC testimony. Ex. T at 528.

On July 25, 2024, WM reported it had reached a settlement with the SEC. Ex. V at 570. Two months later, the SEC announced its no-admit, no-deny settlements with WM, Beals, and Lee. ¶¶95-97; SEC Order, at 1. The settlement documents outlined the SEC's theory and focused on a single use of the word "engaged" in each of the Registration Statement and four periodic SEC filings: "In any particular period, we determine our number of MAUs by counting the total number of users who have *engaged* with the weedmaps.com site during the final calendar month of the given period." SEC Compl., ¶¶32-33. The SEC alleged the use of the word "engaged" in this sentence was inconsistent with internal reports purportedly indicating pop-under traffic was accounting for an increasingly larger percentage of MAU and that such traffic did not "meaningfully engage" with the website. *Id.*, ¶62. Based on these allegations—which were never adjudicated or admitted by any Defendant—the SEC alleged WM Defendants were negligent in reporting MAU. SEC Order, ¶¶2, 24, 27; SEC Compl., ¶¶4, 7, 72-79. The SEC did not allege anyone acted with fraudulent intent or deliberate recklessness.

On the date the SEC settlement was announced, WM's stock price dropped two cents—from $0.94/share to $0.92/share. ¶98.

### E. Plaintiffs Belatedly File This Lawsuit.

No lawsuit was filed after WM's August 2022 disclosure of the internal complaint and investigation. It was not until October 17, 2024—over two years later, and three weeks after the SEC published its Complaint and Order—that this action was filed. The AC mirrors the SEC's Complaint, except that Plaintiffs replaced the SEC's allegations of negligence with their own legal conclusion that Defendants committed fraud.

### III. LEGAL STANDARDS

To state a Section 10(b) claim, Plaintiffs must adequately allege "a material misrepresentation or omission of fact, scienter, a connection with the purchase or sale of a security, transaction and loss causation, and economic loss." *Curry v. Yelp*, 875

F.3d 1219, 1224 (9th Cir. 2017). In pleading these elements, Plaintiffs must clear three hurdles.

*First*, Plaintiffs must satisfy Rule 8 and plead a plausible claim for relief. *Bell Atl. v. Twombly*, 550 U.S. 544, 569-70 (2007). The Court need not accept allegations "that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

*Second*, Plaintiffs must satisfy Rule 9(b) by pleading the "who, what, when, where, and how" of the alleged fraud. *Weston Fam. P'ship v. Twitter*, 29 F.4th 611, 619 (9th Cir. 2022). This "particularity" requirement applies to all elements. *Or. Pub. Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 605 (9th Cir. 2014).

*Third*, Plaintiffs must satisfy the "formidable pleading requirements" of the PSLRA. *Metzler Inv. v. Corinthian Colls.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008).

## IV.    ARGUMENT

The AC should be dismissed in its entirety because: **(A)** Plaintiffs' claims are time-barred (Counts I-III); **(B)** Plaintiffs fail to plead a misstatement claim (Count I); **(C)** Plaintiffs fail to plead a scheme claim (Count II); and **(D)** Plaintiffs fail to plead a control person claim (Count III).

### A.    Plaintiffs' Claims Are Time-Barred.

Plaintiffs' claims must be brought within "2 years after the discovery of the facts constituting the violation." 28 U.S.C. §1658(b)(1). The "limitations period…begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010). Here, that date is August 9, 2022—the first alleged corrective disclosure. ¶¶87-89. Because Plaintiffs initiated this lawsuit on October 17, 2024, over two years later, Plaintiffs' claims are time-barred.

Plaintiffs allege the challenged statements were all misleading for the same reasons: they "fail[ed] to disclose that…MAUs were inflated through the use of pop-

under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website." ¶¶35-86. That is precisely the information the Company disclosed in August 2022. ¶88 (10-Q stated MAU was "driven by the purchase of pop-under advertisements" and the "vast majority" of such users "close the site without clicking on any links").

Recognizing this problem, Plaintiffs allege they only "became aware of all the facts constituting this claim"—"particularly the element of scienter"—when the SEC announced its settlement with WM Defendants in September 2024. ¶¶95-97. But the SEC never alleged anyone engaged in intentional or deliberately reckless conduct. SEC Order, at 2-3; SEC Compl., ¶4. And no SEC document "contain[ed] any fundamentally new revelation" giving rise to a strong inference of scienter. *Stichting Pensioenfonds v. Countrywide Fin.*, 802 F.Supp.2d 1125, 1139 (C.D. Cal. 2011) (§10(b) claim time-barred where "[a]ll the facts alleged [in the SEC complaint] had been widely reported already"); *cf. York Cnty. v. HP*, 65 F.4th 459, 467 (9th Cir. 2023) (suggesting defendant could have prevailed if "the SEC Order did not provide information necessary for [plaintiff] to plead an adequate complaint").

All of Plaintiffs' scienter allegations were known or, with reasonable diligence, should have been known before the statute of limitations expired in August 2024:

| Scienter Allegations | August 9, 2022 Disclosures |
|---|---|
| Beals and Lee received reports on user metrics, which showed pop-under traffic was "becoming an increasingly large percentage" of MAU, and that such traffic was "low quality." ¶¶100, 104. | "To an increasing degree over time, growth of our monthly active users, reported as MAUs, has been driven by the purchase of pop-under advertisements…. Our internal data suggests that the vast majority of users who are directed to weedmaps.com via pop-under advertisements close the site without clicking on any links." Ex. N at 401. |
| In Q3'22, WM stopped reporting MAU and identified alternative metrics to measure user activity on the platform. ¶¶101, 105. | "[W]e have continued to review user engagement metrics to determine which metrics may be most useful for investors in evaluating our evolving business and quarterly results of operations, and we intend to update investors on those efforts [next quarter]." Ex. N at 401.<br><br>"We're evaluating other metrics to determine which may be most useful for investors" and "expect to provide an update on that in our third quarter call." Ex. O at 418-19. |
| The Company told investors that "measuring user engagement…was critical to WM's business model." ¶¶102, 106. | N/A: This allegation is based on statements in SEC filings *before* August 9, 2022. ¶¶102, 106. |
| Beals resigned after the August 9 disclosure. ¶¶103, 107. | N/A: No well-pled fact ties Beals' departure to fraud. *Infra* §IV.B.1. |

The public information available before the expiration of the statute of limitations distinguishes this case from *York County*, where the plaintiff did not have **any** information about prior "ostensibly innocuous statements" until the SEC initiated enforcement proceedings. 65 F.4th at 466-68. Here, it is undisputed that WM disclosed, by August 2022, the precise information Plaintiffs claim was previously misstated or omitted. ¶88. There were no longer any "ostensibly innocuous statements" barring Plaintiffs from discovering their purported claims.

All the facts reported by the SEC and cited by Plaintiffs were publicly available more than two years before Plaintiffs filed suit. "The SEC complaint may perhaps include more detail…but it does not contain any fundamentally new revelation." *Stichting*, 802 F.Supp.2d at 1139. Plaintiffs' claims are therefore time-barred, and the AC should be dismissed with prejudice. *Id.* at 1125.

### B.    Plaintiffs Fail to Plead a Misstatement Claim.

Plaintiffs' misstatement claim fails because they **(1)** do not plead a strong inference of scienter, **(2)** do not allege facts supporting falsity, and **(3)** do not plead loss causation as to two of the three alleged corrective disclosures.

### 1.    Plaintiffs Fail to Plead a Strong Inference of Scienter.

Pleading scienter in a securities fraud case is no small feat. The PSLRA imposes exacting requirements, requiring Plaintiffs to state "with particularity" facts giving rise to a "***strong inference***" that each Defendant acted with the intent to deceive, manipulate, or defraud. 15 U.S.C. §78u-4. Conclusory allegations about defendants' state of mind are inadequate. Instead, "the complaint ***must*** contain allegations of ***specific contemporaneous*** statements or conditions that demonstrate the ***intentional or the deliberately reckless*** false or misleading nature of the statements when made." *Metzler*, 540 F.3d at 1066. Deliberate recklessness is an exacting standard, requiring "not merely simple, or even inexcusable negligence, but an ***extreme departure*** from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners v. Digimarc*, 552 F.3d 981, 990-91 (9th Cir. 2009).

### a.    Plaintiffs do not plead motive.

Where, as here, "the complaint fails to plead a plausible motive for the allegedly fraudulent action, the plaintiff will face a substantial hurdle in establishing scienter." *Prodanova v. H.C. Wainwright*, 993 F.3d 1097, 1103 (9th Cir. 2021).

Generally, courts "expect that a financial motive for securities fraud will be clear; for example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information." *Id.*

Here, Plaintiffs do not allege any financial motive whatsoever. No allegations of stock sales or insider trading. *In re Pixar Sec. Litig.*, 450 F.Supp.2d 1096, 1107 (N.D. Cal. 2006) ("[T]he absence of insider trading by a defendant is highly relevant and undermines any inference of scienter"). No allegations that bonuses were tied to MAU targets. *Zucco*, 552 F.3d at 1004 (no scienter where plaintiff failed to allege how "intimately" defendant's bonuses were tied to company's financials). Nothing but generic allegations that "increasing users…would increase the value of WM's bundled SaaS solutions to business customers," ¶¶102, 106, which are insufficient. *Lipton v. Pathogenesis*, 284 F.3d 1027, 1038 (9th Cir. 2002) ("routine business objectives…cannot normally be alleged to be motivations for fraud"); *In re Rigel Pharms. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (same).

### b.    No contemporaneous facts support a strong inference of scienter.

Plaintiffs also fail to plead the "compelling and particularized facts showing fraudulent intent or deliberate recklessness" that are necessary for a court to "overlook the failure to allege a plausible motive." *Prodanova*, 993 F.3d at 1108.

**Core operations**. Plaintiffs attempt to invoke the core operations inference on the ground that "measuring user engagement with WM's website and app was critical to WM's business model." ¶¶102, 106. "Proof under this theory is not easy." *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1062 (9th Cir. 2014). "A plaintiff must produce either *specific admissions* by one or more corporate executives of detailed involvement in the minutia of a company's operations...or witness accounts demonstrating that executives had *actual involvement in creating false reports*." *Ryan v. FIGS*, 2024 WL 187001, at *8 (C.D. Cal. Jan. 17, 2024)

11

(Wright, J.). "In rare circumstances a plaintiff may establish scienter under the core operations theory by pleading with particularity specific events of such prominence that it would be *absurd* to suggest that management was without knowledge of the matter." *Id.*

Plaintiffs plead no such facts. There are no admissions of detailed involvement in MAU tracking or monitoring by any Defendant. Nothing in the AC offers a plausible explanation as to why executives in Beals' or Lee's positions as CEO and CFO, respectively, would have any reason to dig into the methodology behind user metrics or question their veracity. And it would hardly be *absurd* to suggest senior management did not know specific details about the calculation of the non-financial MAU metric. *Cf. Berson v. Applied Signal Tech.*, 527 F.3d 982, 984, 987 (9th Cir. 2008) (scienter pled where defendants failed to disclose stop-work orders from two of their largest customers who "account[ed] for 80% of the company's revenue").

Nor do Plaintiffs' allegations about WM's other user metrics and decision to stop reporting MAU, ¶¶101, 105, support scienter. *In re Solarcity Sec. Litig.*, 274 F.Supp.3d 972, 1002 (N.D. Cal. 2017) ("[T]he Court cannot infer from Defendants' decision to cease reporting some of its key operating metrics that Defendants previously committed securities fraud by reporting those metrics.").

**SEC allegations**. Plaintiffs copy-and-paste SEC allegations about Beals' and Lee's alleged receipt of data to support scienter. ¶¶100, 104. Those allegations might have been sufficient for the SEC to plead negligence, but they do not support a strong inference of deliberate recklessness or fraudulent intent.[2]

---

[2] The SEC allegations were not adjudicated so there is no finding that WM Defendants were even negligent. *ScripsAmerica v. Ironridge Glob.*, 119 F.Supp.3d 1213, 1262 (C.D. Cal. 2015) ("It is well settled that allegations from other complaints or documents, which are unproved and are contested, may not be used to establish facts to demonstrate scienter."); *Amorosa v. Gen. Elec.*, 2022 WL 3577838, at *3 (S.D.N.Y. Aug. 19, 2022) (analogizing allegations in "SEC Order" to "allegations upon information and belief, which cannot ordinarily form the basis for a fraud claim"). Moreover, the SEC and WM Defendants expressly agreed that WM Defendants reserved rights to take contrary legal or factual positions in other legal proceedings, like this one, where the SEC is not a party. SEC Order, 2 n.1; *SEC v. Beals*, No. 2:24-cv-08215 (C.D. Cal.), ECF Nos. 4-5, ¶11.

"[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA." *Lipton*, 284 F.3d at 1036. The AC must include "particularized allegations" about the data to show "whether there is any basis for the allegations that [defendants] had actual or constructive knowledge" that their statements were misleading. *Bodri v. GoPro,* 252 F.Supp.3d 912, 925, 932-33 (N.D. Cal. 2017).

Here, Plaintiffs allege (based solely on the SEC Order) that Beals and Lee received weekly reports indicating "low quality" pop-under traffic was becoming a larger portion of overall MAU and that other user metrics were declining. ¶¶100, 104. But there are no facts about who at the Company—with 600-plus employees in 2021—identified the pop-under traffic as "low quality"; what characteristics of the traffic they relied on to reach that conclusion; how prominently that conclusion was reported; whether Defendants actually reviewed those reports; and if so, whether they agreed with that conclusion. *See In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (requiring allegations about reports to "include adequate corroborating details"); *Wochos v. Tesla*, 985 F.3d 1180, 1194 (9th Cir. 2021) (faulting failure "to plead any facts showing [management] accepted…employees' views"). Nor do Plaintiffs offer a basis to infer that Beals, as CEO of a company with over $200 million in revenue, was scrutinizing the underlying methodology for calculating consumer internet traffic for the side of the business that ***did not generate any revenue.*** Likewise, no facts support an inference that Lee, as CFO, would have reason to review raw data underlying a ***non-financial marketing metric.***

Nor does the AC identify what specific statements the reports purportedly contradicted. There is no allegation that Beals and Lee were told that pop-under traffic represented users who did not engage at all with the platform. To the contrary, Plaintiffs claim Beals and Lee received information showing pop-under traffic did not "***meaningfully*** engage" and received other data showing MAU included "***low***

engagement paid traffic." ¶¶100, 104. Both expressly contemplate *some* level of engagement, and thus, are not "necessarily inconsistent" with any challenged statement. *In re Vantive Sec. Litig.*, 283 F.3d 1079, 1087 n.7 (9th Cir. 2002); *see id.* at 1086-87 (allegations that company did not hire "sufficient numbers" of employees and "a substantial percentage" of people quit do not "show that Vantive's statement that its hiring was 'on plan' was misleading and deliberately reckless at the time it was made"); *FIGS*, 2024 WL 187001, at *10 (no scienter where "Plaintiffs fail to identify any uncontroverted data, inconsistent with FIGS' public statements, that Hasson or Spear learned from these analytics"); *In re Wet Seal Sec. Litig.*, 518 F.Supp.2d 1148, 1174 (C.D. Cal. 2007) (defendants' alleged access to reports showing deteriorating finances were insufficient because they failed to identify specific data in reports inconsistent with company's public statements).

Indeed, the SEC did not allege that Beals' and Lee's receipt of the reports indicated deliberate recklessness or intent to defraud; but rather, it showed merely a "fail[ure] to exercise reasonable care." SEC Compl., ¶¶67-69. Plaintiffs cannot copy those allegations, add nothing, and conclude they support fraud when the SEC alleged nothing of the sort. *In re DNTW Chartered Accts. Sec. Litig.*, 172 F.Supp.3d 675, 691 (S.D.N.Y. 2016) (no scienter even where SEC alleged defendants "committed either intentional or reckless conduct *or* negligent conduct"), *aff'd*, 666 F.App'x 78 (2d Cir. 2016); *Amorosa*, 2022 WL 3577838, at *4 (rejecting allegation that SEC's negligence finding implicitly suggested an "intent to deceive," concluding that "even if true," such a suggestion "is plainly insufficient under the PSLRA").

**Executive departure**. Plaintiffs allege Beals' resignation in November 2022 supports an inference of scienter. ¶103.[3] This lacks factual support, and the timing of Beals' resignation—months after the conclusion of the internal investigation— undermines any inference of fraud. *Waterford Twp. Police v. Mattel*, 321 F.Supp.3d

---

[3] The AC erroneously claims Beals stepped down as both CEO *and* CFO in November 2022. ¶¶103, 107.

WM TECH DEFS'
MEM. ISO MOTION TO DISMISS
2:24-CV-08959-ODW-PVC

1133, 1155 (C.D. Cal. 2018) (five-month delay "undermines any inference that he was fired for fraudulent acts"); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, 856 F.3d 605, 622 (9th Cir. 2017) (six-month delay "diminishes any inference of scienter based on his resignation").

### c. Viewed holistically, the more compelling inference is not fraudulent.

Considering the allegations holistically and comparing the "malicious and innocent inferences cognizable from the facts pled," *Zucco*, 552 F.3d at 991, the more compelling inference is that Defendants did not engage in fraud. The AC simply copies the SEC's allegations, without offering any additional details—from confidential witnesses or otherwise. And yet, even after a thorough investigation—which included extensive document productions and testimony from current and former employees, SEC Order, ¶28; Ex. R at 501; Ex. T at 528—the SEC brought only negligence claims. Thus, the more compelling inference is that none of those allegations supported an inference of scienter. *E.g.*, *Mehedi v. View*, 2024 WL 3236706, at *11 (N.D. Cal. June 28, 2024) ("The Court finds that the additional allegations from the SEC Complaint, although sufficient for the SEC to allege negligence, are not sufficient on their own for Plaintiffs to allege a strong inference of scienter under the PSLRA.").

WM's response to the internal complaint further underscores the lack of scienter. It promptly conducted an investigation, voluntarily reported the issue to the SEC, reassessed the usefulness of MAU, and disclosed those actions. ¶¶88, 92; Ex. N at 400; Ex. Q at 458; Ex. R at 501-02; *see Dillard v. Platform Specialty Prods.*, 2016 WL 10586301, at *9 (S.D. Fla. Dec. 8, 2016) (no scienter where company conducted internal investigation, self-reported to the SEC and DOJ, and voluntarily disclosed the issues to the public); *In re Bausch & Lomb Sec. Litig.*, 592 F.Supp.2d 323, 343 (W.D.N.Y. 2008) (no scienter where audit committee launched independent investigation and company "voluntarily reported…to the SEC").

### 2.  Plaintiffs Fail to Plead Falsity.

Plaintiffs' failure to plead falsity is an independent basis for dismissal. To be misleading, a statement must give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard*, 845 F.3d 1268, 1275 (9th Cir. 2017). For an alleged misstatement to be material, there must be "a substantial likelihood that the disclosure of the omitted fact would have…***significantly altered*** the 'total mix' of information made available." *In re Silver Lake Grp. Sec. Litig.*, 108 F.4th 1178, 1194 (9th Cir. 2024). The challenged statement must also be more than incomplete, it must mislead; that is, it must "affirmatively le[a]d the plaintiff in a wrong direction." *Veal v. LendingClub*, 423 F.Supp.3d 785, 807 (N.D. Cal. 2019).

Plaintiffs identify four categories of statements: **(a)** MAU's description as a key indicator of growth; **(b)** the actual MAU figures reported; **(c)** the definition of MAU; and **(d)** SOX certifications. ¶¶35-86. As to each, Plaintiffs fail to plead falsity.

#### a.  Statements that MAU was a key indicator of growth are inactionable opinions and puffery.

Plaintiffs allege WM's characterization of MAU as "a key indicator of…growth" was misleading because it did not disclose the use of "pop-under advertisements" and that "MAU numbers did not actually reflect users who engaged with the weedmaps.com website." ¶¶39-40, 44-45, 57-58, 70-71, 81-82. But Defendants' "view[]" that MAU was "a key indicator of growth" is an opinion. *United Ass'n Nat'l Pension Fund v. Carvana*, 759 F.Supp.3d 926, 964 (D. Ariz. 2024) (defendant's "assessment that one metric was more important than another is an opinion statement" insufficient to allege falsity).[4]

---

[4] Statements "need not be qualified with the language 'I think' or 'I believe' to constitute mere opinions." *In re Adobe Sec. Litig.*, 2025 WL 936416, at *10 (S.D.N.Y. Mar. 27, 2025).

Pleading falsity for an opinion "is no small task." *Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). Plaintiff must allege specific facts showing the opinion (i) was disbelieved **when made**, (ii) contained an objectively false embedded fact, or (iii) omitted "particular (and material) facts going to the basis for the [speaker's] opinion." *Id.*

Nothing in the AC suggests Defendants did not genuinely believe MAU was **a** key indicator of growth when the statements were made. To the contrary, the AC alleges Defendants "received various weekly updates" on MAU and that "measuring user engagement…was critical to WM's business model." ¶¶100, 102. Such allegations are consistent with the belief that MAU was one of many key indicators of growth. And Plaintiffs do not identify any embedded fact or material omission going to the basis for this opinion.

Additionally, the statement itself is generic and aspirational, using phrases like "key indicator of growth," "value proposition," etc. ¶39. It is not "objectively verifiable," *Carvana*, 759 F.Supp.3d at 964, and lacks any "detailed factual assertions" warranting additional disclosure. *Veal*, 423 F.Supp.3d at 804 (finding inactionable statements about a company's priorities, focus, and "key principle[s]"). Plaintiffs fail to allege how a statement referencing generic and aspirational phrases could in some way be interpreted as a guarantee that MAU would be free from paid advertising traffic.

### b. The Company reported MAU consistent with footnotes defining the calculations for those figures.

Plaintiffs also allege the reported MAU figures and related statistics were misleading because they included users directed to the platform via pop-under advertisements who purportedly did not "engage" with the app or website. ¶¶37-38, 41-42, 48-49, 54-55, 61-64, 74-77, 85-86. That is a red herring. The footnotes accompanying the MAU figures stated: "MAUs are the number of unique users **opening** WMH's Weedmaps mobile app or **accessing** WMH's Weedmaps.com

17

website over the course of a calendar month." Ex. A at 81; Ex. B at 153; Ex. C at 164; Ex. D at 180; Ex. F at 238; Ex. G at 251; Ex. H at 267; Ex. J at 335; Ex. K at 352; Ex. M at 387. This definition says nothing about "engaging," and Plaintiffs do not allege that pop-under users did not "access" the website. Falsity cannot be pled with allegations that "mischaracterize [Defendants'] statements." *Lopes v. Fitbit*, 2020 WL 1465932, at *9 (N.D. Cal. Mar. 23, 2020); *Ng v. Berkeley Lights*, 2024 WL 695699, at *8 (N.D. Cal. Feb. 20, 2024) (dismissing complaint because "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements").

To the extent Plaintiffs allege that MAU was defined differently in ***other*** portions of the SEC filings, that argument also fails. Even if other references to MAU introduced some ambiguity (due to different phrasing), the footnotes to the tables where the numbers were reported clarified exactly how MAU was measured. And this specific definition controls over general references elsewhere—under both common sense and general interpretive principles. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (court should "draw on its judicial experience and common sense"); *Idaho v. Shoshone-Bannock Tribes,* 465 F.3d 1095, 1099 (9th Cir. 2006) ("Specific terms of a contract govern inconsistent, more general terms.").

### c. The Company defined MAU as the number of users "accessing" the website.

The Company's SEC filings consistently defined MAU in multiple places as "the number of unique users ***opening*** [the] Weedmaps mobile app or ***accessing*** [the] Weedmaps.com website over the course of a calendar month." *E.g.*, Ex. A at 19, 81. As discussed above, this definition appeared in the footnotes accompanying the reported MAU figures. In one instance, however, the Company added: "In any particular period, we determine our number of MAUs by counting the total number of users who have engaged with the weedmaps.com site during the final calendar month of the given period." ¶¶46, 59, 72, 83. Plaintiffs allege the use of the word

"engaged" in this instance misled the market into believing users had to take some action **beyond** opening or accessing the platform to be counted in MAU. ¶¶46-47, 59-60, 72-73, 83-84. They are wrong.[5]

To start, Plaintiffs' allegation is directly contrary to the immediately preceding sentence. Read in context, as required by *Omnicare*, 575 U.S. at 190, a reasonable investor would have understood the term "engaged" to be shorthand for "opening" or "accessing." ¶¶46, 59, 72, 83. Plaintiffs plead no facts to support their contrary interpretation. "Where, as here, a plaintiff claims that the words used in a statement have some special or nuanced meaning that differs from what the literal words suggest, the plaintiff must plead…sufficient facts to establish that the actual term used had the distinctive, and false, meaning" plaintiff attributes to it. *In re Cloudera*, 121 F.4th 1180, 1188 (9th Cir. 2024). Plaintiffs make no attempt to meet this standard. Nor do Plaintiffs offer any explanation as to why pop-under traffic—which undisputedly **accesses** the website, SEC Order, ¶2 (explaining such users are "shown the WM Technology site")—cannot be said to **engage** with the website. *See* https://www.merriam-webster.com/dictionary/engage (defining "engage" as, *inter alia*, "to give attention to something").[6]

Moreover, Plaintiffs' theory of falsity conflates the **definition** of MAU with the **measurement** period. The first sentence provides the actual definition: users **opening** the mobile app or **accessing** the website. ¶¶46, 59, 72, 83. The second sentence addresses the **time** during which MAU was measured: the final month of the period. A contrary interpretation renders the first sentence either surplusage or contradictory to the second. Neither reading is plausible.

Plaintiffs allege references to MAU growth on earnings calls were misleading for the same reasons—because the Company did not disclose the use of pop-under

---

[5] Plaintiffs' theory relies solely on the SEC allegations, which are insufficient to support falsity because they were neither subject to the strict pleading requirements of the PSLRA nor were they adjudicated. *Supra* §I.D.

[6] Plaintiffs allege no facts suggesting Beals or Lee—to the extent they were focused on it at all—ascribed some sort of volitional requirement to the word "engaged."

advertisements or that MAU included users who did not engage with the website. ¶¶50-53, 65-68, 78-79; Ex. E at 219, 222; Ex. I at 285, 287; Ex. L at 372. But these allegations likewise fail: they ignore the context in which the statements were made, including the definition repeated throughout the Company's disclosures that MAU consisted of users "opening" or "accessing" the platform.

Plaintiffs also ignore WM's accompanying disclosures that it used paid advertising to generate traffic and that paid advertising could "have outsized impacts on MAU growth," Ex. A at 83; Ex. B at 155; Ex. D at 183; Ex. J at 337; that it made no representations regarding the strength of different users covered by the MAU metric, instead expressly cautioning that not all were equal, *i.e.*, "app users tend to be stronger users than [] non app users," Ex. I at 293; and that measuring MAU "require[d] significant judgment," and inaccuracies in measurement "could negatively affect our business." Ex. A at 37-38. In light of these disclosures, no reasonable investor could have been misled into thinking MAU did not encompass paid user traffic. *Paskowitz v. Pac. Cap. Bancorp*, 2009 WL 4911850, at *5 (C.D. Cal. Nov. 6, 2009) (statements not misleading where "many, if not all, of the alleged risks" were "disclosed").

### d.    Plaintiffs fail to plead any SOX certifications were misleading.

The AC also references SOX certifications signed by Beals and Lee. ¶¶43, 56, 69, 80. It is unclear whether these certifications are alleged to be false or misleading, and if so, what portions and why. *Id*. This alone warrants dismissal. 15 U.S.C. §78u-4(b)(1)(B); *In re Tenaris Sec. Litig.*, 493 F.Supp.3d 143, 158 (E.D.N.Y. 2020) (dismissing misstatement claim where pleading failed to identify any inaccuracies in challenged SOX certifications).

To the extent Plaintiffs claim the certifications were misleading for the same reasons as the other challenged statements, their allegations fail for the same reasons. *Supra* §§IV.B.2.a-c.; *Weston*, 29 F.4th at 623.

### 3.    Plaintiffs Fail to Plead Loss Causation.

To plead loss causation, Plaintiffs must allege particularized facts showing "the defendant misrepresented or omitted the ***very facts*** that were a substantial factor in causing the plaintiff's economic loss." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013). A "corrective disclosure must by definition reveal new information to the market that has not yet been incorporated into the stock price." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022).

Plaintiffs seek to recover losses from stock drops following three announcements: August 9, 2022, November 7, 2022, and September 24, 2024. ¶¶87-99. The latter two do not support loss causation.

On **November 7, 2022**, Defendants disclosed "WM would no longer be reporting MAU" and "Beals would be stepping down as CEO." ¶¶92-93. These cannot be ***corrective*** disclosures because they reveal nothing false or misleading about MAU. *Cf. Nuveen*, 730 F.3d at 119. Additionally, the decision to stop reporting MAU was not new information. In August, the Company told investors it was "review[ing] user engagement metrics to determine which metrics may be most useful for investors" and promised "to update investors on those efforts." Ex. P at 443. The November disclosure provided that update. *Palm Harbor Special Fire Control & Rescue v. First Solar*, 2023 WL 4161355, at *7 (D. Ariz. June 23, 2023) (no loss causation where company "already disclosed…it was expecting to exit the year missing its…target, and the February 2020 call merely confirmed as much").

Nor do Plaintiffs plead any facts suggesting the market believed Beals' resignation was related to MAU disclosures, much less a "revelation" of fraud. *Metzler*, 540 F.3d at 1065; *Loos v. Immersion*, 762 F.3d 880, 889 (9th Cir. 2014) (plaintiff must allege "the decline in…stock price was proximately caused by a revelation of fraudulent activity").

On **September 24, 2024**, the SEC announced its settlements with WM Defendants. ¶95. But this was not new information. WM provided regular updates on the SEC investigation and announced a settlement in principle two months earlier. Ex. R at 501-02; Ex. T at 528; Ex. V at 570. A disclosure is not "corrective" if, like this one, it contains information that was already "publicly available." *Loos*, 762 F.3d at 886.

The size of the stock drop—a mere $0.02 or 2.13%—also undercuts loss causation. *E.g.*, *Carey Camp v. Qualcomm*, 2020 WL 1157192, at *6 (S.D. Cal. Mar. 10, 2020) (4% stock drop insufficient; "securities complaints tend to be predicated on double digit declines").

As for the ***overall*** decline in WM's stock price in the years after the de-SPAC Transaction, the AC does not allege that is fraud-related. Nor could it, given industry-wide price deflation and increased competition during that period. Ex. U at 544, 546.

**C.   Plaintiffs Fail to Plead a Scheme Claim.**

Plaintiffs' scheme claim is based solely on the alleged misstatements, ¶¶140-141, and thus, fails for the same reasons. *Sneed v. AcelRx Pharms*., 2022 WL 4544721, at *6 (N.D. Cal. Sept. 28, 2022); *supra* §IV.B. The references to Allianz and AGI US, ¶¶142-145, are copy-and-paste errors from another complaint.

**D.   Plaintiffs Fail to Plead a Control Person Claim.**

Because Plaintiffs fail to plead a primary violation, their Section 20(a) claim necessarily fails. *Zucco*, 552 F.3d at 990.

**V.   CONCLUSION**

The AC should be dismissed with prejudice.

Dated: July 11, 2025                              COOLEY LLP


                                                 By: /s/ Alexandra R. Mayhugh
                                                     Alexandra R. Mayhugh

                                                 *Attorneys for Defendants WM Technology, Inc., Christopher Beals, and Arden Lee*


        The undersigned, counsel of record for Defendants WM Technology, Inc., Christopher Beals, and Arden Lee, certifies that this brief contains 6,938 words, which complies with the word limit of L.R. 11-6.1.


Dated: July 11, 2025                              COOLEY LLP


                                                 By: /s/ Alexandra R. Mayhugh
                                                     Alexandra R. Mayhugh

                                                 *Attorneys for Defendants WM Technology, Inc., Christopher Beals, and Arden Lee*