# Exhibit A

Excerpted

**As filed with the Securities and Exchange Commission on May 25, 2021**

Registration No. 333-252186

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**AMENDMENT NO. 4 TO**
**FORM S-4**
**REGISTRATION STATEMENT**
*UNDER*
*THE SECURITIES ACT OF 1933*

**Silver Spike Acquisition Corp.**
**(Exact Name of Registrant as Specified in Its Charter)**

| Cayman Islands | 6770 | N/A |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification Number)** |

**660 Madison Ave., Suite 1600**
**New York, New York 10065**
**(212) 905-4923**
**(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)**

**Scott Gordon, Chief Executive Officer**
**Gregory Gentile, Chief Financial Officer**
**c/o Silver Spike Acquisition Corp.**
**660 Madison Ave., Suite 1600**
**New York, New York 10065**
**(212) 905-4923**
**(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)**

*Copies to:*

| | |
|---|---|
| **Derek J. Dostal** | **David Peinsipp** |
| **Lee Hochbaum** | **Garth Osterman** |
| **Davis Polk & Wardwell LLP** | **Kristin VanderPas** |
| **450 Lexington Avenue** | **Peter Byrne** |
| **New York, New York 10017** | **Cooley LLP** |
| **(212) 450-4000** | **101 California Street, 5th Floor** |
| | **San Francisco, California 94111** |
| | **(415) 693-2177** |

**Approximate date of commencement of proposed sale of the securities to the public:** As soon as practicable after this Registration Statement is declared effective and all other conditions to the business combination described in the enclosed Proxy Statement/Prospectus have been satisfied or waived.

If the securities being registered on this form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act of 1933, as amended (the "Securities Act"), check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Securities Exchange Act of 1934.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging Growth Company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Securities Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Securities Exchange Act Rule 14d-l(d) (Cross-Border Third-Party Tender Offer) ☐

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to Be Registered | Amount to be Registered[(1)] | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee[(7)] |
|---|---|---|---|---|
| Class A common stock, par value $0.0001 per share[(2)(3)] | 24,998,575 | $16.01[(4)] | $400,227,185.75 | $43,644.79 |
| Redeemable warrants, each warrant exercisable for one share of Class A common stock at an exercise price of $11.50[(2)(5)] | 12,500,000 | $ 4.89[(6)] | $ 61,026,500 | $ 6,704.66 |
| Total | | | $ 461,289,685.75 | $50,326.70[(8)] |

(1)   Prior to the completion of the business combination described herein, the registrant, a Cayman Islands exempted company, intends to effect a deregistration under Section 206 of the Cayman Islands Companies Act (2020 Revision) and a domestication under Section 388 of the Delaware General Corporation Law (the "domestication"), pursuant to which the registrant's jurisdiction of incorporation will be transferred by way of continuation from the Cayman Islands to the State of Delaware and the name of the registrant will be changed to "WM Technology, Inc." ("New WMH"). All securities being registered will be issued by New WMH.

(2)   Pursuant to Rule 416(a), there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from share splits, share dividends or similar transactions.

(3)   The number of shares of Class A common stock of New WMH, par value $0.0001 per share (the "Class A common stock"), being registered includes up to 25,000,000 Class A ordinary shares of Silver Spike that were sold pursuant to Silver Spike's Registration Statement on Form S-1 (File No. 333-232734) as part of the units in Silver Spike's initial public offering, which will automatically convert into shares of Class A common stock in connection with the domestication and the business combination described in the proxy statement/prospectus forming part of this registration statement less the 1,425 Class A ordinary shares that were redeemed on January 13, 2021 in connection with extraordinary general meeting in lieu of annual general meeting held in connection with a proposal to amend Silver Spike's existing organizational documents.

(4)   Estimated solely for the purpose of calculating the registration fee, based on the average of the high and low prices of the Class A ordinary shares of Silver Spike Acquisition Corp. ("Silver Spike") on The Nasdaq Capital Market on January 11, 2021 in accordance with Rule 457(f)(1) and Rule 457(f)(3).

(5)   The number of warrants being registered includes 12,500,000 warrants to acquire Class A ordinary shares that were sold as part of the units in Silver Spike's initial public offering, which will automatically convert into warrants to acquire shares of Class A common stock in connection with the domestication and the business combination described in the proxy statement/prospectus forming part of this registration statement.

(6)   Estimated solely for the purpose of calculating the registration fee, based on the average of the high and low prices of the redeemable warrants on The Nasdaq Capital Market on January 11, 2021 in accordance with Rule 457(f)(1).

(7)   Determined in accordance with Section 6(b) of the Securities Act at a rate equal to $109.10 per $1,000,000 of the proposed maximum aggregate offering price.

(8)   Previously paid.

**The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**Exhibit A**
**Page 10**

Information contained herein is subject to completion or amendment. A registration statement relating to these securities has been filed with the Securities and Exchange Commission. These securities may not be sold nor may offers to buy be accepted prior to the time the registration statement becomes effective. This preliminary proxy statement/prospectus shall not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of these securities in any jurisdiction in which such offer, solicitation or sale would be unlawful.

**PRELIMINARY PROXY STATEMENT/PROSPECTUS SUBJECT TO COMPLETION, DATED MAY 25, 2021**

## PROXY STATEMENT/PROSPECTUS FOR EXTRAORDINARY GENERAL MEETING OF SHAREHOLDERS OF SILVER SPIKE ACQUISITION CORP.

PROXY STATEMENT/PROSPECTUS FOR 24,998,575 SHARES OF CLASS A COMMON STOCK AND 12,500,000 WARRANTS TO PURCHASE SHARES OF CLASS A COMMON STOCK, IN EACH CASE OF SILVER SPIKE ACQUISITION CORP. AFTER ITS DOMESTICATION AS A CORPORATION INCORPORATED IN THE STATE OF DELAWARE, WHICH WILL BE RENAMED "WM TECHNOLOGY, INC." IN CONNECTION WITH THE BUSINESS COMBINATION.

The board of directors of Silver Spike Acquisition Corp., a Cayman Islands exempted company ("Silver Spike," "we," "our" or "us"), has unanimously approved the agreement and plan of merger, dated as of December 10, 2020 (as amended or modified from time to time, the "merger agreement"), by and among Silver Spike, Silver Spike Merger Sub LLC, a Delaware limited liability company and a wholly owned direct subsidiary of Silver Spike ("Merger Sub"), WM Holding Company, LLC, a Delaware limited liability company ("WMH"), and Ghost Media Group, LLC, a Nevada limited liability company, solely in its capacity as the initial holder representative (the "holder representative"), pursuant to which Merger Sub will be merged with and into WMH, whereupon the separate limited liability company existence of Merger Sub will cease and WMH will be the surviving company and continue in existence as a subsidiary of Silver Spike, on the terms and subject to the conditions set forth therein (the transactions contemplated by the merger agreement, the "business combination").

As described in this proxy statement/prospectus, Silver Spike's shareholders are being asked to consider and vote upon (among other things) the business combination and the change of Silver Spike's jurisdiction of incorporation from the Cayman Islands to the State of Delaware by deregistering as an exempted company in the Cayman Islands and domesticating and continuing as a corporation incorporated under the laws of the State of Delaware (the "domestication" and Silver Spike post-domestication, "New WMH"). Assuming the domestication proposal is approved, the domestication is expected to be effectuated prior to, but conditioned upon, the closing of the business combination (the "closing"). The continuing entity following the domestication will be named "WM Technology, Inc."

The merger consideration (the "merger consideration") received by holders of the limited liability company interests of WMH (each, a "WMH equity holder") at the closing of the business combination (the "Closing") pursuant to the merger agreement will have a value of $1,310,000,000 and will be paid in a mix of cash and equity consideration.

Financing for the business combination and for related transaction expenses will consist of (i) $250,000,000 of proceeds from Silver Spike's initial public offering (the "IPO") and certain related transactions on deposit in the trust account (plus interest income accrued thereon since the IPO), net of any redemptions of Silver Spike's Class A ordinary shares in connection with the shareholder votes to be held at the extraordinary general meeting of Silver Spike shareholders to be held in connection with the business combination (the "general meeting") and held at the extraordinary general meeting in lieu of annual general meeting on January 13, 2021 in connection with a proposal to amend Silver Spike's existing organizational documents ("the extension meeting") and (ii) $325,000,000 of proceeds from the purchase by certain accredited investors, pursuant to subscription agreements entered into in connection with the entry into the merger agreement (the "subscription agreements"), of an aggregate of 32,500,000 shares of Class A common stock of New WMH for a purchase price of $10.00 per share of Class A common stock of New WMH in a private placement to close immediately prior to the closing, each as described more fully in this proxy statement/prospectus.

Upon the consummation of the domestication, each of Silver Spike's currently issued and outstanding Class A ordinary shares and Class B ordinary shares, par value $0.0001 per share ("Class B ordinary shares" or the "founder shares") will automatically convert by operation of law, on a one-for-one basis, into shares of Class A common stock, par value $0.0001 per share, of New WMH ("Class A common stock"). Similarly, all of Silver Spike's outstanding warrants will become warrants to acquire the shares of Class A common stock, and no other changes will be made to the terms of any outstanding warrants as a result of the domestication.

This proxy statement/prospectus covers the following securities of New WMH to be issued in the domestication: (i) 24,998,575 shares of Class A common stock, representing our currently issued and outstanding public shares and (ii) 12,500,000 warrants to acquire shares of Class A common stock, representing our currently issued and outstanding public warrants.

Following the business combination, we will have two classes of common stock, Class A common stock and Class V common stock. The rights of the holders of Class A common stock and Class V common stock are identical, except with respect to dividend rights, rights upon liquidation, dissolution and winding-up and preemptive rights. The holders of Class V common stock will not participate in any dividends of New WMH, will not be entitled to receive any assets of New WMH in any liquidation, dissolution or winding up, and do not have preemptive, subscription, redemption or conversion rights. Each share of Class A common stock and Class V common stock is entitled to one vote per share. Upon completion of the business combination, there will be 149,748,575 shares of Class A common stock outstanding and approximately 65,984,049 shares of Class V common stock outstanding, based upon certain assumptions stated in this proxy statement/prospectus. See the section entitled "Summary Term Sheet" for more information.

Our units, Class A ordinary shares originally sold as part of the units, and warrants originally sold as part of the units are currently listed on The Nasdaq Stock Market LLC (the "Nasdaq") under the symbols "SSPKU," "SSPK" and "SSPKW," respectively. The Class A ordinary shares and warrants comprising the units began separately trading on January 14, 2020. Upon the closing, we intend to apply to continue the listing of our Class A common stock and warrants on the Nasdaq under the symbols "MAPS" and "MAPSW," respectively. Our units will not be traded following the closing.

This business combination is being accomplished through what is commonly referred to as an "Up-C" structure, which is often used by partnerships and limited liability companies undertaking an initial public offering. The Up-C structure allows the current WMH equity holders to retain their equity ownership in WMH, an entity that is classified as a partnership for U.S. federal income tax purposes, in the form of post-merger WMH units and provides potential future tax benefits for both New WMH and the post-merger WMH equity holders when they ultimately exchange their pass-through interests for shares of Class A common stock. New WMH will be a holding company, and immediately after the consummation of the business combination, its principal asset will be its ownership interests in WMH. At the closing, New WMH will become the managing member of WMH with control over the affairs and decision making of WMH, and will own approximately 42.6% of the economic interest in WMH, assuming no redemptions, and 25.9% of the economic interest in WMH, assuming maximum redemptions. See the section entitled "Summary of the Proxy Statement/Prospectus—The Business Combination" for more information. We do not believe that the Up-C organizational structure will give rise to any significant business or strategic benefit or detriment. We will consolidate the financial results of WMH in our combined financial statements.

**This proxy statement/prospectus provides you with detailed information about the business combination. domestication and other matters to be considered at the general meeting. We urge you to read the accompanying proxy statement/prospectus and the documents incorporated therein by reference carefully. In particular, you should review the matters discussed under the caption "Risk Factors" beginning on page 55 of the proxy statement/prospectus.**

**Neither the Securities Exchange Commission nor any state securities commission has approved or disapproved of the transactions described in the accompanying proxy statement/prospectus, passed upon the merits or fairness of either of the merger agreement or the transactions contemplated thereby, or passed upon the adequacy or accuracy of the accompanying proxy statement/prospectus. Any representation to the contrary is a criminal offense.**

This proxy statement/prospectus is dated May 25, 2021, and is first being mailed to Silver Spike shareholders on or about May 28, 2021.

**NOTICE OF EXTRAORDINARY GENERAL MEETING OF SHAREHOLDERS OF SILVER SPIKE
ACQUISITION CORP.**

**To Be Held On June 10, 2021**

To the Shareholders of Silver Spike Acquisition Corp:

NOTICE IS HEREBY GIVEN that an extraordinary general meeting (the "general meeting") of Silver Spike Acquisition Corp., a Cayman Islands exempted company ("Silver Spike," "we," "our" or "us"), will be held on June 10, 2021, at 10:00 a.m. (local time), at the offices of Silver Spike, located at 660 Madison Ave., Suite 1600, New York, New York 10065 for the following purposes:

1. The Business Combination Proposal – To consider and vote upon a proposal to approve the transactions contemplated by the agreement and plan of merger, dated as of December 10, 2020 (as amended or modified from time to time, the "merger agreement"), by and among Silver Spike, Silver Spike Merger Sub LLC, a Delaware limited liability company and a wholly owned direct subsidiary of Silver Spike ("Merger Sub"), WM Holding Company, LLC, a Delaware limited liability company ("WMH"), and Ghost Media Group, LLC, a Nevada limited liability company, solely in its capacity as the initial holder representative (the "holder representative"), pursuant to which Merger Sub, will merge with and into WMH, with WMH continuing as the surviving entity and a subsidiary of New WMH (as defined below), on the terms and subject to the conditions set forth therein (the "business combination" and such proposal, the "Business Combination Proposal"). A copy of the merger agreement is attached to the accompanying proxy statement/prospectus as Annex A.

2. The Nasdaq Proposal – To consider and vote upon a proposal to approve, for purposes of complying with applicable listing rules of The Nasdaq Stock Market LLC (the "Nasdaq"), the issuance by New WMH (as defined below) of (i) shares of Class A common stock, par value $0.0001 per share, to certain accredited investors, in each case in a private placement, the proceeds of which will be used to finance the business combination and related transactions and the costs and expenses incurred in connection therewith and (ii) shares of Class V common stock, par value $0.0001, per share to certain equity holders of WMH (the "Nasdaq Proposal").

3. The Domestication Proposal – To consider and vote upon a proposal to approve by special resolution the change of Silver Spike's jurisdiction of incorporation from the Cayman Islands to the State of Delaware by deregistering as an exempted company in the Cayman Islands and domesticating and continuing as a corporation incorporated under the laws of the State of Delaware (the "domestication" and such proposal, the "Domestication Proposal").

4. The Organizational Documents Proposals – To consider and vote upon six separate proposals (collectively, the "Organizational Documents Proposals") with respect to material differences between the existing amended and restated memorandum and articles of association of Silver Spike the "existing organizational documents") and the proposed new certificate of incorporation (the "proposed charter") and bylaws (the "proposed bylaws," and, together with the proposed charter, the "proposed organizational documents") of Silver Spike following its domestication as a Delaware corporation (the post-domestication entity, "New WMH");

5. The Director Election Proposal – For the holders of Class B ordinary shares to consider and vote upon a proposal to elect Chris Beals, Justin Hartfield, Douglas Francis, Scott Gordon, Tony Aquila, Fiona Tan, Olga Gonzalez and Brenda Freeman, in each case, to serve as directors until their respective successors are duly elected and qualified, or until their earlier death, resignation or removal (the "Director Election Proposal");

6. The Equity Incentive Plan Proposal – To consider and vote upon a proposal to approve the WM Technology, Inc. 2021 Equity Incentive Plan (the "Equity Incentive Plan Proposal");

7. The Employee Stock Purchase Plan Proposal – To consider and vote upon a proposal to approve the WM Technology, Inc. 2021 Employee Stock Purchase Plan (the "Employee Stock Purchase Plan Proposal"); and

8. The Adjournment Proposal – To consider and vote upon a proposal to approve the adjournment of the general meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote

of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Nasdaq Proposal, the Domestication Proposal, the Organizational Documents Proposals, the Equity Incentive Plan Proposal or the Employee Stock Purchase Plan Proposal (the "Adjournment Proposal" and, together with the Business Combination Proposal, the Nasdaq Proposal, the Director Election Proposal, the Domestication Proposal, the Organizational Documents Proposals, the Equity Incentive Plan Proposal and the Employee Stock Purchase Plan Proposal, the "Transaction Proposals").

Each of the Transaction Proposals is more fully described in the accompanying proxy statement/prospectus, which we urge each Silver Spike shareholder to review carefully.

Only holders of record of Silver Spike's Class A ordinary shares, par value $0.0001 per share ("Class A ordinary shares) and Class B ordinary shares, par value $0.0001 per share ("Class B ordinary shares") at the close of business on May 19, 2021 are entitled to notice of and to vote and have their votes counted at the general meeting and any adjournment of the general meeting.

We are providing the accompanying proxy statement/prospectus and accompanying proxy card to our shareholders in connection with the solicitation of proxies to be voted at the general meeting and at any adjournment of the general meeting. **Whether or not you plan to attend the general meeting, we urge you to read the accompanying proxy statement/prospectus (and any documents incorporated into the accompanying proxy statement/prospectus by reference) carefully. Please pay particular attention to the section entitled "Risk Factors."**

**After careful consideration, Silver Spike's board of directors has determined that each of the Transaction Proposals is in the best interests of Silver Spike and its shareholders and unanimously recommends that you vote or give instruction to vote "FOR" each of the Transaction Proposals.**

**The existence of financial and personal interests of Silver Spike's directors may result in a conflict of interest on the part of one or more of the directors between what he or they may believe is in the best interests of Silver Spike and its shareholders and what he or they may believe is best for himself or themselves in determining to recommend that shareholders vote for the Transaction Proposals. See the section entitled "The Business Combination – Interests of Certain Persons in the Business Combination" in the proxy statement/prospectus for a further discussion.**

Pursuant to our existing organizational documents, we are providing the holders of our Class A ordinary shares originally sold as part of the units issued in our initial public offering (the "IPO") (such shares, the "public shares" and such holders, the "public shareholders") with the opportunity to have their public shares redeemed at the closing of the business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of a business combination, including interest (which interest shall be net of taxes payable), divided by the number of then outstanding Class A ordinary shares included as part of the units sold in the IPO, subject to the limitations described in the accompanying proxy statement/prospectus. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. For illustrative purposes, based on the fair value of marketable securities held in the trust account as of March 31, 2021 of $254,202,898, the estimated per share redemption price would have been approximately $10.17. **Public shareholders may elect to redeem their public shares even if they vote for the Business Combination Proposal and the other Transaction Proposals.** Our existing organizational documents provide that a public shareholder, acting together with any affiliate of such shareholder or any other person with whom such shareholder is acting in concert or as a partnership, limited partnership, syndicate, or other group for purposes of acquiring, holding, or disposing of any shares of Silver Spike, will be restricted from exercising this redemption right with respect to more than 15% of the public shares in the aggregate without the prior consent of Silver Spike. There will be no redemption rights with respect to our warrants or the "founder shares", issued to Silver Spike Sponsor, LLC (our "sponsor"), the holder of our Class B ordinary shares issued in a private placement prior to the IPO. Our sponsor, has entered into a letter agreement (the "sponsor IPO letter agreement") with us pursuant to which our sponsor has agreed to waive its redemption rights with respect to its founder shares and any public shares our sponsor may have acquired after our IPO in connection with the completion of the business combination.

We will pay the redemption price to public shareholders who properly exercise their redemption rights promptly following the closing. The closing is subject to the satisfaction of a number of conditions. As a result, there may be a significant delay between the deadline for exercising redemption requests prior to the general meeting and payment of the redemption price.

The closing is conditioned on, among other things, the approval of the Transaction Proposals (other than the Adjournment Proposal) at the general meeting. The holders of 20% of our outstanding ordinary shares entitled to vote have agreed to vote any voting ordinary shares owned by them in favor of the Transaction Proposals.

We urge you to read the proxy statement/prospectus accompanying this notice (including the annexes thereto) carefully for a more complete description of the business combination and related transactions and each of the Transaction Proposals. If you have any questions or need assistance voting your shares, please call our proxy solicitor, D.F. King & Co., Inc., at (212) 269-5550 (banks and brokers call collect at (877) 478-5045) or email at SSPK@dfking.com.

Thank you for your participation. We look forward to your continued support.

By Order of the Board of Directors,

/s/ Scott Gordon

Scott Gordon
*Chairman and Chief Executive Officer*

May 25, 2021

**Exhibit A
Page 14**

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Additional Information | 1 |
| Cautionary Note Regarding Forward-Looking Statements | 2 |
| Certain Defined Terms | 3 |
| Summary Term Sheet | 7 |
| Questions and Answers About the Transaction Proposals for Silver Spike Shareholders | 13 |
| Summary of the Proxy Statement/Prospectus | 31 |
| Selected Historical Financial Information of Silver Spike | 48 |
| Selected Historical Financial And Operating Data of WMH | 49 |
| Selected Unaudited Pro Forma Condensed Combined Financial Information | 51 |
| Comparative Share Information | 53 |
| Market Price and Dividend Information | 54 |
| Risk Factors | 55 |
| The Business Combination | 107 |
| The Domestication | 140 |
| General Meeting of Silver Spike Shareholders | 142 |
| U.S. Federal Income Tax Considerations | 142 |
| Proposal No. 1 – The Business Combination Proposal | 160 |
| Proposal No. 2 – The Nasdaq Proposal | 161 |
| Proposal No. 3 – The Domestication Proposal | 163 |
| Organizational Documents Proposals | 164 |
| Proposal No. 4 – Organizational Documents Proposal A | 166 |
| Proposal No. 5 – Organizational Documents Proposal B | 167 |
| Proposal No. 6 – Organizational Documents Proposal C | 168 |
| Proposal No. 7 – Organizational Documents Proposal D | 169 |
| Proposal No. 8 – Organizational Documents Proposal E | 170 |
| Proposal No. 9 – Organizational Documents Proposal F | 171 |
| Proposal No. 10 – Director Election Proposal | 172 |
| Proposal No. 11 – The Equity Incentive Plan Proposal | 174 |
| Proposal No. 12 – The Employee Stock Purchase Plan Proposal | 180 |
| Proposal No. 13 – The Adjournment Proposal | 183 |
| Unaudited Pro Forma Condensed Combined Financial Information | 184 |
| Comparison of Corporate Governance and Shareholder Rights | 196 |
| Business of Silver Spike | 199 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations of Silver Spike | 200 |
| Business of WMH | 201 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations of WMH | 218 |
| Market, Industry, Other Data and Certain Key Metrics | 242 |
| Management After the Business Combination | 243 |
| Executive Compensation | 250 |
| Beneficial Ownership of Securities | 255 |
| Certain Silver Spike Relationships and Related Party Transactions | 258 |
| Certain WMH Relationships and Related Party Transactions | 259 |
| Description of Securities | 261 |
| Securities Act Restrictions on Resale of Common Stock | 268 |
| Appraisal Rights | 269 |
| Stockholder Nominations and Proposals | 270 |
| Shareholder Communications | 273 |
| Legal Matters | 273 |

**Exhibit A
Page 15**

i

**Exhibit A**
**Page 16**

|                                                                                              | **Page** |
| -------------------------------------------------------------------------------------------- | ----- |
| Enforceability of Civil Liability                                                            | 273   |
| Householding Information                                                                      | 274   |
| Where You Can Find Additional Information; Incorporation By Reference                          | 274   |
| Index to Financial Statements                                                                  | FS-1  |

**ANNEXES**

|                                                                                                            |      |
| ---------------------------------------------------------------------------------------------------------- | ---- |
| Annex A – Merger Agreement                                                                                  | A-1  |
| Annex B – Form of Certificate of Incorporation of New WMH.                                                  | B-1  |
| Annex C – Form of By-Laws of New WMH                                                                        | C-1  |
| Annex D – Form of Fourth Amended and Restated Operating Agreement of WM Holding Company, LLC.              | D-1  |
| Annex E – Form of Tax Receivable Agreement                                                                  | E-1  |
| Annex F – Form of WM Technology, Inc. 2021 Equity Incentive Plan.                                           | F-1  |
| Annex G – Form of WM Technology, Inc. 2021 Employee Stock Purchase Plan                                     | G-1  |
| Annex H – Amended and Restated Memorandum and Articles of Association of Silver Spike                       | H-1  |
| Annex I – Silver Spike's Annual Report on Form 10-K/A, filed with the SEC on May 12, 2021                   | I-1  |
| Annex J – Silver Spike's Quarterly Report on Form 10-Q, filed with the SEC on May 13, 2021                  | J-1  |
| Annex K – Silver Spike's Form 8-A, filed on August 7, 2019                                                  | K-1  |

CERTAIN DEFINED TERMS

Unless the context otherwise requires, references in this proxy statement/prospectus to:

"amended and restated registration rights agreement" are to the Amended and Restated Registration Rights Agreement to be entered into, by and among Silver Spike, our sponsor, WMH, Doug Francis, Justin Hartfield and any person that is a WMH equity holder and is controlled by either Doug Francis and Justin Hartfield upon the completion of the business combination;

"amended operating agreement" are to the fourth amended and restated operating agreement of WMH to be entered into in connection with the closing, pursuant to which New WMH will be appointed as the sole manager of, and the managing member of, WMH, with all management rights with respect to WMH;

"business combination" are to the transactions contemplated by the merger agreement;

"Cannabis Act" are to the Cannabis Act (Canada);

"CARES Act" are to the Coronavirus Aid, Relief, and Economic Security Act;

"certificate of merger" are to the certificate of merger to be filed in Delaware evidencing the merger, at the effective time, of Merger Sub with and into WMH, with WMH being the surviving company.

"Cayman Islands Companies Act" are to the Cayman Islands Companies Act (2020 Revision) of the Cayman Islands as the same may be amended;

"Class A common stock" are to the shares of Class A common stock of New WMH, par value $0.0001 per share;

"Class A ordinary shares" are to our Class A ordinary shares, par value $0.0001 per share;

"Class A units" are to the units of WMH designated as Class A-1 units, Class A-2 units and Class A-3 units, each as defined in the WMH current operating agreement;

"Class B units" are to the units of WMH designated as Class B units, as defined in the WMH current operating agreement;

"Class B ordinary shares" are to our Class B ordinary shares, par value $0.0001 per share;

"Class V common stock" are to the shares of Class V common stock of New WMH, par value $0.0001 per share;

"closing" are to the closing of the business combination;

"Code" are to the Internal Revenue Code of 1986, as amended;

"common units" are to the units of WMH designated as Class A-1 units and Class A-2 units, each as defined in the WMH current operating agreement;

"common stock" are to the Class A common stock and Class V common stock;

"CSA" are to the U.S. Controlled Substances Act of 1970, as amended;

"deferred underwriting amount" are to the portion of the underwriting discounts and commissions held in the trust account, which the underwriters of the IPO are entitled to receive upon the closing in accordance with the trust agreement;

"directors" are to our current directors;

"DGCL" are to the Delaware General Corporation Law, as amended;

"DOJ" are to the U.S. Department of Justice;

"effective time" are to the time when the certificate of merger has been duly filed with the Secretary of State of the State of Delaware or at such later time as may be agreed by Silver Spike and WMH in writing and specified in the certificate of merger, but in any event immediately following the consummation of the domestication;

"Exchange Act" are to the Securities Exchange Act of 1934, as amended;

"exchange agreement" are to the Exchange Agreement to be entered into by and among New WMH, WMH and each post-merger WMH equity holder upon the completion of the business combination;

"existing organizational documents" are to our amended and restated memorandum and articles of association, dated as of August 7, 2019, as the same may be amended from time to time;

"extension meeting" are to the extraordinary meeting held on January 13, 2021 for Silver Spike shareholders to vote on a proposal to amend the existing organizational documents to extend the date on which Silver Spike is required to liquidate if it has not completed a business combination;

"extension proposal" are to the proposals approved by Silver Spike's shareholders in connection with the extension meeting and extension proxy statement, including any postponement or adjournment thereof;

"extension proxy statement" are to the proxy statement filed by Silver Spike with the SEC in connection with the extension meeting, as amended or supplemented;

"FFCRA" are to the Families First Coronavirus Response Act;

"founder shares" are to our Class B ordinary shares initially purchased by our sponsor in a private placement prior to our initial public offering and the Class A common stock that will be issued upon the automatic conversion of the Class B ordinary shares at the time of the domestication and the business combination;

"GAAP" are to United States generally accepted accounting principles;

"holder representative" are to Ghost Media Group, LLC, a Nevada limited liability company, in its capacity as holder representative under the merger agreement;

"holder of our founder shares" are to our sponsor, the sole holder of our founder shares;

"incentive units" are to the units of WMH designated as Class A-3 units and Class B units, each as defined in the WMH current operating agreement;

"intended tax treatment" are to the intended U.S. federal income tax treatment of certain aspects of the business combination as set forth in the merger agreement;

"IPO" or "initial public offering" are to Silver Spike's initial public offering of units, which closed on August 12, 2019;

"letter agreement" refers to the letter agreement entered into by and among us and our initial shareholder, directors and officers on August 7, 2019;

"LLC Act" means the Limited Liability Company Act of the State of Delaware;

"management" or our "management team" are to our officers and directors;

"MAUs" are to the number of unique users opening WMH's Weedmaps mobile app or accessing WMH's Weedmaps.com website over the course of a calendar month;

"merger" are to the merger evidenced by a certificate of merger between Merger Sub and WMH pursuant to which Merger Sub will merge with and into WMH, with WMH continuing as the surviving entity and a subsidiary of New WMH;

"merger agreement" are to the agreement and plan of merger, dated as of December 10, 2020, as amended or modified from time to time, by and among Silver Spike, Merger Sub, WMH and the holder representative;

"Merger Sub" are to Silver Spike Merger Sub LLC, a Delaware limited liability company and a wholly owned direct subsidiary of Silver Spike;

"Nasdaq" are to The Nasdaq Stock Market LLC;

"New WMH" are to WM Technology, Inc., the continuing entity post-domestication;

"New WMH warrants" are to the warrants to acquire shares of Class A common stock;

"ordinary shares" are to our Class A ordinary shares and Class B ordinary shares;

"PFIC" are to passive foreign investment companies, as defined in the Code;

"PIPE subscription financing" are to the aggregate $325,000,000 of proceeds from the issuance of the subscription shares;

"post-merger Class A units" are to the units of WMH designated as Class A units, as defined in the amended operating agreement;

4

"post-merger Class P units" are to the units of WMH designated as Class P units, as defined in the amended operating agreement;

"post-merger WMH Class A equity holders" are to the holders of post-merger Class A units;

"post-merger WMH equity holders" are to members of WMH, other than New WMH, following the business combination;

"post-merger WMH units" are to the units representing limited liability company interests of WMH as the surviving company following the merger, which will be non-voting interests in WMH;

"private placement warrants" are to the warrants issued to our sponsor in a private placement simultaneously with the closing of our initial public offering;

"proposed bylaws" are to the proposed bylaws of New WMH upon the effective time of the domestication substantially in the form attached to this proxy statement/prospectus as Annex C;

"proposed charter" are to the proposed certificate of incorporation of New WMH upon the effective time of the domestication substantially in the form attached to this proxy statement/prospectus as Annex B;

"proposed organizational documents" are to the proposed charter and proposed bylaws;

"public shareholders" are to the holders of our public shares;

"public shares" are to our Class A ordinary shares sold as part of the units in our IPO (whether they were purchased in our IPO or thereafter in the open market);

"public warrants" are to our redeemable warrants sold as part of the units in our IPO (whether they were purchased in our IPO or thereafter in the open market), with each whole warrant exercisable for one Class A ordinary share at an exercise price of $11.50;

"registration rights agreement" are to the Registration Rights Agreement, dated August 7, 2019, between Silver Spike and our sponsor;

"related party" are to our directors, officers and substantial security holders;

"SaaS" are to software-as-a-service;

"Securities Act" are to the Securities Act of 1933, as amended;

"Silver Spike," "we," "our" or "us" are to Silver Spike Acquisition Corp., an exempted company incorporated under the laws of the Cayman Islands;

"Silver Spike parties" are to Silver Spike and Merger Sub;

"sponsor" are to Silver Spike Sponsor, LLC, a Delaware limited liability company;

"sponsor IPO letter agreement" are to the letter agreement entered into between us and our sponsor on August 7, 2019;

"sponsor letter agreement" are to the letter agreement entered into between us, our sponsor and WMH on December 10, 2020;

"SPV" are to Silver Spike Opportunities I, LLC, a subscription investor;

"subscription agreements" are to the subscription agreements, dated as of December 10, 2020, by and among Silver Spike and the subscription investors, pursuant to which the subscription investors will purchase subscription shares in a privately negotiated transaction in connection with the consummation of the business combination;

"subscription investors" are to the accredited investors with whom Silver Spike entered into the subscription agreements, pursuant to which the subscription investors will purchase subscription shares in a privately negotiated transaction in connection with the consummation of the business combination;

"subscription shares" are to the shares issued to the subscription investors pursuant to the subscription agreements;

5

"tax receivable agreement" are to the Tax Receivable Agreement to be entered into by and among New WMH, the holder representative and the WMH Class A equity holders upon the completion of the business combination, substantially in the form attached to this proxy statement/prospectus as Annex E;

"Transaction Proposals" are to the Business Combination Proposal, the Domestication Proposal, the Director Election Proposal, the Organizational Documents Proposals, the Nasdaq Proposal, the Director Election Proposal, the Equity Incentive Plan Proposal, the Employee Stock Purchase Plan Proposal and the Adjournment Proposal;

"transfer agent" are to Continental Stock Transfer & Trust Company, as transfer agent;

"trust account" are to the U.S.-based trust account at J.P. Morgan Chase Bank, N.A., maintained by the trustee, established to hold a portion of the net proceeds from the IPO and the sale of the private placement warrants;

"trust agreement" are to the Investment Management Trust Agreement, dated as of August 7, 2019, by and between Silver Spike and the trustee;

"trustee" are to Continental Stock Transfer & Trust Company, a New York corporation;

"units" are to our units sold in the IPO, each of which consists of one Class A ordinary share and one-half of one warrant;

"warrant agent" are to Continental Stock Transfer & Trust Company, as warrant agent;

"warrant agreement" are to the Warrant Agreement, dated as of August 7, 2019, by and between Silver Spike and the warrant agent;

"warrants" are to our public warrants and the private placement warrants;

"WMH" are to WM Holding Company, LLC, a Delaware limited liability company;

"WMH current operating agreement" are to the Third Amended and Restated Operating Agreement of WMH dated as of August 15, 2018, by and among WMH and the current members of WMH, as may be amended and in effect from time to time;

"WMH Class A equity holders" are to members of WMH who hold Class A units immediately prior to the closing;

"WMH Class B equity holders" are to members of WMH who hold Class B units immediately prior to the closing;

"WMH equity holders" are to members of WMH immediately prior to the closing;

"WMH support members" are to certain holders of Class A Units who executed the voting and support agreement;

"voting and support agreement" are to the Amended and Restated Voting and Support Agreement, dated as of December 10, 2020, by and among Silver Spike and each of Christopher Beals, Douglas Francis, Justin Hartfield and Ghost Media Group, LLC; and

"$," "US$" and "U.S. dollar" each refer to the United States dollar.

Unless otherwise specified, the voting and economic interests of stockholders of New WMH set forth in this proxy statement/prospectus are based on the capitalization of Silver Spike and WMH as of March 31, 2021 and (x) assume that (i) no public shareholders elect to have their public shares redeemed in connection with the business combination, (ii) none of Silver Spike's existing shareholders or the investors who will become shareholders of Silver Spike at the closing of the transactions contemplated by the subscriptions agreements purchase public shares in the open market, (iii) there are no other issuances of equity interests of Silver Spike, (iv) all post-merger Class A units are exchanged for shares of Class A common stock at such time (even if not permitted under the terms of the exchange agreement), and (v) all post-merger Class P units are exchanged for shares of Class A common stock at such time (even if not permitted under the terms of the exchange agreement) as if all such post-merger Class P units are fully vested and using a Per Unit Equity Value (as defined in the exchange agreement) of $10 for the purposes of calculating the Class P Unit Exchange Rate (as defined in the exchange agreement) and (y) do not take into account private placement warrants and public warrants that will be outstanding upon the closing and may be exercised thereafter.

6

Exhibit A
Page 21

**SELECTED HISTORICAL FINANCIAL AND OPERATING DATA OF WMH**

The following tables set forth a summary of WMH's historical consolidated financial and operating data as of, and for the periods ended on, the dates indicated. The selected historical consolidated statements of income data of WMH for the years ended December 31, 2018, 2019 and 2020, and the historical consolidated balance sheet data as of December 31, 2019 and 2020, are derived from WMH's audited consolidated financial statements included elsewhere in this proxy statement/prospectus. The selected historical consolidated statements of operations data of WMH for the three months ended March 31, 2020 and 2021 and the consolidated balance sheet data as of March 31, 2020 and 2021 are derived from WMH's unaudited interim condensed consolidated financial statements included elsewhere in this proxy statement/prospectus. In WMH's management's opinion, the unaudited interim condensed consolidated financial statements include all adjustments necessary to state fairly WMH's financial position as of March 31, 2020 and March 31, 2021, and the results of operations for the three months ended March 31, 2020 and 2021. WMH's historical results are not necessarily indicative of the results that may be expected in the future and WMH's results for the three months ended March 31, 2021 are not necessarily indicative of the results that may be expected for the full year ending December 31, 2021 or any other period. You should read the following selected historical consolidated financial and operating data together with "WMH's Management's Discussion and Analysis of Financial Condition and Results of Operations" and WMH's consolidated financial statements and related notes included elsewhere in this proxy statement/prospectus.

**Consolidated Statements of Income Data:**

| | Year Ended December 31, | | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | **2018** | **2019** | **2020** | **2020** | **2021** |
| | (in thousands, except unit and per unit) | | | (in thousands, except unit and per unit) | |
| Revenue | $101,402 | $144,232 | $ 161,791 | $ 32,210 | $ 41,154 |
| Cost of revenue | 6,304 | 7,074 | 7,630 | 1,607 | 1,857 |
| Gross profit | 95,098 | 137,158 | 154,161 | 30,603 | 39,297 |
| Operating expenses: | | | | | |
| Sales and marketing expenses | 17,799 | 39,746 | 30,716 | 6,631 | 9,117 |
| Product development expenses | 20,034 | 29,497 | 27,142 | 6,708 | 7,868 |
| General and administrative expenses | 38,935 | 56,466 | 51,127 | 11,999 | 13,366 |
| Depreciation and amortization expenses | 2,149 | 5,162 | 3,978 | 999 | 1,002 |
| Total operating expenses | 78,917 | 130,871 | 112,963 | 26,337 | 31,353 |
| Other expense, net | (1,827) | (5,341) | (2,368) | (457) | 28 |
| Net Income before tax | 14,354 | 946 | 38,830 | 3,809 | 7,972 |
| Provision for income taxes | — | 1,321 | — | — | 241 |
| Income (loss) from continuing operations | 14,354 | (375) | 38,830 | 3,809 | 7,731 |
| Loss from discontinued operations | (1,675) | — | — | — | — |
| Net income (loss) | $ 12,679 | $ (375) | $ 38,830 | $ 3,809 | $ 7,731 |
| **EARNINGS (LOSS) PER UNIT** | | | | | |
| Basic and diluted earnings (loss) per Class A-1, A-2 and A-3 units from continuing operations | $ 16.95 | $ (0.42) | $ 43.18 | $ 4.24 | $ 8.60 |
| Basic and diluted earnings per Class A-1, A-2 and A-3 units from discontinued operations | $ (1.98) | $ — | $ — | $ — | $ — |
| Basic and diluted earnings (loss) per Class A-1, A-2 and A-3 units | $ 14.97 | $ (0.42) | $ 43.18 | $ 4.24 | $ 8.60 |
| Basic and diluted weighted-average number of units outstanding | 847,024 | 899,160 | 899,160 | 899,160 | 899,160 |

49

|  | Year Ended December 31, | | | Three Months Ended March 31, |
|---|---|---|---|---|
|  | **2018** | **2019** | **2020** | **2021** |
|  | (in thousands, except unit and per unit) | | | |
| Cash | $25,771 | $  4,968 | $19,919 | $19,604 |
| Working capital[1] | 10,659 | (10,175) | 10,917 | 9,727 |
| Total assets | 48,063 | 33,754 | 53,894 | 95,621 |
| Total debt | 5,225 | 205 | 205 | 205 |
| Total liabilities | 17,939 | 20,955 | 24,623 | 69,238 |
| Total equity | 30,124 | 12,799 | 29,271 | 26,383 |

(1)    Working capital is defined as current assets less current liabilities.

**Historical Cash Flows:**

|  | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
|  | **2018** | **2019** | **2020** | **2020** | **2021** |
|  | (in thousands) | | | (in thousands) | |
| Net cash provided by operating activities | $17,689 | $  6,295 | $ 38,620 | $ 4,896 | $ 10,587 |
| Net cash used in investing activities | (2,124) | (5,129) | (1,311) | (201) | (283) |
| Net cash provided by (used in) financing activities | 3,244 | (21,969) | (22,358) | (3,213) | (10,619) |

50

**SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

The following selected unaudited pro forma condensed combined financial data (the "selected pro forma data") gives effect to the business combination, domestication and PIPE subscription financing as described in the section entitled "Unaudited Pro Forma Condensed Combined Financial Information" included in this proxy statement/prospectus. The business combination will be accounted for as a reverse recapitalization, with no goodwill or other intangible assets recorded, in accordance with U.S. generally accepted accounting principles ("GAAP"). Under this method of accounting, Silver Spike will be treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the business combination will be treated as the equivalent of WMH issuing stock for the net assets of Silver Spike, accompanied by a recapitalization. The selected unaudited pro forma condensed combined balance sheet data as of March 31, 2021 gives pro forma effect to the business combination, domestication and PIPE subscription financing as if they had occurred on March 31, 2021. The selected unaudited pro forma condensed combined statements of operations data for the three months ended March 31, 2021 and year ended December 31, 2020 gives pro forma effect to the business combination, domestication, and PIPE subscription financing as if they had occurred on January 1, 2020.

The selected pro forma data have been derived from, and should be read in conjunction with, the more detailed unaudited pro forma condensed combined financial information (the "pro forma financial statements") of the combined company appearing elsewhere in this proxy statement/prospectus and the accompanying notes to the pro forma financial statements. The unaudited pro forma condensed combined financial information is based upon, and should be read in conjunction with, the historical consolidated financial statements and related notes of Silver Spike and WMH for the applicable periods included in this proxy statement/prospectus. The selected pro forma data have been presented for informational purposes only and are not necessarily indicative of what the combined company's financial position or results of operations actually would have been had the business combination and related transactions been completed as of the dates indicated. In addition, the selected pro forma data do not purport to project the future financial position or operating results of the combined company.

The unaudited pro forma condensed combined financial information has been prepared using the assumptions below with respect to the potential redemption into cash of Silver Spike's common stock:

- **Assuming No Redemptions:** This presentation assumes that no Silver Spike shareholders exercise redemption rights with respect to their public shares. This scenario assumes that there are 24,998,575 public shares (i.e., all of the public shares outstanding as of March 31, 2021).

- **Assuming Maximum Redemptions:** This presentation assumes that all of Silver Spike's public shareholders exercise redemption rights with respect to their public shares. This scenario assumes that 24,998,575 public shares (i.e., all of the public shares outstanding as of March 31, 2021) are redeemed for an aggregate redemption payment of approximately $10.17, based on $254,202,898 in the trust account and 24,998,575 public shares outstanding as of March 31, 2021. Our existing organizational documents provide that a public shareholder, acting together with any affiliate of such shareholder or any other person with whom such shareholder is acting in concert or as a partnership, limited partnership, syndicate, or other group for purposes of acquiring, holding, or disposing of any shares of Silver Spike, will be restricted from exercising this redemption right with respect to more than 15% of the public shares in the aggregate without the prior consent of Silver Spike. Furthermore, Silver Spike will only proceed with the business combination if it will have net tangible assets of at least $5,000,001 upon consummation of the business combination.

51

Exhibit A
Page 24

| in thousands, except share and per share data | Pro Forma Combined (Assuming No Redemptions) | | Pro Forma Combined (Assuming Maximum Redemptions) | |
|---|---|---|---|---|
| **Selected Unaudited Pro Forma Condensed Combined Statement of Operations Data** | | | | |
| **Three Months Ended March 31, 2021** | | | | |
| Revenues | $ | 41,154 | $ | 41,154 |
| Net loss | $ | (62,318) | $ | (65,610) |
| Net loss attributable to noncontrolling interests | $ | (40,471) | $ | (52,236) |
| Net loss attributable to common shareholders | $ | (21,847) | $ | (13,374) |
| Basic and diluted net loss per share - Class A | $ | (0.34) | $ | (0.35) |
| Basic and diluted weighted average shares outstanding - Class A | | 63,748,575 | | 37,812,500 |
| **Selected Unaudited Pro Forma Condensed Combined Statement of Operations Data** | | | | |
| **Year Ended December 31, 2020** | | | | |
| Revenues | $ | 161,791 | $ | 161,791 |
| Net loss | $ | (25,427) | $ | (26,775) |
| Net loss attributable to noncontrolling interests | $ | (16,577) | $ | (21,396) |
| Net loss attributable to common shareholders | $ | (8,850) | $ | (5,379) |
| Basic and diluted net loss per share - Class A | $ | (0.14) | $ | (0.14) |
| Basic and diluted weighted average shares outstanding - Class A | | 63,748,575 | | 37,812,500 |
| **Selected Unaudited Pro Forma Condensed Combined Balance Sheet** | | | | |
| **As of March 31, 2021** | | | | |
| Total assets | $ | 344,398 | $ | 252,915 |
| Total liabilities | $ | 344,766 | $ | 270,578 |
| Total stockholders' deficit | $ | (368) | $ | (17,663) |

52

**Exhibit A**
**Page 25**

**COMPARATIVE SHARE INFORMATION**

The following table sets forth selected historical comparative share and unit information for Silver Spike Acquisition Corp. and WMH and unaudited pro forma condensed combined per share information of New WMH after giving effect to the business combination, assuming two redemption scenarios, as follows:

- **Assuming No Redemptions:** This presentation assumes that no Silver Spike shareholders exercise redemption rights with respect to their public shares. This scenario assumes that there are 24,998,575 public shares (i.e., all of the public shares outstanding as of March 31, 2021).

- **Assuming Maximum Redemptions:** This presentation assumes that all of Silver Spike's public shareholders exercise redemption rights with respect to their public shares. This scenario assumes that 24,998,575 public shares (i.e., all of the public shares outstanding as of March 31, 2021) are redeemed for an aggregate redemption payment of approximately $10.17, based on $254,202,898 in the trust account and 24,998,575 public shares outstanding as of March 31, 2021. Our existing organizational documents provide that a public shareholder, acting together with any affiliate of such shareholder or any other person with whom such shareholder is acting in concert or as a partnership, limited partnership, syndicate, or other group for purposes of acquiring, holding, or disposing of any shares of Silver Spike, will be restricted from exercising this redemption right with respect to more than 15% of the public shares in the aggregate without the prior consent of Silver Spike. Furthermore, Silver Spike will only proceed with the business combination if it will have net tangible assets of at least $5,000,001 upon consummation of the business combination.

The pro forma book value information reflects the business combination as if it had occurred on March 31, 2021. The weighted average shares outstanding and net earnings per share information reflect the business combination as if it had occurred on January 1, 2020.

This information is only a summary and should be read together with the selected historical financial information included elsewhere in this proxy statement/prospectus, and the historical financial statements of Silver Spike and WMH and related notes that are included elsewhere in this proxy statement/prospectus. The unaudited pro forma combined per share information of Silver Spike and WMH is derived from, and should be read in conjunction with, the unaudited pro forma condensed combined financial statements and related notes included elsewhere in this proxy statement/prospectus.

The unaudited pro forma combined earnings per share information below does not purport to represent the earnings per share which would have occurred had the companies been combined during the periods presented, nor earnings per share for any future date or period. The unaudited pro forma combined book value per share information below does not purport to represent what the value of Silver Spike and WMH would have been had the companies been combined during the periods presented.

| | WMH (Historical) | Silver Spike (Historical) | Pro Forma Combined (Assuming No Redemptions) | Pro Forma Combined (Assuming Maximum Redemptions) |
|---|---|---|---|---|
| **As of and for the Three Months Ended March 31, 2021** | | | | |
| Book value per share | $ 29.34 | $ 0.35 | $ (0.01) | $ (0.47) |
| Basic and diluted net income (loss) per share | $ 8.60 | $ (5.58) | $ (0.34) | $ (0.35) |
| Basic and diluted weighted average shares outstanding | 899,160 | 14,141,750 | 63,748,575 | 37,812,500 |
| **For the Year Ended December 31, 2020** | | | | |
| Basic and diluted net income (loss) per share | $ 43.18 | $ (5.94) | $ (0.14) | $ (0.14) |
| Basic and diluted weighted average shares outstanding | 899,160 | 9,023,672 | 63,748,575 | 37,812,500 |

53

**MARKET PRICE AND DIVIDEND INFORMATION**

**Silver Spike**

Silver Spike's units, public shares and public warrants are currently listed on the Nasdaq Stock Market LLC ("Nasdaq") under the symbols "SSPKU," "SSPK" and "SSPKW," respectively.

The closing price of the units, Class A ordinary shares and public warrants on December 9, 2020, the last trading day before announcement of the execution of the merger agreement, was $13.00, $10.49 and $1.35, respectively. As of May 19, 2021, the record date for the extraordinary general meeting, the most recent closing price for each unit, Class A ordinary share and public warrant was $17.80, $15.18 and $4.65, respectively.

Holders of the units, public shares and public warrants should obtain current market quotations for their securities. The market price of Silver Spike's securities could vary at any time before the business combination.

**Holders**

As of May 19, 2021, there was 1 holder of record of our units, 1 holder of record of our Class A ordinary shares, 1 holder of record of our Class B ordinary shares and 1 holder of record of our public warrants. The number of holders of record does not include a substantially greater number of "street name" holders or beneficial holders whose units, public shares and public warrants are held of record by banks, brokers and other financial institutions.

**Dividend Policy**

Silver Spike has not paid any cash dividends on the ordinary shares to date and does not intend to pay cash dividends prior to the completion of the business combination. The payment of cash dividends in the future will be dependent upon New WMH's revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of the business combination. The payment of any cash dividends subsequent to the business combination will be within the discretion of New WMH's board of directors at such time.

**WMH**

Historical market price information for WMH's capital stock is not provided because there is no public market for WMH's capital stock. See "WMH Management's Discussion and Analysis of Financial Condition and Results of Operations."

54

**RISK FACTORS**

The risks described below should be carefully considered before making an investment decision. These are the most significant risk factors, but they are not the only risk factors that should be considered in making an investment decision. This proxy statement/prospectus also contains and may incorporate by reference forward-looking statements that involve risks and uncertainties. See the sections entitled "Cautionary Notice Regarding Forward-Looking Statements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of WMH" in this proxy statement/prospectus. Please also see the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Silver Spike's Annual Report on Form 10-K/A for the year ended December 31, 2020, which is incorporated herein and attached as Annex I to this proxy statement/prospectus. The value of your investment following the completion of the business combination will be subject to significant risks affecting, among other things, New WMH's business, consolidated financial condition or results of operations. The trading price of our securities could decline due to any of these risks, and investors in our securities may lose all or part of their investment.

**Risks Related to WMH's Business and Industry**

*For purposes of this subsection only, "WMH," "the Company," "we," "us" or "our" refer to WM Holding Company, LLC and its subsidiaries, unless the context otherwise requires.*

***As our costs increase, we may not be able to generate sufficient revenue to maintain profitability in the future.***

While our revenue has grown in recent periods, this growth may not be sustainable due to a number of factors, including the maturation of our business and the eventual decline in the number of new major geographic markets in which the sale of cannabis is permitted and to which we have not already expanded. We may not be able to generate sufficient revenue to sustain profitability. Additionally, we expect our costs to increase in future periods as we expend substantial financial and other resources on, among other things:

- sales and marketing, including continued investment in our current marketing efforts and future marketing initiatives;

- hiring of additional employees, including our product and engineering teams;

- expansion domestically and internationally in an effort to increase our client usage, client base, and our sales to our clients;

- development of new products, and increased investment in the ongoing development of our existing products; and

- general administration, including a significant increase in legal and accounting expenses related to public company compliance, continued compliance with various regulations applicable to cannabis industry businesses and other work arising from the growth and maturity of our company.

These expenditures may not result in additional revenue or the growth of our business. If we fail to continue to grow revenue or to sustain profitability, the market price of our securities could decline, and our business, operating results and financial condition could be adversely affected.

***If we fail to retain our existing clients and consumers or to acquire new clients and consumers in a cost-effective manner, our revenue may decrease and our business may be harmed.***

We compete in a dynamic, innovative market, which we expect will continue to evolve rapidly. We believe that our success is dependent on our ability to continue identifying and anticipating the needs of our clients and consumers and growing our two-sided network by retaining our existing clients and consumers and adding new clients and consumers. This two-sided network takes time to build and may grow more slowly than we expect or than it has grown in the past. As we have become larger through organic growth, the growth rates for MAUs, number of paying clients and monthly revenue per client have at times slowed and may similarly slow in the future, even if we continue to add clients and consumers on an absolute basis. Although we expect that our growth rates will continue to slow during certain periods as our business increases in size, if we fail to retain either our existing clients or consumers, the value of our two-sided network will be diminished.

In addition, the costs associated with client and consumer retention are substantially lower than costs associated with the acquisition of new clients or consumers. We have incurred significant costs to attract clients to our platform

55

and expect to incur significant additional costs to attract and retain clients for the foreseeable future. Because expenditures on our platform can represent a significant financial investment for our clients, our ability to retain clients depends in part on our ability to create and maintain high levels of client satisfaction, which we may not always be capable of providing, including for reasons outside of our control. Our clients generally do not have long-term obligations to purchase our products and solutions and may cancel their use of our products and solutions at any time without penalty. Thus, any decrease in client satisfaction or other change negatively affecting our ability to retain clients could result in a rapid, concentrated impact to our results going forward. Therefore, our failure to retain existing clients or consumers, even if such losses are offset by an increase in revenue resulting from the acquisition of new clients or consumers, could have an adverse effect on our business and operating results.

### *We may fail to offer the optimal pricing of our products and solutions.*

We have limited experience in determining the optimal pricing of our products and solutions, and we may need to change our pricing model from time to time. For example, we recently changed our pricing model for our subscription software services to our WM Business bundled software services model and increased the amount our clients need to pay to access our listing products. We also have historically priced our add-on premium offerings in a bid-auction format. Our ability to continue growing depends on our ability to maintain and expand our client base. If our clients do not believe the incremental additional cost we are charging for WM Business is justified by the additional components included in our software bundles or that our add-on offerings do not generate proper return on investment, such clients may decline to continue using our services, and our revenue and other financial results may be adversely impacted.

### *If we fail to expand effectively into new markets, our revenue and business will be adversely affected.*

While a key part of our business strategy is to add clients and consumers in our existing geographic markets, we intend to expand our operations into new markets if and as cannabis continues to be legalized. Any such expansion places us in competitive markets with which we may be unfamiliar, requires us to analyze the potential applicability of new and potentially complicated regulations regarding the usage, sale and marketing of cannabis, and involves various risks, including the need to invest significant time and resources and the possibility that returns on such investments will not be achieved for several years, if at all. As a result of such expansion, we may incur losses or otherwise fail to enter new markets successfully. In attempting to establish a presence in new markets, we expect to incur significant expenses and face various other challenges, such as expanding our compliance efforts to cover those new markets. For example, in 2020, we re-launched our sales and marketing efforts in the state of Oregon, and we have incurred and expect to continue to incur significant expenses selling our business solutions and marketing our platform in that market. These efforts may prove more expensive than we currently anticipate, and we may not succeed in increasing our revenues sufficiently to offset these expenses. Our current and any future expansion plans will require significant resources and management attention.

### *Our business is concentrated in California, and, as a result, our performance may be affected by factors unique to the California market.*

California represents one of the largest state legal cannabis markets in the United States, and approximately 64.0% of our revenue for the three months ended March 31, 2021, was generated in California. As new markets develop and our current markets expand, we anticipate that there will be a reduction in the percentage of our revenue generated in California, but we do not know with any certainty when and to what degree, if ever, this would occur. Moreover, the cannabis market in California is rapidly evolving, and we expect our growth in California to continue as the cannabis industry continues to develop, which could further concentrate our client base. As a result, our business and results of operations are particularly susceptible to trends in the California cannabis market, as well as adverse economic, regulatory, political and other conditions in California. Additionally, adverse economic, regulatory, political or other developments that are limited to California may have a disproportionately greater effect on us. In particular, we rely on licensed cannabis businesses to drive the growth of our revenue and the use of our products, and the failure of the licensed cannabis markets to sufficiently overtake or eliminate the illegal market may have an adverse effect on our ability to grow our revenue.

### *Federal law enforcement may deem our clients to be in violation of U.S. federal law, and, in particular the CSA. A change in U.S. federal policy on cannabis enforcement and strict enforcement of federal cannabis laws against our clients would undermine our business model and materially affect our business and operations.*

U.S. federal law, and more specifically the CSA, proscribes the cultivation, processing, distribution, sale, advertisement and possession of cannabis. As a result, U.S. federal law enforcement authorities, in their attempt to

56

regulate the illegal or unauthorized production, distribution, promotion, sale, possession, or use of cannabis, may seek to bring criminal actions against our clients under the CSA. If our clients are found to be violating U.S. federal law relating to cannabis, they may be subject not only to criminal charges and convictions, but also to forfeiture of property, significant fines and penalties, disgorgement of profits, administrative sanctions, cessation of business activities, or civil liabilities arising from proceedings initiated by either the U.S. government or private citizens. Any of these actions or consequences on our clients could have a material adverse effect on our business, operating results or financial condition, or could force us to cease operations, and as a result, our investors could lose their entire investment.

Further, to the extent any law enforcement actions require us to respond to subpoenas, or undergo search warrants, for client records, cannabis businesses could elect to cease using our products. Until the U.S. federal government changes the laws with respect to cannabis, and particularly if the U.S. Congress does not extend the Omnibus Spending Bill's protection of state medical cannabis programs, described below, to apply to all state cannabis programs, U.S. federal authorities could more strictly enforce current federal prohibitions and restrictions. An increase in federal enforcement against companies licensed under state cannabis laws could negatively impact the state cannabis industries and, in turn, our business, operating results, financial condition, brand and reputation.

***We are currently subject to an ongoing inquiry by the U.S. Attorney's Office for the Eastern District of California, the results of which could result in material liability and have an adverse effect on our business.***

In September 2019, we received a grand-jury subpoena from the U.S. Attorney's Office for the Eastern District of California, requiring the production of a broad range of documents related to our business, personnel, finances, and operations, including documents related to our dealings with various companies in the cannabis industry. We are fully cooperating with the inquiry. We cannot estimate at this time the potential impact that this inquiry and any results from this inquiry or any related proceedings could have on our business, operating results, financial condition, brand, and reputation. However, the very existence of the inquiry and our response to it could adversely impact our reputation, including our consumers' and clients' perception of us.

In addition, cooperation with this inquiry may be time-consuming and require a great deal of financial resources and attention from us and our senior management. If, as a result of this inquiry, the U.S. Attorney's Office initiates legal proceedings against us, we may be subject to significant financial consequences, including criminal fines and penalties, or criminal or civil forfeitures of funds or other property. We also might be required to enter into a settlement with the government resulting in a substantial payment to the government. The conduct that is the subject of the U.S. Attorney's investigation could also form the basis for private civil litigation by third parties claiming damages from such conduct. In addition, if the U.S. Attorney's Office or third parties challenge the legality of some of our existing business practices, we may have to change those practices, which could severely impact our business strategy and growth. Any of these consequences could have an adverse effect on our business, operating results, financial condition, brand, and reputation.

***Some of our clients or their listings currently and in the future may not be in compliance with licensing and related requirements under applicable laws and regulations. Allowing unlicensed or noncompliant businesses to access our products, or allowing businesses to use our solutions in a noncompliant manner, may subject us to legal or regulatory enforcement and negative publicity, which could adversely impact our business, operating results, financial condition, brand and reputation. In addition, allowing businesses that engage in false or deceptive advertising practices to use our solutions may subject us to negative publicity, which could have similar adverse impacts on us.***

Our clients are contractually required to represent, warrant and covenant to us that they conduct their business in compliance with applicable state law, which includes any applicable licensing requirements and the regulatory framework enacted by each state or province in which they do business. Clients further contractually agree to indemnify us for any damages we may suffer as a result of their noncompliance. We rely on our clients' contractual representations, and generally do not verify them, other than with respect to the licensed status of our clients operating cannabis retail businesses, where we have historically and currently require such clients who request access to our WM Orders, WM Store's orders feature, WM Ads, WM Retail, or WM Exchange products to provide evidence of a valid state or provincial cannabis license prior to their initial access and from time to time during the term of their use of such products. We have recently begun requiring similar evidence for retail listings clients. Previously, we only required retail listings and premium placement clients to provide us with a state license number at the time we initially onboarded them, and did not routinely validate whether that license number actually belonged to the

client or whether it remains valid. We require all operational cannabis retailer clients, including storefronts and delivery services, to display on their WMH listing a valid, unexpired state-issued license number. We also do not currently require cannabis brand clients to provide a valid license number in order to get access to our listings and premium placement products. As a result, some of our clients or their listings currently and in the future may not be in compliance with licensing and related requirements under applicable state laws and regulations. There could be legal enforcement actions against unlicensed or insufficiently licensed entities selling cannabis, which could negatively impact us.

Any legal or regulatory enforcement against us based on the business solutions that we offer, the third-party content available on our platform or noncompliance by our clients with licensing and other legal requirements, could subject us to various risks, including monetary penalties and the risk that we elect or are compelled to remove content from our platform and would likely cause us to experience negative publicity. Any of these developments could materially and adversely impact our business, operating results, financial condition, brand, and reputation.

***While our solutions provide features to support our clients' compliance with the complex, disparate and constantly evolving regulations and other legal requirements applicable to the cannabis industry, we generally do not, and cannot, ensure that our clients will conduct their business activities in a manner compliant with such regulations and requirements. As a result, federal, state, provincial or local government authorities may seek to bring criminal, administrative or regulatory enforcement actions against our clients, which could have a material adverse effect on our business, operating results or financial conditions, or could force us to cease operations.***

While our solutions provide features to support our clients' compliance with certain regulations and other legal requirements applicable to the cannabis industry, we generally do not, and cannot, ensure that our clients will conduct their business activities in a manner compliant with such regulations and requirements, in whole or in part. Their legal noncompliance could result in regulatory and even criminal actions against them, which could a material adverse impact on our business and operating results or financial condition, and as a result, our investors could lose their entire investment. For additional information, see the other risk factors in this section captioned "Risk Factors —Risks Related to WMH's Business and Industry," including "Some of our clients or their listings currently and in the future may not be in compliance with licensing and related requirements under applicable laws and regulations. Allowing unlicensed or noncompliant businesses to access our products, or allowing businesses to use our solutions in a noncompliant manner, may subject us to legal or regulatory enforcement and negative publicity, which could adversely impact our business, operating results, financial condition, brand and reputation. In addition, allowing businesses who engage in false or deceptive advertising practices to use our solutions may subject us to negative publicity, which could have similar adverse impacts on us."

***Our business is dependent on U.S. state laws and regulations and Canadian federal and provincial laws and regulations pertaining to the cannabis industry.***

Although the federal CSA classifies cannabis as a Schedule I controlled substance, many U.S. states have legalized cannabis to varying degrees. In addition, the enactment of the Cannabis Act legalized the commercial cultivation and processing of cannabis for medical and adult-use purposes in Canada and created a federal legal framework for controlling the production, distribution, promotion, sale and possession of cannabis. The Cannabis Act also provides the provinces and territories of Canada with the authority to regulate other aspects of adult-use cannabis, such as distribution, sale, minimum age requirements (subject to the minimum set forth in the Cannabis Act), places where cannabis can be consumed, and a range of other matters. The governments of every Canadian province and territory have implemented regulatory regimes for the distribution and sale of cannabis for recreational purposes. In addition, subsection 23(1) of the Cannabis Act provides that it is prohibited to publish, broadcast or otherwise disseminate, on behalf of another person, with or without consideration, any promotion that is prohibited by a number of sections of the Cannabis Act. The Cannabis Act therefore includes provisions that could apply to certain aspects of our business, both directly to the solutions we provide and indirectly on account of any noncompliance by those who use our offerings. However, as the Cannabis Act has been recently enacted, there is a lack of available interpretation, application and enforcement of the provisions that may be relevant to digital platforms such as ours, and as a result, it is difficult to assess our potential exposure under the Cannabis Act.

Laws and regulations affecting the cannabis industry in U.S. states and Canada are continually changing. Any change or even the speed of changes could require us to incur substantial costs associated with compliance or alter our business plan, and could detrimentally affect our operations, revenue, and profitability. The commercial cannabis industry is still a young industry, and we cannot predict the impact of the compliance regime to which it may be

58

subject. We will incur ongoing costs and obligations related to regulatory compliance, and such costs may prove to be material. Failure to comply with regulations may result in additional costs for corrective measures, penalties or restrictions on our operations. In addition, changes in regulations, more vigorous enforcement thereof, or other unanticipated events could require extensive changes to our operations or increased compliance costs or give rise to material liabilities, which could have a material adverse effect on us.

Given the concentration of our revenue from the sale of listing products, any increase in the stringency of any applicable laws, including U.S. state, or Canadian federal, provincial or territorial, laws and regulations relating to cannabis, or any escalation in the enforcement of such existing laws and regulations against the current or putative cannabis industry within any jurisdiction, could negatively impact the profitability or viability of cannabis businesses in such affected jurisdictions, which in turn could materially adversely affect our business and operating results.

In addition, although we have not yet been required to obtain any cannabis license as a result of existing cannabis regulations, it is possible that cannabis regulations may be enacted in the future that will require us to obtain such a cannabis license or otherwise seek to substantially regulate our business. U.S. and Canadian federal, state, provincial, local and other non-U.S. jurisdictions' cannabis laws and regulations are broad in scope and subject to evolving interpretations, which could require us to incur substantial costs associated with compliance or alter our business plan. Our failure to adequately manage the risk associated with future regulations and adequately manage future compliance requirements may adversely affect our business, our status as a reporting company and our public listing. Further, any adverse pronouncements from political leaders or regulators about businesses related to the legal cannabis industry could adversely affect the price of our securities following the business combination.

***The rapid changes in the cannabis industry and applicable laws and regulations make predicting and evaluating our future prospects difficult, and may increase the risk that we will not be successful.***

The cannabis industry – and the complex regulatory regime applicable to it – is evolving rapidly and may develop in ways that we cannot anticipate. The pace of dramatic change in the cannabis industry makes it difficult to assess our future prospects, and you should evaluate our business in light of the risks and difficulties we may encounter as the industry continues to evolve. These risks and difficulties include:

- managing complex, disparate and rapidly evolving regulatory regimes imposed by U.S. and Canadian federal, state and provincial, local and other non-U.S. governments around the world applicable to cannabis and cannabis-related businesses;

- adapting to rapidly evolving trends in the cannabis industry and the way consumers and cannabis industry businesses interact with technology;

- maintaining and increasing our base of clients and consumers;

- continuing to preserve and build our brand while upgrading our existing offerings;

- successfully competing with existing and future participants in the cannabis information market and related services;

- successfully attracting, hiring, and retaining qualified personnel to manage operations;

- adapting to changes in the cannabis industry if sales of cannabis expands significantly beyond a regulated model, and commodification of the cannabis industry;

- successfully implementing and executing our business and marketing strategies; and

- successfully expanding our business into new and existing cannabis markets.

If the demand for our software solutions does not develop as we expect, or if we fail to address the needs of our clients or consumers, our business will be harmed. We may not be able to successfully address these risks and difficulties, which could harm our business and operating results.

***Because our business is dependent, in part, upon continued market acceptance of cannabis by consumers, any negative trends could adversely affect our business operations.***

We are dependent on public support, continued market acceptance and the proliferation of consumers in the state-level and Canadian legal cannabis markets. While we believe that the market and opportunities in the space will continue to grow, we cannot predict the future growth rate or size of the market. Any downturns in, or negative outlooks on, the cannabis industry may adversely affect our business and financial condition.

59

*Expansion of our business is dependent on the continued legalization of cannabis.*

Expansion of our business is in part dependent upon continued legislative authorization, including by voter initiatives and referenda, of cannabis in various jurisdictions worldwide. Any number of factors could slow, halt, or even reverse progress in this area. For example, some ballot measures in 2020 were delayed due to the COVID-19 pandemic. Further, progress for the industry, while encouraging, is not assured. While there may be ample public support for legislative action in a particular jurisdiction, numerous factors could impact the legislative process, including lobbying efforts by opposing stakeholders as well as legislators' disagreements about how to legalize cannabis as well as the interpretation, implementation, and enforcement of applicable laws or regulations. Any one of these factors could slow or halt the legalization of cannabis, which would negatively impact our ability to expand our business. Additionally, the expansion of our business also depends on jurisdictions in which cannabis is currently legalized not narrowing, limiting or repealing existing laws legalizing and regulating cannabis, or altering the regulatory landscape in a way that diminishes the viability of cannabis businesses in those jurisdictions. For example, in April 2019, a lawsuit was filed in the Fresno County Superior Court challenging the California Bureau of Cannabis Control regulation that allows cannabis businesses to deliver products in local jurisdictions that have prohibited the sale of cannabis. In November 2020, in a mixed result, the Fresno County Superior Court upheld the state regulation that allows licensed cannabis delivery companies to offer services anywhere in the state, while also affirming that cities and counties can forbid those operations, though enforcement of the bans is also up to the local governments. More litigation is likely to follow if local governments ban deliveries into their jurisdictions. This result may negatively impact the viability and attractiveness of our offerings in California going forward. We generated approximately 64.0% of our revenue for the three months ended March 31, 2021 in California, and such developments may in turn have a material adverse effect on our business, operating results and financial condition. For more information, see "– Our business is concentrated in California, and, as a result, our performance may be affected by factors unique to the California market." Additionally, if such challenges are successful in any other jurisdictions that have legalized or are in the process of legalizing cannabis, our ability to expand our business would be negatively impacted.

*If clients and consumers using our platform fail to provide high-quality content that attracts consumers, we may not be able to generate sufficient consumer traffic to remain competitive.*

Our success depends on our platform providing consumers with useful information about our clients and their products, which in turn depends on the content provided by consumers and clients. For example, the platform will not provide useful information about cannabis brands or products if clients or consumers do not contribute content that is helpful and reliable, or if they remove previously submitted content.

Additionally, if we filter out helpful content or fail to filter out unhelpful content, clients and consumers alike may stop or reduce their use of our platform and products, which could negatively impact our business. For example, in 2016, the media reported allegations that many of the consumer-generated reviews on our website were fake or inauthentic. Allegations made against us, whether or not accurate, can materially harm our reputation and operating results. While we are continually seeking to improve our ability to identify and remove offensive, biased, unreliable, inauthentic, duplicative, fraudulent or otherwise unhelpful content, and have implemented safeguards on the platform to facilitate those efforts, we cannot guarantee that those efforts or safeguards will be effective or adequate.

If our website is not perceived as providing useful, accurate and current information about our clients and their products, consumers may stop or reduce their use of our platform, which could suppress the demand for our advertising placements and adversely affect our business and operating results. Moreover, our platform has evolved substantially since we were founded in 2008. Consumers who were familiar with earlier iterations of our platform may not be aware of our increased functionality (such as WM Orders and WM Store) and as a result may turn to competitors for similar offerings.

*Our business is highly dependent upon our brand recognition and reputation, and the erosion or degradation of our brand recognition or reputation would likely adversely affect our business and operating results.*

We believe that our business is highly dependent on the WMH brand identity and our reputation, which is critical to our ability to attract and retain clients and consumers. We also believe that the importance of our brand recognition and reputation will continue to increase as competition in the markets in which we operate continues to develop. Our success in this area will depend on a wide range of factors, some of which are within our control and some of which

are not. The factors affecting our brand recognition and reputation that are within our control include the following:

- the efficacy of our marketing efforts;

- our ability to maintain a high-quality, innovative, and error- and bug-free platform;

- our ability to maintain high satisfaction among clients and consumers;

- the quality and perceived value of our platform;

- successfully implementing and developing new features, including alternative revenue streams;

- our ability to obtain, maintain and enforce trademarks and other indicia of origin that are valuable to our brand;

- our ability to successfully differentiate our platform from competitors' products;

- our compliance with laws and regulations, including those applicable to any political action committees affiliated with us and to our registered lobbying activities;

- our ability to provide client support; and

- any actual or perceived data breach or data loss, or misuse or perceived misuse of our platform.

In addition, our brand recognition and reputation may be affected by factors that are outside our control, such as:

- actions of competitors or other third parties;

- the quality and timeliness of our clients' delivery businesses;

- consumers' experiences with clients or products identified through our platform;

- positive or negative publicity, including with respect to events or activities attributed to us, our employees, partners or others associated with any of these parties;

- interruptions, delays or attacks on our platform; and

- litigation or regulatory developments.

Damage to our reputation and loss of brand equity from one or more of the factors listed above may reduce demand for our platform and have an adverse effect on our business, operating results and financial condition. Moreover, any attempts to rebuild our reputation and restore the value of our brand may be costly and time-consuming, and such efforts may not ultimately be successful.

***We currently face intense competition in the cannabis information market, and we expect competition to further intensify as the cannabis industry continues to evolve.***

The cannabis information market is rapidly evolving and is currently characterized by intense competition, due in part to relatively low barriers to entry. We expect competition to further intensify in the future as cannabis continues to be legalized and regulated, new technologies are developed and new participants enter the cannabis information market. Our direct competitors for individual components of our platform include cannabis-focused, two-sided networks like Leafly (for retailer listing pages), Dutchie and Jane Technologies (for menu embed and orders functionality), Leaflink (for B2B sales) and a variety of cannabis-focused point-of-sale providers. In addition, our platform also may compete with current or potential products and solutions offered by internet search engines and advertising networks, like Google, general two-sided networks like Yelp, various other newspaper, television, media companies, outdoor billboard advertising, and online merchant platforms, such as Shopify, Square, and Lightspeed. If the regulatory regime for cannabis becomes more settled and the legal market for cannabis becomes more accepted, competition may further intensify as new participants may be encouraged to enter the cannabis information market, including established companies, such as tobacco and alcohol companies, with substantially greater financial, technical, and other resources than existing market participants. Additionally, as consumers and cannabis industry clients demand richer data, integrations with other cannabis industry participants such as point-of-sale providers and loyalty service providers may become increasingly important. If we are unable to complete such new integrations as quickly as our competitors, or improve our existing integrations based on legacy systems, we may lose market share to such competitors. Our current and future competitors may also enjoy other competitive advantages, such as greater name recognition, more varied or more focused offerings, better market acceptance, and larger marketing budgets.

Additionally, as the legalization of cannabis continues, cannabis cultivators and distributors could experience consolidation as existing cannabis businesses seek to obtain greater market share and purchasing power and new entrants seek to establish a significant market presence. Consolidation of the cannabis markets could reduce the size of our potential client base and give remaining clients greater bargaining or purchasing power. This may in turn erode the prices for our advertising placements and result in decreased margins. Consolidation could particularly affect smaller cannabis businesses, with whom we have historically conducted the majority of our business. Further, heightened competition between cannabis businesses could ultimately have a negative impact on the viability of individual market participants, which could reduce or eliminate their ability to purchase our products and solution.

If we are unable to compete effectively for any of these reasons, we may be unable to maintain our operations or develop our products and solutions, and as a result our business and operating results may be adversely affected.

***If we fail to manage our growth effectively, our brand, business and operating results could be harmed.***

We have experienced rapid organic growth in our headcount and operations, which places substantial demands on management and our operational infrastructure. As a result of our rapid growth, many of our employees have been with us for less than 24 months. To manage the expected growth of our operations and personnel, we will be required to improve existing, and implement new, transaction-processing, operational and financial systems, procedures and controls. We will also be required to expand our finance, administrative and operations staff. We intend to continue making substantial investments in our technology, sales and data infrastructure. As we continue to grow, we must effectively integrate, develop and motivate a significant number of new employees, while maintaining the beneficial aspects of our existing corporate culture, which we believe fosters innovation, teamwork and a passion for our products and clients. In addition, our revenue may not grow at the same rate as the expansion of our business. There can be no assurance that our current and planned personnel, systems, procedures and controls will be adequate to support our future operations or that management will be able to hire, train, retrain, motivate and manage required personnel. If we are unable to manage our growth effectively, the quality of our platform, efficiency of our operations, and management of our expenses could suffer, which could negatively impact our brand, business, profitability and operating results.

***If we are unable to recruit, train, retain and motivate key personnel, we may not achieve our business objectives.***

Our future success depends on our ability to recruit, train, retain and motivate key personnel, including Christopher Beals, our Chief Executive Officer; Brian Camire, our General Counsel; Justin Dean, our Chief Technology Officer and Chief Information Officer; Juanjo Feijoo, our Chief Marketing Officer; Steven Jung, our President and Chief Operations Officer; and Arden Lee, our Chief Financial Officer. Competition for qualified personnel in the technology industry is intense, particularly in Southern California, where we are headquartered. Additionally, we face additional challenges in attracting, retaining and motivating highly qualified personnel due to our relationship to the cannabis industry, which is rapidly evolving and has varying levels of social acceptance. We do not maintain fixed term employment contracts or key man life insurance with any of our employees. Any failure to attract, train, retain and motivate qualified personnel could materially harm our operating results and growth prospects.

***We rely on search engine placement, syndicated content, paid digital advertising, and social media marketing to attract a meaningful portion of our clients and consumers. If we are not able to generate traffic to our website through search engines and paid digital advertising, or increase the profile of our company brand through social media engagement, our ability to attract new clients may be impaired.***

Many consumers locate our website through internet search engines, like Google, and paid digital advertisements in certain jurisdictions. The prominence of our website in response to internet searches is a critical factor in the attractiveness of our advertising placements, and our digital marketing efforts, such as search engine optimization, are intended to improve our search result rankings and draw additional traffic to our website. Visits to our website could decline significantly if we are listed less prominently or fail to appear in search results for any reason, including ineffective implementation of our digital marketing strategies or any change by a search engine to its ranking algorithms or advertising policies.

Visits to our website could also decline if our accounts on Facebook, Instagram or Twitter are shut down or restricted. We work across these social networks to increase brand awareness of our company by consumers and clients, and to promote client acquisition. Our engagement on these social media platforms is subject to their

62

respective terms of service and community guidelines, which generally restrict the promotion, sale and, often, depiction of cannabis. While we do not directly promote the sale of cannabis or cannabis-related products by our clients on these social media platforms, the perception that we may be engaging in such promotion or our inadvertent violation of other aspects of these platforms' terms of service or community guidelines may result in our accounts being shut down or restricted. For example, our Instagram account was suspended in 2015. Our accounts might also be suspended or restricted due to changes in the rules and regulations of such social media platforms. Any such suspension or restriction could result in reduced traffic to our website and diminished demand for our products, which could adversely affect our business and operating results.

*If our current marketing model is not effective in attracting new clients, we may need to employ higher-cost sales and marketing methods to attract and retain clients, which could adversely affect our profitability.*

We use our sales team to build relationships with our client base. Our sales team builds and maintains relationships with clients primarily through phone and email contact, which is designed to allow us to cost-effectively service a large number of clients. We may need to employ more resource-intensive sales methods, such as increasing our enterprise or field sales teams, to continue to attract and retain clients, particularly as we increase the number of our clients and our client base employs more sophisticated marketing operations, strategies and processes. This could cause us to incur higher sales and marketing expenses, which could adversely affect our business and operating results.

*If the Google Play Store or Apple iTunes App Store limit the functionality or availability of our mobile application platform, including as a result of changes or violations of terms and conditions, access to and utilization of our platform may suffer.*

Our platform is available for download on iOS and Android, and is also accessible online. As of March 31, 2021, our mobile application platform was downloaded approximately 8.8 million times on iOS and approximately 5.2 million times on Android. The availability of our platform and its various functionalities to a significant percentage of our clients is subject to standard policies and terms of service of these third-party platforms, which govern the promotion, distribution and operation generally of our platform. In addition, each platform provider has broad discretion to change and interpret its terms of service and other policies with respect to our platform and its functionalities, and those changes and interpretations may be unfavorable. A platform provider may also change its fee structure, add fees associated with access to and use of its platform, or restrict how users can access the platform, which would similarly be unfavorable.

For example, we are unable to offer our WM Orders functionality in our iOS Weedmaps mobile application or in our Android Weedmaps mobile application due to restrictions imposed by the Apple iTunes App Store and Google Play, respectively. While our platform is still available in the Apple iTunes App Store and on Google Play for download, there can be no assurance that our platform or all of its functionalities will remain available in the immediate or longer term. To the extent that we are limited or prohibited from making some or all of our solutions available through any third-party platform, including the Apple iTunes App Store or the Google Play Store, we may need, or choose, to provide our solutions through alternative venues that may be more difficult for potential users to access. Limits on, or discontinuation of, access to our mobile platform or its various functionalities could, in turn, have a material adverse impact on utilization of our platform, our business, and our ability to attract clients and consumers.

*We may be unable to scale and adapt our existing technology and network infrastructure in a timely or effective manner to ensure that our platform is accessible, which would harm our reputation, business and operating results.*

It is critical to our success that clients and consumers within our geographic markets be able to access our platform at all times. We have previously experienced service disruptions, and in the future, we may experience service disruptions, outages or other performance problems due to a variety of factors, including infrastructure changes, human or software errors, capacity constraints, and distributed denial of service, or DDoS, fraud or security attacks. In some instances, we may not be able to identify the cause or causes of these performance problems within an acceptable period of time. It may become increasingly difficult to maintain and improve the availability of our platform, especially during peak usage times and as our products become more complex and our traffic increases. If our platform is unavailable when consumers attempt to access it or it does not load as quickly as they expect, consumers may seek other solutions and may not return to our platform as often in the future, or at all. This would

63

harm our ability to attract clients and decrease the frequency with which they subscribe for our advertising placements. We expect to continue to make significant investments to maintain and improve the availability of our platform and to enable rapid releases of new features and products. To the extent that we do not effectively address capacity constraints, respond adequately to service disruptions, upgrade our systems as needed or continually develop our technology and network architecture to accommodate actual and anticipated changes in technology, our business and operating results would be harmed.

We expect to continue making significant investments in the functionality, performance, reliability, design, security and scalability of our platform. We may experience difficulties with the development of our platform that could delay or prevent the implementation of new solutions and enhancements. Software development involves a significant amount of time and resources for our product development team, and we may not be able to continue making those investments in the future.

To the extent we are not able to continue successfully improving and enhancing our platform, our business could be adversely affected.

***Our payment system and the payment systems of our clients depend on third-party providers and are subject to evolving laws and regulations.***

We have engaged third-party service providers to perform credit and debit card processing services for client's payments to us, and we understand that some of our clients use those services, and we may engage third-party service providers in the future to provide fraud analysis services. If these service providers do not perform adequately or if our relationships, or the relationships of our clients, with these service providers were to terminate, our ability or the ability of our clients to process payments could be adversely affected and our business could be harmed. The laws and regulations related to payments are complex and are potentially impacted by tensions between federal and state treatment of the vaporization, tobacco, nicotine and cannabis industries. These laws and regulations also vary across different jurisdictions in the United States, Canada and globally. As a result, we are required to spend significant time and effort to comply with those laws and regulations. Any failure or claim of our failure to comply, or any failure by our third-party service providers to comply, could cost us substantial resources, could result in liabilities, or could force us to stop offering our clients the ability to pay with credit cards, debit cards and bank transfers. As we expand the availability of these payment methods or offer new payment methods to our clients in the future, we may become subject to additional regulations and compliance requirements. Due to the constantly evolving and complex laws and regulations applicable to our industry, third-party merchant banks and third-party payment processors may consider our business a high risk. This could cause a third party to discontinue its services to us, and we may not be able to find a suitable replacement. If this were to occur, we would need to collect from our clients using less efficient methods, which could adversely impact our collections, revenues and financial performance. Additionally, if a third party were to discontinue its services to us or if the applicable laws and regulations were to evolve in a way that impacted us negatively, we may not be able to realize our plans of expanding our business offerings, which could have a material adverse effect on our operations and our plans for expansion. For more information, see "— We are subject to industry standards, governmental laws, regulations and other legal obligations, particularly related to privacy, data protection and information security, and any actual or perceived failure to comply with such obligations could harm our business" below.

Further, through our agreement with our third-party credit card processors, we are subject to payment card association operating rules and certification requirements, including restrictions on product mix and the Payment Card Industry Data Security Standard, or PCI-DSS. We are also subject to rules governing electronic funds transfers. Any change in these rules and requirements could make it difficult or impossible for us to comply. Additionally, any data breach or failure to hold certain information in accordance with PCI-DSS may have an adverse effect on our business and results of operations.

***We track certain performance metrics with internal tools and do not independently verify such metrics. Certain of our performance metrics are subject to inherent challenges in measurement, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business.***

We calculate and track performance metrics with internal tools, which are not independently verified by any third-party. While we believe our metrics are reasonable estimates of our user or client base for the applicable period of measurement, the methodologies used to measure these metrics require significant judgment and may be susceptible to algorithm or other technical errors. For example, user accounts are based on email addresses, and a user

64

could use multiple email addresses to establish multiple accounts, and clients in many instances will have multiple accounts. As a result, the data we report may not be accurate. Our internal tools and processes we use to identify multiple accounts or fraudulent accounts have a number of limitations, and our methodologies for tracking key metrics may change over time, which could result in unexpected changes to our metrics, including historical metrics. Our ability to recalculate our historical metrics may be impacted by data limitations or other factors that require us to apply different methodologies for such adjustments and we generally do not intend to update previously disclosed metrics for any such changes. Though we regularly review our processes for calculating metrics and may adjust our processes for calculating metrics to improve their accuracy, limitations or errors with respect to how we measure data (or the data that we measure) may affect our understanding of certain details of our business, which could affect our longer term strategies. If our performance metrics are not accurate representations of our business, user or client base, or traffic levels; if we discover material inaccuracies in our metrics; or if the metrics we rely on to track our performance do not provide an accurate measurement of our business, user or client base or traffic levels, we may not be able to effectively implement our business strategy, our reputation may be harmed, and our operating and financial results could be adversely affected.

Our clients and investors rely on our key metrics as a representation of our performance. If these third parties do not perceive our user metrics to be accurate representations of our user base or user engagement, or if we discover material inaccuracies in our user metrics, our reputation may be harmed and retailers may be less willing to list a business on our platform, which could negatively affect our business, financial condition, or results of operations.

*We may be unable to prevent others from aggregating or misappropriating data from our websites.*

From time to time, third parties have misappropriated data from our website through website scraping, software robots or other means, and aggregated this data on their websites with data from other companies. Additionally, copycat websites have misappropriated data on our network and attempted to imitate our brand or the functionality of our website. We may be unable to detect all such websites in a timely manner and even timely technological and legal measures may be insufficient to halt their operations or protect us against the impact of the operation of such websites. Regardless of whether we can successfully enforce our rights against the operators of these websites, any measures that we may take could require us to expend significant financial or other resources, which could harm our business, operating results or financial condition. In addition, to the extent that such activity creates confusion among clients or consumers, decreases the likelihood that consumers use our platform to access information, or reduces the distinctiveness of our products in the marketplace, our brand and business could be harmed.

*Real or perceived errors, failures, or bugs in our platform could adversely affect our operating results and growth prospects.*

We update our platform on a frequent basis. Despite efforts to test our updates, errors, failures or bugs may not be found in our platform until after it is deployed to our clients. We have discovered and expect we will continue to discover errors, failures and bugs in our platform and anticipate that certain of these errors, failures and bugs will only be discovered and remediated after deployment to clients. Real or perceived errors, failures or bugs in our platform could result in negative publicity, security incidents, such as data breaches, government inquiries, loss of or delay in market acceptance of our platform, loss of competitive position, or claims by clients for losses sustained by them. In such an event, we may be required, or may choose, for client relations or other reasons, to expend additional resources in order to help correct the problem.

We implement bug fixes and upgrades as part of our regular system maintenance, which may lead to system downtime. Even if we are able to implement the bug fixes and upgrades in a timely manner, any history of inaccuracies in the data we collect for our clients, or unauthorized access or damage to, or the loss, acquisition, or inadvertent release or exposure of confidential or other sensitive data could cause our reputation to be harmed and result in claims against us, and cannabis businesses may elect not to purchase our products or, in the case of existing clients, renew their agreements with us or we may incur increased insurance costs. The costs associated with any material defects or errors in our software or other performance problems may be substantial and could harm our operating results and growth prospects.

*A distributed denial of service attack, ransomware attack, security breach or unauthorized data access could impair or incapacitate our information technology systems and delay or interrupt service to our clients and consumers, harm our reputation, or subject us to significant liability.*

We may become subject to DDoS attacks, a technique used by hackers to take an internet service offline by overloading its servers. In addition, ransomware attacks against businesses of all sizes are becoming increasingly

65

common. Further, as a result of the COVID-19 pandemic, we may face increased cybersecurity risks due to our reliance on internet technology and the number of our employees who are working remotely, which may create additional opportunities for cybercriminals to exploit vulnerabilities. Our platform may be subject to DDoS, ransomware or other cybersecurity attacks in the future and we cannot guarantee that applicable recovery systems, security protocols, network protection mechanisms and other procedures are or will be adequate to prevent network and service interruption, system failure or data loss. Moreover, our platform could be breached if vulnerabilities in our platform are exploited by unauthorized third parties or others. Techniques used to obtain unauthorized access change frequently, and the size of DDoS attacks and the number and types of ransomware attacks are increasing. As a result, we may be unable to implement adequate preventative measures or stop such attacks while they are occurring. A DDoS attack, ransomware attack or security breach could delay or interrupt service to our clients and consumers and may deter the utilization of our platform.

We also use information technology and security systems to maintain the physical security of our facilities and to protect our proprietary and confidential information, including that of our clients, consumers, and employees. Accidental or willful security breaches or other unauthorized access to our facilities or information systems, or viruses, loggers, malware, ransomware, or other malfeasant code in our data or software, could compromise this information or render our systems and data unusable. Additionally, we rely on a number of third-party "cloud-based" providers of corporate infrastructure services relating to, among other things, human resources, electronic communication services, some financial functions, and systems used to provide solutions to our clients, and we are therefore dependent on the security systems of these providers. Any security breaches or other unauthorized access to our service providers' facilities or systems, or viruses, loggers, malware, ransomware or other malfeasant code in their data or software, could expose us to information loss, and misappropriation of confidential information, and other security breaches. In addition, our employees, contractors, or other third parties with whom we do business may attempt to circumvent security measures in order to misappropriate personal information, confidential information or other data, or may inadvertently release or compromise such data. Because the techniques used to obtain unauthorized access to or sabotage security systems, or to obtain unauthorized access to data we or our contractors maintain, change frequently and are often not recognized until after an attack, we and our service providers may be unable to anticipate the techniques or implement adequate preventative measures.

Any actual or perceived DDoS attack, ransomware attack, security breach or other unauthorized access could damage our reputation and brand, result in decreased utilization of our platform, expose us to fines and penalties, government investigations, and a risk of litigation and possible liability, require us to expend significant capital and other resources to alleviate any resulting problems and otherwise to remediate the incident, and require us to expend increased cybersecurity protection costs. We expect to incur significant costs in an effort to detect and prevent security breaches and other security-related incidents. Numerous state, federal and foreign laws and regulations require companies to notify individuals and/or regulatory authorities of data security breaches involving certain types of personal data. Any disclosures of security breaches, pursuant to these laws or regulations or otherwise, could lead to regulatory investigations and enforcement and negative publicity, and may cause our clients and consumers to lose confidence in the effectiveness of our data security measures.

Additionally, our discovery of any security breach or other security-related incident, or our provision of any related notice, may be delayed or be perceived to have been delayed. Any of these impacts or circumstances arising from an actual or perceived attack, breach or other unauthorized access could materially and adversely affect our business, financial condition, reputation and relationships with clients and consumers.

Furthermore, while our errors and omissions insurance policies include liability coverage for certain of these matters, if we experienced a significant security incident, we could be subject to claims or damages that exceed our insurance coverage. We also cannot be certain that our insurance coverage will be adequate for data handling or data security liabilities actually incurred, that insurance will continue to be available to us on economically reasonable terms, or at all, or that any insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage, or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could have a material and adverse effect on our business, including our financial condition, operating results, and reputation.

*We rely upon cloud-based data centers, infrastructure and technologies provided by third parties, and technology systems and electronic networks supplied and managed by third parties, to operate our business, and interruptions or performance problems with these systems, technologies and networks may adversely affect our business and operating results.*

We rely on data centers and other technologies and services provided by third parties in order to host our cloud-based infrastructure that operates our business. If any of these services becomes unavailable or otherwise is unable to serve our requirements due to extended outages, interruptions, or facility closure, or because it is no longer available on commercially reasonable terms, our expenses could increase, our ability to manage finances could be interrupted and our operations otherwise could be disrupted or otherwise impacted until appropriate substitute services, if available, are identified, obtained, and implemented.

We do not control, or in some cases have limited control over, the operation of the data center facilities and infrastructure we use, and they are vulnerable to damage or interruption from earthquakes, floods, fires, power loss, telecommunications failures, cyberattack, terrorism and similar other events. They may also be subject to break-ins, sabotage, intentional acts of vandalism and similar misconduct, to adverse events caused by operator error, and to interruptions, data loss or corruption, and other performance problems due to various factors, including introductions of new capabilities, technology errors, infrastructure changes, DDoS attacks, or other security-related incidents. Changes in law or regulations applicable to data centers in various jurisdictions could also cause a disruption in service. Despite precautions taken at these facilities, the occurrence of a natural disaster, an act of terrorism or other act of malfeasance, a decision to close the facilities without adequate notice or other unanticipated problems at these facilities could result in lengthy interruptions in our platform operations and the loss, corruption of, unauthorized access to or acquisition of client or consumer data.

Our platform also depends on our ability to communicate through the public internet and electronic networks that are owned and operated by third parties. In addition, in order to provide our solutions on-demand and promptly, our computer equipment and network servers must be functional 24 hours per day, which requires access to telecommunications facilities managed by third parties and the availability of electricity, which we do not control. A severe disruption of one or more of these networks or facilities, including as a result of utility or third-party system interruptions, could impair our ability to process information and provide our solutions to our clients and consumers.

Any unavailability of, or failure to meet our requirements by, third-party data centers or other third-party technologies or services, or any disruption of the internet, utilities or the third-party networks or facilities that we rely upon, could impede our ability to make our platform accessible, harm our reputation, result in reduced traffic from consumers, cause us to issue refunds or credits to our clients, and subject us to potential liabilities. Any of these circumstances could adversely affect our business, reputation and operating results.

*The impact of global, regional or local economic and market conditions may adversely affect our business, operating results and financial condition.*

Our performance is subject to global economic conditions and economic conditions in one or more of our key markets, which impact spending by our clients and consumers. A majority of our clients are small and medium-sized businesses that operate one or two retail locations, and their access to capital, liquidity and other financial resources is constrained due to the regulatory restrictions applicable to cannabis businesses. As a result, these clients may be disproportionately affected by economic downturns. Clients may choose to allocate their spending to items other than our platform, especially during economic downturns.

Economic conditions may also adversely impact retail sales of cannabis. Declining retail sales of cannabis could result in our clients going out of business or deciding to stop using our platform to conserve financial resources. Negative economic conditions may also affect third parties with whom we have entered into relationships and upon whom we depend in order to grow our business.

Furthermore, economic downturns could also lead to limitations on our ability to obtain debt or equity financing on favorable terms or at all, reduced liquidity, decreases in the market price of New WMH's securities following the business combination, decreases in the fair market value of our financial or other assets, and write-downs of and increased credit and collectability risk on our trade receivables, any of which could have a material adverse effect on our business, operating results or financial condition.

67

***Catastrophic events may disrupt our business and impair our ability to provide our platform to clients and consumers, resulting in costs for remediation, client and consumer dissatisfaction, and other business or financial losses.***

Our operations depend, in part, on our ability to protect our facilities against damage or interruption from natural disasters, power or telecommunications failures, criminal acts and similar events. Despite precautions taken at our facilities, the occurrence of a natural disaster, an act of terrorism, vandalism or sabotage, spikes in usage volume or other unanticipated problems at a facility could result in lengthy interruptions in the availability of our platform. Even with current and planned disaster recovery arrangements, our business could be harmed. Also, in the event of damage or interruption, our insurance policies may not adequately compensate us for any losses that we may incur. These factors in turn could further reduce revenue, subject us to liability and lead to decreased usage of our platform and decrease sales of our advertising placements, any of which could harm our business.

***WMH's operations and employees face risks related to health crises, such as the ongoing COVID-19 pandemic, that could adversely affect WMH's financial condition and operating results. The COVID-19 pandemic could materially affect WMH's operations, including at WMH's headquarters or anywhere else WMH operates, and the business or operations of WMH's clients, consumers, partners or other third parties with whom WMH conducts business.***

In connection with the COVID-19 pandemic, governments have implemented significant measures intended to control the spread of the virus, including closures, quarantines, travel restrictions and other social distancing directives, and fiscal stimulus, and legislation designed to deliver monetary aid and other relief. In response to the risks posed by the COVID-19 pandemic and to comply with applicable governmental orders, WMH has taken active measures to promote health and safety, including requiring substantially all of our employees to work remotely, implementing additional safety protocols for any employees working onsite, and distributing masks to our employees. These and other operational changes WMH has implemented or may implement in the future may negatively impact productivity and disrupt WMH's business.

To the extent that these restrictions remain in place, additional prevention and mitigation measures are implemented in the future, or there is uncertainty about the effectiveness of these or any other measures to contain or treat COVID-19, there is likely to be an adverse impact on global economic conditions and consumer confidence and spending, which could materially and adversely affect WMH's operations as well as WMH's relationships with clients and consumers. For instance, despite the overall increases in demand described below, some WMH's clients' operations were initially significantly disrupted in certain jurisdictions, causing a temporary significant decrease in activity on WMH's platform in those jurisdictions.

Beginning in the first quarter of fiscal 2020, WMH experienced a significant increase in demand from retailers, including storefronts and delivery services, for its technology solutions (such as clients using WM Orders functionality to enable reservation of products by consumers for curbside pickup), which resulted in increased revenue (including from technology services fees relating to product reservation orders submitted prior to December 31, 2020, although such per order fee has been eliminated effective January 1, 2021). Although we experienced increased consumer demand in the form of increases in MAU, which grew from 7.4 million in February 2020 to 9.1 million in March 2021, we cannot determine what, if any, impact the pandemic had on our MAU growth in 2020. While we believe, like other industries, the pandemic accelerated existing trends towards consumer adoption of online platforms, we cannot be certain to what impact, if any, the end of the pandemic will have on our MAUs or MAU growth. To the extent the circumstances that accelerated the initial growth of WMH's business stemmed from the effects of the COVID-19 pandemic, this may not continue in the future, and the growth rates in revenue and increases in MAUs may decline in future periods.

Shelter-in-place orders and similar regulations impact WMH's client's ability to operate their businesses, consumers' ability to pick up orders, and WMH's client's ability to make deliveries. Such events have in the past caused, and may in the future cause, a temporary closure of WMH's clients' businesses, either due to government mandate or voluntary preventative measures, and many of WMH's clients may not be able to withstand prolonged interruptions to their businesses, and may be forced to go out of business. Even if WMH's clients are able to continue to operate their businesses, many may operate with limited hours and capacity and other limitations. Any limitations on or disruptions or closures of WMH's clients' businesses could adversely affect WMH's business. Further, we may experience a decrease in new clients due to a lack of financial resources or a decline in new markets as businesses and financial markets deal with the impact of COVID-19. Further, these conditions may impact our ability to access financial markets to obtain the necessary funding to expand our business as currently contemplated, which may adversely affect our liquidity and working capital.

68

Even if a virus or other disease does not spread significantly and such measures are not implemented, the perceived risk of infection or significant health risk may adversely affect WMH's business. WMH's clients may be perceived as unsafe during such public health threats, even for order delivery or pickup. If the services offered through WMH's platform or at other businesses in WMH's industry become a significant risk for transmitting COVID-19 or similar public health threats, or if there is a public perception that such risk exists, demand for the use of WMH's platform would be adversely affected.

In addition, the CARES Act and FFCRA were enacted to provide economic relief to businesses in response to the COVID-19 pandemic. Pursuant to the relief related to federal employment taxes provided in such legislation, we have (i) elected to defer eligible payroll taxes, which will be due in two equal installments in 2021 and 2022, and (ii) claimed certain employment-related tax credits under the legislation. While we may be eligible to receive some economic relief pursuant to the CARES Act, FFCRA or other legislation related to the COVID-19 pandemic, cannabis businesses may not be eligible to take full advantage of the government-sponsored COVID-19 relief packages. As a result, we may not benefit from these relief efforts to the same extent other businesses do in different industries. These relief measures, including the CARES Act, may be beneficial to us in one or more reporting periods but may adversely affect us on a going-forward basis.

The extent of COVID-19's effect on WMH's operational and financial performance will depend on future developments, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. As a result, it is not currently possible to ascertain the overall impact of COVID-19 on WMH's business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease may harm WMH's business, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.

*Fluctuations in our quarterly and annual operating results may adversely affect our business and prospects.*

You should consider our business and prospects in light of the risks and difficulties we encounter in the uncertain and rapidly evolving market for our solutions. Because the cannabis information market is new and evolving, predicting its future growth rate and size is difficult. This reduces our ability to accurately evaluate our future prospects and forecast quarterly or annual performance. In addition to the other risk factors discussed in this section, factors that may contribute to the variability of our quarterly and annual results include:

- our ability to attract new clients and consumers and retain existing clients and consumers;
- our ability to accurately forecast revenue and appropriately plan our expenses;
- the effects of changes in search engine placement and prominence;
- the effects of increased competition on our business;
- our ability to successfully expand in existing markets and successfully enter new markets;
- the impact of global, regional or economic conditions;
- the ability of licensed cannabis markets to successfully grow and outcompete illegal cannabis markets;
- our ability to protect our intellectual property;
- our ability to maintain and effectively manage an adequate rate of growth;
- our ability to maintain and increase traffic to our platform;
- costs associated with defending claims, including intellectual property infringement claims and related judgments or settlements;
- changes in governmental or other regulation affecting our business;
- interruptions in platform availability and any related impact on our business, reputation or brand;
- the attraction and retention of qualified personnel;
- the effects of natural or man-made catastrophic events; and
- the effectiveness of our internal controls.

69

***We may improve our products and solutions in ways that forego short-term gains.***

We seek to provide the best experience for the clients and consumers who use our platform. Some of our changes may have the effect of reducing our short-term revenue or profitability if we believe that the benefits will ultimately improve our business and financial performance over the long term. Any short-term reductions in revenue or profitability could be greater than planned or the changes mentioned above may not produce the long-term benefits that we expect, in which case our business and operating results could be adversely affected.

We are subject to risks inherent in foreign operations, including social, political and economic flux and compliance with additional U.S. and foreign laws, including those related to anti-bribery and anti-corruption, and may not be able to successfully maintain or expand our foreign operations.

We sell our offerings in the United States and Canada, and we have a limited number of non-monetized listings in several international countries including Austria, Germany, the Netherlands, Spain, and Switzerland. We anticipate growing our business, in part, by continuing to expand our foreign operations. As we continue our expansion, we may enter new foreign markets where we have limited or no experience marketing and deploying our platform. If we fail to launch or manage our foreign operations successfully, our business may suffer. Additionally, as our foreign operations expand, or more of our expenses are denominated in currencies other than the U.S. dollar, our operating results may be more greatly affected by fluctuations in the exchange rates of the currencies in which we do business. In addition, as our foreign operations continue to grow, we are subject to a variety of risks inherent in doing business internationally, including:

- political, social, and economic instability;

- risks related to the legal and regulatory environment in foreign jurisdictions, including with respect to privacy and data protection, and unexpected changes in laws, regulatory requirements, and enforcement;

- fluctuations in currency exchange rates;

- higher levels of credit risk and payment fraud;

- complying with tax requirements of multiple jurisdictions;

- enhanced difficulties of integrating any foreign acquisitions;

- the ability to present our content effectively in foreign languages;

- complying with a variety of foreign laws, including certain employment laws requiring national collective bargaining agreements that set minimum salaries, benefits, working conditions, and termination requirements;

- reduced protection for intellectual property rights in some countries;

- difficulties in staffing and managing global operations and the increased travel, infrastructure, and compliance costs associated with multiple foreign locations;

- regulations that might add difficulties in repatriating cash earned outside the United States and otherwise preventing us from freely moving cash;

- import and export restrictions and changes in trade regulation;

- complying with statutory equity requirements;

- complying with the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act 2010, the Corruption of Public Officials Act (Canada), and similar laws in other jurisdictions; and

- export controls and economic sanctions administered by the U.S. Department of Commerce Bureau of Industry and Security and the U.S. Treasury Department's Office of Foreign Assets Control.

***We are subject to industry standards, governmental laws, regulations and other legal obligations, particularly related to privacy, data protection and information security, and any actual or perceived failure to comply with such obligations could harm our business.***

We are subject to regulation by various federal, state, provincial, local and foreign governmental authorities, including those responsible for monitoring and enforcing employment and labor laws, anti-bribery laws, lobbying and

70

election laws, securities laws and tax laws. These laws and regulations are subject to change over time and thus we must continue to monitor and dedicate resources to ensure continued compliance.

In addition, our business is subject to regulation by various federal, state, provincial and foreign governmental agencies responsible for monitoring and enforcing privacy and data protection laws and regulations. Numerous foreign, federal and state laws and regulations govern collection, dissemination, use and confidentiality of personally identifiable health information, including state privacy and confidentiality laws (including state laws requiring disclosure of breaches); federal and state consumer protection and employment laws; the Health Insurance Portability and Accountability Act of 1996, or HIPAA; and European and other foreign data protection laws.

We receive, store, process, and use personal information and other user content. The regulatory framework for privacy issues worldwide, including in the United States, is rapidly evolving and is likely to remain uncertain for the foreseeable future, as many new laws and regulations regarding the collection, use and disclosure of personally identifiable information, or PII, and other data have been adopted or are under consideration and existing laws and regulations may be subject to new and changing interpretations. In the United States, the Federal Trade Commission and many state attorneys general are applying federal and state consumer protection laws to impose standards for the online collection, use and dissemination of data. The California Consumer Privacy Act of 2018, or CCPA, which became effective January 1, 2020, imposes significant additional requirements with respect to the collection of personal information from California residents. The CCPA, among other things, creates new data privacy obligations for covered companies and provides new privacy rights to California residents, including the right to opt out of certain disclosures of their information. The CCPA also creates a private right of action with statutory damages for certain data breaches, thereby potentially increasing risks associated with a data breach. It remains unclear what, if any, modifications will be made to this legislation or how it will be interpreted. Additionally, a new privacy law, the California Privacy Rights Act, or CPRA, significantly modified the CCPA, potentially resulting in further uncertainty and requiring us to incur additional costs and expenses. The CPRA created a new California state agency charged with enforcing state privacy laws, and there is uncertainty about potential enforcement actions that the new agency may take in the future. The effects of the CCPA and the CPRA remain far-reaching, and depending on final regulatory guidance and related developments, may require us to modify our data processing practices and policies and to incur substantial costs and expenses in an effort to comply.

Many foreign countries and governmental bodies, including Canada and the European Union, or E.U., and other relevant jurisdictions where we conduct business, have laws and regulations concerning the collection and use of PII and other data obtained from their residents or by businesses operating within their jurisdiction. These laws and regulations often are more restrictive than those in the United States Laws and regulations in these jurisdictions apply broadly to the collection, use, storage, disclosure and security of data that identifies or may be used to identify or locate an individual, such as names, email addresses and, in some jurisdictions, internet protocol addresses and other types of data. In Canada, the federal Personal Information Protection and Electronic Documents Act, or PIPEDA, governs the collection, use and disclosure of PII in many provinces in Canada, and though it is silent with respect to territorial reach, the Federal Court of Canada has found that PIPEDA will apply to businesses established in other jurisdictions if there is a "real and substantial connection" between the organization's activities and Canada. Provincial privacy commissioners take a similar approach to the interpretation and application of provincial private-sector privacy laws equivalent to PIPEDA. Further, Canada has robust anti-spam legislation. Organizations sending commercial electronic messages to individuals must either have express consent from the individual in the prescribed form or the situation must qualify as an instance of implied consent or other authorization set out in Canada's Anti-Spam Legislation, or CASL. The penalties for non-compliance under CASL are significant and the regulator, the Canadian Radio- Television and Telecommunications Commission, is active with respect to enforcement. In addition, the E.U.'s General Data Protection Regulation, or the GDPR, which went into effect in May 2018, requires subject companies to implement and maintain comprehensive information privacy and security protections with respect to personal data (data that relates to an identified or identifiable individual) about persons in the E.U. that is collected or processed by such companies. The GDPR provides for substantial penalties for noncompliance.

Although we are working to comply with those federal, state, provincial and foreign laws and regulations, industry standards, governmental standards, contractual obligations and other legal obligations that apply to us, those laws, regulations, standards and obligations are evolving and may be modified, interpreted and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another, other requirements or legal obligations, our practices or the features of our applications or platform. Any failure or perceived failure by us or our

71

Exhibit A
Page 44

contractors to comply with federal, state, provincial or foreign laws or regulations, industry standards, contractual obligations or other legal obligations, or any actual or suspected security incident, whether or not resulting in loss of, unauthorized access to, or acquisition, alteration, destruction, release or transfer of PII or other data, may result in governmental enforcement actions and prosecutions, private litigation, fines and penalties or adverse publicity and could cause employees, clients and consumers to lose trust in us, which could have an adverse effect on our reputation and business. Any inability or perceived inability (even if unfounded) on our part to adequately address privacy, data protection, and information security concerns, or comply with applicable laws, regulations, policies, industry standards, governmental standards, contractual obligations, or other legal obligations, could result in additional cost and liability to us, damage our reputation, inhibit sales, and adversely affect our business.

We also expect that there will continue to be new proposed laws, regulations and industry standards concerning privacy, data protection and information security in the United States, Canada, the E.U. and other jurisdictions, and we cannot yet determine the impact such future laws, regulations and standards may have on our business. Future laws, regulations, standards and other obligations, or amendments or changes in the interpretation of existing laws, regulations, standards and other obligations, could impair our or our clients' ability to collect, use, disclose or otherwise process information relating to employees or consumers, which could decrease demand for our applications, increase our costs and impair our ability to maintain and grow our client and consumer bases and increase revenue. Such laws and regulations may require us to implement privacy and security policies, permit users to access, correct and delete personal information stored or maintained by such companies, inform individuals of security breaches that affect their personal information, and, in some cases, obtain individuals' consent to use PII or other data for certain purposes. In addition, a foreign government could require that any data collected in a country not be transferred or disseminated outside of that country, or impose restrictions or conditions upon such dissemination, and we may face difficulty in complying with any such requirements for certain geographic regions. Indeed, many privacy laws, such as those in force in Canada and the E.U., already impose these requirements. If we fail to comply with federal, state, provincial and foreign data privacy laws and regulations, our ability to successfully operate our business and pursue our business goals could be harmed. Furthermore, due to our acceptance of credit cards, we are subject to the PCI- DSS, which is designed to protect the information of credit card users.

We have had security incidents in the past, which we do not believe reached the level of a breach that would be reportable under applicable state laws or our other obligations; however, there can be no assurance that our determinations were correct. In the event our determinations are challenged and found to have been incorrect, we may be subject to unfavorable publicity or claims by one or more state attorneys general, federal regulators, or private plaintiffs, any of which could damage our reputation, inhibit sales and adversely affect our business.

***Governmental regulation of the internet continues to develop, and unfavorable changes could substantially harm our business and operating results.***

We are subject to general business regulations and laws as well as federal, state, provincial and foreign laws specifically governing the internet. Existing and future laws and regulations, narrowing of any existing legal safe harbors, or previous or future court decisions may impede the growth of the internet or online products and solutions, and increase the cost of providing online products and solutions. These laws may govern, among other issues, taxation, tariffs, user privacy, data protection, pricing, content, copyrights, distribution, electronic contracts and other communications, consumer protection, broadband residential internet access and the characteristics and quality of offerings. It is not clear how existing laws governing issues such as property ownership, sales, use and other taxes, libel and personal privacy apply to the internet or online services. There is also a risk that these laws may be interpreted and applied in conflicting ways across jurisdictions, and in a manner that is not consistent with our current practices. Unfavorable resolution of these issues may limit our business activities, expose us to potential legal claims or cause us to spend significant resources on ensuring compliance, any of which could harm our business and operating results.

***We may be subject to claims brought against us as a result of content we provide.***

We provide educational information regarding the use and potential effects of various types of cannabis products through our platform, including information regarding therapeutic uses for cannabis. If our content, or content we obtain from third parties, contains inaccuracies, it is possible that consumers or others may sue us for various causes of action. Although our website and mobile applications contain terms and conditions, including disclaimers of liability, that are intended to reduce or eliminate our liability, the law governing the validity and enforceability of online agreements and other electronic transactions is evolving. We could be subject to claims by third parties that our online agreements with consumers that provide the terms and conditions for use of our websites and mobile

72

applications are unenforceable. A finding by a court that these agreements are invalid and that we are subject to liability could harm our business and require costly changes to our business.

For content that we publish or provide ourselves, we have editorial procedures in place to provide quality control of the information that we publish or provide. However, we cannot assure you that our editorial and other quality control procedures will be sufficient to ensure that there are no errors or omissions in particular content. Even if potential claims do not result in liability to us, investigating and defending against these claims could be expensive and time-consuming and could divert management's attention away from our operations. In addition, our business is based on establishing the reputation of our platform as trustworthy and dependable sources of educational information. Allegations of impropriety or inaccuracy, even if unfounded, could harm our reputation and business.

***We may be subject to legal claims based on the content published to our platform.***

We may be subject to legal claims relating to information made available through our platform, including claims for defamation, libel, negligence and copyright or trademark infringement, among others. These claims or allegations could divert management time and attention away from our business and result in significant costs to investigate and defend, regardless of the merits of the claims or allegations. In some instances, we may elect or be compelled to remove content, or may be forced to pay substantial damages or administrative monetary penalties, if we are unsuccessful in our efforts to defend against these claims or allegations. If we elect, or are compelled, to remove valuable content from our platform, our platform or services may become less useful to consumers, which could have a negative impact on our business and financial performance. This risk may also be greater in certain jurisdictions outside of the United States where our protections from such liability may be unclear.

***Future investments in alternative revenue streams or acquisitions could disrupt our business and adversely affect our operating results, financial condition and cash flows.***

We believe that our long-term growth depends in part on our ability to develop and monetize additional aspects of our platform. Developing new products and solutions may involve significant investments of capital, time, resources and managerial attention. We have limited experience with developing, implementing and managing revenue streams other than our core listing business, and there can be no assurance that we will successfully implement any new products or solutions. External factors, such as additional regulatory compliance obligations, may also affect the successful implementation of new products and solutions through our platform.

Additionally, we may make acquisitions that could be material to our business, operating results, financial condition and cash flows. Our ability as an organization to successfully acquire and integrate technologies or businesses is unproven. Acquisitions involve many risks, including the following:

- an acquisition may negatively affect our operating results, financial condition or cash flows because it may require us to incur charges or assume substantial debt or other liabilities, may cause adverse tax consequences or unfavorable accounting treatment, may expose us to claims and disputes by third parties, including intellectual property claims and disputes, or may not generate sufficient financial return to offset additional costs and expenses related to the acquisition;

- we may encounter difficulties or unforeseen expenditures in integrating the business, technologies, products, personnel or operations of any company that we acquire, particularly if key personnel of the acquired company decide not to work for us, and potentially across different cultures and languages in the event of a foreign acquisition;

- an acquisition may disrupt our ongoing business, divert resources, increase our expenses and distract our management;

- an acquisition may result in a delay or reduction of sales for both us and the company we acquired due to uncertainty about continuity and effectiveness of products or support from either company;

- we may encounter difficulties in, or may be unable to, successfully sell any acquired products;

- an acquisition may involve the entry into geographic or business markets in which we have little or no prior experience or where competitors have stronger market positions;

- potential strain on our financial and managerial controls and reporting systems and procedures;

- potential known and unknown liabilities associated with an acquired company;

73

- if we incur debt to fund such acquisitions, such debt may subject us to material restrictions on our ability to conduct our business as well as financial maintenance covenants;

- the risk of impairment charges related to potential write-downs of acquired assets or goodwill in future acquisitions;

- to the extent that we issue a significant amount of equity or convertible debt securities in connection with future acquisitions, existing equity holders may be diluted and earnings per share may decrease; and

- managing the varying intellectual property protection strategies and other activities of an acquired company.

We may not succeed in addressing these or other risks or any other problems encountered in connection with the integration of any acquired business. The inability to integrate successfully the business, technologies, products, personnel or operations of any acquired business, or any significant delay in achieving integration, could have a material adverse effect on our business, operating results, financial condition and cash flows.

***We may need to raise additional capital, which may not be available on favorable terms, if at all, causing dilution to our stockholders, restricting our operations or adversely affecting our ability to operate our business.***

In the course of running our business, we may need to raise capital, certain forms of which may cause dilution to our stockholders. If our need is due to unforeseen circumstances or material expenditures or if our operating results are worse than expected, then we cannot be certain that we will be able to obtain additional financing on favorable terms, if at all, and these additional financings could cause further dilution to our stockholders. Due to the current legal status of cannabis under U.S. federal law, we have experienced, and may in the future experience, difficulty attracting additional debt or equity financing. In addition, the current legal status of cannabis may increase the cost of capital now and in the future. Debt financing, if available, may involve agreements that include equity conversion rights, covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, expending capital, or declaring dividends, or that impose financial covenants on us that limit our ability to achieve our business objectives. Debt financings may contain provisions, which, if breached, may entitle lenders to accelerate repayment of loans, and there is no assurance that we would be able to repay such loans in such an event or prevent the foreclosure of security interests granted pursuant to such debt financing. If we need but cannot raise additional capital on acceptable terms, then we may not be able to meet our business objectives, our stock price may fall, and you may lose some or all of your investment.

***Our business and operating results may be harmed if we are deemed responsible for the collection and remittance of state sales taxes or other indirect taxes for clients using our order functionality.***

We do not collect sales and value-added tax as part of our client agreements in the United States or Canada, based on our determination that such tax is not applicable to our platform. Sales and use, value-added, and similar tax laws and rates vary greatly by jurisdiction. If we are deemed an agent for the clients on our platform under state or other applicable tax law, we may be deemed responsible for collecting and remitting sales taxes directly to certain states or jurisdictions. It is possible that one or more states could seek to impose sales, use or other tax obligations on us with regard to the ordering functionality that we offer our clients. These taxes may be applicable to past sales. In addition, the U.S. Supreme Court's ruling in *South Dakota v. Wayfair* that a U.S. state may require an online retailer with no in-state property or personnel to collect and remit sales tax on sales to the state's residents may permit wider enforcement of sales tax collection requirements, which may increase the jurisdictions in which we may be required to collect and/or remit taxes. A successful assertion that we should be collecting additional sales, use or other taxes or remitting such taxes directly to states or other jurisdictions could result in substantial tax liabilities for past sales and additional administrative expenses and increase the cost of our products and solutions, which could harm our business and operating results.

***We may be subject to potential adverse tax consequences both domestically and in foreign jurisdictions.***

We are a limited liability company that is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a result, we generally are not liable for U.S. federal or state and local income taxes in most jurisdictions in which we operate. We are subject to taxes, such as income, payroll, sales, use, value-added, property and goods and services taxes, in both the United States and various foreign jurisdictions. Our domestic and foreign tax liabilities are subject to various jurisdictional rules regarding the timing and allocation of revenue and

74

expenses. Additionally, the amount of income taxes paid is subject to our interpretation of applicable tax laws in the jurisdictions in which we file and to changes in tax laws. Significant judgment is required in determining our worldwide provision for income taxes and other tax liabilities. From time to time, we may be subject to income and non-income tax audits. While we believe we have complied with all applicable income tax laws, there can be no assurance that a governing tax authority will not have a different interpretation of the law and assess us with additional taxes. Should we be assessed with additional taxes, there could be a material adverse effect on our business, results of operations, and financial condition. In addition, audits may require ongoing time and attention from our management, which could limit their ability to focus on other aspects of our business and impact our business in the future.

### Changes in accounting standards or other factors could negatively impact our future effective tax rate.

Our future effective tax rate may be affected by such factors as changing interpretation of existing laws or regulations, the impact of accounting for equity-based compensation, the impact of accounting for business combinations, changes in our international organization, and changes in overall levels of income before tax. In addition, in the ordinary course of our global business, there are many intercompany transactions and calculations where the ultimate tax determination is uncertain.

Although we believe that our tax estimates are reasonable, we cannot ensure that the final determination of tax audits or tax disputes will not be different from what is reflected in our historical income tax provisions and accruals.

### Changes in tax laws or regulations and compliance in multiple jurisdictions may have a material adverse effect on our business, cash flow, financial condition or operating results.

We are subject to the income tax laws of the United States, Canada, and several other foreign jurisdictions. New income, sales, use or other tax laws, statutes, rules, regulations, or ordinances could be enacted at any time, which could affect the tax treatment of our U.S. and foreign earnings. Any new taxes could adversely affect our domestic and foreign business operations, and our business and financial performance. In addition, existing tax laws, statutes, rules, regulations, or ordinances, such as Section 280E of the Code, discussed below, could be interpreted, changed, modified or applied adversely to us. Furthermore, changes to the taxation of undistributed foreign earnings could change our future intentions regarding reinvestment of such earnings. The foregoing items could have a material adverse effect on our business, cash flow, financial condition or operating results.

Requirements as to taxation vary substantially among jurisdictions. Complying with the tax laws of these jurisdictions can be time consuming and expensive and could potentially subject us to penalties and fees in the future if we were to inadvertently fail to comply. If we were to inadvertently fail to comply with applicable tax laws, this could have a material adverse effect on our business, results of operations and financial condition.

### Additional Risks Related to the Cannabis Industry

*For purposes of this subsection only, "WMH," "the Company," "we," "us" or "our" refer to WM Holding Company, LLC and its subsidiaries, unless the context otherwise requires.*

### Cannabis remains illegal under federal law, and therefore, strict enforcement of federal laws regarding cannabis would likely result in our inability to execute our business plan.

Cannabis, other than hemp (defined by the U.S. government as *Cannabis sativa L*. with a THC concentration of not more than 0.3% on a dry weight basis), is a Schedule I controlled substance under the CSA. Even in states or territories that have legalized cannabis to some extent, the cultivation, possession, and sale of cannabis all violate the CSA and are punishable by imprisonment, substantial fines and forfeiture. Moreover, individuals and entities may violate federal law if they aid and abet another in violating the CSA, or conspire with another to violate the law, and violating the CSA is a predicate for certain other crimes, including money laundering laws and the Racketeer Influenced and Corrupt Organizations Act. The U.S. Supreme Court has ruled that the federal government has the authority to regulate and criminalize the sale, possession and use of cannabis, even for individual medical purposes, regardless of whether it is legal under state law. For over five years, however, the U.S. government has not prioritized the enforcement of those laws against cannabis companies complying with state law and their vendors. No reversal of that policy of prosecutorial discretion is expected under a Biden administration given his campaign's position on cannabis, and recent statements of Attorney General Merrick Garland discussed further below, although prosecutions against state-legal entities cannot be ruled out entirely at this time.

75

On January 4, 2018, then U.S. Attorney General Jeff Sessions issued a memorandum for all U.S. Attorneys (the "Sessions Memo") rescinding certain past DOJ memoranda on cannabis law enforcement, including the Memorandum by former Deputy Attorney General James Michael Cole (the "Cole Memo") issued on August 29, 2013, under the Obama administration. Describing the criminal enforcement of federal cannabis prohibitions against those complying with state cannabis regulatory systems as an inefficient use of federal investigative and prosecutorial resources, the Cole Memo gave federal prosecutors discretion not to prosecute state law compliant cannabis companies in states that were regulating cannabis, unless one or more of eight federal priorities were implicated, including use of cannabis by minors, violence, or the use of federal lands for cultivation. The Sessions Memo, which remains in effect, states that each U.S. Attorney's Office should follow established principles that govern all federal prosecutions when deciding which cannabis activities to prosecute. As a result, federal prosecutors could and still can use their prosecutorial discretion to decide to prosecute even state-legal cannabis activities. Since the Sessions Memo was issued nearly three years ago, however, U.S. Attorneys have generally not prioritized the targeting of state law compliant entities.

We cannot assure that each U.S. Attorney's Office in each judicial district where we operate will not choose to enforce federal laws governing cannabis sales against state-legal companies like our business clients. The basis for the federal government's lack of recent enforcement with respect to the cannabis industry extends beyond the strong public sentiment and ongoing prosecutorial discretion. Since 2014, versions of the U.S. omnibus spending bill have included a provision prohibiting the DOJ, which includes the Drug Enforcement Administration, from using appropriated funds to prevent states from implementing their medical-use cannabis laws. In *USA vs. McIntosh*, the U.S. Court of Appeals for the Ninth Circuit held that the provision prohibits the DOJ from spending funds to prosecute individuals who engage in conduct permitted by state medical-use cannabis laws and who strictly comply with such laws. The court noted that, if the spending bill provision were not continued, prosecutors could enforce against conduct occurring during the statute of limitations even while the provision was previously in force. Other courts that have considered the issue have ruled similarly, although courts disagree about which party bears the burden of proof of showing compliance or noncompliance with state law. Our policies do not prohibit our state-licensed cannabis retailers from engaging in the cannabis business for adult use that is permissible under state and local laws. Consequently, certain of our retailers currently (and may in the future) sell adult-use cannabis, if permitted by such state and local laws now or in the future, and therefore may be outside any protections extended to medical-use cannabis under the spending bill provision. This could subject our clients to greater and/or different federal legal and other risks as compared to businesses where cannabis is sold exclusively for medical use, which could in turn materially adversely affect our business. Furthermore, any change in the federal government's enforcement posture with respect to state-licensed cannabis sales, including the enforcement postures of individual federal prosecutors in judicial districts where we operate, would result in our inability to execute our business plan, and we would likely suffer significant losses with respect to client base, which would adversely affect our operations, cash flow and financial condition.

While President Biden's campaign position on cannabis falls short of full legalization, he has campaigned on a platform of relaxing enforcement of cannabis proscriptions, including decriminalization generally. According to the Biden campaign website: "A Biden Administration will support the legalization of cannabis for medical purposes and reschedule cannabis as a CSA Schedule II drug so researchers can study its positive and negative impacts. This will include allowing the VA to research the use of medical cannabis to treat veteran-specific health needs." He has pledged to "decriminalize" cannabis, which could prompt his U.S. Attorney General to issue policy guidance to U.S. Attorneys that they should not enforce federal cannabis prohibition against state law compliant entities and others legally transacting business with them. Indeed, the Biden-Sanders Unity Platform, which was released at the time President Biden won the Democratic Party nomination for President, affirmed that his administration would seek to "[d]ecriminalize marijuana use and legalize marijuana for medical purposes at the federal level;" "allow states to make their own decisions about legalizing recreational use;" and "automatically expunge all past marijuana convictions for use and possession." Vice President Harris echoed these intentions during the vice presidential debate, saying that "[w]e will decriminalize marijuana and we will expunge the records of those who have been convicted of marijuana[-related offenses]." While President Biden's promise to decriminalize likely would mean that the federal government would not criminally enforce the Schedule II status against state legal entities, and would expand opportunities for cannabis research in the U.S., the implications of the potential re-scheduling are not entirely clear for state legal commercial cannabis operators.

Although the U.S. Attorney General could issue policy guidance to federal prosecutors that they should not interfere with cannabis businesses operating in compliance with states' laws, any such guidance would not have the

76

force of law, and could not be enforced by the courts. The President alone cannot legalize medical cannabis, and as states have demonstrated, legalizing medical cannabis can take many different forms. While rescheduling cannabis to the CSA's Schedule II would ease certain research restrictions, it would not make the state medical or adult-use programs federally legal.

On January 20, 2021 President Biden formally nominated Merrick Garland to his cabinet as the U.S. Attorney General. Confirmation hearings for Attorney General Garland began on February 22, 2021. On the first date of his confirmation hearing, Attorney General Garland stated that he did not see enforcement of federal cannabis law as a high priority use of resources for the DOJ: "This is a question of the prioritization of our resources and prosecutorial discretion. It does not seem to me a useful use of limited resources that we have, to be pursuing prosecutions in states that have legalized and that are regulating the use of marijuana, either medically or otherwise. I don't think that's a useful use. I do think we need to be sure there are no end-runs around the state laws that criminal enterprises are doing. So that kind of enforcement should be continued. But I don't think it's a good use of our resources, where states have already authorized. That only confuses people, obviously, within the state." While the statement is not a promise to avoid federal interference with state cannabis laws, it does signal that the enforcement priorities of DOJ lie elsewhere.

Furthermore, while industry observers are hopeful that a Democrat-controlled Senate, along with a Biden presidency, will increase the chances of federal cannabis policy reform, such as the Marijuana Opportunity Reinvestment and Expungement Act (or MORE Act), which was originally co-sponsored by now Vice President Harris in the Senate, or banking reform, such as the SAFE Banking Act, which recently passed the House of Representatives but has not yet passed the Senate, we cannot provide assurances about the content, timing or chances of passage of a bill legalizing cannabis. Accordingly, we cannot predict the timing of any change in federal law or possible changes in federal enforcement. In the unlikely event that the federal government were to reverse its long-standing hands-off approach to the state legal cannabis markets and start more broadly enforcing federal law regarding cannabis, we would likely be unable to execute our business plan, and our business and financial results would be adversely affected.

***Our business and our clients are subject to a variety of U.S. and foreign laws regarding financial transactions related to cannabis, which could subject our clients to legal claims or otherwise adversely affect our business.***

We and our clients are subject to a variety of laws and regulations in the United States regarding financial transactions. Violations of the U.S. anti-money laundering (AML) laws require proceeds from enumerated criminal activity, which includes trafficking in cannabis in violation of the CSA. Financial institutions that both we and our clients rely on are subject to the Bank Secrecy Act, as amended by Title III of the USA Patriot Act. In Canada, the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), as amended and the rules and regulations thereunder and the Criminal Code (Canada) apply. The penalties for violation of these laws include imprisonment, substantial fines and forfeiture.

In 2014, the DOJ under the Obama administration directed federal prosecutors to exercise restraint in prosecuting AML violations arising in the state legal cannabis programs and to consider the federal enforcement priorities enumerated in the Cole Memo when determining whether to charge institutions or individuals based upon cannabis-related activity. Around the same time, the Treasury Department issued guidance that clarified how financial institutions can provide services to cannabis-related businesses, consistent with financial institutions' obligations under the Bank Secrecy Act. Then-Attorney General Sessions's rescission of the DOJ's guidance on the state cannabis programs in early 2018 increased uncertainty and heighted the risk that federal law enforcement authorities could seek to pursue money laundering charges against entities, or individuals, engaged in supporting the cannabis industry. On January 31, 2018, the Treasury Department issued additional guidance that the 2014 Guidance would remain in place until further notice, despite the rescission of the DOJ's earlier guidance memoranda. A detailed description of current U.S. policy and the legal status of cannabis, including President Biden's stance on cannabis enforcement and current and foreseeable decriminalization and legalization initiatives, can be found in the "U.S. and Territories" section.

We are subject to a variety of laws and regulations in the United States, Canada and elsewhere that prohibit money laundering, including the Proceeds of Crime and Terrorist Financing Act (Canada) and the Money Laundering Control Act (U.S.), as amended, and the rules and regulations thereunder and any related or similar rules, regulations or guidelines issued, administered or enforced by governmental authorities in the United States, Canada or any other jurisdiction in which we have business operations or to which we export our offerings. If any of our clients' business activities, any dividends or distributions therefrom, or any profits or revenue accruing thereby are found to be in

violation of money laundering statutes, our clients could be subject to criminal liability and significant penalties and fines. Any violations of these laws, or allegations of such violations, by our clients could disrupt our operations and involve significant management distraction and expenses. As a result, a significant number of our clients facing money laundering charges could materially affect our business, operations and financial condition. Additionally, proceeds from our clients' business activities, including payments we have received from those clients, could be subject to seizure or forfeiture if they are found to be illegal proceeds of a crime transmitted in violation of anti-money laundering laws, which could have a material adverse effect on our business. Finally, if any of our clients are found to be violating the above statutes, this could have a material adverse effect on their ability to access or maintain financial services, as discussed in detail below, which could, in turn, have a material adverse effect on our business.

***We are dependent on our banking relations, and we may have difficulty accessing or consistently maintaining banking or other financial services due to our connection with the cannabis industry.***

Although we do not grow or sell cannabis products, our general connection with the cannabis industry may hamper our efforts to do business or establish collaborative relationships with others that may fear disruption or increased regulatory scrutiny of their own activities.

We are dependent on the banking industry to support the financial functions of our products and solutions. Our business operating functions including payroll for our employees, real estate leases, and other expenses are handled reliant on traditional banking. Additionally, many of our clients pay us via wire transfer to our bank accounts, or via checks that we deposit into our banks. We require access to banking services for both us and our clients to receive payments in a timely manner. Lastly, to the extent we rely on any lines of credit, these could be affected by our relationships with financial institutions and could be jeopardized if we lose access to a bank account. Important components of our offerings depend on client accounts and relationships, which in turn depend on banking functions. Most federal and federally-insured state banks currently do not serve businesses that grow and sell cannabis products on the stated ground that growing and selling cannabis is illegal under federal law, even though the Treasury Department's Financial Crimes Enforcement Network, or FinCEN, issued guidelines to banks in February 2014 that clarified how financial institutions can provide services to cannabis-related businesses, consistent with financial institutions' obligations under the Bank Secrecy Act. While the federal government has generally not initiated financial crimes prosecutions against state-law compliant cannabis companies or their vendors, the government theoretically could, at least against companies in the adult-use markets. The continued uncertainty surrounding financial transactions related to cannabis activities and the subsequent risks this uncertainty presents to financial institutions may result in their discontinuing services to the cannabis industry or limit their ability to provide services to the cannabis industry or ancillary businesses providing services to the cannabis industry.

As a result of federal-level illegality and the risk that providing services to state-licensed cannabis businesses poses to banks, cannabis-related businesses face difficulties accessing banks that will provide services to them. When cannabis businesses are able to find a bank that will provide services, they face extensive client due diligence in light of complex state regulatory requirements and guidance from FinCEN, and these reviews may be time-consuming and costly, potentially creating additional barriers to financial services for, and imposing additional compliance requirements on, us and our clients. FinCEN requires a party in trade or business to file with the U.S. Internal Revenue Service, or the IRS, a Form 8300 report within 15 days of receiving a cash payment of over $10,000. While we receive very few cash payments for the products we sell, if we fail to comply with these laws and regulations, the imposition of a substantial penalty could have a material adverse effect on our business, results of operations and financial condition. We cannot assure that our strategies and techniques for designing our products and solutions for our clients will operate effectively and efficiently and not be adversely impacted by any refusal or reluctance of banks to serve businesses that grow and sell cannabis products. A change in banking regulations or a change in the position of the banking industry that permits banks to serve businesses that grow and sell cannabis products may increase competition for us, facilitate new entrants into the industry offering products or solutions similar to those that we offer, or otherwise adversely affect our results of operations. Also, the inability of potential clients in our target market to open accounts and otherwise use the services of banks or other financial institutions may make it difficult for us to conduct business, including receiving payments in a timely manner.

We do not sell cannabis, or products that contain cannabis; accordingly, our company is not part of the cannabis industry that would be restricted from using federal and federally insured banks. However, because of "weed" in our name and the fact that our revenue is generated largely from companies licensed as operators in the cannabis industry, banks have and may continue to consider us to be part of the cannabis industry that is subject to banking restrictions.

If we were to lose any of our banking relationships or fail to secure additional banking relationships in the future, we could experience difficulty and incur increased costs in the administration of our business, paying our employees, accepting payments from clients, each of which may adversely affect our reputation or results of operations. Additionally, the closure of many or one of our bank accounts due to a bank's reluctance to provide services to a business working with state legal cannabis businesses would require significant management attention from WMH and could materially adversely affect our business and operations. In addition to banks and financial institutions, merchant processors may take a similar view of the risks of working with WMH since we provide services to cannabis businesses, and loss of any of our merchant processor relationships could have similar results. Moreover, Visa reportedly prohibits processing of transactions involving cannabis on its network, and Mastercard has reportedly stated that it is evaluating the inconsistency between U.S. state and federal cannabis law. In October 2020, we responded to an inquiry from certain of our merchant processors on behalf of Mastercard relating to the applicability of U.S. state and federal law to our services, including our WM Orders services. Although consumers cannot purchase products on the Weedmaps listings marketplace and we do not currently use, nor have we historically used, any of our merchant processing relationships to process payments for cannabis transactions, to the extent Visa or Mastercard extend these restrictions to cannabis-related businesses, our merchant processing relationships could be terminated, or we could be prevented from processing any Visa or Mastercard transactions, which could have a material adverse effect on our business and results of operations.

### We may have difficulty using bankruptcy courts due to our involvement in the regulated cannabis industry.

We currently have no need or plans to seek bankruptcy protection. U.S. courts have held that debtors whose income is derived from cannabis or cannabis assets in violation of the CSA cannot seek federal bankruptcy protections. Although we are not in the business of growing or processing cannabis or selling or even possessing cannabis or cannabis products, a U.S. court could determine that our revenue is derived from cannabis or cannabis assets and prevent us from obtaining bankruptcy protections if necessary.

### The conduct of third parties may jeopardize our business.

We cannot guarantee that our systems, protocols, and practices will prevent all unauthorized or illegal activities by our clients. Our success depends in part on our clients' ability to operate consistently with the regulatory and licensing requirements of each state, local, and regional jurisdiction in which they operate. We have a dedicated Trust and Safety team that reviews cannabis license information for operational cannabis retail clients, both on submission and on an ongoing basis, to ensure validity and accuracy. We require all operational cannabis retailer clients, including storefronts and delivery services, to display on their WMH listing a valid, unexpired state-issued license number. For certain WMH products or services, we request additional verification and documentation. We cannot ensure that the conduct of our clients, who are third parties, and their actions could expose them to legal sanctions and costs, which would in turn, adversely affect our business and operations.

### The conduct of third parties may jeopardize our regulatory compliance.

While we are a technology company, not a cannabis licensee, and as such, are not subject to commercial cannabis regulations that apply to cannabis operators, we cannot guarantee that our systems, protocols, and practices will prevent any and all unauthorized or illegal activities by our clients. Our success depends in part on our clients' ability to operate consistently with the regulatory and licensing requirements of each state, local, and regional jurisdiction in which they operate. Despite the procedures and protocols in place for license verification by our Trust & Safety team, any non-compliance by our clients could put our business at risk, as discussed herein, and could also subject us to potential actions by state regulators, to the extent they could be applied to technology service providers, which could materially adversely affect our business, operations, financial condition, brand, and reputation.

### We believe that Section 230(c)(1) of the Communications Decency Act (CDA) provides immunity from civil and state criminal liability, but it is possible that it does not.

We believe that Section 230(c)(1) provides immunity from civil and state criminal liability to internet service provider intermediaries in the United States, such as us, for content provided on their platforms that they did not create or develop. We do not create or develop the information that appears on our clients' listing pages and advertising placements, although our moderation teams may take down a client's information if it breaches our listing restrictions or admonish consumers who post reviews that violate our community terms of use (which, for example, prohibit profanity and racism). We do author and edit certain original content that appears in other sections of our

79

site, such as WM News, WM Learn and WM Policy. All of these sections are general news and information, and none of these sections are advertisements for, or listing pages of, cannabis businesses. For additional information about Section 230, see the sections captioned "Business—Overview" and "Risk Factors—Risks Related to WMH's Business and Industry." Our clients are subject to licensing and related requirements under applicable laws and regulations, and our own compliance policies, and some of our clients currently and in the future may not be in compliance with all such requirements. Despite our belief that we are protected by Section 230, it is possible that we are not, which would subject us to legal, business, and operational risks. In addition, there have been various Congressional efforts to restrict the scope of the protections available to online platforms under Section 230 of the CDA, and our current protections from liability for third-party content in the United States could decrease or change. We could incur significant costs investigating and defending such claims and, if we are found liable, significant damages. We could also face fines or orders restricting or blocking our services in particular geographies as a result of content hosted on our services. For example, recently enacted legislation in Germany may impose significant fines for failure to comply with certain content removal and disclosure obligations.

### We may continue to be subject to constraints on marketing our products.

Certain of the states in which we operate have enacted strict regulations regarding marketing and sales activities on cannabis products, which could affect our cannabis retail clients' demand for our listing and marketing services. There may be restrictions on sales and marketing activities of cannabis businesses imposed by government regulatory bodies that can hinder the development of our business and operating results because of the restrictions our clients face. If our clients are unable to effectively market our products and compete for market share, or if the costs of compliance with government legislation and regulation cannot be absorbed through increased selling prices for our products for our clients, this could hamper demand for our products and services from licensed cannabis retailers, which could result in a loss of revenue.

### Cannabis businesses are subject to unfavorable U.S. tax treatment.

Section 280E of the Code does not allow any deduction or credit for any amount paid or incurred during the taxable year in carrying on business, other than costs of goods sold, if the business (or the activities which comprise the trade or business) consists of trafficking in controlled substances (within the meaning of Schedules I and II of the Controlled Substances Act). The IRS has applied this provision to cannabis operations, prohibiting them from deducting expenses associated with cannabis businesses beyond costs of goods sold and asserting assessments and penalties for additional taxes owed. Section 280E may have a lesser impact on cannabis cultivation and manufacturing operations than on sales operations, which directly affects our clients, who are cannabis retailers. However, Section 280E and related IRS enforcement activity have had a significant impact on the operations of all cannabis companies. While the Section does not directly affect our Company, it lowers our clients' profitability, and could result in decreased demand for our listing and marketing services. An otherwise profitable cannabis business may operate at a loss after taking into account its U.S. income tax expenses. This affects WMH because our sales and operating results could be adversely affected if our clients decrease their marketing budgets and are operating on lower profit margins as a result of unfavorable treatment by the Code.

### Service providers to cannabis businesses may also be subject to unfavorable U.S. tax treatment.

As discussed above, under Section 280E of the Code, no deduction or credit is allowed for any amount paid or incurred during the taxable year in carrying on business, other than costs of goods sold, if the business (or the activities which comprise the trade or business) consists of trafficking in controlled substances (within the meaning of Schedules I and II of the CSA). The IRS has applied this provision to cannabis operations, prohibiting them from deducting expenses associated with cannabis businesses and asserting assessments and penalties for additional taxes owed. While we do believe that Section 280E does not apply to our business, or ancillary service providers that work with state-licensed cannabis businesses, if the IRS interprets the section to apply, it would significantly and materially affect our profitability and financial condition.

The MORE Act, which was passed by the House of Representatives but did not become law in the 116th Congress and has not yet been reintroduced into the 117th, would remove marijuana from the CSA, which would effectively carve out state-legal cannabis businesses from Section 280E of the Code. The MORE Act would impose two new taxes on cannabis businesses: an excise tax measured by the value of certain cannabis products and an occupational tax assessed on the enterprises engaging in cannabis production and sales. Although these novel tax

80

provisions are included in the MORE Act passed by the House of Representatives, it is challenging to predict whether, when, and in what form the MORE Act could be enacted into law and how any such legislation would affect the activities of WMH.

*Cannabis businesses may be subject to civil asset forfeiture.*

Any property owned by participants in the cannabis industry used in the course of conducting such business, or that represents proceeds of such business or is traceable to proceeds of such business, could be subject to seizure by law enforcement and subsequent civil asset forfeiture because of the illegality of the cannabis industry under federal law. Even if the owner of the property is never charged with a crime, the property in question could still be seized and subject to an administrative proceeding by which, with minimal due process, it could be subject to forfeiture. Forfeiture of assets of our cannabis business clients could adversely affect our revenues if it impedes their profitability or operations and our clients' ability to continue to subscribe to our services.

*Due to our involvement in the cannabis industry, we may have a difficult time obtaining the various insurances that are desired to operate our business, which may expose us to additional risk and financial liability.*

Insurance that is otherwise readily available, such as general liability and directors' and officers' insurance, is more difficult for us to find and is more expensive or contains significant exclusions because our clients are cannabis industry participants. There are no guarantees that we will be able to find such insurance coverage in the future or that the cost will be affordable to us. If we are forced to go without such insurance coverage, it may prevent us from entering into certain business sectors, may inhibit our growth, and may expose us to additional risk and financial liabilities. If we experience an uninsured loss, it may result in loss of anticipated cash flow and could materially adversely affect our results of operations, financial condition, and business.

*There may be difficulty enforcing certain of our commercial agreements and contracts.*

Courts will not enforce a contract deemed to involve a violation of law or public policy. Because cannabis remains illegal under U.S. federal law, parties to contracts involving the state legal cannabis industry have argued that the agreement was void as federally illegal or against public policy. Some courts have accepted this argument in certain cases, usually against the company trafficking in cannabis. While courts have enforced contracts related to activities by state-legal cannabis companies, and the trend is generally to enforce contracts with state-legal cannabis companies and their vendors, there remains doubt and uncertainty that we will be able to enforce our commercial agreements in court for this reason. We cannot be assured that we will have a remedy for breach of contract, which would have a material adverse effect on our business.

*Certain of our directors, officers, employees and investors who are not U.S. citizens may face constraints on cross-border travel into the United States.*

Because cannabis remains illegal under U.S. federal law, non-U.S. citizens employed at or investing in companies doing business in the state legal cannabis industry could face detention, denial of entry or lifetime bans from the United States for their business associations with cannabis businesses. Entry to the United States happens at the sole discretion of the officers on duty of the U.S. Customs and Border Protection, or CBP, and these officers have wide latitude to ask questions to determine the admissibility of a foreign national. The government of Canada has started warning travelers on its website that previous use of cannabis, or any substance prohibited by U.S. federal laws, could mean denial of entry to the United States. Business or financial involvement in the legal cannabis industry in Canada or in the United States could also be grounds for U.S. border guards to deny entry. On September 21, 2018, CBP released a statement outlining its current position with respect to enforcement of the laws of the United States. It stated that Canada's legalization of cannabis will not change CBP enforcement of U.S. laws regarding controlled substances and because cannabis continues to be a controlled substance under U.S. federal law, working in or facilitating the proliferation of the legal marijuana industry in U.S. states where it is deemed legal or in Canada may affect admissibility to the United States. CBP updated its stated policy on October 9, 2018 to clarify that a Canadian citizen coming to the United States for reasons unrelated to the cannabis industry will generally be admissible to the United States.

As a result, CBP has affirmed that employees, directors, officers, managers and investors of companies involved in business activities related to cannabis in the United States or Canada (such as us), who are not U.S. citizens, face the risk of being barred from entry into the United States for life. On October 9, 2018, CBP released an additional

81

policy statement indicating that Canadian citizens working in or facilitating the proliferation of the legal cannabis industry in Canada, if travelling to the United States for reasons unrelated to the cannabis industry, will generally be admissible. However, if the traveler is found to be entering into the United States for reasons related to the cannabis industry, he or she may be deemed inadmissible. Ultimately, travel restrictions imposed on our directors, officers, employees and investors could impair our ability to conduct business and to freely explore new strategic relationships.

**Risks Related to WMH's Intellectual Property**

*For purposes of this subsection only, "WMH," "the Company," "we," "us" or "our" refer to WM Holding Company, LLC and its subsidiaries, unless the context otherwise requires. The numbers in this subsection based upon the assumptions described in the last paragraph of the section entitled "Certain Defined Terms."*

***We are, and may in the future be, subject to disputes and assertions by third parties that we violate their intellectual property rights. These disputes could be costly to defend and could harm our business and operating results.***

We currently face, and we expect to face from time to time in the future, allegations that we have violated the rights of third parties, including patent, trademark, copyright and other intellectual property rights. Even if the claims are without merit, defending these types of claims may result in substantial costs, the diversion of the attention of management, and the disruption of our operations. In particular, patent and other intellectual property litigation may be protracted and expensive, and the results are difficult to predict. We may be required to stop offering certain features, purchase licenses or modify our products and features while we develop non-infringing substitutes, or become subject to significant settlement costs. These claims also could subject us to significant liability for damages and could result in our having to stop using or hosting technology, content, branding or business methods found to be in violation of another party's rights. We do not own any patents and, therefore, may be unable to deter competitors or others from pursuing patent or other intellectual property infringement claims against us through the threat of counter-suit.

Companies in the software-as-a-service (SaaS) vertical in which we operate and other industries may own large numbers of patents, copyrights and marks and may frequently request license agreements, threaten litigation or file suit against us based on allegations of infringement or other violations of intellectual property rights. We routinely host listing pages that offer third-party goods and feature third-party brands, which may themselves infringe third party intellectual property rights and which bring us into litigation between the parties to such litigation. Further, although we contractually require our clients to indemnify us against any liability for claims that arise out of their brands and their materials being featured on our sites, clients may not be solvent or financially able to indemnify us. We might be required or may opt to seek a license of intellectual property rights held by others, which may not be available on commercially reasonable terms, or at all. Even if a license is available, we could be required to pay significant royalties, which would increase our operating expenses. We may also be required to develop alternative non-infringing technology, content, branding or business methods, which could require significant effort and expense and which we may not be able to accomplish efficiently, or at all. If we cannot use, license or develop technology, content, branding, or business methods for any allegedly infringing aspect of our business, we may be unable to compete effectively. Further, as we face increasing competition and as our business grows, we will likely face more claims of infringement.

The results of litigation and claims to which we may be subject cannot be predicted with certainty. Even if these matters do not result in litigation or are resolved in our favor or without significant cash settlements, these matters, and the time and resources necessary to litigate or resolve them, could harm our business, reputation and operating results.

***Our use of "open source" software could negatively affect our ability to offer our platform and subject us to possible litigation.***

Our platform uses "open source" software that we have obtained from third parties or is included in software packages. Open source software is generally freely accessible, usable and modifiable, and is made available to the general public on an "as-is" basis under the terms of a non-negotiable license. Use and distribution of open source software may entail greater risks than use of closed-source commercial software. Open source licensors generally do not provide warranties or other contractual protections regarding infringement claims or other claims relating to violation of intellectual property rights or the quality of the software. In addition, certain open source licenses, like

82

the GNU Affero General Public License, or AGPL, may require us to offer for no cost the components of our platform that incorporate the open source software, to make available source code for modifications or derivative works we create by incorporating or using the open source software, or to license our modifications or derivative works under the terms of the particular open source license. If we are required, under the terms of an open source license, to release our proprietary source code to the public, competitors could create similar products with lower development effort and time, which ultimately could result in a loss of sales for us.

We may also face claims alleging noncompliance with open source license terms or infringement, misappropriation or other violation of open source technology. These claims could result in litigation or require us to purchase a costly license, devote additional research and development resources to re-engineer our platform, discontinue the sale of our products if re- engineering cannot be accomplished on a timely or cost-effective basis, or make generally available our proprietary code in source code form, any of which would have a negative effect on our business and operating results, including being enjoined from offering those components of our platform that contain the open source software. We could also be subject to lawsuits by parties claiming ownership of what we believe to be open source software. Litigation could be time-consuming and costly for us to defend or settle, divert our management's attention and other resources, have a negative effect on our operating results and financial condition and require us to devote additional research and development resources to re-engineer our platform.

Although we monitor our use of open source software and try to ensure that none is used in a manner that would subject our platform to unintended conditions, few courts have interpreted open source licenses, and there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on our ability to commercialize our platform. We cannot guarantee that we have incorporated open source software in our platform in a manner that will not subject us to liability, or in a manner that is consistent with our current policies and procedures.

***The success of our business heavily depends on our ability to protect and enforce our intellectual property rights.***

Our business depends on our intellectual property, the protection of which is crucial to the success of our business. We rely on a combination of trademark, trade secret, copyright and other intellectual property rights and laws and contractual restrictions to protect our intellectual property. As examples of such restrictions, we attempt to protect our intellectual property, technology and confidential information by entering into confidentiality and inventions assignment agreements and non-competition agreements with employees, contractors, consultants and business partners who develop intellectual property on our behalf, and entering into non-disclosure agreements with our business partners. These agreements may not effectively prevent unauthorized use or disclosure of our confidential information, intellectual property or technology and may not provide an adequate remedy in the event of unauthorized use or disclosure of our confidential information, intellectual property or technology. Despite our efforts to protect our proprietary rights, unauthorized parties, as examples, may copy aspects of our website features, software and functionality or obtain and use information that we consider proprietary.

Despite our efforts to protect our intellectual property rights, including trademarks, they may not be respected in the future, or may be invalidated, circumvented or challenged. For example, we have registered, among numerous other trademarks, "Weedmaps" as a trademark in the U.S. Competitors have and may continue to adopt service names similar to ours, thereby harming our ability to build brand identity and possibly leading to consumer confusion. In addition, there could be potential trade name or trademark infringement claims brought by owners of other trademarks that are similar to our trademarks. Litigation or proceedings before the U.S. Patent and Trademark Office or other governmental authorities and administrative bodies in the U.S. and abroad may be necessary in the future to enforce our intellectual property rights and to determine the validity and scope of the proprietary rights of others. Our efforts to enforce or protect our proprietary rights may be ineffective and could result in substantial costs and diversion of resources, which could harm our business and operating results.

***If we are unable to protect our domain names, our brand, business, and operating results could be adversely affected.***

We have registered domain names for the websites that we use in our business, such as "www.weedmaps.com." If we lose the ability to use a domain name, whether due to trademark claims, failure to renew the applicable registration or any other cause, we may be forced to market our products under a new domain name, which could cause us substantial harm or cause us to incur significant expense in order to purchase rights to the domain name in question. In addition, our competitors and others could attempt to capitalize on our brand recognition by using

Exhibit A
Page 56

domain names similar to ours. Domain names similar to ours have been registered by others in the United States and elsewhere. We may be unable to prevent third parties from acquiring and using domain names that infringe on, are similar to or otherwise decrease the value of our brand or our trademarks or service marks. Protecting and enforcing our rights in our domain names may require litigation, which could result in substantial costs and diversion of management's attention.

**Risks Related to Silver Spike and the Business Combination**

*For purposes of this subsection only, "we," "us" or "our" refer to Silver Spike pre-domestication and to New WMH after the consummation of the domestication, unless the context otherwise requires.*

***Future resales of Class A common stock after the consummation of the business combination may cause the market price of our securities to drop significantly, even if our business is doing well.***

Pursuant to the sponsor IPO letter agreement, after the consummation of the business combination and subject to certain exceptions, the sponsor will be contractually restricted from selling or transferring any of its shares of Class A common stock until the earlier of (A) one year after the completion of the business combination or (B) subsequent to the business combination, (x) if the last reported sale price of the Class A common stock equals or exceeds $12.00 per share (as adjusted for share splits, share dividends, rights issuances, subdivisions, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the business combination or (y) the date following the completion of the business combination on which we complete a liquidation, merger, amalgamation, share exchange, reorganization or other similar transaction that results in all of our shareholders having the right to exchange their Class A common stock for cash, securities or other property. Pursuant to the voting and support agreements and the amended operating agreement, after the consummation of the business combination and subject to certain exceptions, certain post-merger WMH equity holders will be contractually restricted from selling or transferring any of their respective shares of common stock until 180 days after completion of the business combination.

However, following the expiration of the applicable lockups described in the preceding paragraph, the sponsor and the restricted post-merger WMH equity holders will not be restricted from selling shares of our common stock held by them, other than by applicable securities laws. Additionally, the subscription investors will not be restricted from selling any of their shares of our Class A common stock following the closing of the business combination, other than by applicable securities laws. As such, sales of a substantial number of shares of our common stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock. Upon completion of the business combination, the sponsor and the restricted post-merger WMH equity holders will collectively own post-merger WMH units that are exchangeable for approximately 92,250,000, or 61.6% of our shares of our Class A common stock, assuming that no additional public shareholders redeem their public shares in connection with the business combination. Assuming redemption of the maximum number of public shares in connection with the business combination, in the aggregate, the ownership of the sponsor and the restricted post-merger WMH equity holders would rise to 73.2% of the outstanding shares of our Class A common stock.

The shares held by sponsor and the restricted post-merger WMH equity holders may be sold after the expiration of the applicable lock-up period under the amended and restated registration rights agreement. As restrictions on resale end and registration statements (filed after the closing to provide for the resale of such shares from time to time) are available for use, the sale or possibility of sale of these shares could have the effect of increasing the volatility in our share price or the market price of our common stock could decline if the holders of currently restricted shares sell them or are perceived by the market as intending to sell them.

***After completion of the business combination, the post-merger WMH equity holders, the subscription investors and our sponsor will own a significant portion of the outstanding voting shares of New WMH.***

Upon completion of the business combination and the related transactions (based on the assumptions as described in the last paragraph of the section entitled "Certain Defined Terms"), the post-merger WMH equity holders will own approximately 57.4% of New WMH's common stock, the subscription investors will own approximately 21.7% of New WMH's common stock and our sponsor and its affiliates will own approximately 6.5% of New WMH's common stock. Directors Justin Hartfield and Douglas Francis, our two largest post-merger WMH equity holders, would own approximately 32.7% of New WMH's common stock. As long as the post-merger WMH

84

equity holders, the subscription investors and our sponsor own or control a significant percentage of outstanding voting power, they will have the ability to strongly influence all corporate actions requiring stockholder approval, including the election and removal of directors and the size of our board of directors, any amendment of our organizational documents, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets.

The interests of the post-merger WMH equity holders, the subscription investors and our sponsor may not align with the interests of our other stockholders. Certain of the post-merger WMH equity holders, the subscription investors and our sponsor are in the business of making investments in companies and may acquire and hold interests in businesses that compete directly or indirectly with us. Certain of the post-merger WMH equity holders, the subscription investors and our sponsor may also pursue acquisition opportunities that may be complementary to our business, and, as a result, those acquisition opportunities may not be available to us.

***Subsequent to the consummation of the business combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.***

Although we have conducted due diligence on WMH, we cannot assure you that this diligence revealed all material issues that may be present in WMH's business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of our and WMH's control will not later arise. As a result, we may be forced to later write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in losses. Even if our due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and may not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about New WMH following the completion of the business combination or our securities. In addition, charges of this nature may cause us to be unable to obtain future financing on favorable terms or at all.

***We and WMH will be subject to business uncertainties and contractual restrictions while the business combination is pending.***

Uncertainty about the effect of the business combination on employees and third parties may have an adverse effect on us and WMH. These uncertainties may impair WMH's ability to retain and motivate key personnel and could cause third parties that deal with WMH to defer entering into contracts or making other decisions or seek to change existing business relationships. If employees depart because of uncertainty about their future roles and the potential complexities of the business combination, our or WMH's business could be harmed.

***We are dependent upon our current executive officers and directors and their loss could adversely affect our ability to operate.***

Our operations are dependent upon a relatively small group of individuals and, in particular, our executive officers and directors. We believe that our success depends on the continued service of our officers and directors, at least until we have completed the business combination.

***Our ability to successfully effect the business combination and successfully operate the business thereafter will be largely dependent upon the efforts of certain key personnel of WMH. The loss of such key personnel and our inability to hire and retain replacements could negatively impact the operations and profitability of New WMH following the business combination.***

Our ability to successfully effect the business combination and successfully operate the business is dependent upon the efforts of certain key personnel, including WMH senior management. Although we contemplate that the majority of WMH senior management team will remain associated with the combined company following the business combination, it is possible that additional members of the WMH management team will depart. The loss of such key personnel and our inability to hire and retain replacements could negatively impact the operations and profitability of New WMH following the business combination.

***Certain of our existing shareholders have agreed to vote in favor of the business combination, regardless of how our public shareholders vote.***

Certain of our existing shareholders, including our sponsor and our directors and officers, have agreed to vote the founder shares, as well as any public shares purchased during or after the IPO, in favor of a business combination.

85

At the time of the general meeting, we expect that our sponsor and our directors and officers will collectively own approximately 20% of our outstanding ordinary shares. Accordingly, it is more likely that the necessary shareholder approval will be received than would be the case if such persons agreed to vote their shares in accordance with the majority of the votes cast by our public shareholders.

***Neither the board of directors of Silver Spike nor any committee thereof obtained a third party financial opinion in determining whether or not to pursue the business combination.***

Neither the board of directors of Silver Spike nor any committee thereof obtained an opinion from an independent investment banking or accounting firm that the price that Silver Spike is paying for WMH is fair to Silver Spike from a financial point of view. Neither the board of directors of Silver Spike nor any committee thereof obtained a third party valuation in connection with the business combination. In analyzing the business combination, the board of directors of Silver Spike and management conducted due diligence on WMH and researched the industry in which WMH operates. The board of directors of Silver Spike reviewed, among other things, financial due diligence materials prepared by professional advisors, including tax due diligence reports, financial and market data information on selected comparable companies, the implied purchase price multiple of WMH and the financial terms set forth in the merger agreement, and concluded that the business combination was in the best interest of its shareholders. Accordingly, investors will be relying solely on the judgment of the board of directors and management of Silver Spike in valuing WMH, and the board of directors and management of Silver Spike may not have properly valued such businesses. The lack of a third party valuation may also lead an increased number of shareholders to vote against the business combination or demand redemption of their shares, which could potentially impact our ability to consummate the business combination.

***We do not intend to pay cash dividends for the foreseeable future.***

Following the business combination, we currently intend to retain our future earnings, if any, to finance the further development and expansion of our business and do not intend to pay cash dividends in the foreseeable future. Any future determination to pay dividends will be at the discretion of our board of directors and will depend on our financial condition, results of operations, capital requirements, restrictions contained in future agreements and financing instruments, business prospects and such other factors as our board of directors deems relevant.

***We may be subject to securities litigation, which is expensive and could divert management attention.***

The market price of our common stock may be volatile and, in the past, companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation. We may be the target of this type of litigation in the future. Securities litigation against us could result in substantial costs and divert management's attention from other business concerns, which could seriously harm our business.

***Because Silver Spike is incorporated under the laws of the Cayman Islands, in the event the business combination is not completed, you may face difficulties in protecting your interests, and your ability to protect your rights through the U.S. federal courts may be limited.***

Because Silver Spike is currently incorporated under the laws of the Cayman Islands, you may face difficulties in protecting your interests and your ability to protect your rights through the U.S. federal courts may be limited prior to the domestication. Silver Spike is currently an exempted company under the laws of the Cayman Islands. As a result, it may be difficult for investors to effect service of process within the United States upon Silver Spike's directors or officers, or enforce judgments obtained in the United States courts against Silver Spike's directors or officers.

Until the domestication is effected, Silver Spike's corporate affairs are governed by the existing organizational documents, the Cayman Islands Companies Act and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary responsibilities of its directors to Silver Spike under the laws of the Cayman Islands are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, the decisions of whose courts are of persuasive authority, but are not binding on a court in the Cayman Islands. The rights of Silver Spike's shareholders and the fiduciary responsibilities of its directors under Cayman Islands law are different from what they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has

a different body of securities laws as compared to the United States, and certain states, such as Delaware, may have more fully developed and judicially interpreted bodies of corporate law. In addition, Cayman Islands companies may not have standing to initiate a shareholders derivative action in a Federal court of the United States.

Silver Spike has been advised by its Cayman Islands legal counsel that the courts of the Cayman Islands are unlikely (i) to recognize or enforce against Silver Spike judgments of courts of the United States predicated upon the civil liability provisions of the federal securities laws of the United States or any state; and (ii) in original actions brought in the Cayman Islands, to impose liabilities against Silver Spike predicated upon the civil liability provisions of the federal securities laws of the United States or any state, so far as the liabilities imposed by those provisions are penal in nature. In those circumstances, although there is no statutory enforcement in the Cayman Islands of judgments obtained in the United States, the courts of the Cayman Islands will recognize and enforce a foreign money judgment of a foreign court of competent jurisdiction without retrial on the merits based on the principle that a judgment of a competent foreign court imposes upon the judgment debtor an obligation to pay the sum for which judgment has been given provided certain conditions are met. For a foreign judgment to be enforced in the Cayman Islands, such judgment must be final and conclusive and for a liquidated sum, and must not be in respect of taxes or a fine or penalty, inconsistent with a Cayman Islands judgment in respect of the same matter, impeachable on the grounds of fraud or obtained in a manner, or be of a kind the enforcement of which is, contrary to natural justice or the public policy of the Cayman Islands (awards of punitive or multiple damages may well be held to be contrary to public policy). A Cayman Islands court may stay enforcement proceedings if concurrent proceedings are being brought elsewhere.

The shareholders of Silver Spike may have more difficulty in protecting their interests in the face of actions taken by management, the members of the board of directors of Silver Spike or controlling shareholders than they would as public shareholders of a United States company.

***In evaluating the target business for our business combination, our management has relied on the availability of all of the funds from the sale of the subscription shares to be used as part of the consideration in the business combination. If the sale of some or all of the subscription shares fails to close, we may lack sufficient funds to consummate the business combination.***

In connection with the entry into the merger agreement, we entered into the subscription agreements pursuant to which the subscription investors agreed to purchase an aggregate of 32,500,000 shares of Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) for a purchase price of $10.00 per share, or $325,000,000 in the aggregate, in a private placement to close immediately prior to our business combination. The funds from the PIPE subscription financing may be used as part of the consideration in the business combination, expenses in connection with the business combination or for working capital in WMH post-closing. The obligations under the subscription agreements do not depend on whether any public shareholders elect to redeem their shares and provide us with a minimum funding level for the business combination. However, if the sales of the subscription shares do not close for any reason, including by reason of the failure by some or all of the subscription investors, as applicable, to fund the purchase price for their respective subscription shares, for example, we may lack sufficient funds to consummate the business combination. The subscription investors' obligations to purchase the subscription shares are subject to fulfillment of customary closing conditions. The subscription investors' obligations to purchase subscription shares pursuant to the subscription agreements are subject to termination prior to the closing of the sale of such subscription shares automatically upon termination of the merger agreement. In the event of any such failure to fund by a subscription investor, any obligation is so terminated or any such condition is not satisfied and not waived by such subscription investor, we may not be able to obtain additional funds to account for such shortfall on terms favorable to us or at all. Any such shortfall may also reduce the amount of funds that we have available for working capital of WMH post-business combination.

87

*Our sponsor, directors, executive officers, advisors and their affiliates may elect to purchase public shares or public warrants from public shareholders, which may influence the vote on the business combination and reduce the public "float" of our Class A ordinary shares.*

Our sponsor, directors, executive officers, advisors or their affiliates may purchase public shares or public warrants in privately negotiated transactions or in the open market either prior to or following the completion of our business combination, although they are under no obligation to do so. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the trust account will be used to purchase shares or public warrants in such transactions.

The purpose of any such purchases of public shares could be to vote such shares in favor of the business combination and thereby increase the likelihood of obtaining shareholder approval of the business combination. Any such purchases of our securities may result in the completion of our business combination that may not otherwise have been possible.

In addition, if such purchases are made, the public "float" of our Class A ordinary shares or public warrants and the number of beneficial holders of our securities may be reduced, possibly making it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

*If a shareholder fails to comply with the procedures for redeeming its public shares, such shares may not be redeemed.*

In order to validly redeem public shares, holders of our public shares will need to comply with the various procedures described in this proxy statement/prospectus. In the event that a shareholder fails to comply with these procedures, its shares may not be redeemed.

*You will not have any rights or interests in funds from the trust account, except under certain limited circumstances. Therefore, to liquidate your investment, you may be forced to sell your public shares or warrants, potentially at a loss.*

Our public shareholders will be entitled to receive funds from the trust account only upon the earlier to occur of: (i) our completion of an initial business combination, and then only in connection with those public shares that such shareholder properly elected to redeem, subject to the limitations described herein, (ii) the redemption of any public shares properly tendered in connection with a shareholder vote to amend our existing organizational documents pursuant to the extension proxy statement and (iii) the redemption of our public shares if we are unable to complete an initial business combination by July 10, 2021, subject to applicable law and as further described herein. In no other circumstances will a public shareholder have any right or interest of any kind in the trust account. Holders of warrants will not have any right to the proceeds held in the trust account with respect to the warrants. Accordingly, to liquidate your investment, you may be forced to sell your public shares or warrants, potentially at a loss.

*Our sponsor, certain members of our board of directors and our officers have interests in the business combination that are different from or are in addition to other shareholders in recommending that shareholders vote in favor of approval of the business combination and the other proposals described in this proxy statement/prospectus.*

When considering our board of directors' recommendation that our shareholders vote in favor of the approval of the business combination, our shareholders should be aware that our sponsor and certain of our directors and officers have interests in the business combination that are different from, or in addition to, the interests of other shareholders generally. Our directors were aware of and considered these interests, among other matters, in evaluating the business combination, and in recommending to shareholders that they approve the business combination. Our shareholders should take these interests into account in deciding whether to approve the business combination. These interests include:

- the fact that certain of our directors and officers are principals of our sponsor;
- the fact that 6,250,000 founder shares held by our sponsor, for which it paid approximately $25,000, will convert on a one-for-one basis, into 6,250,000 shares of Class A common stock upon the closing (assuming (x) no public shares are redeemed by public shareholders in connection with the business combination and (y) no additional Class A ordinary shares, or securities convertible into or exchangeable for Class A

88

ordinary shares are issued by us in connection with or in relation to the consummation of the business combination), and such shares, if unrestricted and freely tradable would be valued at approximately $87,375,000, based on the closing price of our Class A ordinary shares on the Nasdaq on May 13, 2021;

- the fact that our sponsor holds 7,000,000 private placement warrants purchased in a private placement that closed simultaneously with the consummation of the IPO that would expire worthless if a business combination is not consummated by July 10, 2021;

- the fact that in connection with the business combination, we entered into the subscription agreements with the subscription investors, which include a special purpose vehicle managed by an affiliate of our sponsor and in which our independent directors are investors, which provide for the purchase by the subscription investors of an aggregate of 32,500,000 Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication), for an aggregate purchase price of $10.00 per ordinary share, in a private placement, the closing of which will occur immediately prior to the closing;

- the fact that our sponsor has agreed to waive its rights to liquidating distributions from the trust account with respect to its founder shares if Silver Spike fails to complete an initial business combination, including the business combination, by July 10, 2021;

- the fact that if the trust account is liquidated, including in the event Silver Spike is unable to complete an initial business combination by July 10, 2021, our sponsor has agreed that it will be liable to Silver Spike if and to the extent any claims by a third party (other than Silver Spike's independent auditors) for services rendered or products sold to Silver Spike, or a prospective target business with which Silver Spike has discussed entering into a transaction agreement, reduce the amounts in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in the value of the trust assets, in each case net of the amount of interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of our IPO against certain liabilities, including liabilities under the Securities Act;

- the fact that one or more directors of Silver Spike will be a director of New WMH;

- the continued indemnification of Silver Spike's current directors and officers and the continuation of Silver Spike's directors' and officers' liability insurance after the business combination;

- the fact that our sponsor, officers, directors and their respective affiliates will not be reimbursed for any out-of-pocket expenses from any amounts held in the trust account if an initial business combination is not consummated by July 10, 2021.

***Our sponsor, officers and directors will not be eligible to be reimbursed for their out-of-pocket expenses if an initial business combination is not completed.***

At the closing, our sponsor, officers and directors, or any of their respective affiliates, will be reimbursed for any out-of-pocket expenses incurred in connection with activities on Silver Spike's behalf, such as identifying potential target businesses and performing due diligence on suitable business combinations. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred in connection with activities on Silver Spike's behalf. The personal and financial interests of our sponsor, executive officers and directors may influence their motivation in identifying and selecting a target business and completing the business combination.

***We will incur significant transaction costs in connection with the business combination and related transactions.***

We have incurred and expect to continue to incur significant, non-recurring costs in connection with consummating the business combination and related transactions. All expenses incurred in connection with the business combination and related transactions, including all legal, and other fees, expenses and costs, will be for the account of the party incurring such fees, expenses and costs. Our transaction expenses as a result of the business combination and related transactions are currently estimated to be approximately $35.0 million, including $8.75 million in accompanying deferred underwriting commissions, which are contingent upon the consummation of the closing, subject to certain offsets for fees paid to the placement agents for the PIPE subscription financing.

See the notes to the unaudited pro forma financial statements for more information.

*The unaudited pro forma condensed combined financial information included in this proxy statement/prospectus may not be indicative of what our actual financial position or results of operations would have been.*

The unaudited pro forma condensed combined financial information for New WMH following the business combination in this proxy statement/prospectus is presented for illustrative purposes only and is not necessarily indicative of what our actual financial position or results of operations would have been had the business combination been completed on the dates indicated. See the section entitled "Unaudited Pro Forma Condensed Combined Financial Information" for more information.

*We may waive one or more of the conditions to the business combination.*

Subject to our obligations under the merger agreement, we may agree to waive any of the conditions to our obligations to complete the business combination under the merger agreement. For example, it is a condition to our obligations to close the business combination that WMH has performed its covenants in all material respects. However, if our board of directors determines that any such breach is not material to the business of WMH, then our board of directors may elect to waive that condition and close the business combination.

*Our directors may decide not to enforce the indemnification obligations of our sponsor, resulting in a reduction in the amount of funds in the trust account available for distribution to our public shareholders.*

In the event that the proceeds in the trust account are reduced below (1) $10.00 per public share or (2) such lesser amount per share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, and our sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our sponsor to enforce its indemnification obligations. While we currently expect that our independent directors would take legal action on our behalf against our sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment may choose not to do so in any particular instance. If our independent directors choose not to enforce these indemnification obligations, the amount of funds in the trust account available for distribution to our public shareholders may be reduced below $10.00 per share.

*We may not have sufficient funds to satisfy indemnification claims of our directors and executive officers.*

We have agreed to indemnify our officers and directors to the fullest extent permitted by law. However, our officers and directors have agreed to waive any right, title, interest or claim of any kind in or to any monies in the trust account and to not seek recourse against the trust account for any reason whatsoever. Accordingly, any indemnification provided will be able to be satisfied by us only if (i) we have sufficient funds outside of the trust account or (ii) we consummate an initial business combination. Our obligation to indemnify our officers and directors may discourage shareholders from bringing a lawsuit against our officers or directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against our officers and directors, even though such an action, if successful, might otherwise benefit us and our shareholders. Furthermore, a shareholder's investment may be adversely affected to the extent we pay the costs of settlement and damage awards against our officers and directors pursuant to these indemnification provisions.

*If, after we distribute the proceeds in the trust account to our public shareholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and we and our board of directors may be exposed to claims of punitive damages.*

If, after we distribute the proceeds in the trust account to our public shareholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by shareholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our shareholders. In addition, our board of directors may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith, thereby exposing itself and us to claims of punitive damages, by paying public shareholders from the trust account prior to addressing the claims of creditors.

90

*If, before distributing the proceeds in the trust account to our public shareholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our shareholders and the per share amount that would otherwise be received by our shareholders in connection with our liquidation may be reduced.*

If, before distributing the proceeds in the trust account to our public shareholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our shareholders. To the extent any bankruptcy claims deplete the trust account, the per share amount that would otherwise be received by our shareholders in connection with our liquidation may be reduced.

*Our shareholders may be held liable for claims by third parties against us to the extent of distributions received by them upon redemption of their shares.*

If we are forced to enter into an insolvent liquidation, any distributions received by shareholders could be viewed as an unlawful payment if it was proved that immediately following the date on which the distribution was made, we were unable to pay our debts as they fall due in the ordinary course of business. As a result, a liquidator could seek to recover some or all amounts received by our shareholders. Furthermore, our directors may be viewed as having breached their fiduciary duties to us or our creditors and/or may have acted in bad faith, thereby exposing themselves and our company to claims, by paying public shareholders from the trust account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against us for these reasons. We and our directors and officers who knowingly and willfully authorized or permitted any distribution to be paid out of our share premium account while we were unable to pay our debts as they fall due in the ordinary course of business would be guilty of an offence and may be liable to a fine of approximately $18,293 and to imprisonment for five years in the Cayman Islands.

*We are not registering the Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise warrants, thus precluding such investor from being able to exercise its warrants and causing such warrants to expire worthless.*

We are not registering the Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time. However, under the terms of the warrant agreement, we have agreed, as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, to use our reasonable best efforts to file a registration statement under the Securities Act covering the issuance of such shares, to use our reasonable best efforts to cause the same to become effective within 60 business days after the closing of our initial business combination and to maintain the effectiveness of such registration statement and a current prospectus relating to those Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) until the warrants expire or are redeemed. We cannot assure you that we will be able to do so if, for example, any facts or events arise which represent a fundamental change in the information set forth in the registration statement or prospectus, the financial statements contained or incorporated by reference therein are not current, complete or correct or the SEC issues a stop order. If the shares issuable upon exercise of the warrants are not registered under the Securities Act, we will be required to permit holders to exercise their warrants on a cashless basis. However, no warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder, or an exemption from registration is available. Notwithstanding the above, if our Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) are, at the time of any exercise of a warrant, not listed on a national securities exchange such that they do not satisfy the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will use our reasonable best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. In no event will we be required to net cash settle any warrant, or issue securities or other compensation in exchange for the warrants in the event that

we are unable to register or qualify the shares underlying the warrants under applicable state securities laws and no exemption is available. If the issuance of the shares upon exercise of the warrants is not so registered or qualified or exempt from registration or qualification, the holder of such warrant shall not be entitled to exercise such warrant and such warrant may have no value and expire worthless. In such event, holders who acquired their warrants as part of a purchase of units will have paid the full unit purchase price solely for the Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) included in the units. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) for sale under all applicable state securities laws.

***We have agreed to issue additional Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) to complete our business combination and may issue shares of Class A common stock of New WMH, including under an employee incentive plan, after completion of our initial business combination. Any such issuances would dilute the interest of our shareholders and likely present other risks.***

Our existing organizational documents authorize the issuance of up to 200,000,000 Class A ordinary shares, par value $0.0001 per share, 20,000,000 Class B ordinary shares, par value $0.0001 per share, and 1,000,000 preferred shares, $0.0001 per share. At December 31, 2019, there were 155,000,000 and 13,750,000 authorized but unissued Class A ordinary shares and Class B ordinary shares, respectively, available for issuance which amount takes into account shares reserved for issuance upon exercise of outstanding warrants, and 1,000,000 authorized but unissued preferred shares available for issuance.

The proposed charter authorizes the issuance of 1,500,000,000 shares of Class A common stock, 500,000,000 shares of Class V common stock and 75,000,000 shares of preferred stock, par value $0.0001 per share.

We have agreed to issue additional Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) to the subscription investors in order to obtain PIPE subscription financing to complete our business combination and Class V shares to the post-merger WMH equity holders. Prior to the business combination, we may issue additional Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) and preferred shares in order to obtain additional equity financing, and we may issue additional shares of Class A common stock of New WMH under an employee incentive plan after completion of our business combination. However, our existing organizational documents provide, among other things, that prior to our initial business combination, we may not issue additional shares that would entitle the holders thereof to (i) receive funds from the trust account or (ii) vote as a class with our public shares on any business combination. The issuance of additional ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) or preferred shares:

- • may significantly dilute the equity interest of investors in the IPO;

- • may subordinate the rights of holders of Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) if preferred shares are issued with rights senior to those afforded our Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication); and

- • may adversely affect prevailing market prices for our units, Class A ordinary shares and/or warrants.

***We do not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for us to complete the business combination with which a substantial majority of our shareholders do not agree.***

Our amended and restated memorandum and articles of association do not provide a specified maximum redemption threshold, except that in no event will we redeem our public shares in an amount that would cause our net tangible assets, after payment of the deferred underwriting commissions, to be less than $5,000,001 upon completion of our initial business combination (such that we do not then become subject to the SEC's "penny stock" rules), or any greater net tangible asset or cash requirement that may be contained in the agreement relating to our initial business combination. As a result, we may be able to complete our initial business combination even though a substantial majority of our public shareholders do not agree with the transaction and have redeemed their shares

92

or have entered into privately negotiated agreements to sell their shares to our sponsor, officers, directors, advisors or any of their affiliates. In the event the aggregate cash consideration we would be required to pay for all Class A ordinary shares that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed initial business combination exceed the aggregate amount of cash available to us, we will not complete the initial business combination or redeem any shares, all Class A ordinary shares submitted for redemption will be returned to the holders thereof, and we instead may search for an alternate business combination.

***The holder of our founder shares control a substantial interest in us and thus may exert a substantial influence on actions requiring a shareholder vote, potentially in a manner that you do not support.***

The holder of our founder shares own 20% of our issued and outstanding ordinary shares. Accordingly, they may exert a substantial influence on actions requiring a shareholder vote, potentially in a manner that you do not support. If the holders of our founder shares purchase any additional Class A ordinary shares, this would increase their control. To our knowledge, none of our officers or directors, has any current intention to purchase additional securities. Factors that would be considered in making such additional purchases would include consideration of the current trading price of our Class A ordinary shares.

***We may amend the terms of the warrants in a manner that may be adverse to holders with the approval by the holders of at least 65% of then outstanding public warrants. As a result, the exercise price of your warrants could be increased, the exercise period could be shortened and the number of ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) purchasable upon exercise of a warrant could be decreased, all without your approval.***

Our warrants were issued in registered form under the warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and Silver Spike. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder for the purpose of curing any ambiguity or curing, correcting or supplementing any defective provision or adding or changing any other provisions with respect to matters or questions arising under the warrant agreement, but requires the approval by the holders of at least 65% of then outstanding public warrants to make any change that adversely affects the interests of the registered holders. Accordingly, we may amend the terms of the public warrants in a manner adverse to a holder if holders of at least 65% of then outstanding public warrants approve of such amendment. Examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, shorten the exercise period or decrease the number of Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) purchasable upon exercise of a warrant.

***We may redeem unexpired warrants prior to their exercise at a time that is disadvantageous to warrant holders, thereby making their warrants worthless.***

We have the ability to redeem outstanding warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant; provided that the last reported sales price of our Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) equals or exceeds $18.00 per share (as adjusted for share splits, share dividends, rights issuances, subdivisions, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date we send the notice of redemption to the warrant holders. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding warrants could force you to: (1) exercise your warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so; (2) sell your warrants at then-current market price when you might otherwise wish to hold your warrants; or (3) accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of your warrants. None of the private placement warrants will be redeemable by us so long as they are held by our sponsor or its permitted transferees.

***Our warrants may have an adverse effect on the market price of our Class A ordinary shares and make it more difficult to effectuate an initial business combination.***

We issued public warrants to purchase 12,500,000 of our Class A ordinary shares as part of the units sold in the IPO and, simultaneously with the closing of the IPO, we issued in the private placement an aggregate of 7,000,000 private placement warrants, each exercisable to purchase one Class A ordinary share at $11.50 per share. Such

93

warrants, when exercised, will increase the number of issued and outstanding Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication) and reduce the value of the Class A ordinary shares (or shares of Class A common stock of New WMH into which such shares will convert in connection with the domestication).

*Because certain of our ordinary shares and warrants currently trade as units consisting of one ordinary share and one-half of one warrant, the units may be worth less than units of other blank check companies.*

Certain of our ordinary shares and warrants currently trade as units consisting of one ordinary share and one-half of one warrant. Because, pursuant to the warrant agreement, the warrants may only be exercised for a whole number of shares, only a whole warrant may be exercised at any given time. No fractional shares will be issued upon exercise of the warrants. If, upon exercise of the public warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round down to the nearest whole number the number ordinary shares to be issued to the warrant holder. As a result, public warrant holders who did not purchase a number of units or warrants that would convert into a whole share must sell any odd number of warrants in order to obtain full value from the fractional interest that will not be issued.

This is different from other companies similar to ours whose units include one ordinary share and one warrant to purchase one whole share. This unit structure may cause our units to be worth less than if it included a warrant to purchase one whole share.

*Warrants will become exercisable for our ordinary shares, which would increase the number of shares eligible for future resale in the public market and result in dilution to our shareholders.*

We issued public warrants to purchase 12,500,000 ordinary shares as part of our IPO, and we issued an aggregate of 7,000,000 private placement warrants to our sponsor, each exercisable to purchase one whole ordinary share (or one whole share of Class A common stock of New WMH into which such share will convert in connection with the domestication) at $11.50 per whole share.

In addition, prior to consummating the business combination, nothing prevents us from issuing additional securities in a private placement so long as they do not participate in any manner in the trust account or vote as a class with the ordinary shares on a business combination. To the extent such warrants are exercised, additional ordinary shares will be issued, which will result in dilution to then existing holders of our ordinary shares and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of our ordinary shares. In addition, such dilution could, among other things, limit the ability of our current shareholders to influence management of WMH through the election of directors following the business combination.

*The market for our securities may be volatile following the closing.*

Following the business combination, the price of our securities may fluctuate significantly due to the market's reaction to the business combination and general market and economic conditions. The price of our securities after the business combination can vary due to general economic conditions and forecasts, our general business condition and the release of our financial reports.

*A significant portion of our total outstanding shares may be sold into the market in the near future. This could cause the market price of our ordinary shares to drop significantly, even if our business is doing well.*

Sales of a substantial number of ordinary shares in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our ordinary shares. After the consummation of the business combination (based on the assumptions as described in the last paragraph of the section entitled "Certain Defined Terms"), the post-merger WMH equity holders will hold approximately 57.4% of our total outstanding shares, the subscription investors hold approximately 21.7% of our total outstanding shares, our sponsor and its affiliates will hold approximately 4.2% of our total outstanding shares and our officers and directors will hold approximately 43.0% of our total outstanding shares, which does not take into account any warrants that will be outstanding as of the closing and may be exercised thereafter.

*If the business combination's benefits do not meet the expectations of investors, shareholders or financial analysts, the market price of our securities may decline.*

If the benefits of the business combination do not meet the expectations of investors or securities analysts, the market price of our securities prior to the closing may decline. The market values of our securities at the time of the business combination may vary significantly from their prices on the date the merger agreement was executed, the date of this proxy statement/prospectus, or the date on which our shareholders vote on the business combination.

In addition, following the business combination, fluctuations in the price of our securities could contribute to the loss of all or part of your investment. Any of the factors listed below could have a material adverse effect on your investment in our securities and our securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of our securities may not recover and may experience a further decline.

Factors affecting the trading price of our securities following the business combination may include:

- actual or anticipated fluctuations in our quarterly financial results or the quarterly financial results of companies perceived to be similar to us;

- changes in the market's expectations about our operating results;

- success of competitors;

- our operating results failing to meet the expectation of securities analysts or investors in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning New WMH or the market in general;

- operating and stock price performance of other companies that investors deem comparable to New WMH;

- changes in laws and regulations affecting our business;

- commencement of, or involvement in, litigation involving New WMH;

- changes in our capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares available for public sale;

- any major change in our board of directors or management;

- sales of substantial amounts of securities by our directors, executive officers or significant shareholders or the perception that such sales could occur;

- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations and acts of war or terrorism; and

- other developments affecting the cannabis industry.

Broad market and industry factors may materially harm the market price of our securities irrespective of our operating performance. The stock market in general and Nasdaq have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of our securities, may not be predictable. A loss of investor confidence in the market for retail stocks or the stocks of other companies, notably in the cannabis industry, which investors perceive to be similar to New WMH could depress our stock price regardless of our business, prospects, financial conditions or results of operations. A decline in the market price for our securities also could adversely affect our ability to issue additional securities and our ability to obtain additional financing in the future.

*Following the business combination, if securities or industry analysts do not publish or cease publishing research or reports about us, our business, or our market, or if they change their recommendations regarding our common stock adversely, the price and trading volume of our common stock could decline.*

The trading market for our common stock will be influenced by the research and reports that industry or securities analysts may publish about us, our business, our market, or our competitors. If any of the analysts who may cover New WMH change their recommendation regarding our stock adversely, or provide more favorable relative recommendations about our competitors, the price of our common stock would likely decline. If any analyst who may cover New WMH were to cease their coverage or fail to regularly publish reports on us, we could lose visibility in the financial markets, which could cause our stock price or trading volume to decline.

95

*Activities taken by affiliates of Silver Spike to purchase, directly or indirectly, public shares will increase the likelihood of approval of the business combination and other proposals and may affect the market price of our securities.*

Prior to or in connection with the business combination, our sponsor, directors, officers, advisors or their affiliates may purchase public shares. None of our sponsor, directors, officers, advisors or their affiliates will make any such purchases when such parties are in possession of any material non-public information not disclosed to the seller or if prohibited during a restricted period under Regulation M under the Exchange Act. Such purchases may be made in privately negotiated transactions. Although none of our sponsor, directors, officers, advisors or their affiliates currently anticipate paying any premium purchase price for such public shares, in the event such parties do, the payment of a premium may not be in the best interest of those shareholders not receiving any such additional consideration. There is no limit on the number of shares that could be acquired by our sponsor, directors, officers, advisors or their affiliates, or the price such parties may pay.

If such transactions are effected, the consequence could be to cause the business combination to be approved in circumstances where such approval could not otherwise be obtained. Purchases of shares by the persons described above would allow them to exert more influence over the approval of the business combination and other proposals and would likely increase the chances that such proposals would be approved. If the market does not view the business combination positively, purchases of public shares may have the effect of counteracting the market's view, which would otherwise be reflected in a decline in the market price of our securities. In addition, the termination of the support provided by these purchases may materially adversely affect the market price of our securities.

As of the date of this proxy statement/prospectus, no agreements with respect to the private purchase of public shares by Silver Spike or the persons described above have been entered into with any such investor or holder.

***New WMH may be unable to obtain additional financing to fund its operations or growth.***

New WMH may require additional financing to fund its operations or growth. The failure to secure additional financing could have a material adverse effect on the continued development or growth of New WMH. None of our officers, directors or shareholders is required to provide any financing to us in connection with or after our initial business combination.

***Changes in laws or regulations, or a failure to comply with any laws and regulations, may adversely affect our business, investments and results of operations.***

We are subject to laws, regulations and rules enacted by national, regional and local governments and the Nasdaq. In particular, we are required to comply with certain SEC, Nasdaq and other legal or regulatory requirements. Compliance with, and monitoring of, applicable laws, regulations and rules may be difficult, time consuming and costly. Those laws, regulations and rules and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, investments and results of operations. In addition, a failure to comply with applicable laws, regulations and rules, as interpreted and applied, could have a material adverse effect on our business and results of operations.

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our financial condition and results of operations.***

Following our domestication as a Delaware corporation, we will be subject to income and other taxes in the United States, and our domestic tax liabilities will be subject to the allocation of expenses in differing jurisdictions. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- tax effects of stock-based compensation;

- costs related to intercompany restructurings;

- changes in tax laws, regulations or interpretations thereof; or

- lower than anticipated future earnings in jurisdictions where we have lower statutory tax rates and higher than anticipated future earnings in jurisdictions where we have higher statutory tax rates.

96

In addition, we may be subject to audits of our income, sales and other taxes by U.S. federal and state authorities. Outcomes from these audits could have an adverse effect on our financial condition and results of operations.

*Our shareholders will experience immediate dilution as a consequence of the issuance of Class A common stock in connection with the business combination.*

In connection with the business combination, we will issue 65,984,049 shares of Class V common stock to post-merger WMH equity holders and 32,500,000 shares of Class A common stock pursuant to the subscription agreements. As a result, following the consummation of the business combination and related transactions, our public shareholders will hold 24,998,575 shares of Class A common stock of New WMH, or approximately 16.7% of New WMH issued and outstanding common stock (assuming that no holders of public shares elect to redeem their shares for a portion of the trust account and we do not otherwise issue any additional shares in connection with the business combination), which does not take into account any warrants that will be outstanding as of the closing and may be exercised thereafter or post-merger Class P units issued by WMH in connection with the business combination that may be exchanged for Class A common stock.

*We are an emerging growth company within the meaning of the Securities Act, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies, this could make our securities less attractive to investors and may make it more difficult to compare our performance with other public companies.*

We are an emerging growth company within the meaning of the Securities Act, as modified by the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved. As a result, our shareholders may not have access to certain information they may deem important. We could remain an emerging growth company for up to five years from the date of our IPO, although circumstances could cause us to lose that status earlier, including if the market value of our Class A ordinary shares held by non-affiliates exceeds $700,000,000 as of any June 30 before that time, in which case we would no longer be an emerging growth company as of the following December 31. We cannot predict whether investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. We have elected not to opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accountant standards used.

*WMH's financial results forecast relies in large part upon assumptions and analyses developed by WMH. If these assumptions or analyses prove to be incorrect, WMH's actual results may be materially different from its forecasted results.*

The projected financial information appearing elsewhere in this proxy statement/prospectus reflect numerous estimates and assumptions with respect to industry performance, general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to WMH's business, all of which are difficult to predict and many of which are beyond WMH's and Silver Spike's control. As a result, there can be no assurance

97

that the projected results will be realized or that actual results will not be significantly higher or lower than projected. Since the projections cover multiple years, such information by its nature becomes less reliable with each successive year. These financial projections are subjective in many respects and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments. As such, these financial projections constitute forward-looking information and are subject to risks and uncertainties, including the various risks and uncertainties set forth in the "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements" sections of this proxy statement/prospectus. In addition, WMH's projected revenue forecast is based on a variety of regulatory and operational assumptions, including available retail licenses across the U.S. and Canada, number of paying clients, and monthly revenue per paying client and its projected gross margin and adjusted EBITDA forecasts are driven by web hosting, internet service, and credit card processing expenses, sales and marketing expenses, product development expenses, and other general and administrative expenses.

The financial projections were prepared solely for internal use and not with a view toward public disclosure, the published guidelines of the SEC regarding projections or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. None of WMH's independent registered accounting firm, Silver Spike's independent registered accounting firm or any other independent accountants, have compiled, examined or performed any procedures with respect to the financial projections, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and they assume no responsibility for, and disclaim any association with, the financial projections. Furthermore, the financial projections do not take into account any circumstances or events occurring after the date they were prepared. The inclusion of financial projections in this proxy statement/prospectus should not be regarded as an indication that Silver Spike, our board of directors, or their respective affiliates, advisors or other representatives considered, or now considers, such financial projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the Business Combination Proposal. The financial forecasts are not fact and should not be relied upon as being necessarily indicative of future results, and readers of this information statement are cautioned not to place undue reliance on this information. Unfavorable changes in any of these or other factors, most of which are beyond WMH's or Silver Spike's control, could materially and adversely affect its business, results of operations and financial results.

***As a private company, we have not been required to document and test our internal controls over financial reporting nor has management been required to certify the effectiveness of our internal controls and our auditors have not been required to opine on the effectiveness of our internal control over financial reporting. Failure to maintain adequate financial, information technology and management processes and controls could result in material weaknesses which could lead to errors in our financial reporting, which could adversely affect our business.***

We have not been required to document and test our internal controls over financial reporting nor has management been required to certify the effectiveness of our internal controls and our auditors have not been required to opine on the effectiveness of our internal control over financial reporting. Similarly, as an "emerging growth company," we have so far been exempt from the SEC's internal control reporting requirements. New WMH may lose its emerging growth company status and become subject to the SEC's internal control over financial reporting management and auditor attestation requirements in the year in which it is deemed to be a large accelerated filer, which would occur once the market value of its common equity held by non-affiliates exceeds $700 million as of the end of the prior fiscal year's second fiscal quarter. While we expect to attest to the effectiveness of New WMH internal controls on Form 10-K for the year ended December 31, 2022, the New WMH's independent registered public accounting firm may be required to formally attest to the effectiveness of New WMH's internal controls over financial reporting as early as New WMH's annual report on Form 10-K for the year ended December 31, 2021. New WMH may not be able to complete its evaluation, testing and any required remediation in a timely fashion. In addition, New WMH's current controls and any new controls that it develops may become inadequate because of poor design and changes in its business. Any failure to implement and maintain effective internal controls over financial reporting could adversely affect the results of assessments by its independent registered public accounting firm and their attestation reports.

If New WMH is unable to certify the effectiveness of its internal controls, or if New WMH's internal controls have a material weakness, New WMH may not detect errors timely, its consolidated financial statements could be misstated, it could be subject to regulatory scrutiny and a loss of confidence by stakeholders, which could harm New WMH's business and adversely affect the market price of New WMH's securities following the business combination.

98

We will incur increased costs as a result of operating as a public company, and our management will devote substantial time to new compliance initiatives. If we complete the Business Combination and become a public company, we will incur significant legal, accounting and other expenses that we did not incur as a private company. As a public company, we will be subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, as well as rules adopted, and to be adopted, by the SEC and the applicable stock exchange. Our management and other personnel will need to devote a substantial amount of time to these compliance initiatives and may not effectively or efficiently manage our transition into a public company. Moreover, we expect these rules and regulations to substantially increase our legal and financial compliance costs and to make some activities more time-consuming and costly. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be forced to accept reduced policy limits or incur substantially higher costs to maintain the same or similar coverage. We cannot predict or estimate the amount or timing of additional costs we may incur to respond to these requirements. The impact of these requirements could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, its board committees or as executive officers.

***Our warrants are accounted for as liabilities and the changes in value of our warrants could have a material effect on our financial results.***

On April 12, 2021, the SEC issued a statement (the "Statement") discussing the accounting implications of certain terms that are common in warrants issued by special purpose acquisition companies ("SPACs"). In light of the Statement and guidance in ASC 815-40, "Derivatives and Hedging — Contracts in Entity's Own Equity", our management evaluated the terms of the Warrant Agreement entered into in connection with its initial public offering and concluded that its public warrants and private placement warrants (together, the "Warrants") include provisions that, based on the Statement, preclude the Warrants from being classified as components of equity. As a result, we have classified the Warrants as liabilities. Under this accounting treatment, we are required to measure the fair value of the Warrants at the end of each reporting period and recognize changes in the fair value from the prior period in our operating results for the current period. As a result of the recurring fair value measurement, our financial statements and results of operations may fluctuate quarterly based on factors which are outside our control. We expect that we will recognize non-cash gains or losses due to the quarterly fair valuation of our Warrants and that such gains or losses could be material.

***Silver Spike has identified a material weakness in its internal control over financial reporting as of December 31, 2020. If we are unable to develop and maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results in a timely manner, which may adversely affect investor confidence in us and materially and adversely affect our business and operating results.***

Following the issuance of the SEC Statement, on April 30, 2021, Silver Spike's management and its audit committee, after consultation with management and a discussion with Marcum LLP, the Company's independent registered public accounting firm, concluded that, in light of the SEC Statement, it was appropriate to restate certain items in (i) the Silver Spike's previously issued audited balance sheet dated as of August 12, 2019, which was related to the IPO, and (ii) the Silver Spike's previously issued audited financial statements as of December 31, 2019 and December 31, 2020 and for the period from July 7, 2019 (inception) through December 31, 2019 and for the period from January 1, 2020 to December 31, 2020 (the "Relevant Periods"). See "—Our warrants are accounted for as liabilities and the changes in value of our warrants could have a material effect on our financial results." As part of such process, Silver Spike identified a material weakness in its internal controls over financial reporting.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented, or detected and corrected on a timely basis. Effective internal controls are necessary for us to provide reliable financial reports and prevent fraud. We continue to evaluate steps to remediate the material weakness. These remediation measures may be time consuming and costly and there is no assurance that these initiatives will ultimately have the intended effects.

If we identify any new material weaknesses in the future, any such newly identified material weakness could limit our ability to prevent or detect a misstatement of our accounts or disclosures that could result in a material misstatement of our annual or interim financial statements. In such case, we may be unable to maintain compliance with securities law requirements regarding timely filing of periodic reports in addition to applicable stock exchange listing requirements, investors may lose confidence in our financial reporting and our stock price may decline as a

99

result. We cannot assure you that the measures we have taken to date, or any measures we may take in the future, will be sufficient to avoid potential future material weaknesses.

***Compliance obligations under the Sarbanes-Oxley Act may make it more difficult for us to effectuate the business combination, require substantial financial and management resources and increase the time and costs of completing the business combination.***

The fact that we are a blank check company makes compliance with the requirements of the Sarbanes-Oxley Act particularly burdensome on us as compared to other public companies because WMH is not currently subject to Section 404 of the Sarbanes-Oxley Act. The standards required for a public company under Section 404 of the Sarbanes-Oxley Act are significantly more stringent than those required of WMH as a privately held company. Management may not be able to effectively and timely implement controls and procedures that adequately respond to the increased regulatory compliance and reporting requirements that will be applicable to us after the business combination. If we are not able to implement the requirements of Section 404, including any additional requirements once we are no longer an emerging growth company, in a timely manner or with adequate compliance, we may not be able to assess whether its internal controls over financial reporting are effective, which may subject us to adverse regulatory consequences and could harm investor confidence and the market price of our common stock. Additionally, once we are no longer an emerging growth company, we will be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting.

***Lawsuits have been filed against Silver Spike, WMH and Merger Sub and certain of Silver Spike's current officers and directors and other lawsuits may be filed against Silver Spike, WMH and Merger Sub and their respective board of directors and officers challenging the business combination. An adverse ruling in any such lawsuit may prevent the business combination from being completed.***

Beginning on January 27, 2021, purported shareholders of Silver Spike filed or threatened to file lawsuits in connection with the merger, including two actions filed in the Supreme Court of the State of New York, captioned, *Brait v. Silver Spike Acquisition Corp., et al.,* Index No. 650629/2021 (N.Y. Sup. Ct.), and *Stout v. Silver Spike Acquisition Corp., et al.,* No. 650686/2021 (N.Y. Sup. Ct.). The operative complaints in the *Brait* and *Stout* actions allege that this proxy/prospectus omits material information related to the business combination, and asserts claims for breach of fiduciary duty against certain of Silver Spike's current officers and directors and for aiding and abetting breach of fiduciary duty against Silver Spike. The *Stout* complaint also asserts aiding and abetting claims against WMH and Merger Sub. Plaintiffs seek injunctive relief to enjoin the merger and to require defendants to issue supplemental disclosures as outlined in the complaints or, in the event the transaction is consummated in the absence of such supplemental disclosures, an order rescinding the transaction and awarding rescissory damages. Plaintiffs also seek an award of attorneys' fees and costs. Silver Spike has received similar demands from other purported shareholders of Silver Spike, including one that attached a draft complaint, styled *Fusco v. Silver Spike Acquisition Corp., et al.,* asserting similar fiduciary duty claims as in the *Brait* and *Stout* actions, as well as separate claims for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934; the draft complaint seeks an injunction of the proposed merger, pending dissemination of supplemental disclosures, unspecified damages and attorneys' fees and costs. The defendants believe that the claims made in these lawsuits are without merit.

There can be no assurances that additional complaints or demands will not be filed or made with respect to the merger. If additional similar complaints or demands are filed or made, absent new or different allegations that are material, neither Silver Spike nor WMH will necessarily announce them.

Please see the section entitled "The Business Combination – Litigation Relating to the Merger."

**Risks Related to Domestication**

***Upon completion of the business combination, the rights of holders of New WMH's common stock arising under the DGCL will differ from and may be less favorable than the rights of holders of Silver Spike's ordinary shares arising under the Cayman Islands Companies Act.***

Upon completion of the business combination, the rights of holders of New WMH's common stock will arise under the DGCL. The DGCL contains provisions that differ in some respects from those in the Cayman Islands Companies Act, and, therefore, some rights of holders of the New WMH's common stock could differ from the rights that holders of Silver Spike ordinary shares currently possess. For instance, while class actions are generally not available to shareholders under Cayman Islands law, such actions are generally available under Delaware law. This change could increase the likelihood that New WMH becomes involved in costly litigation, which could have a material adverse effect on New WMH.

For a more detailed description of the rights of holders of New WMH's common stock under the DGCL and how they may differ from the rights of holders of Silver ordinary shares under the Cayman Islands Companies Act, please see the section entitled "Comparison of Corporate Governance and Shareholder Rights" beginning on page 196 Forms of the proposed organizational documents of New WMH are attached as Annexes B and C to this proxy statement/prospectus and we urge you to read them.

***Provisions in our proposed organizational documents effected in connection with our domestication as a Delaware corporation, assuming shareholder approval of the Domestication Proposal, may inhibit a takeover of us, which could limit the price investors might be willing to pay in the future for our common stock and could entrench management.***

Our existing organizational documents and our proposed organizational documents in connection with our domestication as a Delaware corporation, assuming shareholder approval of the Domestication Proposal and the Organizational Documents Proposals, contain provisions that may discourage unsolicited takeover proposals that shareholders may consider to be in their best interests. These provisions include the ability of the board of directors to designate the terms of and issue new series of preference shares, which may make more difficult the removal of management and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities.

***New WMH's proposed organizational documents will designate the Court of Chancery of the State of Delaware as the sole and exclusive forum for substantially all disputes between New WMH and its stockholders, to the fullest extent permitted by law, which could limit New WMH's stockholders' ability to obtain a favorable judicial forum for disputes with New WMH or its directors, officers, stockholders, employees or agents.***

New WMH's proposed organizational documents that will be in effect upon the domestication provide that, to the fullest extent permitted by law, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for:

- any derivative action or proceeding brought on behalf of New WMH;

- any action or proceeding (including any class action) asserting a claim of breach of a fiduciary duty owed by any current or former director, officer or other employee of New WMH to New WMH or New WMH's stockholders;

- any action or proceeding (including any class action) asserting a claim against New WMH or any of our current or former director, officer or other employee arising out of or pursuant to any provision of the DGCL, the proposed charter and proposed bylaws (as each may be amended from time to time);

- any action or proceeding (including any class action) to interpret, apply, enforce or determine the validity of the proposed charter or the proposed bylaws of New WMH (including any right, obligation or remedy thereunder);

- any action or proceeding as to which the DGCL confers jurisdiction to the Court of Chancery of the State of Delaware; or

- any action asserting a claim against New WMH or any director, officer or other employee of New WMH governed by the internal affairs doctrine, in all cases to the fullest extent permitted by law and subject to the court's having personal jurisdiction over the indispensable parties named as defendants.

This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with New WMH or any of New WMH's directors, officers, or other employees, which may discourage lawsuits with respect to such claims. However, stockholders will not be deemed to have waived New WMH's compliance with the federal securities laws and the rules and regulations thereunder and this provision would not apply to suits brought to enforce a duty or liability created by the Exchange Act, which provides for the exclusive jurisdiction of the federal courts with respect to all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder, or the Securities Act. Further, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder. Accordingly, both state and federal courts have jurisdiction to entertain such claims. To prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, New WMH's proposed organizational documents provide that the federal district courts of the United States of America will be the exclusive

101

forum for resolving any complaint asserting a cause of action arising under the Securities Act. Accordingly, there is uncertainty as to whether a court would enforce such provision with respect to suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder. If a court were to find the choice of forum provision contained in New WMH's proposed organizational documents to be inapplicable or unenforceable in an action, New WMH may incur additional costs associated with resolving such action in other jurisdictions, which could harm New WMH's business, results of operations and financial condition.

***Certain Holders may be required to recognize gain for U.S. federal income tax purposes as a result of the domestication.***

As discussed more fully under the section "U.S. Federal Income Tax Considerations," the domestication should constitute a tax-free reorganization within the meaning of Section 368(a)(1)(F) of the Code. Assuming that the domestication so qualifies, U.S. Holders (as defined in such section) of Silver Spike ordinary shares will be subject to Section 367(b) of the Code and, as a result:

- Subject to the discussion below concerning PFICs, a U.S. Holder of Silver Spike ordinary shares whose ordinary shares have a fair market value of less than $50,000 on the date of the domestication and who is not a 10% shareholder (as defined above) will not recognize any gain or loss and will not be required to include any part of Silver Spike's earnings in income.

- Subject to the discussion below concerning PFICs, a U.S. Holder of Silver Spike ordinary shares whose ordinary shares have a fair market value of $50,000 or more, but who is not a 10% shareholder will generally recognize gain (but not loss) on the deemed receipt of Class A common stock in the domestication. As an alternative to recognizing gain as a result of the domestication, such U.S. Holder may file an election to include in income, as a dividend, the "all earnings and profits amount" (as defined in the Treasury Regulations under Section 367) attributable to its Silver Spike ordinary shares provided certain other requirements are satisfied.

- Subject to the discussion below concerning PFICs, a U.S. Holder of Silver Spike ordinary shares who on the date of the domestication is a 10% shareholder will generally be required to include in income, as a dividend, the "all earnings and profits amount" (as defined in the Treasury Regulations under Section 367) attributable to its Silver Spike ordinary shares provided certain other requirements are satisfied.

- As discussed further under "U.S. Federal Income Tax Considerations" below, Silver Spike believes that it is (and has been) treated as a PFIC for U.S. federal income tax purposes. In the event that Silver Spike is (or in some cases has been) treated as a PFIC, notwithstanding the foregoing, proposed Treasury Regulations under Section 1291(f) of the Code (which have a retroactive effective date), if finalized in their current form, generally would require a U.S. Holder to recognize gain as a result of the domestication unless the U.S. Holder makes (or has made) certain elections discussed further under "U.S. Federal Income Tax Considerations – The Domestication." The tax on any such gain would be imposed at the rate applicable to ordinary income and an interest charge would apply based on a complex set of rules. It is difficult to predict whether such proposed regulations will be finalized and whether, in what form, and with what effective date, other final Treasury Regulations under Section 1291(f) of the Code will be adopted. Further, it is not clear how any such regulations would apply to the warrants. For a more complete discussion of the potential application of the PFIC rules to U.S. Holders as a result of the domestication, see the section entitled "U.S. Federal Income Tax Considerations." Each U.S. Holder of Silver Spike ordinary shares or warrants is urged to consult its own tax advisor concerning the application of the PFIC rules to the exchange of Silver Spike ordinary shares for Class A common stock and Silver Spike warrants for New WMH warrants pursuant to the domestication.

Additionally, the domestication may cause Non-U.S. Holders (as defined in "U.S. Federal Income Tax Considerations" below) to become subject to U.S. federal income withholding taxes on any dividends in respect of such Non-U.S. Holder's Class A common stock subsequent to the domestication.

The tax consequences of the domestication are complex and will depend on a holder's particular circumstances. All holders are strongly urged to consult their tax advisor for a full description and understanding of the tax consequences of the domestication, including the applicability and effect of U.S. federal, state, local and foreign income and other tax laws. For a more complete discussion of the U.S. federal income tax considerations of the domestication, see the section entitled "U.S. Federal Income Tax Considerations."

102

***Nasdaq may delist New WMH's securities from trading on its exchange, which could limit investors' ability to make transactions in New WMH's securities and subject New WMH to additional trading restrictions.***

Silver Spike's public shares, public warrants and units are currently listed on Nasdaq and it is a condition to WMH's obligations to complete the business combination, that New WMH's Class A common stock shall have been listed on Nasdaq and will be eligible for continued listing on Nasdaq immediately following the business combination after giving effect to the redemptions (as if it were a new initial listing by an issuer that had never been listed prior to closing). However, Silver Spike cannot assure you that New WMH's securities will continue to be listed on Nasdaq in the future. In addition, in connection with the business combination and as a condition to WMH's obligations to complete the business combination, New WMH is required to demonstrate compliance with Nasdaq's initial listing requirements, which are more rigorous than Nasdaq's continued listing requirements, in order to continue to maintain the listing of New WMH's securities on Nasdaq. For instance, New WMH's stock price would generally be required to be at least $4 per share and its stockholders' equity would generally be required to be at least $5 million and New WMH would be required to have a minimum of 300 public holders of "round lots" of 100 shares. In addition to the listing requirements for New WMH's Class A common stock, Nasdaq imposes listing standards on warrants. Silver Spike cannot assure you that New WMH will be able to meet those initial listing requirements, in which case WMH will not be obligated to complete the business combination. In addition, it is possible that New WMH's Class A common stock and public warrants will cease to meet the Nasdaq listing requirements following the business combination.

If Nasdaq delists New WMH's securities from trading on its exchange and New WMH is not able to list its securities on another national securities exchange, Silver Spike expects New WMH's securities could be quoted on an over-the-counter market. If this were to occur, New WMH could face significant material adverse consequences, including:

- a limited availability of market quotations for its securities;

- reduced liquidity for its securities;

- a determination that New WMH's Class A common stock is a "penny stock" which will require brokers trading in the common stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for New WMH's securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

***Upon consummation of the business combination, the rights of holders of New WMH common stock arising under the DGCL as well as the proposed organizational documents will differ from and may be less favorable to the rights of holders of Silver Spike Class A ordinary shares arising under the Cayman Islands Companies Act as well as our current memorandum and articles of association.***

Upon consummation of the business combination, the rights of holders of New WMH common stock will arise under the proposed organizational documents as well as the DGCL. Those new organizational documents and the DGCL contain provisions that differ in some respects from those in our current memorandum and articles of association and the Cayman Islands Companies Act and, therefore, some rights of holders of New WMH common stock could differ from the rights that holders of Class A ordinary shares currently possess. For instance, while class actions are generally not available to shareholders under Cayman Islands Companies Act, such actions are generally available under the DGCL. This change could increase the likelihood that New WMH becomes involved in costly litigation, which could have a material adverse effect on New WMH.

In addition, there are differences between the new organizational documents of New WMH and the existing organizational documents of Silver Spike. For a more detailed description of the rights of holders of New WMH common stock and how they may differ from the rights of holders of Class A ordinary shares, please see "Comparison of Corporate Governance and Shareholder Rights." The forms of the proposed charter and the proposed bylaws of New WMH are attached as Annex B and Annex C, respectively, to this proxy statement/prospectus and we urge you to read them.

*New WMH will be a holding company and its only material asset after completion of the business combination will be its interest in WMH, and it is accordingly dependent upon distributions made by its subsidiaries to pay taxes, make payments under the tax receivable agreement and pay dividends.*

Upon completion of the business combination, New WMH will be a holding company with no material assets other than its ownership of post-merger WMH units and its managing member interest in WMH. As a result, New WMH will have no independent means of generating revenue or cash flow. New WMH's ability to pay taxes, make payments under the tax receivable agreement and pay dividends will depend on the financial results and cash flows of WMH and its subsidiaries and the distributions it receives from WMH. Deterioration in the financial condition, earnings or cash flow of WMH and its subsidiaries, for any reason could limit or impair WMH's ability to pay such distributions. Additionally, to the extent that New WMH needs funds and WMH and/or any of its subsidiaries are restricted from making such distributions under applicable law or regulation or under the terms of any financing arrangements, or WMH is otherwise unable to provide such funds, it could materially adversely affect New WMH's liquidity and financial condition.

WMH will continue to be treated as a partnership for U.S. federal income tax purposes and, as such, generally will not be subject to any entity-level U.S. federal income tax. Instead, the taxable income of WMH will be allocated to holders of post-merger WMH units, including New WMH. Accordingly, New WMH will be required to pay income taxes on its allocable share of any net taxable income of WMH. Under the terms of the amended operating agreement, WMH is obligated to make tax distributions to holders of post-merger WMH units (including New WMH) calculated at certain assumed tax rates. In addition to tax expenses, New WMH will also incur expenses related to its operations, including payment obligations under the tax receivable agreement (and the cost of administering such payment obligations), which could be significant. See the section entitled "The Business Combination – Related Agreements – Tax Receivable Agreement." New WMH intends to cause WMH to make distributions to holders of post-merger WMH units in amounts sufficient to cover all applicable taxes (calculated at assumed tax rates), relevant operating expenses, payments under the tax receivable agreement and dividends, if any, declared by New WMH. However, as discussed below, WMH's ability to make such distributions may be subject to various limitations and restrictions including, but not limited to, restrictions on distributions that would either violate any contract or agreement to which WMH is then a party, including debt agreements, or any applicable law, or that would have the effect of rendering WMH insolvent. If New WMH's cash resources are insufficient to meet its obligations under the tax receivable agreement and to fund its obligations, New WMH may be required to incur additional indebtedness to provide the liquidity needed to make such payments, which could materially adversely affect its liquidity and financial condition and subject New WMH to various restrictions imposed by any such lenders. To the extent that New WMH is unable to make payments under the tax receivable agreement for any reason, such payments will be deferred and will accrue interest until paid; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the tax receivable agreement and therefore accelerate payments due under the tax receivable agreement.

Additionally, although WMH generally will not be subject to any entity-level U.S. federal income tax, it may be liable under recent federal tax legislation for adjustments to its tax return, absent an election to the contrary. In the event WMH's calculations of taxable income are incorrect, its members, including New WMH, in later years may be subject to material liabilities pursuant to this federal legislation and its related guidance.

Dividends on New WMH's Class A common stock, if any, will be paid at the discretion of the board of directors of New WMH, which will consider, among other things, New WMH's business, operating results, financial condition, current and expected cash needs, plans for expansion and any legal or contractual limitations on its ability to pay such dividends. Financing arrangements may include restrictive covenants that restrict New WMH's ability to pay dividends or make other distributions to its stockholders. In addition, WMH is generally prohibited under Delaware law from making a distribution to a member to the extent that, at the time of the distribution, after giving effect to the distribution, liabilities of WMH (with certain exceptions) exceed the fair value of its assets. WMH's subsidiaries are generally subject to similar legal limitations on their ability to make distributions to WMH. If WMH does not have sufficient funds to make distributions, New WMH's ability to declare and pay cash dividends may also be restricted or impaired.

*In certain circumstances, WMH will be required to make distributions to us and the other holders of post-merger WMH units, and the distributions that WMH will be required to make may be substantial.*

As discussed above, WMH will generally be required from time to time to make pro rata distributions in cash to us and the other holders of post-merger WMH units at certain assumed tax rates in amounts that are intended to

104

be sufficient to cover the taxes on our and the other WMH equity holders' respective allocable shares of the taxable income of WMH. As a result of (i) potential differences in the amount of net taxable income allocable to us and the other holders of post-merger WMH units, (ii) the lower tax rate applicable to corporations than individuals and (iii) the use of an assumed tax rate (based on the tax rate applicable to individuals) in calculating WMH's distribution obligations, we may receive tax distributions significantly in excess of our tax liabilities and obligations to make payments under the tax receivable agreement. New WMH will determine in its sole discretion the appropriate uses for any excess cash so accumulated, which may include, among other uses, dividends, the payment of obligations under the tax receivable agreement and the payment of other expenses. New WMH will have no obligation to distribute such excess cash (or other available cash other than any declared dividend) to the holders of Class A common stock. No adjustments to the redemption or exchange ratio of post-merger WMH units for shares of Class A common stock will be made as a result of either (i) any cash dividend by us or (ii) any cash that we retain and do not distribute to our stockholders. To the extent that New WMH does not distribute such excess cash as dividends on Class A common stock and instead, for example, holds such cash balances or lends them to WMH, post-merger WMH equity holders would benefit from any value attributable to such cash balances as a result of their ownership of Class A common stock following a redemption or exchange of their post-merger WMH units.

***New WMH will be required to pay the WMH Class A equity holders and any other persons that become parties to the tax receivable agreement for certain tax benefits New WMH may receive and the amounts payable may be substantial.***

Acquisitions by New WMH of common units in the business combination and future taxable redemptions or exchanges of post-merger Class A units by the WMH equity holders for shares of Class A common stock or cash pursuant to the exchange agreement are expected to result in favorable tax attributes for New WMH.

Upon the completion of the business combination, New WMH, the holder representative and the WMH Class A equity holders will enter into the tax receivable agreement. Under the tax receivable agreement, New WMH generally will be required to pay to the WMH Class A equity holders, in the aggregate, 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax or franchise tax that New WMH actually realizes as a result of (i) increases to the tax basis of WMH's assets resulting from acquisitions by New WMH of common units for cash in the business combination and future taxable redemptions or exchanges of post-merger Class A units for shares of Class A common stock or cash pursuant to the exchange agreement, (ii) tax benefits related to imputed interest or (iii) tax attributes resulting from payments made under the tax receivable agreement. The payment obligations under the tax receivable agreement are New WMH's obligations and not obligations of WMH.

We expect that the payments New WMH will be required to make under the tax receivable agreement will be substantial. Assuming no material changes in relevant tax law, that no Silver Spike shareholders exercise redemption rights with respect to their public shares, that there are no future redemptions or exchanges of post-merger Class A units and that New WMH earns sufficient taxable income to realize all tax benefits that are subject to the tax receivable agreement, the tax savings associated with acquisitions of common units in the business combination would aggregate to approximately $157.1 million over 15 years from the date of the completion of the business combination. Under this scenario, New WMH would be required to pay to the WMH Class A equity holders approximately 85% of such amount, or $133.5 million, over the 15-year period from the date of the completion of the business combination. The actual amounts New WMH will be required to pay may materially differ from these hypothetical amounts, because potential future tax savings that New WMH will be deemed to realize, and the tax receivable agreement payments made by New WMH, will be calculated based in part on the market value of the Class A common stock at the time of each redemption or exchange under the exchange agreement and the prevailing applicable tax rates applicable to New WMH over the life of the tax receivable agreement and will depend on New WMH generating sufficient taxable income to realize the tax benefits that are subject to the tax receivable agreement. Payments under the tax receivable agreement are not conditioned on the WMH Class A equity holders' continued ownership of New WMH.

***In certain cases, payments under the tax receivable agreement may be accelerated and/or significantly exceed the actual benefits New WMH realizes in respect of the tax attributes subject to the tax receivable agreement.***

Payments under the tax receivable agreement will be based on the tax reporting positions New WMH determines, and the IRS or another tax authority may challenge all or a part of the existing tax basis, tax basis increases, or other tax attributes subject to the tax receivable agreement, and a court could sustain such challenge. The parties to the tax receivable agreement will not reimburse New WMH for any payments previously made if such

Exhibit A
Page 78

tax basis, or other tax benefits are subsequently disallowed, except that any excess payments made to a party under the tax receivable agreement will be netted against future payments otherwise to be made under the tax receivable agreement, if any, after the determination of such excess.

In addition, the tax receivable agreement provides that if (1) New WMH breaches any of its material obligations under the tax receivable agreement (including in the event that New WMH is more than three months late making a payment that is due under the tax receivable agreement, except in the case of certain liquidity exceptions) (2) New WMH is subject to certain bankruptcy, insolvency or similar proceedings, or (3) at any time, New WMH elects an early termination of the tax receivable agreement, New WMH's obligations under the tax receivable agreement (with respect to all post-merger Class A units, whether or not such units have been exchanged or redeemed before or after such transaction) would accelerate and become payable in a lump sum amount equal to the present value of the anticipated future tax benefits calculated based on certain assumptions, including that New WMH would have sufficient taxable income to fully utilize the deductions arising from the tax deductions, tax basis and other tax attributes subject to the tax receivable agreement. The tax receivable agreement also provides that, upon certain mergers, asset sales or other forms of business combination, or certain other changes of control, (x) New WMH's obligations under the tax receivable agreement with respect to post-merger Class A units that have been exchanged or redeemed prior to or in connection with such change of control transaction would accelerate and become payable in a lump sum as described above and (y) with respect to post-merger Class A units that have not been exchanged as of such change of control transaction, New WMH's or its successor's obligations under the tax receivable agreement would be based on certain assumptions, including that New WMH or its successor would have sufficient taxable income to fully utilize the increased tax deductions and tax basis and other benefits covered by the tax receivable agreement. As a result, upon any acceleration of New WMH's obligations under the tax receivable agreement (including upon a change of control), New WMH could be required to make payments under the tax receivable agreement that are greater than 85% of its actual cash tax savings, which could negatively impact its liquidity. The change of control provisions in the tax receivable agreement may also result in situations where the WMH Class A equity holders have interests that differ from or are in addition to those of the Class A stockholders.

Finally, because New WMH is a holding company with no operations of its own, its ability to make payments under the tax receivable agreement depends on the ability of WMH to make distributions to it. To the extent that New WMH is unable to make payments under the tax receivable agreement for any reason, such payments will be deferred and will accrue interest until paid, which could negatively impact New WMH's results of operations and could also affect its liquidity in periods in which such payments are made.

106

**Exhibit A**
**Page 79**

in December 2020, which is significantly lower than other digital marketing platforms servicing less specialized end-markets without requiring the level of user targeting that our platform provides. Further, during the last six months of fiscal 2020, our platform had an average click-through-rate in excess of 10% for our dispensary and delivery featured listings inventory which is significantly higher than other less specialized digital marketing platforms. We recently launched a self-serve bidding engine in select regions within Michigan and Colorado, allowing clients to purchase featured listings on a cost-per-click basis based on a target budget. We will look to expand these performance-based pricing tests in additional markets over time.

We have seen significant growth in our monthly revenue per client over time. We have generally seen that the longer clients stay on the Weedmaps listings marketplace and leverage our WM Business solutions, the more they spend with us. We have also experienced rising levels of spend by our more recent client cohorts as seen in the below chart, which is dated as of December 31, 2020, where our more recent 2018 and 2019 client cohorts are spending at higher levels in the first three months on the platform vs. our 2016 and 2017 client cohorts.



We believe these dynamics are driven by (i) increasing retail density as license issuance continues within the markets we serve, creating more new potential clients and increased competition among clients we serve, and (ii) more client engagement across our WM Business solution set, leading to an enhanced awareness of the return on investment that our clients receive from spend on our platform.

We sell our offerings in the United States and Canada, and we have a limited number of non-monetized listings in several international countries including Austria, Germany, the Netherlands, Spain, and Switzerland. As of March 31, 2021, we actively operate in 23 U.S. states and territories that have adult-use and/or medical-use regulations in place.

**Key Operating and Financial Metrics**

We monitor the following key financial and operational metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans, and make strategic decisions.

|  | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
|  | 2018 | 2019 | 2020 | 2020 | 2021 |
|  | (dollars in thousands, except for revenue by client) | | | | |
| Revenue | $101,402 | $144,232 | $161,791 | $32,210 | $41,154 |
| Net Income | $ 12,679 | $ (375) | $ 38,830 | $ 3,809 | $ 7,731 |
| EBITDA[1] | $ 15,448 | $ 6,232 | $ 42,808 | $ 4,808 | $ 8,974 |
| Adjusted EBITDA[1] | $ 17,123 | $ 13,828 | $ 42,808 | $ 4,808 | $ 8,974 |
| Monthly revenue per paying client[2] | $ 2,526 | $ 2,888 | $ 3,609 | $ 2,842 | $ 3,689 |

222

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2020** | **2021** |
| | (dollars in thousands, except for revenue by client) | | | | |
| Paying clients[3] | 4,024 | 4,644 | 3,786 | 4,101 | 4,058 |
| MAUs (in thousands)[4] | 4,684 | 8,009 | 10,000 | 6,457 | 9,163 |

---

(1)  For further information about how we calculate EBITDA and Adjusted EBITDA as well as limitations of its use and a reconciliation of EBITDA and Adjusted EBITDA to net income, see "—EBITDA and Adjusted EBITDA."

(2)  Monthly revenue per client is defined as monthly revenue for the last month of any particular period divided by the number of paying clients in that last month of a particular period. The calculation of monthly revenue includes revenue from any clients that cease to be paying clients during the applicable month.

(3)  Paying clients are defined as the number of paying clients billed during the last month of a particular period (and for which services were provided).

(4)  MAUs are defined as the number of unique users opening our Weedmaps mobile app or accessing our Weedmaps.com website over the course of a calendar month. Monthly active users in this table is for the last month in the period.

*Revenue*

We generate revenue from the sale of monthly subscriptions and our additional offerings as described previously. Our monthly subscription offering is sold based on a fixed price per month with the pricing based on the type of client. These subscriptions generally have one-month terms that automatically renew unless notice of cancellation is provided in advance. Our additional offerings range in price and terms. For clients that pay us in advance for subscription and other services, we record deferred revenue and recognize revenue over the applicable term of services provided.

*EBITDA and Adjusted EBITDA*

To provide investors with additional information regarding our financial results, we have disclosed in the table above EBITDA and Adjusted EBITDA, both of which are non-GAAP financial measures that we calculate as net income before interest, taxes, depreciation and amortization in the case of EBITDA and further adjusted to exclude loss from discontinued operations, and other unusual and/or infrequent costs in the case of Adjusted EBITDA. Below we have provided a reconciliation of net income (the most directly comparable GAAP financial measure) to EBITDA and from EBITDA to Adjusted EBITDA.

We present EBITDA and Adjusted EBITDA because these metrics are a key measure used by our management and board of managers to evaluate our operating performance, generate future operating plans and make strategic decisions regarding the allocation of investment capacity. Accordingly, we believe that EBITDA and Adjusted EBITDA provides useful information to investors and others in understanding and evaluating our operating results in the same manner as our management and board of managers.

EBITDA and Adjusted EBITDA have limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under GAAP. Some of these limitations are:

- although depreciation and amortization are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and both EBITDA and Adjusted EBITDA do not reflect cash capital expenditure requirements for such replacements or for new capital expenditure requirements;

- EBITDA and Adjusted EBITDA do not reflect changes in, or cash requirements for, our working capital needs; and

- EBITDA and Adjusted EBITDA do not reflect tax payments that may represent a reduction in cash available to us.

Because of these limitations, you should consider EBITDA and Adjusted EBITDA alongside other financial performance measures, including net income and our other GAAP results.

223

A reconciliation of net income to non-GAAP EBITDA and Adjusted EBITDA is as follows:

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2020 | 2021 |
| | | | (in thousands) | | |
| Net income (loss) | $12,679 | $ (375) | $38,830 | $3,809 | $7,731 |
| Interest expenses & taxes | 620 | 1,445 | — | — | 241 |
| Depreciation and amortization expenses | 2,149 | 5,162 | 3,978 | 999 | 1,002 |
| EBITDA | $15,448 | $ 6,232 | $42,808 | $4,808 | $8,974 |
| Loss from discontinued operations | 1,675 | — | — | — | — |
| Financing fees | — | 3,394 | — | — | — |
| Reduction in force | — | 4,202 | — | — | — |
| Adjusted EBITDA | $17,123 | $13,828 | $42,808 | $4,808 | $8,974 |

### Monthly Revenue Per Paying Client

Monthly revenue per paying client measures how much clients, as of the period of measurement, are willing to pay us for our subscription and additional offerings and the efficiency of the bid-auction process for our featured listings placements. We calculate this metric by dividing total monthly revenue for the last month of any particular period by the number of paying clients in that last month of a particular period. The calculation of total monthly revenue includes revenue from any clients that cease to be paying clients during the applicable month. We have consistently grown our monthly revenue per paying client, reflecting the increased functionality we have provided over time with our WM Business software solutions and the increased retailer density within the markets we serve.

### Paying Clients

We define paying clients as the number of clients billed during the last month of a particular period (and for which services were provided). Our paying clients include both individual cannabis businesses as well as retail sites or businesses within a larger organization that have independent relationships with us, many of whom are owned by holding companies where decision-making is decentralized such that purchasing decisions are made, and relationships with us are located, at a lower organizational level. In addition, any client may choose to purchase multiple listing solutions for each of their retail sites or businesses. While we have historically seen consistent growth in the number of our paying clients, we saw a decline starting in late 2017 through the first half of 2018 that we believe was driven by the uncertainty around legalization of adult-use cannabis by California on January 2, 2018. The first half of 2018 was a transition period within the state of California during which only temporary licenses were granted to local retailers and the status and scope of permanent licenses was uncertain. During such time, we experienced a decline in paying clients, which moderated in the second half of 2018 when we saw our results in California to begin to return to more typical patterns. On December 31, 2019, we discontinued our service to California-based clients who failed to provide valid licensing information, in accordance with our prior announcement in August 2019 to support only licensed cannabis retail operators and their partners on our platform. As a result, we experienced a high level of client churn in January as a result of the elimination of these non-licensed operators. In June 2020, we initiated a similar effort in Canada to discontinue services to Canada-based retail operators clients who failed to provide valid license information, which drove a decline in paying clients beginning in September 2020. This reset of Canada was completed on November 30, 2020.

### MAUs

We define MAUs as the number of unique users opening our Weedmaps mobile app or accessing our Weedmaps.com website over the course of a calendar month. In any particular period, we determine our number of MAUs by counting the total number of users who have engaged with the weedmaps.com site during the final calendar month of the given period. We view the number of MAUs as a key indicator of our growth, the breadth and reach of our weedmaps.com site, the value proposition and consumer awareness of our brand, the continued use of our sites by our users and their level of interest in the cannabis industry.

As our business has grown, our MAUs increased each year from 2018 through 2020. This increase is due to a number of factors including, but not limited to, our continued expansion into new markets, further investments in our

224

existing markets, increase in marketing spend, including web advertising, and the general increased awareness of our platform as the cannabis industry has grown and jurisdictions experience continued legalization of cannabis for medical and/or adult use. We also believe we were increasingly efficient with our marketing spend and, therefore, have been able to acquire users at lower costs. However, as our platform has grown organically, our MAU growth rates have at times naturally slowed and we may experience similarly slower growth rates in the future, even if we continue to add MAUs on an absolute basis. While it is not possible to identify all drivers of a change in any given period, an increase or decrease in digital marketing spend as well as significant market shifts including the removal of non-licensed operators in certain markets can have outsized impacts on MAU growth. We cannot determine what, if any, impact the pandemic had on our MAU growth in 2020.

Since the beginning of the pandemic, we have grown our MAUs from 7.4 million in February 2020 to 9.1 million in March 2021. While we believe, like other industries, the pandemic accelerated existing trends towards consumer adoption of online platforms, we cannot be certain to what impact, if any, the end of the pandemic will have on our MAUs or MAU growth.

We believe as we increase MAUs, we increase the value of our bundled SaaS solutions to business customers. We intend to disclose MAUs on a quarterly basis (based on the last month of the applicable quarter) going forward in connection with our quarterly reporting and filings.

## Factors Affecting Our Performance

### *Growth of Our Two-Sided Weedmaps Listings Marketplace*

We have historically grown through and intend to focus on continuing to grow through the expansion of our two-sided listings marketplace, which occurs through growth of the number and type of businesses and consumers that we attract to our platform. We believe that expansion of the number and types of cannabis businesses that choose to list on our platform will continue to make our platform more compelling for consumers and drive traffic and consumer engagement, which in turn will make our platform more valuable to cannabis businesses.

### *Growth and Retention of Our Paying Clients*

Our revenue grows primarily through acquiring and retaining paying clients and increasing the revenue per paying client over time. We have a history of attracting new paying clients and increasing their annual spend with us over time, primarily due to the value they receive once they are onboarded and able to take advantage of the benefits of participating in our two-sided marketplace and leveraging our software solutions. Our monthly net dollar retention, which is defined as total revenue for clients in a given month who were paying clients in the immediately preceding month, has averaged at 100% for the eleven months between February 1 and December 31, 2020 (we exclude January 2020 given the high level of client churn that we experienced as a result of our decision to remove non-licensed operators in California at the end of 2019). In the first quarter of 2021, our net dollar retention averaged 102%, as we removed our paid Canada-based retail operator clients who failed to provide valid license information beginning in September 2020 (following the earlier removal of such Canada-based clients who were receiving free listing subscriptions), which resulted in a decrease in our overall net dollar retention for the period from February 2020 to December 2020. For fiscal years 2018-2019, our monthly net dollar retention averaged 98%.

### *Regulation and Maturation of Cannabis Markets*

We believe that we will have significant opportunities for greater growth as more jurisdictions legalize cannabis for medical and/or adult use and the regulatory environment continues to develop. Thirty-six U.S. states, the District of Columbia, Puerto Rico, and several U.S. territories have legalized some form of whole-plant cannabis cultivation, sales, and use for certain medical purposes. Seventeen of those states and the District of Columbia have also legalized cannabis use by adults for non-medical or adult-use purposes, and several other states are at various stages of similar legalization measures. We intend to explore new expansion opportunities as additional jurisdictions legalize cannabis for medical or adult use and leverage our business model informed by our 13-year operating history to enter new markets.

We also have a significant opportunity to monetize transactions originating from users engaging with a retailer on the Weedmaps listings marketplace or tracked via one of our WM Business solutions. Given U.S. federal prohibitions on plant-touching businesses and our current policy not to participate in the chain of commerce associated with the sale of cannabis products, we do not charge take-rates or payment fees for transactions originating

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant has duly caused this amendment No. 4 to the registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on the 25th day of May, 2021.

**SILVER SPIKE ACQUISITION CORP.**

By:   /s/ Scott Gordon

Name:   Scott Gordon

Title:   Chief Executive Officer and Chairman

\* \* \*

Pursuant to the requirements of the Securities Act of 1933, as amended, this amendment No. 4 to the registration statement has been signed by the following persons on the date indicated.

| Signature | Capacity | Date |
| --- | --- | --- |
| /s/ Scott Gordon<br>Scott Gordon | Chief Executive Officer and Chairman (Principal Executive Officer) | May 25, 2021 |
| *<br>William Healy | President and Director | May 25, 2021 |
| *<br>Gregory M. Gentile | Chief Financial Officer (Principal Financial and Accounting Officer) | May 25, 2021 |
| *<br>Orrin Devinsky | Director | May 25, 2021 |
| *<br>Richard M. Goldman | Director | May 25, 2021 |
| *<br>Kenneth H. Landis | Director | May 25, 2021 |

*By:   /s/ Scott Gordon

Attorney-in-fact

II-6

**Exhibit A
Page 84**