DAVIS POLK & WARDWELL LLP
EDMUND POLUBINSKI (*pro hac vice*)
DANIEL J. SCHWARTZ (*pro hac vice*)
MARIE KILLMOND (*pro hac vice*)
MARY KATE SHERWOOD (*pro hac vice*)
(edmund.polubinski@davispolk.com)
(daniel.schwartz@davispolk.com)
(marie.killmond@davispolk.com)
(mary.sherwood@davispolk.com)
450 Lexington Ave.
New York, New York 10017
Telephone: +1 212 450 4000
Facsimile: +1 212 450 5000

MANDAVIA EPHRAIM & BURG LLPG
ANJANI MANDAVIA (SBN 94092)
(amandavia@mandaviallp.com)
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: +1 310 556 9694

*Attorneys for Scott Gordon,*
*William Healy, and Gregory Gentile*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERET ISHAK, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> WM TECHNOLOGY, INC. f/k/a SILVER SPIKE ACQUISITION CORP., CHRISTOPHER BEALS, ARDEN LEE, DOUGLAS FRANCIS, SUSAN ECHERD, MARY HOITT, SCOTT GORDON, WILLIAM HEALY, and GREGORY M. GENTILE <br><br> Defendants. | Case No. 2:24-cv-08959-ODW-PVC <br><br> **AMENDED DECLARATION OF EDMUND POLUBINSKI IN SUPPORT OF (1) THE SILVER SPIKE INDIVIDUALS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT AND (2) THE SILVER SPIKE INDIVIDUALS' REQUEST FOR CONSIDERATION OF DOCUMENTS AND JUDICIAL NOTICE** <br><br> Date:      October 27, 2025 <br> Time:     1:30 p.m. <br> Dept:     Courtroom 5D, 5th Fl. <br> Judge:    Hon. Otis D. Wright, II |

I, Edmund Polubinski, hereby declare as follows:

1.    I am an attorney licensed to practice law in the state of New York, and I have been admitted to practice *pro hac vice* before this Court.  I am an attorney at Davis Polk & Wardwell LLP, counsel for Defendants Scott Gordon, William Healy, and Gregory M. Gentile (collectively, the "Silver Spike Individuals"), in the above-captioned action. I submit this declaration in support of the Silver Spike Individuals' Motion to Dismiss the Amended Class Action Complaint and Request for Consideration of Documents and Judicial Notice. I make this declaration of my personal knowledge. If called as a witness, I could and would competently testify to the matters set forth herein.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the Proxy Statement/Prospectus ("Proxy") that Silver Spike Acquisition Corp. ("Silver Spike") filed with the Securities Exchange Commission ("SEC") on Form 424(B)(3) on May 26, 2021.  Plaintiffs' Amended Class Action Complaint (the "AC") incorporates the Proxy by reference at Paragraphs 35, 37, and 39, among others.

3.    Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the Registration Statement (Amended) (the "Registration Statement") that Silver Spike filed with the SEC on Form S-4 on May 25, 2021.  The AC incorporates the Proxy by reference at Paragraphs 35, 37, and 39, among others.

4.    Attached hereto as **Exhibit 3** is the Current Report that Silver Spike filed with the SEC on Form 8-K on June 2, 2021 (the "8-K").  The 8-K supplemented the Proxy with additional information.  Because the 8-K forms part of the Proxy, which is incorporated by reference into the AC, the 8-K is also incorporated by reference in the AC.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

2

**DECLARATION OF
EDMUND POLUBINSKI
2:24-CV-08959-ODW-PVC**

Executed on this 11th day of July, 2025, in New York, New York.

*/s/ Edmund Polubinski*
Edmund Polubinski

# Exhibit 1

TABLE OF CONTENTS

**File Pursuant to rule 424(b)(3)**
**Registration No. 333-252186**

## PROXY STATEMENT/PROSPECTUS FOR EXTRAORDINARY GENERAL MEETING OF SHAREHOLDERS OF SILVER SPIKE ACQUISITION CORP.

**PROXY STATEMENT/PROSPECTUS FOR 24,998,575 SHARES OF CLASS A COMMON STOCK AND 12,500,000 WARRANTS TO PURCHASE SHARES OF CLASS A COMMON STOCK, IN EACH CASE OF SILVER SPIKE ACQUISITION CORP. AFTER ITS DOMESTICATION AS A CORPORATION INCORPORATED IN THE STATE OF DELAWARE, WHICH WILL BE RENAMED "WM TECHNOLOGY, INC." IN CONNECTION WITH THE BUSINESS COMBINATION).**

The board of directors of Silver Spike Acquisition Corp., a Cayman Islands exempted company ("Silver Spike," "we," "our" or "us"), has unanimously approved the agreement and plan of merger, dated as of December 10, 2020 (as amended or modified from time to time, the "merger agreement"), by and among Silver Spike, Silver Spike Merger Sub LLC, a Delaware limited liability company and a wholly owned direct subsidiary of Silver Spike ("Merger Sub"), WM Holding Company, LLC, a Delaware limited liability company ("WMH"), and Ghost Media Group, LLC, a Nevada limited liability company, solely in its capacity as the initial holder representative (the "holder representative"), pursuant to which Merger Sub will be merged with and into WMH, whereupon the separate limited liability company existence of Merger Sub will cease and WMH will be the surviving company and continue in existence as a subsidiary of Silver Spike, on the terms and subject to the conditions set forth therein (the transactions contemplated by the merger agreement, the "business combination").

As described in this proxy statement/prospectus, Silver Spike's shareholders are being asked to consider and vote upon (among other things) the business combination and the change of Silver Spike's jurisdiction of incorporation from the Cayman Islands to the State of Delaware by deregistering as an exempted company in the Cayman Islands and domesticating and continuing as a corporation incorporated under the laws of the State of Delaware (the "domestication" and Silver Spike post-domestication, "New WMH"). Assuming the domestication proposal is approved, the domestication is expected to be effectuated prior to, but conditioned upon, the closing of the business combination (the "closing"). The continuing entity following the domestication will be named "WM Technology, Inc."

The merger consideration (the "merger consideration") received by holders of the limited liability company interests of WMH (each, a "WMH equity holder") at the closing of the business combination (the "Closing") pursuant to the merger agreement will have a value of $1,310,000,000 and will be paid in a mix of cash and equity consideration.

Financing for the business combination and for related transaction expenses will consist of (i) $250,000,000 of proceeds from Silver Spike's initial public offering (the "IPO") and certain related transactions on deposit in the trust account (plus interest income accrued thereon since the IPO), net of any redemptions of Silver Spike's Class A ordinary shares in connection with the shareholder votes to be held at the extraordinary general meeting of Silver Spike shareholders to be held in connection with the business combination (the "general meeting") and held at the extraordinary general meeting in lieu of annual general meeting on January 13, 2021 in connection with a proposal to amend Silver Spike's existing organizational documents ("the extension meeting") and (ii) $325,000,000 of proceeds from the purchase by certain accredited investors, pursuant to subscription agreements entered into in connection with the entry into the merger agreement (the "subscription agreements"), of an aggregate of 32,500,000 shares of Class A common stock of New WMH for a purchase price of $10.00 per share of Class A common stock of New WMH in a private placement to close immediately prior to the closing, each as described more fully in this proxy statement/prospectus.

Upon the consummation of the domestication, each of Silver Spike's currently issued and outstanding Class A ordinary shares and Class B ordinary shares, par value $0.0001 per share ("Class B ordinary shares" or the "founder shares") will automatically convert by operation of law, on a one-for-one basis, into shares of Class A common stock, par value $0.0001 per share, of New WMH ("Class A common stock"). Similarly, all of Silver Spike's outstanding warrants will become warrants to acquire the shares of Class A common stock, and no other changes will be made to the terms of any outstanding warrants as a result of the domestication.

This proxy statement/prospectus covers the following securities of New WMH to be issued in the domestication: (i) 24,998,575 shares of Class A common stock, representing our currently issued and outstanding public shares and (ii) 12,500,000 warrants to acquire shares of Class A common stock, representing our currently issued and outstanding public warrants.

Following the business combination, we will have two classes of common stock, Class A common stock and Class V common stock. The rights of the holders of Class A common stock and Class V common stock are identical, except with respect to dividend rights, rights upon liquidation, dissolution and winding-up and preemptive rights. The holders of Class V common stock will not participate in any dividends of New WMH, will not be entitled to receive any assets of New WMH in any liquidation, dissolution or winding up, and do not have preemptive, subscription, redemption or conversion rights. Each share of Class A common stock and Class V common stock is entitled to one vote per share. Upon completion of the business combination, there will be 149,748,575 shares of Class A common stock outstanding and approximately 65,984,049 shares of Class V common stock outstanding, based upon certain assumptions stated in this proxy statement/prospectus. See the section entitled "Summary Term Sheet" for more information.

Our units, Class A ordinary shares originally sold as part of the units, and warrants originally sold as part of the units are currently listed on The Nasdaq Stock Market LLC (the "Nasdaq") under the symbols "SSPKU," "SSPK" and "SSPKW," respectively. The Class A ordinary shares and warrants comprising the units began separately trading on January 14, 2020. Upon the closing, we intend to apply to continue the listing of our Class A common stock and warrants on the Nasdaq under the symbols "MAPS" and "MAPSW," respectively. Our units will not be traded following the closing.

This business combination is being accomplished through what is commonly referred to as an "Up-C" structure, which is often used by partnerships and limited liability companies undertaking an initial public offering. The Up-C structure allows the current WMH equity holders to retain their equity ownership in WMH, an entity that is classified as a partnership for U.S. federal income tax purposes, in the form of post-merger WMH units and provides potential future tax benefits for both New WMH and the post-merger WMH equity holders when they ultimately exchange their pass-through interests for shares of Class A common stock. New WMH will be a holding company, and immediately after the consummation of the business combination, its principal asset will be its ownership interests in WMH. At the closing, New WMH will become the managing member of WMH with control over the affairs and decision making of WMH, and will own approximately 42.6% of the economic interest in WMH, assuming no redemptions, and 25.9% of the economic interest in WMH, assuming maximum redemptions. See the section entitled "Summary of the Proxy Statement/Prospectus-The Business Combination" for more information. We do not believe that the Up-C organizational structure will give rise to any significant business or strategic benefit or detriment. We will consolidate the financial results of WMH in our combined financial statements.

**This proxy statement/prospectus provides you with detailed information about the business combination. domestication and other matters to be considered at the general meeting. We urge you to read the accompanying proxy statement/prospectus and the documents incorporated therein by reference carefully. In particular, you should review the matters discussed under the caption "Risk Factors" beginning on page 55 of the proxy statement/prospectus.**

**Neither the Securities Exchange Commission nor any state securities commission has approved or disapproved of the transactions described in the accompanying proxy statement/prospectus, passed upon the merits or fairness of either of the merger agreement or the transactions contemplated thereby, or passed upon the adequacy or accuracy of the accompanying proxy statement/prospectus. Any representation to the contrary is a criminal offense.**

This proxy statement/prospectus is dated May 25, 2021, and is first being mailed to Silver Spike shareholders on or about May 28, 2021.

TABLE OF CONTENTS

The holders of post-merger WMH units will generally incur U.S. federal, state and local income taxes on their proportionate share of any net taxable income of WMH. Net profits and net losses of WMH will generally be allocated to its members pro rata in accordance with the percentages of their respective ownership of post-merger WMH units. The amended operating agreement will provide for pro rata cash distributions to the holders of post-merger WMH units for purposes of funding their tax obligations in respect of the taxable income of WMH that is allocated to them. Generally, these tax distributions will be computed based on WMH's estimate of the net taxable income of WMH allocable to each holder of post-merger WMH units multiplied by an assumed tax rate equal to the highest effective marginal combined U.S. federal, state and local income tax rate prescribed for an individual or corporate resident of California or New York, New York (taking into account the non-deductibility of certain expenses, the character of our income, and the deductibility of state and local income taxes, to the extent applicable, but not taking into account any deduction under Section 199A of the Code). As a result of (i) potential differences in the amount of net taxable income allocable to New WMH and the other post-merger WMH unit holders, (ii) the lower tax rate applicable to corporations than individuals and (iii) the use of an assumed tax rate in calculating WMH's distribution obligations, New WMH may receive tax distributions significantly in excess of its tax liabilities and obligations to make payments under the tax receivable agreement.

Upon the liquidation or winding up of WMH, subject to the treatment of post-merger Class P units and LTIP Units (as defined in the amended operating agreement) and tax distributions, all net proceeds thereof will be distributed in accordance with each member's number of post-merger WMH units.

*Transfer Restrictions*

The amended operating agreement will contain restrictions on transfers of units and will require the prior consent of the managing member for such transfers, except in specified cases, including (i) certain transfers to permitted transferees under certain conditions and (ii) exchanges of post-merger WMH units for shares of Class A common stock or cash pursuant to the exchange agreement.

The foregoing description of the WMH amended operating agreement is not complete and is qualified in its entirety by reference to the WMH amended operating agreement, which is filed as Exhibit 10.7 and attached as Annex D to this proxy statement/prospectus and is incorporated herein by reference.

**Background of the Business Combination**

**Background of the Business Combination**

Silver Spike is a blank check company incorporated in the Cayman Islands for the purpose of effecting a merger, amalgamation, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses. The transactions contemplated by the merger agreement and related agreements, including the business combination and PIPE subscription financing, are a result of an extensive search for a potential transaction utilizing the global network and investing, operating and transaction experience of Silver Spike's management team and board of directors.

On August 12, 2019, Silver Spike consummated its IPO of 25,000,000 units. Each unit consists of one Class A ordinary share and one-half of one public warrant. Each whole public warrant entitles the holder to purchase one Class A ordinary share at an exercise price of $11.50 per share. The units were sold at an offering price of $10.00 per unit, generating gross proceeds of $250,000,000 (before underwriting discounts and commissions and offering expenses). Simultaneously with the consummation of our IPO and the sale of the units, we consummated a private placement of 7,000,000 warrants at a price of $1.00 per warrant, issued to our sponsor, generating total proceeds of $7,000,000. A total of $250,000,000 was placed in a trust account established for the benefit of our public shareholders.

Prior to the consummation of the IPO, neither Silver Spike, nor anyone on its behalf, contacted any prospective target business or had any substantive discussions, formal or otherwise, with respect to a transaction with Silver Spike.

As described in the prospectus for the IPO, Silver Spike's business strategy was to identify and complete our initial business combination with a target operating in the cannabis and related health and wellness industries that is compliant with all applicable laws and regulations within the jurisdictions in which it is located or operates. Silver Spike identified certain general, non-exclusive criteria and guidelines that it believed were important in evaluating prospective targets for our initial business combination.

126

TABLE OF CONTENTS

On December 9, 2020, the board of directors of Silver Spike held a telephonic meeting at which all senior management and the board of Silver Spike were in attendance. Also in attendance were representatives of Stifel, Piper, Davis Polk and Maples LLP ("Maples"), Cayman counsel to Silver Spike. Prior to the meeting, summaries of the significant transaction documents were distributed to the directors in substantially final form. Mr. Gordon updated Silver Spike's board of directors on Silver Spike's final due diligence findings and the terms of the proposed business combination, including the resolution of the final outstanding items. Representatives of Stifel and Piper then led a discussion designed to aid the board of directors in its evaluation of the proposed transaction, including market perspectives and valuation perspectives with respect to WMH and how the valuation reflected in the transaction compared to similar public companies in the technology and cannabis industries. The market perspectives consisted of a macroeconomic summary, including a discussion of the capital markets and mergers and acquisitions markets, in addition to recent developments in the technology and cannabis industry. The board of directors also discussed the fact that the PIPE subscription financing had been successful at the valuation implied by the transaction indicated support for the reasonableness of the consideration being paid. A representative of Maples reviewed with the board of directors the fiduciary duties that applied to their consideration of the proposed business combination. A representative of Davis Polk then discussed with the board of directors the proposed terms of the merger agreement, the subscription agreements and the other transaction documents to be entered into in connection with the proposed transaction. The board of directors then engaged in extensive discussions and deliberations with Silver Spike management and advisors. Among other things, the board of directors asked questions pertaining to legal due diligence, valuation comparables, feedback from subscription investors, risks, timing and process to closing. Following these discussions and deliberations, Silver Spike's three independent directors held an executive session to further discuss the merits of the proposed transaction. Upon rejoining the broader board of directors meeting, the three independent directors engaged in an additional questions and answers session mainly expanding on a few key legal and financial due diligence points. The board then unanimously determined that the proposed business combination is in the best interests of Silver Spike and its shareholders and adopted resolutions (i) approving the business combination, the merger agreement and the consummation of the transactions contemplated thereby and (ii) recommending that the transaction be submitted to Silver Spike's shareholders for approval.

In the early morning hours of December 10, 2020, following the approval of the business combination by the board of directors of Silver Spike and the WMH board of managers, Silver Spike, Merger Sub, WMH and, solely in its capacity as the holder representative, Ghost Media Group, LLC, executed the merger agreement. Concurrently with the execution of the merger agreement, (i) Silver Spike and our sponsor entered into the sponsor letter agreement, (ii) Silver Spike and the subscription investors entered into the subscription agreements, and (iii) Silver Spike and certain WMH equity holders entered into the voting and support agreements.

On the morning of December 10, 2020, prior to the commencement of trading of the shares of Silver Spike Class A common stock (Ticker: SSPK) on the Nasdaq, Silver Spike and WMH issued a joint press release regarding the business combination.

On December 10, 2020, Silver Spike filed a preliminary proxy statement with the SEC, seeking shareholder approval of the extension proposal.

Since December 10, 2020, Silver Spike and WMH, along with their respective counsel, have worked jointly on the preparation of this proxy statement/prospectus.

After waiting the requisite period of time and having not received comments from the SEC, Silver Spike filed its definitive proxy statement with the SEC with respect to the extension proposal on December 21, 2020.

Additionally, on January 13, 2021, Silver Spike held the extension meeting. At the extension meeting, Silver Spike's shareholder approved, among other matters, an amendment to Silver Spike's amended and restated memorandum and articles of association to extend the date by which Silver Spike has to consummate a business combination from February 12, 2021 to July 10, 2021. The purpose of the amendment to Silver Spike's amended and restated memorandum and articles of association is to allow Silver Spike more time to complete the business combination. 1,425 Class A ordinary shares were redeemed in connection with the vote to approve the extension.

Silver Spike and WMH have continued and expect to continue regular discussions regarding the execution and timing of the business combination and to take actions and exercise their respective rights under the merger agreement to facilitate the completion of the business combination.

TABLE OF CONTENTS

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF WMH**

*The following discussion and analysis of WMH's financial condition and results of operations should be read in conjunction with WMH's consolidated financial statements and notes to those statements included in this proxy statement/prospectus. Certain information contained in the discussion and analysis set forth below includes forward-looking statements that involve risks and uncertainties. WMH's actual results may differ materially from those anticipated in these forward-looking statements as a result of many factors. Please see "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors" in this proxy statement/prospectus.*

*For purposes of this subsection only, "WMH," "the Company," "we," "us" or "our" refer to WM Holding Company, LLC and its subsidiaries, unless the context otherwise requires.*

**Overview**

WMH was founded in 2008, and operates a leading listings marketplace with one of the most comprehensive SaaS subscription offerings sold to retailers and brands in the U.S. state-legal and Canadian cannabis markets. WMH also provides information on the cannabis plant and the industry and advocates for legalization. We address the challenges facing both consumers seeking to understand cannabis products and businesses who serve cannabis users in a legally compliant fashion with our Weedmaps platform and WM Business SaaS solution. Over the past 13 years, we have grown the Weedmaps listings marketplace to become the premier destination for cannabis consumers to discover and browse information regarding cannabis and cannabis products, with over 9 million MAUs on the demand-side and more than 4,000 paying business clients on the supply-side of our marketplace as of March 31, 2021. These paying clients include retailers, brands and other client types (such as doctors). Further, these clients, who can choose to purchase multiple listings solutions for each business, had purchased approximately 8,700 listing pages as of March 2021 (of the over 17,300 listing pages listing pages on the marketplace). The Weedmaps listings marketplace provides consumers with information regarding cannabis retailers and brands, as well as the strain, pricing, and other information regarding locally available cannabis products, through our website and mobile apps, permitting product discovery and order-ahead for pickup or delivery by participating retailers. We provide consumers with discovery channels to improve their knowledge of the local market for cannabis products, whether they are looking by strain, price, effects or form factors. Our weedmaps.com site also has educational content including news articles, information about cannabis strains, a number of "how-to" guides, policy white-papers and research to allow consumers to educate themselves on cannabis and its history, uses and legal status. While consumers can discover cannabis products, brands, and retailers on our site, we neither sell (or fulfill purchases of) cannabis products, nor do we process payments for cannabis transactions across our marketplace or SaaS solutions.

Over the last three years, we have developed and launched several SaaS solutions for our retailer clients. These solutions now comprise an integrated platform for retailers, which we call "WM Business". WM Business provides a comprehensive set of tools to enable cannabis businesses to provide their goods and services compliantly, with what we refer to as "business-in-a-box" functionality. Our "business-in-a-box" solution helps cannabis retailers to improve their workflows and regulatory compliance in the course of serving cannabis consumers. We offer this functionality through a packaged software solution that includes (based on availability within any given market and state-level regulations) (i) a listing page with product menu on weedmaps.com, our iOS Weedmaps mobile application and our Android Weedmaps mobile application, which allows clients to disclose their license information, hours of operation, contact information, discount policies, and other information that may be required under applicable state law, (ii) the ability to receive reservations of products for pickup by consumers or delivery to consumers (either on weedmaps.com, on a white labeled WM Store site or third-party sites through our orders and menu embed product), thereby allowing inventory forecasting and helping retailers ensure sufficient staff are present to confirm product availability (and complete orders and process payments - both of which only occur outside the Weedmaps listings marketplace), (iii) logistics software such as driver apps and fleet-tracking tools to permit legal compliance with state delivery regulations, (iv) retail point-of-sale, or POS, solutions to manage inventory and track-and-trace compliance reporting, (v) analytics dashboards, (vi) access to our online wholesale exchange marketplace to browse brand catalogs and efficiently identify brands to obtain inventory from (and review license information and certificates of analysis, among other compliance features), and (vii) application program interface, or API, integrations to streamline workflows, thereby helping eliminate human error in recordkeeping and promoting compliance through accuracy. We also offer a growing set of offerings for brands to reach consumers and retailers as well as manage their brand catalog information.

TABLE OF CONTENTS

in December 2020, which is significantly lower than other digital marketing platforms servicing less specialized end-markets without requiring the level of user targeting that our platform provides. Further, during the last six months of fiscal 2020, our platform had an average click-through-rate in excess of 10% for our dispensary and delivery featured listings inventory which is significantly higher than other less specialized digital marketing platforms. We recently launched a self-serve bidding engine in select regions within Michigan and Colorado, allowing clients to purchase featured listings on a cost-per-click basis based on a target budget. We will look to expand these performance-based pricing tests in additional markets over time.

We have seen significant growth in our monthly revenue per client over time. We have generally seen that the longer clients stay on the Weedmaps listings marketplace and leverage our WM Business solutions, the more they spend with us. We have also experienced rising levels of spend by our more recent client cohorts as seen in the below chart, which is dated as of December 31, 2020, where our more recent 2018 and 2019 client cohorts are spending at higher levels in the first three months on the platform vs. our 2016 and 2017 client cohorts.



We believe these dynamics are driven by (i) increasing retail density as license issuance continues within the markets we serve, creating more new potential clients and increased competition among clients we serve, and (ii) more client engagement across our WM Business solution set, leading to an enhanced awareness of the return on investment that our clients receive from spend on our platform.

We sell our offerings in the United States and Canada, and we have a limited number of non-monetized listings in several international countries including Austria, Germany, the Netherlands, Spain, and Switzerland. As of March 31, 2021, we actively operate in 23 U.S. states and territories that have adult-use and/or medical-use regulations in place.

**Key Operating and Financial Metrics**

We monitor the following key financial and operational metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans, and make strategic decisions.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2020 | 2021 |
| | (dollars in thousands, except for revenue by client) | | | | |
| Revenue | $101,402 | $144,232 | $161,791 | $32,210 | $41,154 |
| Net Income | $12,679 | $(375) | $38,830 | $3,809 | $7,731 |
| EBITDA[1] | $15,448 | $6,232 | $42,808 | $4,808 | $8,974 |
| Adjusted EBITDA[1] | $17,123 | $13,828 | $42,808 | $4,808 | $8,974 |
| Monthly revenue per paying client[2] | $2,526 | $2,888 | $3,609 | $2,842 | $3,689 |

222

TABLE OF CONTENTS

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2020 | 2021 |
| | (dollars in thousands, except for revenue by client) | | | | |
| Paying clients[3] | 4,024 | 4,644 | 3,786 | 4,101 | 4,058 |
| MAUs (in thousands)[4] | 4,684 | 8,009 | 10,000 | 6,457 | 9,163 |

(1) For further information about how we calculate EBITDA and Adjusted EBITDA as well as limitations of its use and a reconciliation of EBITDA and Adjusted EBITDA to net income, see "-EBITDA and Adjusted EBITDA."

(2) Monthly revenue per client is defined as monthly revenue for the last month of any particular period divided by the number of paying clients in that last month of a particular period. The calculation of monthly revenue includes revenue from any clients that cease to be paying clients during the applicable month.

(3) Paying clients are defined as the number of paying clients billed during the last month of a particular period (and for which services were provided).

(4) MAUs are defined as the number of unique users opening our Weedmaps mobile app or accessing our Weedmaps.com website over the course of a calendar month. Monthly active users in this table is for the last month in the period.

### Revenue

We generate revenue from the sale of monthly subscriptions and our additional offerings as described previously. Our monthly subscription offering is sold based on a fixed price per month with the pricing based on the type of client. These subscriptions generally have one-month terms that automatically renew unless notice of cancellation is provided in advance. Our additional offerings range in price and terms. For clients that pay us in advance for subscription and other services, we record deferred revenue and recognize revenue over the applicable term of services provided.

### EBITDA and Adjusted EBITDA

To provide investors with additional information regarding our financial results, we have disclosed in the table above EBITDA and Adjusted EBITDA, both of which are non-GAAP financial measures that we calculate as net income before interest, taxes, depreciation and amortization in the case of EBITDA and further adjusted to exclude loss from discontinued operations, and other unusual and/or infrequent costs in the case of Adjusted EBITDA. Below we have provided a reconciliation of net income (the most directly comparable GAAP financial measure) to EBITDA and from EBITDA to Adjusted EBITDA.

We present EBITDA and Adjusted EBITDA because these metrics are a key measure used by our management and board of managers to evaluate our operating performance, generate future operating plans and make strategic decisions regarding the allocation of investment capacity. Accordingly, we believe that EBITDA and Adjusted EBITDA provides useful information to investors and others in understanding and evaluating our operating results in the same manner as our management and board of managers.

EBITDA and Adjusted EBITDA have limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under GAAP. Some of these limitations are:

- although depreciation and amortization are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and both EBITDA and Adjusted EBITDA do not reflect cash capital expenditure requirements for such replacements or for new capital expenditure requirements;

- EBITDA and Adjusted EBITDA do not reflect changes in, or cash requirements for, our working capital needs; and

- EBITDA and Adjusted EBITDA do not reflect tax payments that may represent a reduction in cash available to us.

Because of these limitations, you should consider EBITDA and Adjusted EBITDA alongside other financial performance measures, including net income and our other GAAP results.

223

# Exhibit 2

TABLE OF CONTENTS

As filed with the Securities and Exchange Commission on May 25, 2021

Registration No. 333-252186

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

AMENDMENT NO. 4 TO
FORM S-4
REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

## Silver Spike Acquisition Corp.
**(Exact Name of Registrant as Specified in Its Charter)**

| Cayman Islands | 6770 | N/A |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification Number)** |

**660 Madison Ave., Suite 1600**
**New York, New York 10065**
**(212) 905-4923**
**(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)**

**Scott Gordon, Chief Executive Officer**
**Gregory Gentile, Chief Financial Officer**
**c/o Silver Spike Acquisition Corp.**
**660 Madison Ave., Suite 1600**
**New York, New York 10065**
**(212) 905-4923**
**(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)**

*Copies to:*

| | |
|---|---|
| **Derek J. Dostal** | **David Peinsipp** |
| **Lee Hochbaum** | **Garth Osterman** |
| **Davis Polk & Wardwell LLP** | **Kristin VanderPas** |
| **450 Lexington Avenue** | **Peter Byrne** |
| **New York, New York 10017** | **Cooley LLP** |
| **(212) 450-4000** | **101 California Street, 5th Floor** |
| | **San Francisco, California 94111** |
| | **(415) 693-2177** |

**Approximate date of commencement of proposed sale of the securities to the public:** As soon as practicable after this Registration Statement is declared effective and all other conditions to the business combination described in the enclosed Proxy Statement/Prospectus have been satisfied or waived.

If the securities being registered on this form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act of 1933, as amended (the "Securities Act"), check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Securities Exchange Act of 1934.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging Growth Company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Securities Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Securities Exchange Act Rule 14d-l(d) (Cross-Border Third-Party Tender Offer) ☐

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to Be Registered | Amount to be Registered[1] | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee[7] |
|---|---|---|---|---|
| Class A common stock, par value $0.0001 per share[2][3] | 24,998,575 | $16.01[4] | $400,227,185.75 | $43,644.79 |
| Redeemable warrants, each warrant exercisable for one share of Class A common stock at an exercise price of $11.50[2][5] | 12,500,000 | $4.89[6] | $61,026,500 | $6,704.66 |
| Total | | | $461,289,685.75 | $50,326.70[8] |

(1)   Prior to the completion of the business combination described herein, the registrant, a Cayman Islands exempted company, intends to effect a deregistration under Section 206 of the Cayman Islands Companies Act (2020 Revision) and a domestication under Section 388 of the Delaware General Corporation Law (the "domestication"), pursuant to which the registrant's jurisdiction of incorporation will be transferred by way of continuation from the Cayman Islands to the State of Delaware and the name of the registrant will be changed to "WM Technology, Inc." ("New WMH"). All securities being registered will be issued by New WMH.

(2)   Pursuant to Rule 416(a), there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from share splits, share dividends or similar transactions.

(3)   The number of shares of Class A common stock of New WMH, par value $0.0001 per share (the "Class A common stock"), being registered includes up to 25,000,000 Class A ordinary shares of Silver Spike that were sold pursuant to Silver Spike's Registration Statement on Form S-1 (File No. 333-232734) as part of the units in Silver Spike's initial public offering, which will automatically convert into shares of Class A common stock in connection with the domestication and the business combination described in the proxy statement/prospectus forming part of this registration statement less the 1,425 Class A ordinary shares that were redeemed on January 13, 2021 in connection with extraordinary general meeting in lieu of annual general meeting held in connection with a proposal to amend Silver Spike's existing organizational documents.

(4)   Estimated solely for the purpose of calculating the registration fee, based on the average of the high and low prices of the Class A ordinary shares of Silver Spike Acquisition Corp. ("Silver Spike") on The Nasdaq Capital Market on January 11, 2021 in accordance with Rule 457(f)(1) and Rule 457(f)(3).

(5)   The number of warrants being registered includes 12,500,000 warrants to acquire Class A ordinary shares that were sold as part of the units in Silver Spike's initial public offering, which will automatically convert into warrants to acquire shares of Class A common stock in connection with the domestication and the business combination described in the proxy statement/prospectus forming part of this registration statement.

(6)   Estimated solely for the purpose of calculating the registration fee, based on the average of the high and low prices of the redeemable warrants on The Nasdaq Capital Market on January 11, 2021 in accordance with Rule 457(f)(1).

(7)   Determined in accordance with Section 6(b) of the Securities Act at a rate equal to $109.10 per $1,000,000 of the proposed maximum aggregate offering price.

(8)   Previously paid.

**The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

TABLE OF CONTENTS

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF WMH**

*The following discussion and analysis of WMH's financial condition and results of operations should be read in conjunction with WMH's consolidated financial statements and notes to those statements included in this proxy statement/prospectus. Certain information contained in the discussion and analysis set forth below includes forward-looking statements that involve risks and uncertainties. WMH's actual results may differ materially from those anticipated in these forward-looking statements as a result of many factors. Please see "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors" in this proxy statement/prospectus.*

*For purposes of this subsection only, "WMH," "the Company," "we," "us" or "our" refer to WM Holding Company, LLC and its subsidiaries, unless the context otherwise requires.*

**Overview**

WMH was founded in 2008, and operates a leading listings marketplace with one of the most comprehensive SaaS subscription offerings sold to retailers and brands in the U.S. state-legal and Canadian cannabis markets. WMH also provides information on the cannabis plant and the industry and advocates for legalization. We address the challenges facing both consumers seeking to understand cannabis products and businesses who serve cannabis users in a legally compliant fashion with our Weedmaps platform and WM Business SaaS solution. Over the past 13 years, we have grown the Weedmaps listings marketplace to become the premier destination for cannabis consumers to discover and browse information regarding cannabis and cannabis products, with over 9 million MAUs on the demand-side and more than 4,000 paying business clients on the supply-side of our marketplace as of March 31, 2021. These paying clients include retailers, brands and other client types (such as doctors). Further, these clients, who can choose to purchase multiple listings solutions for each business, had purchased approximately 8,700 listing pages as of March 2021 (of the over 17,300 listing pages listing pages on the marketplace). The Weedmaps listings marketplace provides consumers with information regarding cannabis retailers and brands, as well as the strain, pricing, and other information regarding locally available cannabis products, through our website and mobile apps, permitting product discovery and order-ahead for pickup or delivery by participating retailers. We provide consumers with discovery channels to improve their knowledge of the local market for cannabis products, whether they are looking by strain, price, effects or form factors. Our weedmaps.com site also has educational content including news articles, information about cannabis strains, a number of "how-to" guides, policy white-papers and research to allow consumers to educate themselves on cannabis and its history, uses and legal status. While consumers can discover cannabis products, brands, and retailers on our site, we neither sell (or fulfill purchases of) cannabis products, nor do we process payments for cannabis transactions across our marketplace or SaaS solutions.

Over the last three years, we have developed and launched several SaaS solutions for our retailer clients. These solutions now comprise an integrated platform for retailers, which we call "WM Business". WM Business provides a comprehensive set of tools to enable cannabis businesses to provide their goods and services compliantly, with what we refer to as "business-in-a-box" functionality. Our "business-in-a-box" solution helps cannabis retailers to improve their workflows and regulatory compliance in the course of serving cannabis consumers. We offer this functionality through a packaged software solution that includes (based on availability within any given market and state-level regulations) (i) a listing page with product menu on weedmaps.com, our iOS Weedmaps mobile application and our Android Weedmaps mobile application, which allows clients to disclose their license information, hours of operation, contact information, discount policies, and other information that may be required under applicable state law, (ii) the ability to receive reservations of products for pickup by consumers or delivery to consumers (either on weedmaps.com, on a white labeled WM Store site or third-party sites through our orders and menu embed product), thereby allowing inventory forecasting and helping retailers ensure sufficient staff are present to confirm product availability (and complete orders and process payments - both of which only occur outside the Weedmaps listings marketplace), (iii) logistics software such as driver apps and fleet-tracking tools to permit legal compliance with state delivery regulations, (iv) retail point-of-sale, or POS, solutions to manage inventory and track-and-trace compliance reporting, (v) analytics dashboards, (vi) access to our online wholesale exchange marketplace to browse brand catalogs and efficiently identify brands to obtain inventory from (and review license information and certificates of analysis, among other compliance features), and (vii) application program interface, or API, integrations to streamline workflows, thereby helping eliminate human error in recordkeeping and promoting compliance through accuracy. We also offer a growing set of offerings for brands to reach consumers and retailers as well as manage their brand catalog information.

218

TABLE OF CONTENTS

in December 2020, which is significantly lower than other digital marketing platforms servicing less specialized end-markets without requiring the level of user targeting that our platform provides. Further, during the last six months of fiscal 2020, our platform had an average click-through-rate in excess of 10% for our dispensary and delivery featured listings inventory which is significantly higher than other less specialized digital marketing platforms. We recently launched a self-serve bidding engine in select regions within Michigan and Colorado, allowing clients to purchase featured listings on a cost-per-click basis based on a target budget. We will look to expand these performance-based pricing tests in additional markets over time.

We have seen significant growth in our monthly revenue per client over time. We have generally seen that the longer clients stay on the Weedmaps listings marketplace and leverage our WM Business solutions, the more they spend with us. We have also experienced rising levels of spend by our more recent client cohorts as seen in the below chart, which is dated as of December 31, 2020, where our more recent 2018 and 2019 client cohorts are spending at higher levels in the first three months on the platform vs. our 2016 and 2017 client cohorts.



We believe these dynamics are driven by (i) increasing retail density as license issuance continues within the markets we serve, creating more new potential clients and increased competition among clients we serve, and (ii) more client engagement across our WM Business solution set, leading to an enhanced awareness of the return on investment that our clients receive from spend on our platform.

We sell our offerings in the United States and Canada, and we have a limited number of non-monetized listings in several international countries including Austria, Germany, the Netherlands, Spain, and Switzerland. As of March 31, 2021, we actively operate in 23 U.S. states and territories that have adult-use and/or medical-use regulations in place.

**Key Operating and Financial Metrics**

We monitor the following key financial and operational metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans, and make strategic decisions.

|  | Year Ended December 31, | | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- |
|  | 2018 | 2019 | 2020 | 2020 | 2021 |
|  | (dollars in thousands, except for revenue by client) | | | | |
| Revenue | $101,402 | $144,232 | $161,791 | $32,210 | $41,154 |
| Net Income | $12,679 | $(375) | $38,830 | $3,809 | $7,731 |
| EBITDA[1] | $15,448 | $6,232 | $42,808 | $4,808 | $8,974 |
| Adjusted EBITDA[1] | $17,123 | $13,828 | $42,808 | $4,808 | $8,974 |
| Monthly revenue per paying client[2] | $2,526 | $2,888 | $3,609 | $2,842 | $3,689 |

222

TABLE OF CONTENTS

|  | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
|  | 2018 | 2019 | 2020 | 2020 | 2021 |
|  | (dollars in thousands, except for revenue by client) | | | | |
| Paying clients(3) | 4,024 | 4,644 | 3,786 | 4,101 | 4,058 |
| MAUs (in thousands)(4) | 4,684 | 8,009 | 10,000 | 6,457 | 9,163 |

(1)  For further information about how we calculate EBITDA and Adjusted EBITDA as well as limitations of its use and a reconciliation of EBITDA and Adjusted EBITDA to net income, see "-EBITDA and Adjusted EBITDA."

(2)  Monthly revenue per client is defined as monthly revenue for the last month of any particular period divided by the number of paying clients in that last month of a particular period. The calculation of monthly revenue includes revenue from any clients that cease to be paying clients during the applicable month.

(3)  Paying clients are defined as the number of paying clients billed during the last month of a particular period (and for which services were provided).

(4)  MAUs are defined as the number of unique users opening our Weedmaps mobile app or accessing our Weedmaps.com website over the course of a calendar month. Monthly active users in this table is for the last month in the period.

### Revenue

We generate revenue from the sale of monthly subscriptions and our additional offerings as described previously. Our monthly subscription offering is sold based on a fixed price per month with the pricing based on the type of client. These subscriptions generally have one-month terms that automatically renew unless notice of cancellation is provided in advance. Our additional offerings range in price and terms. For clients that pay us in advance for subscription and other services, we record deferred revenue and recognize revenue over the applicable term of services provided.

### EBITDA and Adjusted EBITDA

To provide investors with additional information regarding our financial results, we have disclosed in the table above EBITDA and Adjusted EBITDA, both of which are non-GAAP financial measures that we calculate as net income before interest, taxes, depreciation and amortization in the case of EBITDA and further adjusted to exclude loss from discontinued operations, and other unusual and/or infrequent costs in the case of Adjusted EBITDA. Below we have provided a reconciliation of net income (the most directly comparable GAAP financial measure) to EBITDA and from EBITDA to Adjusted EBITDA.

We present EBITDA and Adjusted EBITDA because these metrics are a key measure used by our management and board of managers to evaluate our operating performance, generate future operating plans and make strategic decisions regarding the allocation of investment capacity. Accordingly, we believe that EBITDA and Adjusted EBITDA provides useful information to investors and others in understanding and evaluating our operating results in the same manner as our management and board of managers.

EBITDA and Adjusted EBITDA have limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under GAAP. Some of these limitations are:

- although depreciation and amortization are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and both EBITDA and Adjusted EBITDA do not reflect cash capital expenditure requirements for such replacements or for new capital expenditure requirements;

- EBITDA and Adjusted EBITDA do not reflect changes in, or cash requirements for, our working capital needs; and

- EBITDA and Adjusted EBITDA do not reflect tax payments that may represent a reduction in cash available to us.

Because of these limitations, you should consider EBITDA and Adjusted EBITDA alongside other financial performance measures, including net income and our other GAAP results.

223

# Exhibit 3

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

# FORM 8-K
### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**Date of report (date of earliest event reported): June 2, 2021**

# SILVER SPIKE ACQUISITION CORP.
(Exact name of registrant as specified in its charter)

**Commission File Number: 001-39021**

| | |
|---|---|
| **Cayman Islands** | **N/A** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

**660 Madison Avenue, Suite 1600, New York, New York 10065**
(Address of principal executive offices, including zip code)

**(212) 905-4923**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☒ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 140.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A ordinary shares, par value $0.0001 per share | SSPK | The NASDAQ Stock Market LLC |
| Redeemable warrants, each whole warrant exercisable for one Class A ordinary share at an exercise price of $11.50 | SSPKW | The NASDAQ Stock Market LLC |
| Units, each consisting of one Class A ordinary share and one-half of one redeemable warrant | SSPKU | The NASDAQ Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01    Other Events.**

On January 15, 2021, Silver Spike Acquisition Corp., a Cayman Islands exempted company (the "Company" or "Silver Spike"), filed a registration statement on Form S-4 (File No. 333-252186) (as amended on March 11, 2021, April 1, 2021, May 14, 2021 and May 25, 2021, the "Registration Statement") in connection with the Company's proposed business combination with WM Holding Company, LLC, a Delaware limited liability company ("WMH") pursuant to that certain Agreement and Plan of Merger, dated as of December 10, 2020 (as amended or modified from time to time, the "Merger Agreement"), by and among Silver Spike, Silver Spike Merger Sub LLC, a Delaware limited liability company and a wholly owned direct subsidiary of Silver Spike ("Merger Sub"'), WMH, and Ghost Media Group, LLC, a Nevada limited liability company, solely in its capacity as the securityholder representative thereunder (the "Holder Representative"). On May 25, 2021, the Registration Statement was declared effective by the Securities and Exchange Commission (the "SEC") and the Company filed a Definitive Proxy Statement/Prospectus relating to the Company's extraordinary general meeting of shareholders scheduled to be held on June 10, 2021 (the "Definitive Proxy Statement/Prospectus") to, among other things, obtain the approvals required for the merger and the other transactions and ancillary agreements contemplated by the Merger Agreement.

As disclosed in the Registration Statement, two putative shareholder lawsuits have been filed against the Company in the Supreme Court of the State of New York, captioned, *Brait v. Silver Spike Acquisition Corp., et al.*, Index No. 650629/2021 (N.Y. Sup. Ct.), and *Stout v. Silver Spike Acquisition Corp., et al.*, No. 650686/2021 (N.Y. Sup. Ct.) (the "Legal Actions"). The Legal Actions allege that the members of the board of directors of the Company (the "Board") breached their fiduciary duties in connection with the merger by omitting material information with respect to the merger from the Definitive Proxy Statement/Prospectus, and that certain other defendants aided and abetted such breaches. The Company has also received similar demands from other purported shareholders of the Company, containing similar allegations.

The defendants and the Board deny that they have violated any laws or breached any duties to the Company's shareholders and believe that the claims asserted in these lawsuits are without merit. The Company believes that the Definitive Proxy Statement/Prospectus contains all material information required to be disclosed and that no supplemental disclosure is required to the Definitive Proxy Statement/Prospectus under any applicable law, rule or regulation. Nevertheless, since the outcome of these lawsuits and shareholder demands is uncertain, may cause delays to the closing of the merger, and litigation may be burdensome and expensive, the Company has decided to make the following supplemental disclosures. Nothing in this Form 8-K shall be deemed an admission of the legal necessity or materiality under applicable laws of any of the disclosures set forth herein.

### SUPPLEMENT TO DEFINITIVE PROXY STATEMENT/PROSPECTUS

*This supplemental information should be read in conjunction with the Definitive Proxy Statement/Prospectus which should be read in its entirety. Page references in the below disclosures are to pages in the Definitive Proxy Statement/Prospectus, and defined terms used but not defined herein have the meanings set forth in the Definitive Proxy Statement/Prospectus. To the extent the following information differs from or conflicts with the information contained in the Definitive Proxy Statement/Prospectus, the information set forth below shall be deemed to supersede the respective information in the Definitive Proxy Statement/Prospectus. The Company denies any alleged violations of law or any legal or equitable duty. Without admitting in any way that the disclosures below are material or otherwise required by law, the Company makes the following supplemental disclosure solely for the purpose of mooting any alleged disclosure issues asserted in the Legal Actions.*

**The following underlined language supplements the fourth paragraph of text on page 127 of the Definitive Proxy Statement/Prospectus under the heading "Background of the Business Combination":**

After the IPO, Silver Spike commenced an active search for prospective business combination candidates. Silver Spike contacted, and was contacted by, a number of individuals and entities with respect to business combination opportunities. During this search process, Silver Spike reviewed, and entered into preliminary discussions with respect to, a number of acquisition opportunities other than WMH.

During that process, Silver Spike's management:

- developed an initial list of potential business combination candidates; potential business combination candidates were primarily identified through Silver Spike's general industry knowledge and network;
- considered and conducted analyses of approximately sixty-five (65) potential business combination candidates, primarily in the cannabis and related health and wellness industries;
- engaged in preliminary, high-level discussions of illustrative transaction structure to effect an initial business combination with ten (10) potential business combination candidates or their representatives; and
- engaged in meaningful and detailed discussions, due diligence, and negotiations with six (6) potential business combination candidates or their representatives, one of which was WMH.

With respect to the five (5) other potential business combination candidates, three (3) were in the CBD brands and processors field, one (1) was in high tech engineering and one (1) was in consumer retail. Silver Spike did not pursue further a potential transaction with the other potential business combination targets with which it engaged in discussions for a variety of factors, including the impact of the COVID-19 crisis on the target companies, weaknesses in projected financial performance, inability to reach an agreement on valuation, structuring challenges, a potential target's failure to satisfy the 80% test included in Silver Spike's memorandum and articles of association (which requires any business acquired by Silver Spike to have a fair market value equal to at least 80% of the balance of the funds in the trust account) and mutual decisions to pursue potential alternative transactions.

**The following underlined language supplements the second paragraph of text on page 129 of the Definitive Proxy Statement/Prospectus under the heading "Background of the Business Combination":**

In the following weeks, Silver Spike executed an engagement letter with Stifel Nicolaus & Company ("Stifel"), pursuant to which Stifel was engaged as Silver Spike's financial advisor and financing agent to provide certain financial advisory and investment banking services in connection with the business combination and the PIPE financing. Silver Spike also executed an engagement letter with Piper Sandler & Co. ("Piper"), pursuant to which Piper was engaged as Silver Spike's financial advisor and financing agent to provide certain financial advisors and investment banking services in connection with the business combination and the PIPE subscription financing. Silver Spike hired each of Stifel and Piper because of their expertise and familiarity with the industry.

**The following language supplements the text on page 133 of the Definitive Proxy Statement/Prospectus under the heading "Silver Spike's Board of Directors' Reasons for Approval of the Business Combination":**

**Summary of Silver Spike Financial Analysis**

The following is a summary of the material financial analyses prepared for and reviewed by the board of directors of Silver Spike in connection with the valuation of WMH. The summary set forth below does not purport to be a complete description of the financial analyses performed or factors considered by Silver Spike nor does the order of the financial analyses described represent the relative importance or weight given to those financial analyses by the board of directors of Silver Spike. Silver Spike may have deemed various assumptions more or less probable than other assumptions, so the value resulting from any particular portion of the analyses summarized below should not be taken to be Silver Spike's view of the actual value of WMH. Some of the summaries of the financial analyses set forth below include information presented in tabular format. Considering the data in the tables below without considering all financial analyses or factors or the full narrative description of such analyses or factors, including the methodologies and assumptions underlying such analyses or factors, could create a misleading or incomplete view of the processes underlying Silver Spike's financial analyses and the board of directors of Silver Spike's recommendation.

None of WMH, Silver Spike or any other person assumes responsibility if future results are materially different from those discussed. Any estimates contained in these analyses are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favorable than as set forth below. In addition, analyses relating to the value of WMH do not purport to be appraisals or reflect the prices at which the common stock may actually be valued. Accordingly, the results derived from the financial analyses are inherently subject to substantial uncertainty. Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data as it existed on or before December 7, 2020 and is not necessarily indicative of current market conditions.

2

*Comparable Company Analysis*

The board of directors of Silver Spike reviewed certain financial information of WMH and compared it to certain publicly traded companies, selected based on the experience and the professional judgment of Silver Spike's board of directors.

Silver Spike considered certain financial and operating data for publicly traded (i) vertical SaaS companies, (ii) online marketplace companies and (iii) e-commerce enablement platform companies, in each case, that Silver Spike deemed relevant for analysis. The selected companies were:

Vertical SaaS companies:
- Veeva Systems Inc.
- Avalara, Inc.
- AppFolio, Inc.
- Chegg, Inc.
- Aspen Technology, Inc.

Online marketplace companies:
- Fiverr International Ltd.
- GoodRX Holdings, Inc.
- Match Group, Inc.
- Etsy, Inc.
- Zillow Group, Inc.

E-Commerce enablement platform companies:
- BigCommerce Holdings, Inc.
- Shopify Inc.
- ZoomInfo Technologies Inc.
- Lightspeed POS Inc.
- HubSpot, Inc.
- Sprout Social, Inc.
- Digital Turbine, Inc.
- Medallia, Inc.
- Square, Inc.

Silver Spike observed that the median enterprise value to next twelve months' total revenue ("EV/Revenue") of the vertical SaaS, online marketplace and e-commerce enablement platform companies were 17.6x, 14.6x and 18.1x, respectively, which compared favorably to the EV/Revenue multiple of WMH of 6.8x (based on the WMH projections) implied by the proposed enterprise value for the transaction.

None of the selected companies has characteristics identical to WMH. Companies were selected because they have certain characteristics which may be deemed comparable to WMH. An analysis of selected publicly traded companies is not purely quantitative; rather it involves complex consideration and judgements concerning differences in financial and operating characteristics of the selected companies and other factors that could affect the public trading values of the companies reviewed. Silver Spike believed that it was inappropriate to, and therefore did not, rely solely on the quantitative results of the selected public company analysis. Accordingly, Silver Spike also made qualitative judgments, based on the experience and professional judgment of its board of directors, concerning differences between the operational, business and/or financial characteristics of Silver Spike and the selected companies to provide a context in which to consider the results of the quantitative analysis.

3

**The following underlined language supplements the text on page 138 of the Definitive Proxy Statement/Prospectus under the heading "Board of Directors of New WMH Following the Business Combination":**

Upon the closing, assuming the election of each of the director nominees and re-nominees, the board of directors of New WMH will consist of the following eight (8) directors: Scott Gordon, Christopher Beals, Justin Hartfield, Douglas Francis, Tony Aquila, Fiona Tan, Olga Gonzalez and Brenda Freeman. See ''Proposal No. 10 - The Director Election Proposal.'' In addition, there will be one vacancy on New WMH's board directors upon the closing, which such vacancy will be filled by an affirmative vote of a majority of New WMH's board directors. <u>Except for Mr. Gordon, no person affiliated with Silver Spike will serve as a director or officer of New WMH.</u>

**Item 7.01. Regulation FD Disclosure.**

On or about June 1, 2021, Steven Jung, WMH's President and Chief Operating Officer, notified WMH that he would resign from his positions effective June 30, 2021. Following his resignation, Mr. Jung will continue as a strategic advisor to WMH's Chief Executive Officer. WMH expects to enter into a strategic advisor agreement with Mr. Jung in connection with this new role and he will continue to receive his salary, employee benefits and vesting of his equity awards during such additional service.

In connection with this notification, WMH promoted Juanjo Feijoo, WMH's current Chief Marketing Officer, to Chief Operating Officer, effective July 1, 2021. Mr. Feijoo, 35, has served as WMH's Chief Marketing Officer since May 2019. Previously, Mr. Feijoo served as Senior Director of Customer Engagement for Creative Cloud at Adobe, a publicly-held global technology company, from 2017 to 2019. Prior to that, from 2015 to 2017, Mr. Feijoo served various roles at Maplebear Inc. (d/b/a Instacart), a private company, including Vice President of Central Operations & Marketing. Prior that, from 2008 to 2015, Mr. Feijoo held several roles at Google, Inc., a publicly-held global technology company, including Head of Consumer Experience, Consumer Operations. Mr. Feijoo holds a B.S. in International Business Management from Oxford Brookes University.

There are no family relationships between Mr. Feijoo and any director or executive officer of WMH, there is no arrangement or understanding between Mr. Feijoo and any other person pursuant to which he was selected to serve as an officer of WMH, and there are no relationships or related transactions between Mr. Feijoo and WMH that would be required to be reported under Item 404(a) of Regulation S-K.

**Forward Looking Statements**

The information in this Current Report includes "forward-looking statements" within the meaning of the "safe harbor" provisions of the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of words such as "estimate," "plan," "project," "forecast," "intend," "will," "expect," "anticipate," "believe," "seek," "target" or other similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, statements regarding estimates and forecasts of financial and performance metrics, projections of market opportunity and market share, expectations and timing related to commercial product launches, potential benefits of the transaction and the potential success of WMH's go-to-market strategy, and expectations related to the terms and timing of the transaction. These statements are based on various assumptions, whether or not identified in this Current Report, and on the current expectations of WMH's and Silver Spike's management and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of WMH and Silver Spike. These forward-looking statements are subject to a number of risks and uncertainties, including changes in domestic and foreign business, market, financial, political and legal conditions; the inability of the parties to successfully or timely consummate the proposed business combination, including the risk that any required regulatory approvals are not obtained, are delayed or are subject to unanticipated conditions that could adversely affect the combined company or the expected benefits of the proposed business combination or that the approval of the shareholders of Silver Spike or the equityholders of WMH is not obtained; failure to realize the anticipated benefits of the proposed business combination; risks relating to the uncertainty of the projected financial information with respect to WMH; future global, regional or local economic and market conditions affecting the cannabis industry; the development, effects and enforcement of laws and regulations, including with respect to the cannabis industry; WMH's ability to successfully capitalize on new and existing cannabis markets, including its ability to successfully monetize its solutions in those markets; WMH's ability to manage future growth; WMH's ability to develop new products and solutions, bring them to market in a timely manner, and make enhancements to its platform and WMH's ability to maintain and grow its two sided digital network, including its ability to acquire and retain paying customers; the effects of competition on WMH's future business; the amount of redemption requests made by Silver Spike's public shareholders; the ability of Silver Spike or the combined company to issue equity or equity-linked securities in connection with the proposed business combination or in the future; the outcome of any potential litigation, government and regulatory proceedings, investigations and inquiries; and those factors discussed in Silver Spike's final prospectus dated August 7, 2019, Annual Report on Form 10-K/A for the fiscal year ended December 31, 2020 and Quarterly Report on Form 10-Q for the quarter ended March 31, 2021, and the Registration Statement, in each case, under the heading "Risk Factors," and other documents of Silver Spike filed, or to be filed, with the SEC. If any of these risks materialize or our assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. There may be additional risks that neither Silver Spike nor WMH presently know or that Silver Spike and WMH currently believe are immaterial that could also cause actual results to differ from those contained in the forward-looking statements. In addition, forward-looking statements reflect Silver Spike's and WMH's expectations, plans or forecasts of future events and views as of the date of this Current Report. Silver Spike and WMH anticipate that subsequent events and developments will cause Silver Spike's and WMH's assessments to change. However, while Silver Spike and WMH may elect to update these forward-looking statements at some point in the future, Silver Spike and WMH specifically disclaim any obligation to do so. These forward-looking statements should not be relied upon as representing Silver Spike's and WMH's assessments as of any date subsequent to the date of this Current Report. Accordingly, undue reliance should not be placed upon the forward-looking statements.

**Additional Information About the Proposed Business Combination and Where To Find It**

In connection with the proposed business combination, Silver Spike filed the Registration Statement with the SEC, which includes a proxy statement/prospectus, that is both the proxy statement to be distributed to holders of the Company's ordinary shares in connection with the Company's solicitation of proxies for the vote by the Company's shareholders with respect to the business combination and other matters as described in the Registration Statement, as well as the prospectus relating to the offer of the securities to be issued to WMH's shareholders in connection with the completion of the business combination. The Registration Statement was declared effective on May 25, 2021 and the Definitive Proxy Statement/Prospectus and other relevant documents were mailed to Silver Spike's shareholders as of May 19, 2021, the record date for the extraordinary general meeting of Silver Spike to be held in connection with the business combination. Silver Spike's shareholders and other interested persons are advised to read the Extension Proxy Statement and the Definitive Proxy Statement/Prospectus as these materials contain important information about Silver Spike, WMH and the business combination. Shareholders may obtain a free copy of the Extension Proxy Statement or the Definitive Proxy Statement/Prospectus, as well as other documents filed with the SEC regarding the proposed business combination and other documents filed with the SEC by Silver Spike, without charge, at the SEC's website located at www.sec.gov or by directing a request to 660 Madison Ave Suite 1600, New York, NY 10065 or notices@silverspikecap.com.

**Participants in the Solicitation**

Silver Spike, WMH and certain of their respective directors, executive officers and other members of management and employees may, under SEC rules, be deemed to be participants in the solicitations of proxies from Silver Spike's shareholders in connection with the proposed business combination. Information regarding the persons who may, under SEC rules, be deemed participants in the solicitation of Silver Spike's shareholders in connection with the proposed business combination is set forth in the Registration Statement. You can find more information about Silver Spike's directors and executive officers in the Registration Statement and the proxy statement / prospectus. Shareholders, potential investors and other interested persons should read the Definitive Proxy Statement/Prospectus carefully before making any voting or investment decisions. You may obtain free copies of these documents from the sources indicated above.

**No Offer or Solicitation**

This Current Report does not constitute an offer to sell or the solicitation of an offer to buy any securities, or a solicitation of any vote or approval, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction.

5

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: June 2, 2021

**SILVER SPIKE ACQUISITION CORP.**

By: */s/* Greg Gentile

| | |
|---|---|
| Name: | Greg Gentile |
| Title: | Chief Financial Officer |