Laurence M. Rosen, Esq. (SBN 219683)
Email: lrosen@rosenlegal.com
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684

*Counsel for Lead Plaintiff*
*Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERET ISHAK, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> WM TECHNOLOGY, INC. f/k/a SILVER SPIKE ACQUISITION CORP., CHRISTOPHER BEALS, ARDEN LEE, DOUGLAS FRANCIS, SUSAN ECHERD, MARY HOITT, SCOTT GORDON, WILLIAM HEALY, and GREGORY M. GENTILE <br><br> Defendants. | Case No. 2:24-CV-08959-ODW-PVC <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITON TO DEFENDANTS WM TECHNOGY DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** <br><br> CLASS ACTION <br><br> JUDGE: Otis D. Wright II <br> HEARING: November 10, 2025 <br> TIME: 1:30 PM <br> CTRM: 5D |

# TABLE OF CONTENTS

I.    Introduction ...............................................................................................1

II.   Factual Background ....................................................................................2

III.  Argument ...................................................................................................8

   A.   Plaintiffs' Allegations are Timely ...................................................8

   B.   The Complaint Alleges Material Misstatements ...............................9

     1.   The Complaint Alleges that WM Technology's MAUs were Materially Misleading ...............................................................9

     2.   The  Description of Monthly Active Users as a "Key Indicator of … Growth" was Misleading ........................................................12

     3.   The Company's Statement that MAUs Reflect Users who "Engaged" with their Website was Misleading ...............................................15

   C.   The Complaint Alleges Scienter .....................................................15

     1.   Defendants Repeatedly Received Information Contradicting their Public Statements ...............................................................16

     2.   Beals' Departure Supports Scienter .......................................18

     3.   An Inference of Fraud Outweighs Any Other Inference ...................19

   D.   The Complaint Alleges Loss Causation...........................................20

     1.   The November 7, 2022 Announcement was Corrective ....................21

     2.   The September 24, 2024 Disclosure was Corrective...........................21

   E.   The Complaint Alleges a Control Person Claim ................................22

IV.  Conclusion .................................................................................................22

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO WM TECHNOLOGY
DEFENDANTS' MOTION TO DISMISS – 2:24-CV-08959-ODW-PVC

## TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008)...............................................................................10

*Borteanu v. Nikola Corp.*,
   No. CV-20-01797-PHX-SPL, 2023 WL 11017679 (D. Ariz. Dec. 8, 2023) ......11

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002).................................................................................9

*Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*,
   709 F. Supp. 3d 1217 (D. Nev. 2024)..................................................................22

*Dillard v. Platform Specialty Prods. Corp.*,
   No. 16-CV-80490, 2016 WL 10586301 (S.D. Fla. Dec. 8, 2016).......................19

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016)......................................................................21

*Flynn v. Sientra, Inc.*,
   No. CV1507548SJORAOX, 2016 WL 3360676 (C.D. Cal. June 9, 2016) ........12

*Gompper v. VISX, Inc.*,
   298 F.3d 893 (9th Cir. 2002)..................................................................................9

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)......................................................20

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020)................................................................................20

*In re BofI Holding, Inc. Sec. Litig.*,
   No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980 (S.D. Cal. May 23, 2017)...9

ii

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ...............................................................................20

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005)....................................................................10

*In re Maiden Holdings, Ltd. Sec. Litig.*,
   No. 24-1118, 2025 WL 2406864 (3d Cir. Aug. 20, 2025) ....................................13

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ..................................................................... 14, 15, 16

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999)...................................................................................18

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ....................................................................18

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ................................................................................17

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012)........................................................................ 15, 18, 19

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. L*iab. Litig.,
   No. 3:15-md-02672-CRB, 2017 WL 66281 (N.D. Cal. Jan. 4, 2017).................18

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..................................................................17

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014)...................................................................................20

*Mauss v. NuVasive, Inc.*,
   2016 WL 3681831 (S.D. Cal. July 12, 2016) .........................................................21

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010) ..................................................................................................8

iii

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008)..................................................................................12

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018).................................................................................20

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ...............................................................................16

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) ..........................................................................20, 21

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)...............................................................................................13

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014)..................................................................................14

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ...............................................................................14

*Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014)..................................................................................21

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014)..................................................................................15

*Ryan v. FIGS, Inc.*,
  No. 2:22-CV-07939-ODW (AGRX), 2024 WL 187001 (C.D. Cal. Jan. 17, 2024)
  ................................................................................................................................17

*S.E.C. v. Currency Trading Int'l, Inc.*,
  No. CV 02-05143PA, 2004 WL 2753128 (C.D. Cal. Feb. 2, 2004) ...................10

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................10

*State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*,
  No. 24-1705, 2025 WL 2374498 (1st Cir. Aug. 15, 2025)..................................11

iv

*Vernon v. Heckler*,
  811 F.2d 1274 (9th Cir. 1987) ..............................................................................8

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ............................................................................18

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*,
  65 F.4th 459 (9th Cir. 2023) .....................................................................9, 15, 18

*Young v. Lepone*,
  305 F.3d 1 (1st Cir. 2002) ....................................................................................8

*Zaghian v. Farrell*,
  675 F. App'x 718 (9th Cir. 2017) .......................................................................14

**Regulations**

17 C.F.R. § 240.10b-5(b)........................................................................................10

## I.    Introduction[1]

Throughout the class period, WM Technology portrayed itself as a growing company operating a website and app for cannabis users, touting monthly active user growth to show investors of its success in attracting those users to its website. This was all a façade. In reality, its user growth was a function of the use of ineffective "pop under advertising" – advertisements that automatically opened windows under the websites customers actually were trying to access – and not because users voluntarily sought out or interacted with WM's platform. Defendants Beals and Lee concealed these facts until a whistleblower went directly to the board of directors, who reported to the SEC, resulting in a settlement in 2024.

Notwithstanding the straightforward facts establishing their fraud, Defendants nonetheless move to dismiss on several grounds, all of them spurious. First, Defendants claim that the statute of limitations has lapsed because they announced, more than two years prior to the filing of the initial complaint in this action, that they had used pop-under advertisements and that this practice had increased MAUs. But Defendants ignore the fact that the statute of limitations begins to run when a reasonable investigator could have uncovered all of the elements of fraud, including Defendants' scienter. That information was not available until the SEC's Cease and Desist Order became public. Second, based on a tortured reading of their own misstatements, Defendants attempt to argue that their statements were technically not false. But this argument ignores well established precedent holding that statements in a securities fraud class action are evaluated not based on technical rules of construction, but on what would mislead

---

[1] Plaintiffs cite to Defendants' Memorandum of Points and Authorities (Dkt. No. 75) as "Mot. __." Plaintiffs cite to the Complaint (Dkt. No. 48) as "¶_." Unless otherwise noted, emphasis is added and internal quotations and citations are omitted. Unless otherwise specified, capitalized terms have the same meaning as set forth in the Complaint.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO WM TECHNOLOGY
DEFENDANTS' MOTION TO DISMISS – 2:24-CV-08959-ODW-PVC

an ordinary investor. Defendants' scienter arguments fare no better, as they ask the court to disregard the Complaint's scienter allegations merely because they are based on an SEC Cease and Desist Order that did not make a formal finding of fraud. But this flies in the face of Ninth Circuit precedent. Finally, Defendants argue that the Complaint fails to allege loss causation as to two of the three corrective disclosures, but their argument also disregards well established precedent that a corrective disclosure need not be a mirror image of a false statement.

## II. Factual Background

WM Technology, Inc., operating under the brand name Weedmaps, is a technology company that provides digital solutions for the cannabis industry. Its primary consumer platform, weedmaps.com, is an online marketplace where users can locate dispensaries, browse product menus, read reviews, and receive pickup or delivery orders where legal. ¶ 25. For cannabis businesses, WM Technology offers a suite of subscription-based software tools—collectively known as Weedmaps for Business—that assist with online advertising, customer relationship management, order fulfillment, and compliance with regulations. *Id.* The company generates revenue by charging cannabis businesses monthly fees for these services, as well as offering additional advertising options to enhance their visibility on the platform. *Id.* Headquartered in Irvine, California, WM Technology became a publicly traded company in June 2021 through a merger with a special purpose acquisition company (SPAC). *Id.*

A central component of WM Technology's value proposition to investors was the scale and engagement of its user base, which the Company measured using a single reported consumer metric: "monthly active users" or "MAUs." ¶ 26. Throughout the Class Period, WM Technology emphasized MAU growth in its SEC filings, earnings calls, and investor presentations, describing MAU as a "key operating metric" and a primary indicator of the Company's reach, brand strength,

2

and user activity. *Id.* In these public statements, WM Technology represented that it determined MAUs by counting the number of unique users who had "engaged with" the Weedmaps website or mobile app during the final month of a reporting period. *Id.* By highlighting MAU growth while simultaneously defining MAUs as engaged users, WM Technology conveyed to investors that its reported user base reflected individuals who had actively and volitionally interacted with the platform. *Id.* This narrative was central to investor perceptions of the Company's growth and monetization potential. *Id.* Crucially, MAUs was the only metric that WM Technology reported to investors purporting to reflect consumer traffic to WM Technology's website. *Id.*

According to the Registration Statement and Proxy, MAUs were used to "evaluate [WM's] business, measure [WM's] performance, identify trends affecting [WM's] business, formulate business plans, and make strategic decisions." ¶ 27. WM further explained in the Registration Statement and Proxy that it viewed "MAUs as a key indicator of our growth, the breadth and reach of our weedmaps.com site, the value proposition and consumer awareness of our brand, the continued use of our sites by our users and their level of interest in the cannabis industry." *Id.*

In reality, WM Technology's reported MAUs were materially misleading. ¶ 28. As detailed in a Cease and Desist Order against WM Technology (the "SEC Order"), entered by the SEC on September 24, 2024, from mid 2020 through August 2022, WM Technology inflated its MAU metric by counting individuals who had been involuntarily directed to the Weedmaps website through so-called "pop-under" advertisements—digital ads that automatically launched the Weedmaps site in a new browser window underneath the user's active screen when they visited unrelated third-party websites. *Id.* These users did not seek out Weedmaps, and the vast majority did not interact with the site at all, and according to the Cease and Desist Order, "less than 2% of the pop-under traffic resulted in an

3

engaged user session." *Id.* Despite knowing that these individuals did not volitionally visit or interact with Weedmaps, WM Technology included all of them in its reported MAU totals. SEC Order ¶¶ 15–16. *Id.*

The SEC Order went on to explain that at the same time WM Technology was reporting increasing MAUs, "actual engaged user traffic and activity on the WM Technology site was stagnant or declining." ¶ 29. WM Technology defined "direct traffic" as traffic that came to the website directly, and "organic traffic" as users who came to Weedmaps through something like a google search. *Id.* Paid traffic refers to traffic through advertisements. *Id.* WM Technology internal records showed that direct and organic traffic declined from July 2020 to June 2022, while paid traffic surged. *Id.* The SEC Order also revealed that while in its public disclosures, MAU was determined by counting users "who have engaged with" the weedmaps.com website, in reality WM Technology included in MAUs any user who visited the site, whether or not they actually engaged with it. *Id.*

The SEC Order further revealed that, internally, WM Technology tracked meaningful user activity through separate metrics such as "active sessions", which required the user to take one of a set of defined actions on the weedmaps.com website, and "eMAUs" (engaged monthly active users), both of which were stagnant or declining during the Class Period.. ¶ 30. WM Technology did not report either of those metrics during the Class Period. *Id.*

During the second half of 2020 and early 2021, Beals and Lee "received information indicating that pop-under traffic was becoming an increasingly large percentage of WM Technology's website traffic and its overall MAU, and that such traffic was "low quality" and did not meaningfully engage with WM Technology's site." ¶ 31. They "received various weekly updates throughout the summer and fall of 2021 that contained graphs, charts, and commentary showing that WM Technology's direct and organic traffic, as well as the active sessions on the site, had declined by double digits since mid-2020 and that the company's MAU growth

4

was being driven by low engagement paid traffic." *Id.* Specifically, a "November 2021 'Weekly Business Review' presentation further highlighted that paid traffic was propping up MAU as direct and organic traffic declined, and that the paid traffic, which increasingly included traffic from popunder advertisements, had reached roughly 50% or more of WM Technology's total MAU." *Id.*

Following a whistleblower complaint to the board of directors, Defendants began to admit to the inaccuracy of its MAU reporting, though not Beals and Lee's culpability.  On August 8, 2022, acknowledging in a press release that "[t]o an increasing degree over time, growth of our monthly active users, reported as MAUs, has been driven by the purchase of pop-under advertisements, which are marketing advertisements on third party websites that automatically present our platform on users' screens in certain circumstances." ¶ 32. They admitted that "the vast majority of users who are directed to weedmaps.com via pop-under advertisements close the site without clicking on any links" and that "users whose access to the website resulted from these pop-under advertisements represented approximately 65% of our MAUs as of June 30, 2022, and 54%, 50% and 54% of our MAUs as of March 31, 2022, December 31, 2021 and September 30, 2021, respectively." *Id.*

On September 24, 2024, the SEC filed a complaint (the "Beals and Lee Complaint") against Defendants Beals and Lee charging them with violations of securities laws. ¶ 33. The Beals and Lee Complaint revealed for the first time Defendants Beals and Lee's scienter regarding the misleading statements concerning the importance of MAUs as a key operating metric and the MAU figures reported during the Class Period. *Id.* Also on September 24, 2024, the SEC filed the SEC Order. *Id.*

The truth began to emerge on August 9, 2022. That day, WM filed with the SEC its quarterly financial report for the period ended June 30, 2022 on the form 10-Q ("2Q 2022 10-Q"). ¶ 87. Attached to the 2Q 2022 10-Q were SOX

5

certifications signed by Defendants Beals and Lee attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. *Id.*

In the 2Q 2022 10-Q, the Company disclosed that its board of directors had received an internal complaint regarding "the calculation, definition, and reporting of [its] MAUs." ¶ 88. The 2Q 2022 10-Q disclosed that:

> "[O]ne of the ways in which we acquire users is through paid advertising. To an increasing degree over time, growth of our monthly active users, reported as MAUs, has been driven by the purchase of pop-under advertisements, which are marketing advertisements on third party websites that automatically present our platform on users' screens in certain circumstances. ***Our internal data suggests that the vast majority of users who are directed to weedmaps.com via pop-under advertisements close the site without clicking on any links. Based on management's review, users whose access to the website resulted from these pop-under advertisements represented approximately 65% of our MAUs as of June 30, 2022, and 54%, 50% and 54% of our MAUs as of March 31, 2022, December 31, 2021 and September 30, 2021, respectively.***"

*Id.* (Emphasis added.)

On this news, WM share prices declined. ¶89. However, Defendants continued to tout MAU as a key operating metric for the Company. ¶ 90. The 2Q 2022 10-Q contained false and/or misleading statements by continuing to include MAU as a key operating metric. ¶ 91.

The truth was further revealed on November 7, 2022, when, after market hours, WM filed its quarterly financial report for the period ended September 30, 2022 on the form 10-Q ("3Q 2022 10-Q"). ¶ 92. The 3Q 2022 10-Q revealed that WM would no longer be reporting MAU as a key operating metric, stating, in pertinent part:

> "Monthly Active Users

In addition to key financial and operational metrics listed above, we also previously reported Monthly Active Users ("MAUs"), which represented, in any given period, the total number of unique users who opened our Weedmaps mobile app or gained access to our Weedmaps.com website, including through paid advertising channels, during the final calendar month of the period. As discussed in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2022 (the "Prior 10-Q"), we decided to reevaluate the value to investors of continuing to report MAUs as a key metric on a quarterly or annual basis. We believe that historically, our MAU correlated to the level of our marketing expenditure (which, as previously explained, utilized pop-under advertisements). We observed this as we downshifted our marketing spend, including to rely less on the use of pop-under advertisements, during the third quarter.

In the quarter ended September 30, 2022, our MAUs decreased to 11.2 million in the final month of the quarter ended September 30, 2022 from 17.4 million in the final month of quarter ended June 30, 2022. *Our listing page visits, which is the number of visits to retailer and brand listing pages on the marketplace, remained relatively steady* during the same period, decreasing slightly from 13.3 million in the final month of the quarter ended June 30, 2022 to 12.8 million during the final month of the quarter ended September 30, 2022. *We believe this reflects, among other things, the value proposition the marketplace provides to repeat cannabis consumers.*

We are evaluating alternative metrics to provide investors that will shed more clarity on down-funnel marketplace behavior than MAUs historically have, and *we have determined not to report MAUs going forward.*"

*Id.* (Emphasis added.)

The 3Q 2022 10-Q also announced that Defendant Beals would be stepping down as CEO and a member of the board of directors. ¶ 93.

It was not until September 24, 2024, that Plaintiff and the class became aware of all the facts constituting this claim – particularly the element of scienter on the part of the Defendants. ¶ 95. On that day, the SEC issued a litigation release (the "Release") announcing the charges against WM Technology, Beals, and Lee.

7

## III.   Argument

### A.   Plaintiffs' Allegations are Timely

This action is timely. Courts will deny motions to dismiss on statute of limitations ("SOL") grounds unless "the running of the statute is apparent from the face of the complaint." *Vernon v. Heckler*, 811 F.2d 1274, 1278 (9th Cir. 1987). Defendants ignore *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010), compelling denial of their SOL defense. In *Merck*, affirming the Third Circuit's reversal of a district court's dismissal of the complaint on SOL grounds, the Supreme Court held that the Exchange Act SOL does not begin to run until facts allowing plaintiff to allege with requisite particularity each element of a securities fraud claim, including scienter, are available. *Id*. at 653 (SOL in Rule 10b-5 claim "does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter").

In *Merck*, the Supreme Court rejected the "inquiry notice" standard for when the SOL period runs, finding that an FDA warning letter, alerting investors to the "possibility" that Merck had misrepresented facts, did not start the SOL period. *Id.* at 650. Because investigations can consume as much as a few years, the SOL does not run from the start of an investigation. *Id*. at 652 (quoting *Young v. Lepone*, 305 F.3d 1, 9 (1st Cir. 2002)). In forming the rule that discovery of a false statement, itself, does not commence the SOL running, the Supreme Court foreshadowed this very case. General allegations of falsity without plaintiffs having "special access to information about Merck's state of mind," did not "reveal 'facts' constituting scienter." *Id.* at 654.

The Ninth Circuit, applying *Merck* to similar facts, held that, where a complaint relies on an SEC order to allege scienter, Defendants may only obtain dismissal on SOL grounds either when defendants "can show that [plaintiff] could have pleaded its claim based solely on things that it knew or should have known prior to the critical date. Or, [defendants] can show that the SEC Order provided

no information necessary to [plaintiff's] claim." *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 467 (9th Cir. 2023) (internal citation omitted). Using this rubric, Defendants fail to show that the SOL had run. It was not until the issuance of the SEC Order that Plaintiffs learned what Defendants Beals and Lee knew and when they knew it. Defendants note that the August 9, 2022 corrective disclosure revealed that "[t]o an increasing degree over time, growth of our monthly active users, reported as MAUs, has been driven by the purchase of pop-under advertisements…. Our internal data suggests that the vast majority of users who are directed to weedmaps.com via popunder advertisements close the site without clicking on any links." But this only reveals what data was available to Defendants on *August 9, 2022*, and not the period of 2020 to 2022 when the alleged false statements were made. It was not until September 24, 2024 that Plaintiffs learned of the information Beals and Lee received during the Class Period. Without this information, Defendants would doubtless have argued, successfully, that any complaint based solely on the information revealed on August 9, 2022 could at best allege "fraud by hindsight". *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

### B.    The Complaint Alleges Material Misstatements

#### 1.    The Complaint Alleges that WM Technology's MAUs were Materially Misleading

Defendants' failure to disclose that MAU growth was driven by pop-under ads rendered misleading the reported MAU numbers. Omissions that "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists" are actionable. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Rule 10b-5 prohibits companies from omitting information "'necessary … to make the statements made, in light of the circumstances under which they were made, not misleading.'" *In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980, at *5 (S.D.

Cal. May 23, 2017) (quoting 17 C.F.R. § 240.10b-5(b)). When defendants make statements, "whether mandatory or volunteered," they must do so in a manner that is not misleading. *S.E.C. v. Currency Trading Int'l, Inc.*, No. CV 02-05143PA, 2004 WL 2753128, at *8 (C.D. Cal. Feb. 2, 2004); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). "[W]hether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005). In *Shenwick*, the Northern District of California sustained a complaint alleging that it was misleading to report positive MAUs while failing to disclose that a different, internal metric, DAUs, cut the other way. *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1138 (N.D. Cal. 2017). Here, similarly, Defendants concealed from the market other metrics of user engagement that cut against their optimistic reporting of MAUs. ¶30. Defendants' reporting of MAUs and MAU growth was misleading for failure to disclose their heavy use of pop-under advertising because, in the absence of such a disclosure, investors would have been misled into believing that MAU growth reflected an actual growth in interest in Weedmaps, rather than increased spending on ineffective advertising. Defendants exacerbated this misimpression by defining MAUs as reflecting users who "engaged" with Weedmaps website.

Defendants argue that they define MAUs as those who "access" Weedmaps, and because a pop-under ad could literally be construed as causing a user to "access" that website, albeit unwillingly and unwittingly, its disclosures were not misleading. This overly technical reading of the definition of MAUs fails to consider that a reasonable investor would not imagine, from the mere use of the term "accessing", that Defendants' reported MAU numbers could consist in large part of users who, through the use of pop-under advertising, did not access the website knowingly or voluntarily, and in almost all cases closed the site without interacting with it. Given that Defendants point to no instance where they disclosed

the use of pop-under advertisements to investors *at all* at the time of the misleading statements, its statements "read less like a truthful disclosure and much more like a way to convey a false message with partial disclosures and too-clever wordsmithing". *State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*, No. 24-1705, 2025 WL 2374498, at *7 (1st Cir. Aug. 15, 2025).

Defendants' argument also fails on its own terms, because no reasonable investor would have understood the definition of "Monthly *Active* User" to include users who did not voluntarily or knowingly access the website. As Defendants themselves note, "engage" generally means to "give attention to something". Def. Br. 19. Pop-under ads "automatically launched the Weedmaps site in a new browser window underneath the user's active screen when they visited unrelated third-party websites." ¶28. Defendants do not, and cannot, explain how someone who was involuntarily and unknowingly directed to the weedmaps website can be said to have "paid attention to" the website. Indeed, it is common sense that most users consider pop-under ads to be an annoyance.  Instead, Defendants argue that because in the footnotes to the portion of its periodic reports where it discloses MAU numbers it provides a more abbreviated explanation of how it determines MAUs, it does not use the word "engage", investors should have understood that when, elsewhere in the company's filings, it used the word "engage" it did not mean "engage."

Even accepting Defendants' argument that the footnote they cite defining MAUs as encompassing users who "access" the weedmaps website was, in itself, accurate, it cannot immunize Defendants' inaccurate statements elsewhere in their disclosures. "Courts must consider the full context in which a statement was made when determining whether the statement is materially false or misleading." *Borteanu v. Nikola Corp.*, No. CV-20-01797-PHX-SPL, 2023 WL 11017679, at *6 (D. Ariz. Dec. 8, 2023). The Ninth Circuit has admonished courts "that statements literally true on their face may nonetheless be misleading when

11

considered in context". *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Defendants turn this standard on its head, arguing that a putatively accurate description of MAUs at one point in their disclosures can render inaccurate statements not misleading. Moreover, as Defendants acknowledge, while the word "access" is used in conjunction with describing how MAUs are defined, "engage" is used in conjunction with how MAUs are *measured*, a more specific description of MAUs than its broad definition.

Nor can risk disclosures cure the falsity of Defendants' statements. First, because the risks had already transpired by the time the disclosures were made, they were if anything misleading themselves. *Flynn v. Sientra, Inc.*, No. CV1507548SJORAOX, 2016 WL 3360676, at *11 (C.D. Cal. June 9, 2016). Moreover, Defendants' vague risk disclosures did not warn investors of their misconduct. Warning that advertisement might impact MAU growth does not warn investors that the users receiving such advertisements do not actually engage with the weedmaps website.

### 2. The Description of Monthly Active Users as a "Key Indicator of … Growth" was Misleading

Throughout the Class Period, Defendants claimed that they

> [V]iew the number of MAUs as a key indicator of our growth, the breadth and reach of our weedmaps.com site, the value proposition and consumer awareness of our brand, the continued use of our sites by our users and their level of interest in the cannabis industry.

¶¶ 39, 44, 57, 70, 81. These statements were misleading "for failing to disclose that WM Technology's MAUs were inflated through the use of pop-under advertisements, and that the MAU numbers did not actually reflect users who engaged with the weedmaps.com website." ¶¶40, 45, 58, 71, 82. Specifically, it was misleading to inform investors that MAUs reflected users' "level of interest in the cannabis industry" when the bulk of those users did not voluntarily visit the weedmaps website.

12

Defendants argue that these statements were not materially misleading because they are inactionable opinions under *Omnicare*, which allows plaintiffs to allege the falsity of opinion statements where the defendants disbelieved the statement, the statement contained an objectively false embedded fact, or it omitted "particular (and material) facts going to the basis for the [speaker's] opinion." *Id. Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). Put another way, a statement of opinion conveys "not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time" *Id.* Defendants' claim that "Plaintiffs do not identify any embedded fact or material omission going to the basis for this opinion" disregards the Complaints' allegation that the statements in question were misleading for failing to disclose the use of pop-under advertisements. Defendants claim to believe that MAUs were a key indicator growth and reflected users' "level of interest" in the cannabis industry do not fairly align with the fact that MAU growth was driven entirely by pop-under traffic, that it did not reflect actual engagement with the website, that 50% to 65% of MAUs were attributable to pop-under traffic, and that without pop-under ads, MAUs were declining. ¶88.

The Third Circuit's recent holding in *Maiden Holdings* is instructive. In *Maiden Holdings* the Third Circuit explained that where a complaint alleges that an opinion statement is misleading for failing to disclose facts going the other way where the omitted information is material. "Reasonable investors do 'not expect that every fact known to an issuer supports its opinion statement,' but they assume that the material ones do". *In re Maiden Holdings, Ltd. Sec. Litig.*, No. 24-1118, 2025 WL 2406864, at *6 (3d Cir. Aug. 20, 2025). The Third Circuit noted that this task is context-specific. Defendants nowhere argue that the omitted information was immaterial, and given that pop-under traffic both constituted a majority of

13

weedmaps' traffic and resulted in fewer than 2% of users engaging with the weedmaps website, ¶¶28, 88, there can be no serious question that it is.

Further, Defendants cannot wave these statements away as "classic puffery." "Statements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). For example, in *Quality Systems*, the Ninth Circuit reversed the dismissal of a securities fraud complaint, where the defendants had told investors that "more than half the large practice market, more than 75% of the midsize practice market is still fair game for new system sales" and "[i]t's very consistent, and there's nothing out of character in the pipeline that we're reporting today versus what we have seen there the past couple of years." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017). The Ninth Circuit found that these statements were not puffery because they "went beyond 'feel good' optimistic statements. In the court's view, these statements "did not just describe the pipeline in subjective or emotive terms. Rather, they provided a concrete description of the past and present state of the pipeline." Id. at 1144. Accordingly, they were actionable, not puffery. *Id.* See also *Zaghian v. Farrell*, 675 F. App'x 718, 720-21 (9th Cir. 2017) ("As to whether the statements were immaterial puffery, the alleged misrepresentations did not vaguely describe THQ's financial health, but instead addressed a particular product and the anticipated profitability of that product."). Here, the statements are not puffery because they conveyed concrete facts to investors, that reported MAU numbers conveyed to investors actual user growth in interest in the cannabis industry in general and the weedmaps website in particular. Defendants' puffery argument is also deficient for ignoring the context in which the statements were made. In assessing puffery, "the context in which the statements were made is key." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014)." "even general statements of optimism, when taken in context, may form a

14

basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly. "*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (internal quotations omitted).

Defendants focus in isolation on the statement that they view the "number of MAUs as a key indicator of our growth", ignoring what follows – several examples of how MAUs reflect customer interest in their product and in the cannabis industry, as well as the broader context that Defendants elsewhere in their disclosures defined MAUs as a "key operating indictor".

### 3.    The Company's Statement that MAUs Reflect Users who "Engaged" with their Website was Misleading

The Complaint alleges that Defendants misled investors by stating that it calculated MAUs by "counting the total number of users who have engaged with the weedmaps.com site during the final calendar month of the given period." ¶¶46, 59, 72, 83. These statements were misleading for the reasons set forth in the foregoing sections.

### C.    The Complaint Alleges Scienter

Where a private securities complaint relies on an SEC Order for fact supporting a strong inference of scienter, "the SEC's decision not to charge a defendant with fraud does not 'hurt[ ]' a plaintiff's 'ability to plead a strong inference of scienter.'" *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 468 (9th Cir. 2023) *quoting In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707 n.5 (9th Cir. 2012)

"The disclosure of information that contradicts internal data creates a 'strong inference' that HP 'knowingly misled' the public as to the state of the company." *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 468 (9th Cir. 2023) (*quoting Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014), *overruled*

15

*on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

### 1. Defendants Repeatedly Received Information Contradicting their Public Statements

The SEC Order specifically stated that Beals and Lee "received various weekly updates throughout the summer and fall of 2021 that contained graphs, charts, and commentary showing that WM Technology's direct and organic traffic, as well as the active sessions on the site, had declined by double digits since mid-2020 and that the company's MAU growth was being driven by low engagement paid traffic." In addition, a "November 2021 'Weekly Business Review' presentation further highlighted that paid traffic was propping up MAU as direct and organic traffic declined, and that the paid traffic, which increasingly included traffic from popunder advertisements, had reached roughly 50% or more of WM Technology's total MAU." Dkt. No. 48-1, ¶21. As the Ninth Circuit has repeatedly held, allegations that Defendants had access to information contradicting their public statements support a strong inference of scienter. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("most direct way" to show a statement was false and that party making the statement knew it was false "is via contemporaneous reports or data, *available to the party*" contradicting the statement)", *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1138-39 (9th Cir. 2017) (allegation that sales database included "real-time information concerning QSI revenues and income" sufficiently detailed to support a strong inference of scienter). Defendants' argument that the complaint fails to allege scienter because Beals and Lee viewed MAUs as a non-revenue generating "marketing metric" (Mot. at 13) does nothing to refute scienter, it confirms it. Defendants told investors that MAUs are a measure of "the continued use of our sites by our users and their level of interest in the cannabis industry". The fact that,

16

as Defendants admit, they viewed it as a mere "marketing metric" exposes their fraud.

Grasping at straws, Defendants argue that because the Complaint alleged that users directed to weedmaps from pop-under advertisements did not "meaningfully engage" with the website and that the traffic was "low engagement", implies some level of engagement and therefore does not contradict their public statements. This argument is meritless because the SEC Order elsewhere makes clear what these references to "meaningful" and "low" engagement mean. The Cease and Desist Order states that "less than 2% of the pop-under traffic resulted in an engaged user session." ¶28. Because 98% of pop-under traffic resulted in no engagement, Defendants' awareness of this fact contradicts their public statements that MAU numbers reflected user engagement or was an indicator of customer awareness. Because the Complaint alleges the specific percentage of users who did not engage with the website, it is distinguishable from the decisions defendants cite. *Vantive* found insufficient a vague allegation in the complaint that the defendant "was unable to hire sufficient numbers of qualified persons" *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086 (9th Cir. 2002). *Figs* found insufficient allegations of data access without allegations of what that data showed. *Ryan v. FIGS, Inc.*, No. 2:22-CV-07939-ODW (AGRX), 2024 WL 187001, at *10 (C.D. Cal. Jan. 17, 2024). *Wet Seal* found insufficient scienter allegations from mere "access to real time reports" without alleging what those reports showed. *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1175 (C.D. Cal. 2007).

Defendants' argument that the Complaint lacks sufficient corroborating detail misstates the case law and misconstrues the Complaint. *Silicon Graphics*, for instance, merely held that a complaint failed to establish the specificity requirements for pleading fraud through a mere boilerplate statement that "Plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of SGI's SEC filings, securities analysts reports and

17

advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants". *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999), *as amended* (Aug. 4, 1999). *Tesla* is inapposite because in that case, the Ninth Circuit merely held that it was insufficient to allege scienter by alleging two employees' views that Tesla's projections were unachievable. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021). Here the Complaint relies not on the subjective assessment of employees, but on reports providing concrete data.

Nor are defendants correct that a Complaint may not rely on the contents of an SEC order to establish a strong inference of scienter, as multiple Ninth Circuit decisions have expressly relied on such orders in reversing dismissals of complaints subject to the PSLRA. *See York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 468 (9th Cir. 2023); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707 (9th Cir. 2012). To the extent Defendants rely on District Court decisions for the contrary position, they are wrongly decided.

### 2.      Beals' Departure Supports Scienter

Beals' abrupt termination from WM Technology at the exact moment when the Company announced it was ceasing reporting of MAUs supports scienter. *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) ("when corporate reshuffling occurs in tandem with financial restatements, these changes add one more piece to the scienter puzzle"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 66281, at *14 (N.D. Cal. Jan. 4, 2017) ("Plaintiffs have pled sufficient facts to compel the inference that the Volkswagen resignations, firings, and suspensions are strongly indicative of scienter."). Defendants assert in a conclusory fashion (unsupported by any allegations in the Complaint) that WM's internal investigation concluded several months prior. Not only is this improper on a motion to dismiss,

18

it runs counter to the fact that Beals' termination was announced at the same time as WM Technology announced they would cease reporting MAUs, indicating that the situation was still in development.

### 3.    An Inference of Fraud Outweighs Any Other Inference

Holistically, the facts plead an overwhelming inference of scienter. Defendants used ineffective advertising to drive user growth, creating a false impression that WM Technology was growing. Despite claiming that users were "engaged", Defendants kept separate internal metrics showing actual engagement, receiving regular reports laying out the extent of their fraud. Defendants Beals and Lee were aware of and did nothing to stop this conduct, and WM Technology did not cease the fraud until a whistleblower went directly to the company's independent directors. This creates a simple, strong inference of scienter.

Defendants invite error, asking the Court to conclude a lack of fraud from the mere fact that the SEC elected not to charge them with fraud. The Ninth Circuit has made clear that this inference is impermissible. "The district court erred in concluding that 'the SEC's decision not to plead scienter hurts plaintiffs' ability to plead a strong inference of scienter.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707 (9th Cir. 2012). Nor can the fact that the audit committee launched an investigation exculpate them. Notably, the whistleblower in this case went over Beals and Lee's heads directly to the board of directors, undercutting any exculpatory inference for them. In *Bausch & Lomb*, the audit committee launched an investigation immediately after a whistleblower went to senior management. *Dillard v. Platform Specialty Prods. Corp.*, No. 16-CV-80490, 2016 WL 10586301, at *3 (S.D. Fla. Dec. 8, 2016). *Dillard v. Platform Specialty Prods. Corp.* similarly did not involve a whistleblower approaching the board directly. No. 16-CV-80490, 2016 WL 10586301, at *3 (S.D. Fla. Dec. 8, 2016).

### D.    The Complaint Alleges Loss Causation

Loss causation is adequately pleaded when the complaint offers "'sufficient detail to give defendants ample notice of [plaintiffs'] loss causation theory, and to give [the court] some assurance that the theory has a basis in fact.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1056 (9th Cir. 2008). Thus, Plaintiffs need only "plausibly allege" that "the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

Proximate causation can be pleaded by identifying corrective disclosures. *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018) (per curiam). A corrective disclosure: (i) does not require an admission of fraud; (ii) does not need to reveal the full scope of the defendant's fraud; (iii) does not need to precisely mirror the earlier misrepresentation, it "is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).

However, "'[d]isclosure of the fraud is not a *sine qua non* of loss causation.'" *First Solar*, 881 F.3d at 753. Plaintiffs may also establish loss causation by "alleging that the defendant's misrepresentations concealed a risk that materialized and played some part in diminishing the value of the security." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *20 (C.D. Cal. Aug. 4, 2014).

Plaintiffs need not show that a misrepresentation was the sole reason for the decline to establish loss causation: "'As long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement ....'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013). Additionally, "'a misstatement or omission is the 'proximate cause' of an

20

investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.'" *Id*. at 1120.

### 1.     The November 7, 2022 Announcement was Corrective

On November 7, 2022, Defendants announced Beals's departure and the fact that the Company would no longer be reporting MAUs. This was a partial corrective disclosure under straightforward case law. As to Beals' termination, executive departures can serve as a corrective event, particularly, like here, when combined with other "'partial disclosures.'" *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *11 (S.D. Cal. July 12, 2016) ("[executive] resignation can qualify as a partial disclosure, even if the announcement did not connect his resignation to the investigation") (citing *Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 322-23 (5th Cir. 2014)) (announcement of executive resignations to "'pursue other interests'" constituted a "partial disclosure"); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 674-75 (D.S.C. 2016) (same). Defendants also argue that WM Technology's announcement that it would not be reporting MAUs going forward was not corrective because Defendants had already announced that they would be "review[ing] user engagement metrics to determine which metrics may be most useful for investors". Mot. at 21. But there is a material difference between announcing that Defendants would be *reviewing* user metrics and announcing that as a result of that review, they would stop reporting MAUs altogether.

### 2.     The September 24, 2024 Disclosure was Corrective

Defendants' claim that the September 24, 2024 disclosure announced nothing new is plainly false. As set forth in Section III.A., the SEC Complaint contained numerous new allegations regarding the true state of affairs at WM Technology. Regarding the scale of the stock decline, Defendants incorrectly assert

that the 2.13% decline in WM Technology stock is insufficient to establish loss causation. This hard-and-fast rule is not supported by the case law. "There is no hard cutoff for what percentage drop constitutes a 'significant' drop for a stock price; instead, such determinations will 'vary depending on the average trading range for the particular stock.'" *Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*, 709 F. Supp. 3d 1217, 1237 (D. Nev. 2024). Therefore, determination of whether a stock decline is statistically significant is properly the subject of expert disclosure after the pleadings.

### E.    The Complaint Alleges a Control Person Claim

Because the Complaint alleges a primary violation, it also alleges a control person claim.

## IV.    Conclusion

The Motion should be denied. If granted, Plaintiffs should be given leave to replead.

Dated: September 9, 2025

**THE ROSEN LAW FIRM, P.A.**
/s/ Jonathan Stern
Jonathan Stern (admitted *pro hac vice*)
275 Madison Ave, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: jstern@rosenlegal.com

Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs and the Class*

22

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certify that this brief contains 6967 words, which:

<u>X</u> complies with the word limit of L.R. 11-6.1.

_ complies with the word limit set by court order.


Dated: September 9, 2025                    **THE ROSEN LAW FIRM, P.A.**
                                            <u>/s/ Jonathan Stern</u>
                                            Jonathan Stern (admitted *pro hac vice*)
                                            275 Madison Ave, 40th Floor
                                            New York, NY 10016
                                            Tel: (212) 686-1060
                                            Fax: (212) 202-3827
                                            Email: jstern@rosenlegal.com


                                            Laurence M. Rosen (SBN 219683)
                                            355 South Grand Avenue, Suite 2450
                                            Los Angeles, CA 90071
                                            Telephone: (213) 785-2610
                                            Facsimile: (213) 226-4684
                                            Email: lrosen@rosenlegal.com

                                            *Counsel for Plaintiffs and the Class*

23