DAVIS POLK & WARDWELL LLP
EDMUND POLUBINSKI (*pro hac vice*)
DANIEL J. SCHWARTZ (*pro hac vice*)
MARIE KILLMOND (*pro hac vice*)
MARY K. SHERWOOD (*pro hac vice*)
(edmund.polubinski@davispolk.com)
(daniel.schwartz@davispolk.com)
(marie.killmond@davispolk.com)
(mary.sherwood@davispolk.com)
450 Lexington Ave.
New York, New York 10017
Telephone: +1 212 450 4000
Facsimile: +1 212 450 5000

MANDAVIA EPHRAIM & BURG LLPG
ANJANI MANDAVIA (SBN 94092)
(amandavia@mandaviallp.com)
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: +1 310 556 9694

*Attorneys for Scott Gordon,*
*William Healy, and Gregory Gentile*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERET ISHAK, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WM TECHNOLOGY, INC. f/k/a SILVER SPIKE ACQUISITION CORP., CHRISTOPHER BEALS, ARDEN LEE, DOUGLAS FRANCIS, SUSAN ECHERD, MARY HOITT, SCOTT GORDON, WILLIAM HEALY, and GREGORY M. GENTILE,<br><br>Defendants. | Case No. 2:24-cv-08959-ODW-PVC<br><br>**REPLY DECLARATION OF EDMUND POLUBINSKI (1) IN FURTHER SUPPORT OF THE SILVER SPIKE INDIVIDUALS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT AND (2) IN SUPPORT OF THE SILVER SPIKE INDIVIDUALS' SUPPLEMENTAL REQUEST FOR CONSIDERATION OF DOCUMENTS AND JUDICIAL NOTICE**<br><br>Date:        November 10, 2025<br>Time:       1:30 p.m.<br>Dept:       Courtroom 5D, 5th Fl.<br>Judge:      Hon. Otis D. Wright, II |

REPLY DECLARATION OF
EDMUND POLUBINSKI
2:24-CV-08959-ODW-PVC

I, Edmund Polubinski, hereby declare as follows:

1.   I am an attorney licensed to practice law in the state of New York, and I have been admitted to practice *pro hac vice* before this Court.  I am a member of Davis Polk & Wardwell LLP, counsel for Defendants Scott Gordon, William Healy, and Gregory M. Gentile (collectively, the "Silver Spike Individuals"), in the above-captioned action.  I submit this declaration in further support of the Silver Spike Individuals' Motion to Dismiss the Amended Class Action Complaint and in support of the Silver Spike Individuals' Supplemental Request for Consideration of Documents and Judicial Notice.  I make this declaration of my personal knowledge.  If called as a witness, I could and would competently testify to the matters set forth herein.

2.   Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the Registration Statement that Stable Road Acquisition Corp. filed with the SEC on Form S-4 on November 2, 2020.

3.   Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the Agreement and Plan of Merger by and among Silver Spike Acquisition Corp., Silver Spike Merger Sub LLC, WM Holding Company, LLC, and solely in its capacity as the Holder Representative, Ghost Media Group, LLC, dated as of December 10, 2020, and filed as Annex A to the Registration Statement that Silver Spike Acquisition Corp. filed with the SEC on May 25, 2021 Form S-4/A.  Other excerpts of that Registration Statement were submitted as Exhibit 2 to my Amended Declaration in Support of (1) the Silver Spike Individuals' Motion to Dismiss the Amended Class Action Complaint and (2) the Silver Spike Individuals' Request for Consideration of Documents and Judicial Notice (Dkt. 71) and were the subject of the Silver Spike Individuals' July 11, 2025 Request for Consideration of Documents and Judicial Notice in Support of Their Motion to Dismiss the Amended Class Action Complaint (Dkt. 70).  Plaintiffs' Amended Class Action Complaint ("AC") incorporates that Registration Statement by reference at Paragraphs 35, 37, and 39,

among others.

4.   Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the Proxy Statement/Prospectus that Silver Spike Acquisition Corp. filed with the SEC on Form 424(B)(3) on May 26, 2021.  Other excerpts of the Proxy were submitted as Exhibit 1 to my Amended Declaration in Support of (1) the Silver Spike Individuals' Motion to Dismiss the Amended Class Action Complaint and (2) the Silver Spike Individuals' Request for Consideration of Documents and Judicial Notice (Dkt. 71) and were the subject of the Silver Spike Individuals' July 11, 2025 Request for Consideration of Documents and Judicial Notice in Support of Their Motion to Dismiss the Amended Class Action Complaint (Dkt. 70).  The AC incorporates the Proxy by reference at Paragraphs 35, 37, and 39, among others.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 9th day of October, 2025, in New York, New York.

*/s/ Edmund Polubinski*
Edmund Polubinski

REPLY DECLARATION OF
EDMUND POLUBINSKI
2:24-CV-08959-ODW-PVC

# Exhibit 1

**AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON NOVEMBER 2, 2020**

**Registration No. 333-**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

———————————————

**Form S-4**
**REGISTRATION STATEMENT**
*UNDER*
*THE SECURITIES ACT OF 1933*

———————————————

# STABLE ROAD ACQUISITION CORP.

(Exact Name of Registrant as Specified in Its Charter)

———————————————

| Delaware | 6770 | 84-1905538 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

———————————————

**1345 Abbot Kinney Blvd.**
**Venice, California 90291**
**(883) 478-2253**

(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Brian Kabot**
**Chief Executive Officer**
**1345 Abbot Kinney Blvd.**
**Venice, California 90291**
**Tel: (883) 478-2253**

(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent for Service)

———————————————

*Copies to***:**

| | | |
|---|---|---|
| Douglas C. Gessner, P.C. | Daniel S. Kim, Esq. | Mikhail Kokorich |
| Bradley C. Reed, P.C. | Albert W. Vanderlaan, Esq. | Chief Executive Officer |
| Kevin M. Frank | Hari Raman, Esq. | Momentus Inc. |
| Kirkland & Ellis LLP | Orrick, Herrington & | 3050 Kenneth St., |
| 300 North LaSalle | Sutcliffe LLP | Santa Clara, California 95054 |
| Chicago, Illinois 60654 | 631 Wilshire Boulevard | Tel: (650) 564-7820 |
| Tel: (312) 862-2000 | Santa Monica, California 90403 | |
| | Tel: (310) 633-2800 | |

———————————————

**Approximate date of commencement of proposed sale of the securities to the public**: As soon as practicable after this registration statement is declared effective.

If the securities being registered on this form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. £

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. £

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. £

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | £ | Accelerated filer | £ |
| Non-accelerated filer | S | Smaller reporting company | S |
| | | Emerging growth company | S |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. £

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer)     £

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer)     £

Table of Contents

The information in this preliminary proxy statement/consent solicitation statement/prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary proxy statement/consent solicitation statement/prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

**PRELIMINARY PROXY STATEMENT/CONSENT SOLICITATION STATEMENT/PROSPECTUS**

**SUBJECT TO COMPLETION, DATED NOVEMBER 2, 2020**

**STABLE ROAD ACQUISITION CORP.**
**1345 ABBOT KINNEY BOULEVARD**
**VENICE, CALIFORNIA 90291**

Dear Stable Road Acquisition Corp. Stockholders:

On October 7, 2020, Stable Road Acquisition Corp., a Delaware corporation ("SRAC"), entered into an Agreement and Plan of Merger (as it may be amended and/or restated from time to time, the "Merger Agreement") by and among SRAC, Momentus Inc., a Delaware corporation ("Momentus"), Project Marvel First Merger Sub, Inc., a Delaware corporation and a direct, wholly owned subsidiary of SRAC ("First Merger Sub"), and Project Marvel Second Merger Sub, LLC, a Delaware limited liability company and a wholly owned subsidiary of SRAC ("Second Merger Sub"). If (i) the Merger Agreement is adopted by Momentus' stockholders, (ii) the Merger Agreement and the transactions contemplated thereby, including the issuance of SRAC Class A common stock to be issued as the merger consideration, are approved by SRAC's stockholders, and (iii) the Merger Agreement and the transactions contemplated by the Merger Agreement are subsequently completed, First Merger Sub will merge with and into Momentus, with Momentus surviving such merger as a wholly owned subsidiary of SRAC, immediately followed by Momentus merging with and into Second Merger Sub, with Second Merger Sub surviving such merger as a wholly owned subsidiary of SRAC (collectively, the "Mergers"; and SRAC following such Mergers, the "Combined Company").

The aggregate merger consideration payable to the holders of Momentus equity interests (including convertible securities) will be paid in shares of newly issued Combined Company Class A common stock (or securities exercisable for Combined Company Class A common stock) having a value equal to $1,131,000,000, *minus* Momentus' indebtedness for borrowed money as of the closing of the Mergers (the "Closing"), *plus* the amount of Momentus' cash and cash equivalents as of the Closing, *plus* the aggregate exercise price of all Momentus options and warrants outstanding as of immediately prior to the Closing. The Combined Company Class A common stock issued (or reserved for issuance upon exercise of options or warrants) in connection with the Mergers will be based on a deemed value of $10.00 per share.

In addition, pursuant to Subscription Agreements that SRAC entered into with certain investors substantially concurrently with the execution of the Merger Agreement, immediately prior to the consummation of the Mergers, such investors will purchase an aggregate of 17,500,000 shares of Combined Company Class A common stock for $10.00 per share.

SRAC's units, Class A common stock and public warrants are publicly traded on the Nasdaq Capital Market ("Nasdaq") under the ticker symbols "SRACU," "SRAC" and "SRACW," respectively. We intend to apply to list the Combined Company Class A common stock, including shares of the Combined Company Class A common stock issued in connection with the Mergers, and SRAC's public warrants on Nasdaq under the symbols "MNTS" and "MNTSW" upon the Closing. SRAC will not have units traded following the Closing. Following the Closing, SRAC intends to change its name to Momentus Inc.

SRAC will hold a special meeting of stockholders (the "Special Meeting") to consider matters relating to the proposed Mergers. SRAC and Momentus cannot complete the Mergers unless (i) SRAC's stockholders consent to the approval of the Merger Agreement and the transactions contemplated thereby, including the issuance of SRAC Class A common stock to be issued as the merger consideration, and (ii) Momentus' stockholders consent to the adoption and approval of the Merger Agreement and the transactions contemplated thereby. SRAC and Momentus are sending you this proxy statement/consent solicitation statement/prospectus to ask you to vote in favor of these and the other matters described in this proxy statement/consent solicitation statement/prospectus.

In light of the ongoing developments related to the COVID-19 pandemic and to protect the health of SRAC stockholders and the community, the Special Meeting will be a completely virtual meeting of stockholders conducted via live audio webcast. You will be able to attend the Special Meeting by visiting and entering your control number as further explained in the accompanying proxy statement/consent solicitation statement/prospectus.

Table of Contents

YOUR VOTE IS VERY IMPORTANT, REGARDLESS OF THE NUMBER OF SHARES OF SRAC COMMON STOCK YOU OWN. Whether or not you plan to attend the Special Meeting, please vote as soon as possible by following the instructions in the accompanying proxy statement/consent solicitation statement/prospectus to make sure that your shares are represented at the Special Meeting. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the Special Meeting.

After careful consideration, the board of directors of SRAC has approved the Merger Agreement, the Merger and the other transactions contemplated by the Merger Agreement (the "Business Combination") and recommends that stockholders vote "**FOR**" adoption of the Merger Agreement and approval of the Business Combination, and "**FOR**" all other proposals presented to SRAC's stockholders in the accompanying proxy statement/consent solicitation statement/prospectus.

The Momentus board of directors has also approved the Business Combination and recommends that Momentus stockholders adopt the Merger Agreement and approve the Business Combination, including the transactions contemplated by the Merger Agreement and the Mergers.

This proxy statement/consent solicitation statement/prospectus provides you with detailed information about the proposed Mergers. It also contains or references information about SRAC and Momentus and certain related matters. You are encouraged to read this proxy statement/consent solicitation statement/prospectus carefully. **In particular, you should read the "*Risk Factors*" section beginning on page 39 for a discussion of the risks you should consider in evaluating the proposed Mergers and how it will affect you.**

If you have any questions regarding the accompanying proxy statement/consent solicitation statement/prospectus, you may contact SRAC's proxy solicitor, Morrow Sodali LLC, at (800) 662-5200 (toll free) or banks and brokers can call collect at (203) 658-9400 or by email to SRAC.info@investor.morrowsodali.com.

Sincerely,

_____
Brian Kabot
Chief Executive Officer

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE MERGERS, THE ISSUANCE OF SHARES OF SRAC CLASS A COMMON STOCK IN CONNECTION WITH THE MERGERS OR THE OTHER TRANSACTIONS DESCRIBED IN THIS PROXY STATEMENT/CONSENT SOLICITATION STATEMENT/PROSPECTUS, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THIS PROXY STATEMENT/CONSENT SOLICITATION STATEMENT/PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

This proxy statement/consent solicitation statement/prospectus is dated             , 2020, and is first being mailed to stockholders of SRAC on or about             , 2020.

Table of Contents

**STABLE ROAD ACQUISITION CORP.**
**1345 ABBOT KINNEY BOULEVARD**
**VENICE, CA 90291**

**NOTICE OF SPECIAL MEETING TO BE HELD ON          , 2020**

To the Stockholders of Stable Road Acquisition Corp.:

NOTICE IS HEREBY GIVEN that a Special Meeting of Stable Road Acquisition Corp., a Delaware corporation ("SRAC," the "Company," "we," "us" or "our"), will be held on          , 2020 at          Eastern Time (the "Special Meeting"). Online check-in will begin at          Eastern Time and you should allow ample time for the check-in procedures. In light of the on-going developments related to the COVID-19 pandemic and to protect the health of SRAC stockholders and the community, the Special Meeting will be a completely virtual meeting of stockholders conducted via live audio webcast. You will be able to attend the Special Meeting by visiting          and inserting the control number included in your proxy card. You will be able to vote your shares electronically over the Internet and submit questions online during the meeting by logging in to the website listed above and using the control number. The Special Meeting is being held to conduct the following items of business:

Proposal No. 1 — The Business Combination Proposal — To consider and vote upon a proposal to approve the Agreement and Plan of Merger, dated as of October 7, 2020 (as it may be amended from time to time, the "Merger Agreement"), by and among Momentus Inc. ("Momentus"), SRAC, Project Marvel First Merger Sub, Inc., a Delaware corporation and a direct, wholly owned subsidiary of SRAC ("First Merger Sub"), and Project Marvel Second Merger Sub, LLC, a Delaware limited liability company and a direct, wholly owned subsidiary of SRAC ("Second Merger Sub"), pursuant to which First Merger Sub will merge with and into Momentus (the "First Merger"), with Momentus being the surviving corporation of the First Merger (the "surviving corporation"), and immediately following the First Merger, the surviving corporation will merge with and into Second Merger Sub (the "Second Merger" and, collectively with the First Merger and the other transactions contemplated by the Merger Agreement, the "Business Combination" and the Company following such Business Combination, the "Combined Company"), with Second Merger Sub being the surviving company of the Second Merger. A copy of the Merger Agreement is attached as  Annex A to the proxy statement/consent solicitation statement/prospectus (the "Business Combination Proposal").

Proposal No. 2 — The Charter Amendment Proposal — To consider and act upon a proposal to adopt the proposed Second Amended and Restated Certificate of Incorporation of the Company attached as Annex B to the proxy statement/consent solicitation statement/prospectus (the "Charter Amendment Proposal");

The Governance Proposals — To consider and act upon, on a non-binding advisory basis, seven separate governance proposals relating to the following material differences between SRAC's existing charter and the proposed charter in accordance with the United States Securities and Exchange Commission requirements:

Proposal No. 3A — To consider and vote upon an amendment to SRAC's existing charter to increase the total number of authorized shares of all classes of capital stock from 111,000,000 shares to, following the automatic conversion of all Class B common stock into Class A common stock immediately prior to the Closing of the Business Combination, 270,000,000 shares, which would consist of (a) 250,000,000 shares of Class A common stock and (b) 20,000,000 shares of preferred stock.

Proposal No. 3B — To consider and vote upon an amendment to SRAC's existing charter to require, with respect to any vote to increase or decrease the number of authorized shares of any class or classes of stock (but not below the number of shares then outstanding), the affirmative vote of a majority of the holders of all the then-outstanding shares of capital stock of the Combined Company entitled to vote thereon, voting together as a single class, irrespective of the provisions of Section 242(b)(2) of the DGCL, and no vote of the holders of the Class A Common Stock voting separately as a class shall be required therefor.

Proposal No. 3C — To consider and vote upon an amendment to SRAC's existing charter to provide, subject to the special rights of the holders of any series of preferred stock of the Combined Company, that no director may be removed from the Combined Company board except for cause and only by the affirmative vote of the holders of at least two-thirds (2/3) of the voting power of the then-outstanding shares of capital stock of the Combined Company entitled to vote generally in the election of directors voting together as a single class;

Table of Contents

Proposal No. 3D — To consider and vote upon an amendment to SRAC's existing charter to require the affirmative vote of either a majority of the total number of authorized directors whether or not there exist any vacancies in previously authorized directorships (the "Whole Board") or the holders of at least two-thirds (2/3) of the voting power of all then-outstanding shares of capital stock of the Combined Company entitled to vote generally in the election of directors, voting together as a single class, for the adoption, amendment, or repeal any provision of the bylaws (in addition to any vote of the holders of any class or series of stock of required by applicable law or by the proposed charter of the Combined Company); provided, however, that if two-thirds (2/3) of the Whole Board has approved such adoption, amendment or repeal, then only the affirmative vote of the holders of at least a majority of the voting power of all then-outstanding shares of capital stock of the Combined Company entitled to vote generally in the election of directors, voting together as a single class, shall be required to adopt, amend or repeal any provision of the Bylaws;

Proposal No. 3E — To consider and vote upon an amendment to SRAC's existing charter to require the affirmative vote of either a majority of the board of directors or the holders of two-thirds (2/3) of the voting power of the then-outstanding shares of capital stock of the Combined Company for the adoption, amendment, or repeal of certain provisions of the charter; provided that if two-thirds (2/3) of the Whole Board has approved such amendment or repeal, then only the affirmative vote of the holders of at least a majority of the voting power of the then-outstanding shares of capital stock of the Combined Company will be required for the amendment or repeal of such provision;

Proposal No. 3F — To consider and vote upon an amendment to SRAC's existing charter to clarify that the exclusive jurisdiction of the Chancery Court of the State of Delaware shall not apply to suits brought to enforce any duty or liability under the Securities Act or the Exchange Act, or any other claim for which the federal courts have exclusive jurisdiction. To the fullest extent permitted by law, the federal district courts of the United States of America shall be the sole and exclusive forum for the resolution of claims arising under the Securities Act; and

Proposal No. 3G — To consider and vote upon an amendment to SRAC's existing charter to authorize all other proposed changes, including, among others, those (i) resulting from the Business Combination, including changing the post-business combination corporate name from "Stable Road Acquisition Corp." to "Momentus Inc." and removing certain provisions relating to SRAC's prior status as a blank check company and SRAC Class B common stock that will no longer apply upon the Closing, or (ii) that are administrative or clarifying in nature, including the deletion of language without substantive effect.

We refer to Proposals No. 3A through 3G collectively as the "Governance Proposals";

Proposal No. 4 — The Director Election Proposal — a proposal to elect, assuming the Business Combination Proposal, the Charter Amendment Proposal and the Nasdaq Proposal (as defined below) are all approved and adopted, six directors to the Combined Company's board of directors (the "Director Election Proposal").

Proposal No. 5 — The Equity Incentive Plan Proposal — To approve and adopt the 2020 Equity Incentive Plan (the "Equity Incentive Plan") and material terms thereunder (the "Equity Incentive Plan Proposal"). A copy of the Equity Incentive Plan is attached to this proxy statement/consent solicitation statement/prospectus as Annex C.

Proposal No. 6 — The Employee Stock Purchase Plan Proposal — To approve and adopt the 2020 Employee Stock Purchase Plan (the "Employee Stock Purchase Plan") and material terms thereunder (the "Employee Stock Purchase Plan Proposal"). A copy of the Employee Stock Purchase Plan is attached to this proxy statement/consent solicitation statement/prospectus as Annex D.

Proposal No. 7 — The CEO Option Grant Proposal — To approve and adopt a stock option grant and material terms thereunder (the "CEO Option Grant") to Mikhail Kokorich, the Chief Executive Officer of Momentus, effective upon Closing (the "CEO Option Grant Proposal"). A copy of the award agreement pursuant to which the CEO Option Grant will be made is attached to this proxy statement/consent solicitation statement/prospectus as Annex E.

Table of Contents

Proposal No. 8 — The Nasdaq Proposal — a proposal to approve, assuming the Business Combination Proposal and the Charter Amendment Proposal are approved and adopted, for purposes of complying with applicable provisions of Nasdaq Listing Rule 5635, the issuance of more than 20% of SRAC's issued and outstanding common stock in connection with the Business Combination and the private placement of shares of Combined Company Class A common stock being issued at the time of the Business Combination (the "PIPE Investment"), and the related change in control (collectively, the "Nasdaq Proposal" and, together with the Business Combination Proposal, the Charter Amendment Proposal, the Governance Proposals, the Director Election Proposal, the Equity Incentive Plan Proposal, the Employee Stock Purchase Plan Proposal and the CEO Option Grant Proposal, the "Proposals").

The above matters are more fully described in the accompanying proxy statement/consent solicitation statement/prospectus. **We urge you to read carefully the accompanying proxy statement/consent solicitation statement/prospectus in its entirety, including the Annexes and the accompanying financial statements of SRAC and Momentus.**

The record date for the Special Meeting is          , 2020. Only stockholders of record at the close of business on that date may vote at the Special Meeting or any adjournment thereof. A complete list of SRAC stockholders of record entitled to vote at the Special Meeting will be available for 10 days before the Special Meeting at SRAC's principal executive offices for inspection by stockholders during ordinary business hours for any purpose germane to the Special Meeting. The eligible stockholder list will also be available at the Special Meeting for examination by any stockholder of record present at such meeting.

We are providing the accompanying proxy statement/consent solicitation statement/prospectus and accompanying proxy card to SRAC's stockholders in connection with the solicitation of proxies to be voted at the Special Meeting and at any adjournments of the Special Meeting. Information about the Special Meeting, the Business Combination and other related business to be considered by SRAC's stockholders at the Special Meeting is included in this proxy statement/consent solicitation statement/prospectus. **Whether or not you plan to attend the Special Meeting, we urge all of SRAC's stockholders to read the accompanying proxy statement/consent solicitation statement/prospectus, including the Annexes and the accompanying financial statements of SRAC and Momentus, carefully and in their entirety.**

**After careful consideration, the SRAC Board has approved the Business Combination and recommends that SRAC's stockholders vote "FOR" adoption of the Merger Agreement and approval of the Business Combination, including the transactions contemplated by the Merger Agreement and the Mergers, and "FOR" all other proposals presented to SRAC's stockholders in the accompanying proxy statement/consent solicitation statement/prospectus. When you consider the SRAC Board's recommendation of these proposals, you should keep in mind that SRAC's directors and officers have interests in the Business Combination that may conflict with your interests as a stockholder. Please see the sections titled "*The Business Combination and the Merger Agreement—Interests of Certain SRAC Persons in the Business Combination*" and "*SRAC Special Meeting of Stockholders—Recommendation to SRAC Stockholders*" for additional information.**

In connection with SRAC's initial public offering (the "IPO"), the initial stockholders of SRAC agreed to vote all shares of SRAC Class B common stock and any shares of SRAC Class A common stock purchased during or after the IPO in favor of the Business Combination. Currently, the initial stockholders and SRAC PIPE Partners LLC own approximately 21.7% of SRAC's issued and outstanding common stock, including all of the outstanding shares of SRAC Class B common stock.

Pursuant to SRAC's existing charter, a holder of SRAC's public shares may request that SRAC redeem all or a portion of such stockholder's public shares for cash if the Business Combination is consummated. You will be entitled to receive cash for any public shares to be redeemed if, prior to 5:00 p.m. Eastern Time on          , 2020 (two business days before the Special Meeting), you tender your shares physically or electronically and submit a request in writing that SRAC redeem your public shares for cash to SRAC's transfer agent.

Holders of units issued in the IPO ("public units") must elect to separate the underlying shares ("public shares") and warrants ("public warrants") prior to exercising redemption rights with respect to the public shares. If holders hold their public units in an account at a brokerage firm or bank, holders must notify their broker or bank that they elect to separate the public units into the underlying public shares and public warrants, or if a holder holds public units

Table of Contents

registered in its own name, the holder must contact the transfer agent directly and instruct it to separate the public units. **Public stockholders may elect to redeem their public shares even if they vote "for" the Business Combination Proposal.** If the Business Combination is not consummated, the public shares will not be redeemed for cash. If a public stockholder properly exercises its right to redeem its public shares and timely delivers its shares to the transfer agent, SRAC will redeem each public share for a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account established in connection with the IPO (the "Trust Account"), calculated as of two business days prior to the Closing, including interest not previously released to SRAC to pay its income taxes, divided by the number of then issued and outstanding public shares. For illustrative purposes, as of October 23, 2020, this would have amounted to approximately $10.03 per public share. If a public stockholder exercises its redemption rights, then it will be exchanging its redeemed public shares for cash and will no longer own such shares. See the section titled "*SRAC Special Meeting of Stockholders — Redemption Rights*" in the accompanying proxy statement/consent solicitation statement/prospectus for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash.

Notwithstanding the foregoing, a holder of public shares, together with any affiliate of such public stockholder or any other person with whom such public stockholder is acting in concert or as a "group" (as defined under Section 13(d) of the Exchange Act), will be restricted from redeeming its public shares with respect to more than an aggregate of 15% of the public shares without SRAC's prior consent. Accordingly, if a public stockholder, alone or acting in concert or as a group, seeks to redeem more than 15% of the public shares, then any such shares in excess of that 15% limit would not be redeemed for cash unless such stockholder first obtains SRAC's prior consent.

The Merger Agreement provides that the obligation of Momentus to consummate the Business Combination is conditioned on the amount in the Trust Account, the proceeds from PIPE Investment and any alternative financing with respect to the PIPE Investment, on terms and conditions no less favorable in the aggregate than the PIPE Investment (after deducting the cash amounts required to satisfy SRAC Share Redemptions), equaling or exceeding $250,000,000. This condition to closing in the Merger Agreement is for the sole benefit of Momentus and may be waived by it. If this condition becomes incapable of being satisfied at the Closing and continues to be incapable of being satisfied at the Closing for a period of 10 business days (after giving effect to any alternative financing that may be arranged with respect to the PIPE Investment), Momentus may elect not to consummate the Business Combination and may terminate the Merger Agreement.

In no event will SRAC redeem public shares in an amount that would result in its net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) being less than $5,000,001. Holders of public warrants do not have redemption rights in connection with the Business Combination.

The initial stockholders have agreed to waive their redemption rights with respect to shares of Class B common stock and with respect to any public shares they may have held in connection with the Closing and to convert such shares of Class B common stock into shares of Class A common stock in connection with the Closing. The shares of Class B common stock will be excluded from the pro rata calculation used to determine the per-share redemption price at the time of the redemptions.

The approval of each of the Business Combination Proposal, the Governance Proposals (on an advisory basis), the Equity Incentive Plan Proposal, the Employee Stock Purchase Plan Proposal, the CEO Option Grant Proposal, and the Nasdaq Proposal requires the affirmative vote of a majority of the votes cast by holders of outstanding SRAC shares of common stock represented in person or by proxy at the Special Meeting and entitled to vote thereon. The approval of the Charter Amendment Proposal requires the affirmative vote of the holders of a majority of SRAC's shares of common stock entitled to vote thereon. Directors are elected by a plurality of all of the votes cast by holders of SRAC's outstanding shares of common stock represented in person or by proxy at the Special Meeting and entitled to vote thereon.

***Your vote is very important.*** **Whether or not you plan to attend the Special Meeting via live audio webcast, please vote as soon as possible by following the instructions in this proxy statement/consent solicitation statement/prospectus to make sure that your shares are represented at the Special Meeting. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the Special Meeting. The Business Combination and the other transactions contemplated by the Merger Agreement will be consummated only if the Business Combination Proposal, the Charter Amendment Proposal and the Nasdaq Proposal are approved at the Special Meeting. Each of the Business Combination Proposal, the**

Table of Contents

**Charter Amendment Proposal and the Nasdaq Proposal are cross-conditioned on the approval of each other. The Director Election Proposal, the Equity Incentive Plan Proposal, the Employee Stock Purchase Plan Proposal, and the CEO Option Grant Proposal are conditioned on the approval of the Business Combination Proposal, the Charter Amendment Proposal and the Nasdaq Proposal. The Governance Proposals are not conditioned on the approval of any other Proposals.**

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted FOR each of the proposals presented at the Special Meeting. If you fail to return your proxy card or fail to instruct your bank, broker or other nominee how to vote, and do not attend the Special Meeting electronically, the effect will be that your shares will not be counted for purposes of determining whether a quorum is present at the Special Meeting. If you are a stockholder of record and you attend the Special Meeting and wish to vote electronically at the Special Meeting, you may withdraw your proxy and vote electronically at the Special Meeting.

Your attention is directed to the proxy statement/consent solicitation statement/prospectus accompanying this notice (including the annexes thereto) for a more complete description of the Merger Agreement, proposed Business Combination and related transactions and each of the proposals. We encourage you to read the accompanying proxy statement/consent solicitation statement/prospectus carefully. If you have any questions or need assistance voting your common stock, please contact SRAC's proxy solicitor, Morrow Sodali LLC, at (800) 662-5200 (toll free) or banks and brokers can call collect at (203) 658-9400, or by email to SRAC.info@investor.morrowsodali.com.

Thank you for your participation. We look forward to your continued support.

By Order of the SRAC Board,

Brian Kabot
Chief Executive Officer

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement on Form S-4 to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Venice, State of California, on November 2, 2020.

**STABLE ROAD ACQUISITION CORP.**

| | |
|---|---|
| By: | /s/ Brian Kabot |
| Name: | Brian Kabot |
| Title: | Chief Executive Officer |

KNOWN ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Brian Kabot and James Norris, and each one of them, as his or her true and lawful attorneys-in-fact and agent, with full power of substitution and resubstitution, for them and in their name, place and stead, in any and all capacities, to sign one or more Registration Statements on Form S-4, or other appropriate form, and all amendments thereto, including post-effective amendments, of Stable Road Acquisition Corp. and to file the same, with any exhibits thereto, with the Securities and Exchange Commission, and/or any state securities department or any other federal or state agency or governmental authority granting unto such attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or their substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Brian Kabot | Chief Executive Officer and Director | November 2, 2020 |
| Brian Kabot | *(Principal Executive Officer)* | |
| /s/ James Norris | Chief Financial Officer | November 2, 2020 |
| James Norris | *(Principal Financial and Accounting Officer)* | |
| /s/ Marc Lehmann | Director | November 2, 2020 |
| Marc Lehmann | | |
| /s/ Kellen O'Keefe | Director | November 2, 2020 |
| Kellen O'Keefe | | |
| /s/ James Hofmockel | Director | November 2, 2020 |
| James Hofmockel | | |
| /s/ Ann Kono | Director | November 2, 2020 |
| Ann Kono | | |

II-8

# Exhibit 2

**Exhibit 2.1**
**EXECUTION VERSION**

**AGREEMENT AND PLAN OF MERGER**
by and among
SILVER SPIKE ACQUISITION CORP.,
SILVER SPIKE MERGER SUB LLC,
WM HOLDING COMPANY, LLC,
and
solely in its capacity as the Holder Representative,
GHOST MEDIA GROUP, LLC
dated as of December 10, 2020

Case 2:24-cv-08959-ODW-PVC    Document 88-1    Filed 10/09/25    Page 15 of 35    Page
ID #:1416

**Exhibit 2.1**
**EXECUTION VERSION**

**AGREEMENT AND PLAN OF MERGER**
by and among
SILVER SPIKE ACQUISITION CORP.,
SILVER SPIKE MERGER SUB LLC,
WM HOLDING COMPANY, LLC,
and
solely in its capacity as the Holder Representative,
GHOST MEDIA GROUP, LLC
dated as of December 10, 2020

(c) If a Holder is unable to provide a duly executed and properly completed IRS Form W-9, then (i) such Holder shall provide a certificate substantially in the form described in Treasury Regulations Section 1.1446(f)-2(c)(2)(ii)(B) or (ii) the Company shall deliver a certificate substantially in in the form described in Treasury Regulations Section 1.1446(f)-2(c)(2)(ii)(C), in each case that is reasonably acceptable to Silver Spike, setting forth the liabilities of the Company allocated to the Common Units or Incentive Units sold or deemed to be sold pursuant to this Agreement under Section 752 of the Code.

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the corresponding section of the Company Disclosure Schedule, the Company represents and warrants to the Silver Spike Parties as of the date hereof and as of the Closing Date as follows:

Section 5.01 *Corporate Organization of the Company.*

(a) The Company has been duly organized and is validly existing as a limited liability company in good standing under the Laws of the State of Delaware and has the limited liability company power and authority to own or lease its properties and to conduct its business as it is now being conducted.

(b) A true and complete copy of the certificate of formation, certified by the Secretary of State of the State of Delaware, and a true and correct copy of the operating agreement of the Company have been made available by the Company to Silver Spike and each is in full force and effect and the Company is not in violation of any of the provisions thereof.

(c) The Company is duly licensed or qualified and, where applicable, in good standing as a foreign corporation in each jurisdiction in which the ownership or lease of its property or the character of its activities is such as to require it to be so licensed, qualified or in good standing, as applicable, except where the failure to be so licensed or qualified would not reasonably be expected to have a Material Adverse Effect.

Section 5.02 *Subsidiaries.*

30

Section 5.25 *Registration Statement and Proxy Statement*. On the date the Proxy Statement is first mailed to Silver Spike Shareholders, and at the time of the Silver Spike Extraordinary General Meeting, none of the information furnished by or on behalf of the Company or the Holder Representative in writing specifically for inclusion in the Registration Statement or Proxy Statement will include any untrue statement of material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Section 5.26 *No Additional Representations and Warranties; No Outside Reliance*. Except for the representations and warranties provided in this Article 5, and the representations and warranties as may be provided in the Ancillary Agreements, neither the Company nor any of its Subsidiaries or Affiliates, nor any of their respective directors, managers, officers, employees, equity holders, partners, members, advisors, agents or representatives has made, or is making, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to or with respect to this Agreement or the transactions contemplated hereby or thereby to any Silver Spike Party. Neither the Company nor any of its Subsidiaries or Affiliates, nor any of their respective directors, managers, officers, employees, equityholders, partners, members, advisors, agents or representatives has made, or is making, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating or with respect to any financial information, financial projections, forecasts, budgets or any other document or information made available to any Silver Spike Party or any other Person (including information in the "data site" maintained by or on behalf of the Company or provided in any formal or informal management presentation) except for the representations and warranties made by the Company to the Silver Spike Parties in this Article 5 and the representations and warranties as may be provided in the Ancillary Agreements. Each of the Company and its Subsidiaries hereby expressly disclaims any representations or warranties other than those expressly given by the Company in this Article 5 and as may be provided in the Ancillary Agreements. The Company acknowledges and agrees that, except for the representations and warranties contained in Article 6 or the Ancillary Agreements, none of the Silver Spike Parties or any of its Subsidiaries or Affiliates nor any other Person has made or is making any representation or warranty, express or implied, as to the accuracy or completeness of any information, data, or statement regarding any of the Silver Spike Parties or the transactions contemplated hereunder or thereunder, including in respect of the Silver Spike Parties, the business, the operations, prospects, or condition (financial or otherwise), or the accuracy or completeness of any document, projection, material, statement, or other information not expressly set forth in Article 6 or the Ancillary Agreements. The Company is not relying on any representations or warranties other than those representations or warranties set forth in Article 6 or the Ancillary Agreements. Notwithstanding the foregoing, nothing in this Section 5.26 shall limit the Silver Spike Parties' remedies in the event of Fraud.

IN WITNESS WHEREOF the parties have hereunto caused this Agreement to be duly executed as of the date hereof.

**SILVER SPIKE ACQUISITION CORP.**

By:  /s/ Greg Gentile

Name:  Greg Gentile

Title:  Chief Financial Officer

**SILVER SPIKE MERGER SUB LLC**

By:  /s/ Greg Gentile

Name:  Greg Gentile

Title:  Secretary

*[Signature Page to Agreement and Plan of Merger]*

**WM HOLDING COMPANY, LLC**

By:  /s/ Chris Beals

Name:  Chris Beals

Title:  Chief Executive Officer

*[Signature Page to Agreement and Plan of Merger]*

**GHOST MEDIA GROUP, LLC,**
solely in its capacity as the Holder Representative

By:    /s/ Douglas Francis
       Name:    Douglas Francis
       Title:    Manager

By:    /s/ Justin Hartfield
       Name:    Justin Hartfield
       Title:    Manager

*[Signature Page to Agreement and Plan of Merger]*

# Exhibit 3

**TABLE OF CONTENTS**

**As filed with the Securities and Exchange Commission on May 25, 2021**

Registration No. 333-252186

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**AMENDMENT NO. 4 TO**
**FORM S-4**
**REGISTRATION STATEMENT**
*UNDER*
*THE SECURITIES ACT OF 1933*

**Silver Spike Acquisition Corp.**
**(Exact Name of Registrant as Specified in Its Charter)**

| Cayman Islands | 6770 | N/A |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification Number)** |

**660 Madison Ave., Suite 1600**
**New York, New York 10065**
**(212) 905-4923**
**(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)**

**Scott Gordon, Chief Executive Officer**
**Gregory Gentile, Chief Financial Officer**
**c/o Silver Spike Acquisition Corp.**
**660 Madison Ave., Suite 1600**
**New York, New York 10065**
**(212) 905-4923**
**(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)**

*Copies to:*

| | |
|---|---|
| **Derek J. Dostal** | **David Peinsipp** |
| **Lee Hochbaum** | **Garth Osterman** |
| **Davis Polk & Wardwell LLP** | **Kristin VanderPas** |
| **450 Lexington Avenue** | **Peter Byrne** |
| **New York, New York 10017** | **Cooley LLP** |
| **(212) 450-4000** | **101 California Street, 5th Floor** |
| | **San Francisco, California 94111** |
| | **(415) 693-2177** |

**Approximate date of commencement of proposed sale of the securities to the public:** As soon as practicable after this Registration Statement is declared effective and all other conditions to the business combination described in the enclosed Proxy Statement/Prospectus have been satisfied or waived.

If the securities being registered on this form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act of 1933, as amended (the "Securities Act"), check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Securities Exchange Act of 1934.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging Growth Company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Securities Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Securities Exchange Act Rule 14d-l(d) (Cross-Border Third-Party Tender Offer) ☐

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to Be Registered | Amount to be Registered[1] | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee[7] |
|---|---|---|---|---|
| Class A common stock, par value $0.0001 per share[2][3] | 24,998,575 | $16.01[4] | $400,227,185.75 | $43,644.79 |
| Redeemable warrants, each warrant exercisable for one share of Class A common stock at an exercise price of $11.50[2][5] | 12,500,000 | $4.89[6] | $61,026,500 | $6,704.66 |
| Total | | | $461,289,685.75 | $50,326.70[8] |

(1)   Prior to the completion of the business combination described herein, the registrant, a Cayman Islands exempted company, intends to effect a deregistration under Section 206 of the Cayman Islands Companies Act (2020 Revision) and a domestication under Section 388 of the Delaware General Corporation Law (the "domestication"), pursuant to which the registrant's jurisdiction of incorporation will be transferred by way of continuation from the Cayman Islands to the State of Delaware and the name of the registrant will be changed to "WM Technology, Inc." ("New WMH"). All securities being registered will be issued by New WMH.

(2)   Pursuant to Rule 416(a), there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from share splits, share dividends or similar transactions.

(3)   The number of shares of Class A common stock of New WMH, par value $0.0001 per share (the "Class A common stock"), being registered includes up to 25,000,000 Class A ordinary shares of Silver Spike that were sold pursuant to Silver Spike's Registration Statement on Form S-1 (File No. 333-232734) as part of the units in Silver Spike's initial public offering, which will automatically convert into shares of Class A common stock in connection with the domestication and the business combination described in the proxy statement/prospectus forming part of this registration statement less the 1,425 Class A ordinary shares that were redeemed on January 13, 2021 in connection with extraordinary general meeting in lieu of annual general meeting held in connection with a proposal to amend Silver Spike's existing organizational documents.

(4)   Estimated solely for the purpose of calculating the registration fee, based on the average of the high and low prices of the Class A ordinary shares of Silver Spike Acquisition Corp. ("Silver Spike") on The Nasdaq Capital Market on January 11, 2021 in accordance with Rule 457(f)(1) and Rule 457(f)(3).

(5)   The number of warrants being registered includes 12,500,000 warrants to acquire Class A ordinary shares that were sold as part of the units in Silver Spike's initial public offering, which will automatically convert into warrants to acquire shares of Class A common stock in connection with the domestication and the business combination described in the proxy statement/prospectus forming part of this registration statement.

(6)   Estimated solely for the purpose of calculating the registration fee, based on the average of the high and low prices of the redeemable warrants on The Nasdaq Capital Market on January 11, 2021 in accordance with Rule 457(f)(1).

(7)   Determined in accordance with Section 6(b) of the Securities Act at a rate equal to $109.10 per $1,000,000 of the proposed maximum aggregate offering price.

(8)   Previously paid.

**The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.

[TABLE OF CONTENTS](#)

**Information contained herein is subject to completion or amendment. A registration statement relating to these securities has been filed with the Securities and Exchange Commission. These securities may not be sold nor may offers to buy be accepted prior to the time the registration statement becomes effective. This preliminary proxy statement/prospectus shall not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of these securities in any jurisdiction in which such offer, solicitation or sale would be unlawful.**

**PRELIMINARY PROXY STATEMENT/PROSPECTUS SUBJECT TO COMPLETION, DATED MAY 25, 2021**

## PROXY STATEMENT/PROSPECTUS FOR EXTRAORDINARY GENERAL MEETING OF SHAREHOLDERS OF SILVER SPIKE ACQUISITION CORP.

**PROXY STATEMENT/PROSPECTUS FOR 24,998,575 SHARES OF CLASS A COMMON STOCK AND 12,500,000 WARRANTS TO PURCHASE SHARES OF CLASS A COMMON STOCK, IN EACH CASE OF SILVER SPIKE ACQUISITION CORP. AFTER ITS DOMESTICATION AS A CORPORATION INCORPORATED IN THE STATE OF DELAWARE, WHICH WILL BE RENAMED "WM TECHNOLOGY, INC." IN CONNECTION WITH THE BUSINESS COMBINATION).**

The board of directors of Silver Spike Acquisition Corp., a Cayman Islands exempted company ("Silver Spike," "we," "our" or "us"), has unanimously approved the agreement and plan of merger, dated as of December 10, 2020 (as amended or modified from time to time, the "merger agreement"), by and among Silver Spike, Silver Spike Merger Sub LLC, a Delaware limited liability company and a wholly owned direct subsidiary of Silver Spike ("Merger Sub"), WM Holding Company, LLC, a Delaware limited liability company ("WMH"), and Ghost Media Group, LLC, a Nevada limited liability company, solely in its capacity as the initial holder representative (the "holder representative"), pursuant to which Merger Sub will be merged with and into WMH, whereupon the separate limited liability company existence of Merger Sub will cease and WMH will be the surviving company and continue in existence as a subsidiary of Silver Spike, on the terms and subject to the conditions set forth therein (the transactions contemplated by the merger agreement, the "business combination").

As described in this proxy statement/prospectus, Silver Spike's shareholders are being asked to consider and vote upon (among other things) the business combination and the change of Silver Spike's jurisdiction of incorporation from the Cayman Islands to the State of Delaware by deregistering as an exempted company in the Cayman Islands and domesticating and continuing as a corporation incorporated under the laws of the State of Delaware (the "domestication" and Silver Spike post-domestication, "New WMH"). Assuming the domestication proposal is approved, the domestication is expected to be effectuated prior to, but conditioned upon, the closing of the business combination (the "closing"). The continuing entity following the domestication will be named "WM Technology, Inc."

The merger consideration (the "merger consideration") received by holders of the limited liability company interests of WMH (each, a "WMH equity holder") at the closing of the business combination (the "Closing") pursuant to the merger agreement will have a value of $1,310,000,000 and will be paid in a mix of cash and equity consideration.

Financing for the business combination and for related transaction expenses will consist of (i) $250,000,000 of proceeds from Silver Spike's initial public offering (the "IPO") and certain related transactions on deposit in the trust account (plus interest income accrued thereon since the IPO), net of any redemptions of Silver Spike's Class A ordinary shares in connection with the shareholder votes to be held at the extraordinary general meeting of Silver Spike shareholders to be held in connection with the business combination (the "general meeting") and held at the extraordinary general meeting in lieu of annual general meeting on January 13, 2021 in connection with a proposal to amend Silver Spike's existing organizational documents ("the extension meeting") and (ii) $325,000,000 of proceeds from the purchase by certain accredited investors, pursuant to subscription agreements entered into in connection with the entry into the merger agreement (the "subscription agreements"), of an aggregate of 32,500,000 shares of Class A common stock of New WMH for a purchase price of $10.00 per share of Class A common stock of New WMH in a private placement to close immediately prior to the closing, each as described more fully in this proxy statement/prospectus.

Upon the consummation of the domestication, each of Silver Spike's currently issued and outstanding Class A ordinary shares and Class B ordinary shares, par value $0.0001 per share ("Class B ordinary shares" or the "founder shares") will automatically convert by operation of law, on a one-for-one basis, into shares of Class A common stock, par value $0.0001 per share, of New WMH ("Class A common stock"). Similarly, all of Silver Spike's outstanding warrants will become warrants to acquire the shares of Class A common stock, and no other changes will be made to the terms of any outstanding warrants as a result of the domestication.

This proxy statement/prospectus covers the following securities of New WMH to be issued in the domestication: (i) 24,998,575 shares of Class A common stock, representing our currently issued and outstanding public shares and (ii) 12,500,000 warrants to acquire shares of Class A common stock, representing our currently issued and outstanding public warrants.

Following the business combination, we will have two classes of common stock, Class A common stock and Class V common stock. The rights of the holders of Class A common stock and Class V common stock are identical, except with respect to dividend rights, rights upon liquidation, dissolution and winding-up and preemptive rights. The holders of Class V common stock will not participate in any dividends of New WMH, will not be entitled to receive any assets of New WMH in any liquidation, dissolution or winding up, and do not have preemptive, subscription, redemption or conversion rights. Each share of Class A common stock and Class V common stock is entitled to one vote per share. Upon completion of the business combination, there will be 149,748,575 shares of Class A common stock outstanding and approximately 65,984,049 shares of Class V common stock outstanding, based upon certain assumptions stated in this proxy statement/prospectus. See the section entitled "Summary Term Sheet" for more information.

Our units, Class A ordinary shares originally sold as part of the units, and warrants originally sold as part of the units are currently listed on The Nasdaq Stock Market LLC (the "Nasdaq") under the symbols "SSPKU," "SSPK" and "SSPKW," respectively. The Class A ordinary shares and warrants comprising the units began separately trading on January 14, 2020. Upon the closing, we intend to apply to continue the listing of our Class A common stock and warrants on the Nasdaq under the symbols "MAPS" and "MAPSW," respectively. Our units will not be traded following the closing.

This business combination is being accomplished through what is commonly referred to as an "Up-C" structure, which is often used by partnerships and limited liability companies undertaking an initial public offering. The Up-C structure allows the current WMH equity holders to retain their equity ownership in WMH, an entity that is classified as a partnership for U.S. federal income tax purposes, in the form of post-merger WMH units and provides potential future tax benefits for both New WMH and the post-merger WMH equity holders when they ultimately exchange their pass-through interests for shares of Class A common stock. New WMH will be a holding company, and immediately after the consummation of the business combination, its principal asset will be its ownership interests in WMH. At the closing, New WMH will become the managing member of WMH with control over the affairs and decision making of WMH, and will own approximately 42.6% of the economic interest in WMH, assuming no redemptions, and 25.9% of the economic interest in WMH, assuming maximum redemptions. See the section entitled "Summary of the Proxy Statement/Prospectus-The Business Combination" for more information. We do not believe that the Up-C organizational structure will give rise to any significant business or strategic benefit or detriment. We will consolidate the financial results of WMH in our combined financial statements.

**This proxy statement/prospectus provides you with detailed information about the business combination. domestication and other matters to be considered at the general meeting. We urge you to read the accompanying proxy statement/prospectus and the documents incorporated therein by reference carefully. In particular, you should review the matters discussed under the caption "Risk Factors" beginning on page [55](#) of the proxy statement/prospectus.**

**Neither the Securities Exchange Commission nor any state securities commission has approved or disapproved of the transactions described in the accompanying proxy statement/prospectus, passed upon the merits or fairness of either of the merger agreement or**

**the transactions contemplated thereby, or passed upon the adequacy or accuracy of the accompanying proxy statement/prospectus. Any representation to the contrary is a criminal offense.**

This proxy statement/prospectus is dated May 25, 2021, and is first being mailed to Silver Spike shareholders on or about May 28, 2021.

TABLE OF CONTENTS

**NOTICE OF EXTRAORDINARY GENERAL MEETING OF SHAREHOLDERS OF SILVER SPIKE ACQUISITION CORP.**

**To Be Held On June 10, 2021**

To the Shareholders of Silver Spike Acquisition Corp:

NOTICE IS HEREBY GIVEN that an extraordinary general meeting (the "general meeting") of Silver Spike Acquisition Corp., a Cayman Islands exempted company ("Silver Spike," "we," "our" or "us"), will be held on June 10, 2021, at 10:00 a.m. (local time), at the offices of Silver Spike, located at 660 Madison Ave., Suite 1600, New York, New York 10065 for the following purposes:

1. The Business Combination Proposal - To consider and vote upon a proposal to approve the transactions contemplated by the agreement and plan of merger, dated as of December 10, 2020 (as amended or modified from time to time, the "merger agreement"), by and among Silver Spike, Silver Spike Merger Sub LLC, a Delaware limited liability company and a wholly owned direct subsidiary of Silver Spike ("Merger Sub"), WM Holding Company, LLC, a Delaware limited liability company ("WMH"), and Ghost Media Group, LLC, a Nevada limited liability company, solely in its capacity as the initial holder representative (the "holder representative"), pursuant to which Merger Sub, will merge with and into WMH, with WMH continuing as the surviving entity and a subsidiary of New WMH (as defined below), on the terms and subject to the conditions set forth therein (the "business combination" and such proposal, the "Business Combination Proposal"). A copy of the merger agreement is attached to the accompanying proxy statement/prospectus as Annex A.

2. The Nasdaq Proposal - To consider and vote upon a proposal to approve, for purposes of complying with applicable listing rules of The Nasdaq Stock Market LLC (the "Nasdaq"), the issuance by New WMH (as defined below) of (i) shares of Class A common stock, par value $0.0001 per share, to certain accredited investors, in each case in a private placement, the proceeds of which will be used to finance the business combination and related transactions and the costs and expenses incurred in connection therewith and (ii) shares of Class V common stock, par value $0.0001, per share to certain equity holders of WMH (the "Nasdaq Proposal").

3. The Domestication Proposal - To consider and vote upon a proposal to approve by special resolution the change of Silver Spike's jurisdiction of incorporation from the Cayman Islands to the State of Delaware by deregistering as an exempted company in the Cayman Islands and domesticating and continuing as a corporation incorporated under the laws of the State of Delaware (the "domestication" and such proposal, the "Domestication Proposal").

4. The Organizational Documents Proposals - To consider and vote upon six separate proposals (collectively, the "Organizational Documents Proposals") with respect to material differences between the existing amended and restated memorandum and articles of association of Silver Spike the "existing organizational documents") and the proposed new certificate of incorporation (the "proposed charter") and bylaws (the "proposed bylaws," and, together with the proposed charter, the "proposed organizational documents") of Silver Spike following its domestication as a Delaware corporation (the post-domestication entity, "New WMH");

5. The Director Election Proposal - For the holders of Class B ordinary shares to consider and vote upon a proposal to elect Chris Beals, Justin Hartfield, Douglas Francis, Scott Gordon, Tony Aquila, Fiona Tan, Olga Gonzalez and Brenda Freeman, in each case, to serve as directors until their respective successors are duly elected and qualified, or until their earlier death, resignation or removal (the "Director Election Proposal");

6. The Equity Incentive Plan Proposal - To consider and vote upon a proposal to approve the WM Technology, Inc. 2021 Equity Incentive Plan (the "Equity Incentive Plan Proposal");

7. The Employee Stock Purchase Plan Proposal - To consider and vote upon a proposal to approve the WM Technology, Inc. 2021 Employee Stock Purchase Plan (the "Employee Stock Purchase Plan Proposal"); and

8. The Adjournment Proposal - To consider and vote upon a proposal to approve the adjournment of the general meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote

TABLE OF CONTENTS

of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Nasdaq Proposal, the Domestication Proposal, the Organizational Documents Proposals, the Equity Incentive Plan Proposal or the Employee Stock Purchase Plan Proposal (the "Adjournment Proposal" and, together with the Business Combination Proposal, the Nasdaq Proposal, the Director Election Proposal, the Domestication Proposal, the Organizational Documents Proposals, the Equity Incentive Plan Proposal and the Employee Stock Purchase Plan Proposal, the "Transaction Proposals").

Each of the Transaction Proposals is more fully described in the accompanying proxy statement/prospectus, which we urge each Silver Spike shareholder to review carefully.

Only holders of record of Silver Spike's Class A ordinary shares, par value $0.0001 per share ("Class A ordinary shares) and Class B ordinary shares, par value $0.0001 per share ("Class B ordinary shares") at the close of business on May 19, 2021 are entitled to notice of and to vote and have their votes counted at the general meeting and any adjournment of the general meeting.

We are providing the accompanying proxy statement/prospectus and accompanying proxy card to our shareholders in connection with the solicitation of proxies to be voted at the general meeting and at any adjournment of the general meeting. **Whether or not you plan to attend the general meeting, we urge you to read the accompanying proxy statement/prospectus (and any documents incorporated into the accompanying proxy statement/prospectus by reference) carefully. Please pay particular attention to the section entitled "Risk Factors."**

**After careful consideration, Silver Spike's board of directors has determined that each of the Transaction Proposals is in the best interests of Silver Spike and its shareholders and unanimously recommends that you vote or give instruction to vote "FOR" each of the Transaction Proposals.**

**The existence of financial and personal interests of Silver Spike's directors may result in a conflict of interest on the part of one or more of the directors between what he or they may believe is in the best interests of Silver Spike and its shareholders and what he or they may believe is best for himself or themselves in determining to recommend that shareholders vote for the Transaction Proposals. See the section entitled "The Business Combination - Interests of Certain Persons in the Business Combination" in the proxy statement/prospectus for a further discussion.**

Pursuant to our existing organizational documents, we are providing the holders of our Class A ordinary shares originally sold as part of the units issued in our initial public offering (the "IPO") (such shares, the "public shares" and such holders, the "public shareholders") with the opportunity to have their public shares redeemed at the closing of the business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of a business combination, including interest (which interest shall be net of taxes payable), divided by the number of then outstanding Class A ordinary shares included as part of the units sold in the IPO, subject to the limitations described in the accompanying proxy statement/prospectus. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. For illustrative purposes, based on the fair value of marketable securities held in the trust account as of March 31, 2021 of $254,202,898, the estimated per share redemption price would have been approximately $10.17. **Public shareholders may elect to redeem their public shares even if they vote for the Business Combination Proposal and the other Transaction Proposals.** Our existing organizational documents provide that a public shareholder, acting together with any affiliate of such shareholder or any other person with whom such shareholder is acting in concert or as a partnership, limited partnership, syndicate, or other group for purposes of acquiring, holding, or disposing of any shares of Silver Spike, will be restricted from exercising this redemption right with respect to more than 15% of the public shares in the aggregate without the prior consent of Silver Spike. There will be no redemption rights with respect to our warrants or the "founder shares", issued to Silver Spike Sponsor, LLC (our "sponsor"), the holder of our Class B ordinary shares issued in a private placement prior to the IPO. Our sponsor, has entered into a letter agreement (the "sponsor IPO letter agreement") with us pursuant to which our sponsor has agreed to waive its redemption rights with respect to its founder shares and any public shares our sponsor may have acquired after our IPO in connection with the completion of the business combination.

TABLE OF CONTENTS

We will pay the redemption price to public shareholders who properly exercise their redemption rights promptly following the closing. The closing is subject to the satisfaction of a number of conditions. As a result, there may be a significant delay between the deadline for exercising redemption requests prior to the general meeting and payment of the redemption price.

The closing is conditioned on, among other things, the approval of the Transaction Proposals (other than the Adjournment Proposal) at the general meeting. The holders of 20% of our outstanding ordinary shares entitled to vote have agreed to vote any voting ordinary shares owned by them in favor of the Transaction Proposals.

We urge you to read the proxy statement/prospectus accompanying this notice (including the annexes thereto) carefully for a more complete description of the business combination and related transactions and each of the Transaction Proposals. If you have any questions or need assistance voting your shares, please call our proxy solicitor, D.F. King & Co., Inc., at (212) 269-5550 (banks and brokers call collect at (877) 478-5045) or email at SSPK@dfking.com.

Thank you for your participation. We look forward to your continued support.

By Order of the Board of Directors,

/s/ Scott Gordon

Scott Gordon
*Chairman and Chief Executive Officer*

May 25, 2021

TABLE OF CONTENTS

**Holder Representative**

Ghost Media Group, LLC is a Nevada limited liability company.

**The Business Combination**

On December 10, 2020, we entered into the merger agreement with WMH, Merger Sub and the Holder Representative, pursuant to which, subject to the satisfaction or waiver of certain conditions set forth therein, Merger Sub will merge with and into WMH with WMH being the surviving entity and a subsidiary of New WMH.

This business combination is being accomplished through what is commonly referred to as an "Up-C" structure, which is often used by partnerships and limited liability companies undertaking an initial public offering. The Up-C structure allows the current WMH equity holders to retain their equity ownership in WMH, an entity that is classified as a partnership for U.S. federal income tax purposes, in the form of post-merger WMH units and provides potential future tax benefits for both New WMH and the post-merger WMH equity holders when they ultimately exchange their pass-through interests for shares of Class A common stock. New WMH will be a holding company, and immediately after the consummation of the business combination, its principal asset will be its ownership interests and managing member interest in WMH. We do not believe that the Up-C organizational structure will give rise to any significant business or strategic benefit or detriment.

The merger consideration to be paid to the WMH equity holders at the closing of the business combination pursuant to the merger agreement will have a value of $1.31 billion and will be paid in a mix of cash and equity consideration. At the closing, New WMH will become the managing member of WMH and will own approximately 42.6% of the economic interest in WMH in the no redemption scenario and 25.9% of the economic interest in WMH in the maximum redemption scenario.

For more information about the merger agreement and the business combination, see the section entitled "The Business Combination."

**Conditions to the Closing**

- **Conditions to Obligations of Silver Spike Parties and WMH to Consummate the Business Combination**

  The obligations of the Silver Spike parties and WMH to consummate, or cause to be consummated, the business combination are subject to the satisfaction of the following conditions, any one or more of which may be waived (if permitted by applicable law) in writing by all of such parties:

  - all applicable waiting periods (and any extensions thereof) under the HSR Act must have expired or been terminated;

  - the shares of Class A common stock contemplated to be listed pursuant to the merger agreement must have been listed on Nasdaq and shall be eligible for continued listing on Nasdaq immediately following the closing (as if it were a new initial listing by an issuer that had never been listed prior to closing);

  - there must not be in force any applicable law or governmental order enjoining, prohibiting, making illegal or preventing the consummation of the business combination;

  - the approval of the Transaction Proposals (other than the Adjournment Proposal) by Silver Spike's shareholders pursuant to this proxy statement/prospectus must have been obtained;

  - the approval of the WMH equity holders holding Class A units of WMH (the "WMH voting members") must have been obtained;

  - the registration statement must have become effective in accordance with the Securities Act, no stop order has been issued by the SEC with respect to the registration statement and no action seeking such stop order has been threatened or initiated;

  - Silver Spike must have at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) remaining after Silver Spike's shareholders have exercised their right to redeem their shares in connection with the closing; and

  - the domestication must have been consummated.

TABLE OF CONTENTS

- **Conditions to Obligations of the Silver Spike Parties to Consummate the Business Combination**

  The obligations of the Silver Spike parties to consummate, or cause to be consummated, the business combination are subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by the Silver Spike parties:

  - the representations and warranties of WMH set forth in the merger agreement (without giving effect to any materiality or "material adverse effect" or similar qualification therein), other than representations and warranties related to corporate organization of WMH and its subsidiaries, due authorization to enter the merger agreement and related documentation, capitalization of WMH and its subsidiaries, brokers' fees and no occurrence of a material adverse effect, must be true and correct as of the date of the merger agreement and as of the closing date, as if made anew at and as of such time, except with respect to representations and warranties which speak as to an earlier date, which representations and warranties must be true and correct at and as of such date, except for, in each case, such failures to be true and correct as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect;

  - the representations and warranties of WMH set forth in the merger agreement related to no occurrence of a material adverse effect must have been true and correct as of the date of the merger agreement and as of the closing, as if made anew at and as of that time;

  - the representations and warranties of WMH set forth in the merger agreement related to corporate organization of WMH and its subsidiaries, due authorization to enter the merger agreement and related documentation, capitalization of WMH and its subsidiaries and brokers' fees (without giving effect to any materiality or "material adverse effect" or similar qualifications therein), must have been true and correct in all respects except for *de minimis* inaccuracies as of the date of the merger agreement and as of the closing, as if made anew at and as of that time (except to the extent that any such representation and warranty speaks expressly as of an earlier date, in which case such representation and warranty must have been true and correct in all respects except for *de minimis* inaccuracies as of such earlier date);

  - each of the covenants of WMH to be performed as of or prior to the date of closing must have been performed in all material respects;

  - from the date of the merger agreement there must have not occurred a material adverse effect;

  - Silver Spike must have received (i) the amended and restated registration rights agreement, the amended operating agreement, the tax receivable agreement and the exchange agreement, in each case executed by WMH, WMH equity holders or the holder representative, as applicable and (ii) a certificate signed by an authorized officer of WMH, dated as of the date of the closing, certifying that the preceding five bullets above have been satisfied;

  - if the closing has not occurred prior to February 16, 2021, WMH must have delivered to Silver Spike the audited financial statements of WMH and its subsidiaries as of and for the year ended December 31, 2020, prepared in accordance with GAAP and Regulation S-X and audited by WMH's independent auditor.

- **Conditions to Obligations of WMH to Consummate the Business Combination**

  The obligation of WMH to consummate the business combination is subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by WMH:

  - each of the representations and warranties of the Silver Spike parties set forth in the merger agreement (without giving effect to any materiality or "Silver Spike material adverse effect" or similar qualifications therein), other than the representations and warranties set forth in the corporate organization of the Silver Spike parties, due authorization to enter the merger agreement and related documentation, capitalization of the Silver Spike parties, brokers' fees and no occurrence of a material adverse effect, must be true and correct as of the date of the merger agreement and as of the date of closing, as if made anew at and as of that time, except with respect to representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct at and as of such date, except for, in each case, such failures to be true and correct as would not reasonably be expected to have, individually or in the aggregate, a Silver Spike material adverse effect;

33

TABLE OF CONTENTS

- the representations and warranties of the Silver Spike parties contained in the no occurrence of a Silver Spike material adverse effect representation have been true and correct as of the date of the merger agreement and as of the closing date, as if made anew at and as of that time;

- each of the representations and warranties of the Silver Spike parties set forth in the merger agreement related to corporate organization of the Silver Spike parties, due authorization to enter the merger agreement and related documentation, capitalization of the Silver Spike parties and brokers' fees (without giving effect to any materiality or "Silver Spike material adverse effect" or similar qualifications therein), must have been true and correct in all respects except for *de minimis* inaccuracies as of the date of the merger agreement and as of closing date, as if made anew at and as of that time (except to the extent that any such representation and warranty speaks expressly as of an earlier date, in which case such representation and warranty shall be true and correct in all respects except for *de minimis* inaccuracies as of such earlier date);

- each of the covenants of the Silver Spike parties to be performed as of or prior to the closing must have been performed in all material respects;

- from the date of the merger agreement there must not have been a Silver Spike material adverse effect;

- WMH must have received (i) the amended and restated registration rights agreement, the amended operating agreement, the tax receivable agreement and the exchange agreement, in each case executed by New WMH and (ii) a certificate signed by an officer of New WMH, dated the date of closing, certifying that the conditions described in the preceding five bullets above have been fulfilled;

- The available cash must be greater than or equal to $300,000,000.

### Other Agreements

The following agreements were entered into or will be entered into in connection with the business combination, the merger agreement and the other transactions contemplated thereby:

#### Voting and Support Agreements

Concurrently with the execution of the merger agreement, the WMH voting and support members entered into the voting and support agreements in favor of Silver Spike and WMH and their respective successors.

In the voting and support agreements, the WMH voting members agreed to vote all of their WMH equity interests in WMH in favor of the merger agreement and related transactions and to take certain other actions in support of the merger agreement and related transactions. The voting and support agreements also prevent the WMH voting and support members from transferring their voting rights with respect to their WMH equity interests in WMH or otherwise transferring their WMH equity interests in WMH prior to the meeting of WMH's members to approve the merger agreement and related transactions, except for certain permitted transfers. The WMH voting and support members also each agreed, with certain exceptions, to a lock-up for a period of 180 days after the closing with respect to any securities of New WMH or WMH that they receive as merger consideration under the merger agreement.

See the section entitled "The Business Combination - Related Agreements."

#### Sponsor Letter Agreement

Concurrently with the execution of the merger agreement, our sponsor entered into the sponsor letter agreement with Silver Spike and WMH pursuant to which our sponsor agreed to vote all of its Class B ordinary shares in favor of the business combination and related transactions and to take certain other actions in support of the merger agreement and related transactions. Our sponsor also agreed that, in the event that the sum of (i) the amount of cash available to be released from the trust account of Silver Spike (after giving effect to all payments made as a result of the completion of all Silver Spike share redemptions) and (ii) the net amount of proceeds actually received by Silver Spike pursuant to the PIPE subscription financing is less than $350,000,000, then 15% of our sponsor's ordinary shares will be deemed to be "deferred founder shares," and a corresponding number of post-merger WMH units held by New WMH will be deemed to be "deferred earnout units." Our sponsor agreed that it will not transfer and, subject to the achievement of certain milestones, may be required to forfeit, any such deferred sponsor shares

34

TABLE OF CONTENTS

impact on WMH and its subsidiaries, taken as a whole, as compared to other participants in the same industry; (vii) the compliance with the express terms of the merger agreement or (viii) in and of itself, the failure of WMH and its subsidiaries, taken as a whole, to meet any projections, forecasts or budgets or estimates of revenues, earnings or other financial metrics for any period beginning on or after the date of the merger agreement; *provided*, that this clause (viii) shall not prevent a determination that any change or effect underlying such failure to meet projections, forecasts or budgets has resulted in or contributed to, or would reasonably be expected to result in or contribute to, a material adverse effect.

Under the merger agreement, certain representations and warranties of Silver Spike are qualified in whole or in part by a "material adverse effect" standard for purposes of determining whether a breach of such representations and warranties has occurred.

Pursuant to the merger agreement, a "Silver Spike material adverse effect" means (a) a material adverse change or a material adverse effect, individually or in the aggregate, upon on the assets, financial condition, business or operations of Silver Spike, taken as a whole, or (b) any effect, change, event or occurrence that would individually or in the aggregate, prevent, materially delay or materially impair the ability of Silver Spike to consummate the transactions contemplated by the merger agreement.

**Conditions to Closing of the Business Combination**

*Conditions to Obligations of the Silver Spike Parties and WMH to Consummate the Business Combination*

The obligations of the Silver Spike parties and WMH to consummate, or cause to be consummated, the business combination are subject to the satisfaction of the following conditions, any one or more of which may be waived (if permitted by applicable law) in writing by all of such parties:

- all applicable waiting periods (and any extensions thereof) under the HSR Act must have expired or been terminated;

- the shares of Class A common stock contemplated to be listed pursuant to the merger agreement must have been listed on Nasdaq and shall be eligible for continued listing on Nasdaq immediately following the closing (as if it were a new initial listing by an issuer that had never been listed prior to closing);

- there must not be in force any applicable law or governmental order enjoining, prohibiting, making illegal or preventing the consummation of the business combination;

- the approval of the Transaction Proposals (other than the Adjournment Proposal) by Silver Spike's shareholders pursuant to this proxy statement/prospectus must have been obtained;

- the approval of the WMH equity holders holding Class A units of WMH (the "WMH voting members") must have been obtained;

- the registration statement must have become effective in accordance with the Securities Act, no stop order has been issued by the SEC with respect to the registration statement and no action seeking such stop order has been threatened or initiated;

- Silver Spike must have at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) remaining after Silver Spike's shareholders have exercised their right to redeem their shares in connection with the closing; and

- the domestication must have been consummated.

*Conditions to Obligations of the Silver Spike Parties to Consummate the Business Combination*

The obligations of the Silver Spike parties to consummate, or cause to be consummated, the business combination are subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by the Silver Spike parties:

- the representations and warranties of WMH set forth in the merger agreement (without giving effect to any materiality or "material adverse effect" or similar qualification therein), other than representations and warranties related to corporate organization of WMH and its subsidiaries, due authorization to enter the merger agreement and related documentation, capitalization of WMH and its subsidiaries, brokers' fees and no occurrence of a material adverse effect, must be true and correct as of the date of the merger agreement

109

TABLE OF CONTENTS

and as of the closing date, as if made anew at and as of such time, except with respect to representations and warranties which speak as to an earlier date, which representations and warranties must be true and correct at and as of such date, except for, in each case, such failures to be true and correct as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect;

- the representations and warranties of WMH set forth in the merger agreement related to no occurrence of a material adverse effect must have been true and correct as of the date of the merger agreement and as of the closing, as if made anew at and as of that time;

- the representations and warranties of WMH set forth in the merger agreement related to corporate organization of WMH and its subsidiaries, due authorization to enter the merger agreement and related documentation, capitalization of WMH and its subsidiaries and brokers' fees (without giving effect to any materiality or "material adverse effect" or similar qualifications therein), must have been true and correct in all respects except for *de minimis* inaccuracies as of the date of the merger agreement and as of the closing, as if made anew at and as of that time (except to the extent that any such representation and warranty speaks expressly as of an earlier date, in which case such representation and warranty must have been true and correct in all respects except for *de minimis* inaccuracies as of such earlier date);

- each of the covenants of WMH to be performed as of or prior to the date of closing must have been performed in all material respects;

- from the date of the merger agreement there must have not occurred a material adverse effect;

- Silver Spike must have received (i) the amended and restated registration rights agreement, the amended operating agreement, the tax receivable agreement and the exchange agreement, in each case executed by WMH, post-merger WMH equity holders or the holder representative, as applicable and (ii) a certificate signed by an authorized officer of WMH, dated as of the date of the closing, certifying that the preceding five bullets above have been satisfied; and

- if the closing has not occurred prior to February 16, 2021, WMH must have delivered to Silver Spike the audited financial statements of WMH and its subsidiaries as of and for the year ended December 31, 2020, prepared in accordance with GAAP and Regulation S-X and audited by WMH's independent auditor.

*Conditions to Obligations of WMH to Consummate the Business Combination*

The obligation of WMH to consummate the business combination is subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by WMH:

- each of the representations and warranties of the Silver Spike parties set forth in the merger agreement (without giving effect to any materiality or "Silver Spike material adverse effect" or similar qualifications therein), other than the representations and warranties set forth in the merger agreement related to the corporate organization of the Silver Spike parties, due authorization to enter the merger agreement and related documentation, capitalization of the Silver Spike parties, brokers' fees and no occurrence of a material adverse effect, must be true and correct as of the date of the merger agreement and as of the date of closing, as if made anew at and as of that time, except with respect to representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct at and as of such date, except for, in each case, such failures to be true and correct as would not reasonably be expected to have, individually or in the aggregate, a Silver Spike material adverse effect;

- the representations and warranties of the Silver Spike parties set forth in the merger agreement related to no occurrence of a Silver Spike material adverse effect representation have been true and correct as of the date of the merger agreement and as of the closing date, as if made anew at and as of that time;

- each of the representations and warranties of the Silver Spike parties set forth in the merger agreement related to corporate organization of the Silver Spike parties, due authorization to enter the merger agreement and related documentation, capitalization of the Silver Spike parties and brokers' fees (without giving effect to any materiality or "Silver Spike material adverse effect" or similar qualifications therein), must have been true and correct in all respects except for *de minimis* inaccuracies as of the date of the

110

TABLE OF CONTENTS

merger agreement and as of closing date, as if made anew at and as of that time (except to the extent that any such representation and warranty speaks expressly as of an earlier date, in which case such representation and warranty shall be true and correct in all respects except for *de minimis* inaccuracies as of such earlier date);

- each of the covenants of the Silver Spike parties to be performed as of or prior to the closing must have been performed in all material respects;

- from the date of the merger agreement there must not have been a Silver Spike material adverse effect;

- WMH must have received (i) the amended and restated registration rights agreement, the amended operating agreement, the tax receivable agreement and the exchange agreement, in each case executed by New WMH and (ii) a certificate signed by an officer of New WMH, dated the date of closing, certifying that the conditions described in the preceding five bullets above have been fulfilled; and

- The available cash must be greater than or equal to $300,000,000.

**Representations and Warranties**

Under the merger agreement, the Silver Spike parties made customary representations and warranties relating to: corporate organization; due authorization; no conflict; litigation and proceedings; governmental authorities and consents; capitalization; undisclosed liabilities; Silver Spike SEC documents and controls; Nasdaq listing; registration statement and proxy statement; brokers' fees; trust account; compliance with laws and permits; absence of certain changes; employees and employee benefits plans; properties; contracts; affiliate transactions; taxes; PIPE investment; independent investigation; and no additional representations and warranties and no outside reliance.

Under the merger agreement, WMH made customary representations and warranties relating to: corporate organization of WMH; subsidiaries; due authorization; no conflict; governmental authorizations and consents; capitalization; financial statements; undisclosed liabilities; litigation and proceedings; compliance with laws and permits; contracts and no defaults; company benefit plans; labor matters; taxes; brokers' fees; insurance; real property and assets; environmental matters; absence of changes; affiliate transactions; intellectual property; data privacy and security; customers and vendors; certain business practices and anti-corruption; registration statement and proxy statement; and no additional representations and warranties and no outside reliance.

**Covenants of the Parties**

*Covenants of WMH*

WMH made certain covenants under the merger agreement, including, among others, the following, subject to certain exceptions and limitations:

- From the date of the merger agreement until the earlier of the closing date, WMH will, and will cause its subsidiaries to, except as expressly required by the merger agreement, as consented to by Silver Spike in writing (which consent will not be unreasonably withheld, conditioned or delayed) or as required by law, use commercially reasonable efforts to operate its business only in the ordinary course of business, as defined in the merger agreement, including using reasonable best efforts to (x) preserve the business of WMH, (y) maintain the services of its officers (including Chris Beals) and (z) maintain the existing business relationships of WMH. Without limiting the generality of the foregoing, except as set forth on the Schedules, as required by law (including any COVID-19 measures) or as consented to by Silver Spike in writing, from the date of the merger agreement until the closing date, WMH will not, and WMH will cause its subsidiaries not to:

  ° change, amend or propose to amend the certificate of formation, operating agreement or other organizational documents of WMH or any of its subsidiaries;

  ° directly or indirectly adjust, split, combine, subdivide, issue, pledge, deliver, award, grant redeem, purchase or otherwise acquire or sell, or authorize or propose the issuance, pledge, delivery, award, grant or sale (including the grant of any encumbrances) of, any equity interests of WMH, including any common units or incentive units or the equity interests of any of its subsidiaries, any securities convertible into or exercisable or exchangeable for any such equity interests, or any rights, warrants or options to acquire, any such equity interests or any phantom stock, phantom stock rights, stock appreciation rights or stock-based performance units;

111

TABLE OF CONTENTS

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant has duly caused this amendment No. 4 to the registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on the 25th day of May, 2021.

**SILVER SPIKE ACQUISITION CORP.**

By:  /s/ Scott Gordon

Name:   Scott Gordon

Title:    Chief Executive Officer and Chairman

\* \* \*

Pursuant to the requirements of the Securities Act of 1933, as amended, this amendment No. 4 to the registration statement has been signed by the following persons on the date indicated.

| Signature | Capacity | Date |
|---|---|---|
| /s/ Scott Gordon<br>Scott Gordon | Chief Executive Officer and Chairman (Principal Executive Officer) | May 25, 2021 |
| *<br>William Healy | President and Director | May 25, 2021 |
| *<br>Gregory M. Gentile | Chief Financial Officer (Principal Financial and Accounting Officer) | May 25, 2021 |
| *<br>Orrin Devinsky | Director | May 25, 2021 |
| *<br>Richard M. Goldman | Director | May 25, 2021 |
| *<br>Kenneth H. Landis | Director | May 25, 2021 |

*By:   /s/ Scott Gordon

Attorney-in-fact

II-6